# United States Bankruptcy Court

NORTHERN DISTRICT OF ILLINOIS

## 219 South Dearborn

## Chicago, Illinois 60604



**FILED**

NOV 1 6 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

·**Jeffrey P. Allsteadt**, Bankruptcy Clerk

| | |
|---|---|
| Date | 11/16/2015 |
| Adversary Case Number | 15-00034 |
| Case Name | Helms v. Hanson |
| Notice of Appeal Filed | 09/16/2015 |
| Appellant | Charles Hanson |
| District Court Number | 15cv08171 |
| District Court Judge | Jeffrey Cole |

Thomas G. Bruton
United States District Court
Northern District of Illinois
219 S. Dearborn Street
Chicago, Illinois 60604

Dear Sir:

Pursuant to **Bankruptcy Rule 8010** transmitted herewith is the Record on Appeal. The Record on Appeal consist of:

☐ Designation and Statement of Issues     ☑ Exhibits

☐ Transmittal Letter     ☐ Transcript(s)

☐ Copy of Docket Sheet

Additional Items Included

☑   Appellee's Additional Items - Trial exhibits hearing held June 29,2015

Plaintiff's Amended List of exhibits for Trial

☐   Total Volumes Transmitted

The following items will be transmitted as a supplemental to the Record on Appeal

☐ _____

_____

Previous D C Judge _____    Case Number _____

By Deputy Clerk   Haley F Poindexter

Rev 03/2015bb

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 7 |
| | : | |
| Mollie Enterprises, Inc.,[1] | : | Case No. 12-20426 (jointly administered) |
| | : | |
| Debtor. | : | Honorable Eugene R. Wedoff |
| | : | |
| | : | |
| BRENDA HELMS, not individually, but | : | Adversary No. 15-00034 |
| solely as Chapter 7 trustee for Mollie | : | |
| Enterprises, Inc., | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| CHARLES HANSON, | : | |
| | : | |
| Defendant. | : | |

## PLAINTIFF'S AMENDED LIST OF EXHIBITS FOR TRIAL

This Plaintiff's List of Exhibits is hereby submitted by plaintiff Brenda Helms, not individually, but solely as Chapter 7 trustee for Mollie Enterprises, Inc. ("Plaintiff"), by and through her undersigned counsel, in connection with the trial in the above-captioned adversary proceeding scheduled to commence on June 29, 2015 at 9:30 a.m.

1.  Complaint [Dkt. No. 1].

2.  Answer and Affirmative Defenses [Dkt. No. 15].

3.  Hanson's Response to Plaintiff's Request for Production.

4.  Hanson's Response to Plaintiff's First Set of Interrogatories.

---

[1]  Jointly administered and substantively consolidated debtor Northwest Building Material of Illinois, Inc.'s case number is 12-37478.

5.   Transcript of Rule 341 meeting of creditors in *In re: Mollie Enterprises, Inc.*

6.   Transcript of deposition ("Deposition") of Peter Cieslak dated June 4, 2015.

7.   Northwest Building Materials & Supply Co. and Affiliated Companies Combined Financial Statements and Independent Accountants' Report – December 31, 2003 and 2002.

8.   Northwest Building Materials & Supply Co. and Affiliated Companies Combined Financial Statements and Independent Accountants' Report – December 31, 2004 and 2003.

9.   Northwest Building Materials & Supply Co. and Affiliated Companies Combined Financial Statements and Independent Accountants' Report – December 31, 2005.

10.   Northwest Building Materials & Supply Co. and Affiliated Companies Combined Financial Statements and Independent Accountants' Report – December 31, 2006 and 2005.

11.   Northwest Building Materials & Supply Co. and Affiliated Companies Combined Financial Statements and Independent Accountants' Report – December 31, 2007 and 2006.

12.   Northwest Building Materials & Supply Co. and Affiliated Companies Combined Financial Statements and Independent Accountants' Report – December 31, 2008 and 2007.

13.   Northwest Bldg Matls Corporate Balance Sheet with Last Year Comparison as of Dec 31, 2008.

14.   Personal Financial Statement of Charles R. Hanson and Marian B. Hanson as of May 31, 2009.

15.   Northwest Building & Materials Year End: December 31, 2009 Trial balance report.

16.   Northwest Bldg Matls Corporate Balance Sheet with Last Year Comparison as of Dec 31, 2010.

17.   Email dated August 26, 2010 10:34 AM from khenry@northwestbuildingmaterial.com to CBelong@sbtbanknow.com and pcieslak@millercooper.com, subject "Re: : Northwest Building," together with certain related emails attached thereto.

18.  Email dated August 26, 2011 12:43 PM from khenry@northwestbuildingmaterial.com to TFMCGUIRE@arnstein.com and pcieslak@millercooper.com, subject "Re: C.S. Realty and Professional Trucking," together with certain related emails attached thereto.

19.  Email dated August 26, 2011 12:57 PM from TFMCGUIRE@arnstein.com to khenry@northwestbuildingmaterial.com and pcieslak@millercooper.com, subject "Re: C.S. Realty and Professional Trucking," together with certain related emails attached thereto.

20.  Email dated October 20, 2011 4:43 PM from pcieslak@millercooper.com to khenry@northwestbuildingmaterial.com, subject "Re: Clark Western v. Charles Hanson," together with certain related emails attached thereto.

21.  Item Number 2 produced by Miller Cooper & Co., Ltd. on or about June 18, 2015, including, without limitation, "Interest receivable from Officer" worksheet and supporting journal entries

22.  Item Number 3 produced by Miller Cooper & Co., Ltd. on or about June 18, 2015, including, without limitation, Balance Sheet with Last Year Comparison as of Dec 31, 2010 and related worksheet.

Plaintiff reserves the right to supplement, modify or amend this Plaintiff's List of Exhibits for Trial.

Dated: June 19, 2015

David L. Kane (ARDC No. 6277758)
Steven R. Rogovin (ARDC No. 6301409)
MELTZER, PURTILL & STELLE LLC
300 South Wacker Drive, Suite 2300
Chicago, Illinois 60606
(312) 987-9900
(312) 987-9854 (facsimile)

**BRENDA HELMS, not individually, but solely as Chapter 7 trustee for the bankruptcy estate of MOLLIE ENTERPRISES, INC.**

By: /s/ Steven R. Rogovin
    One of Her Attorneys



PLAINTIFF'S
EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| MOLLIE ENTERPRISES, INC.,[1] | ) | Case No. 12-20426 (jointly administered) |
| | ) | |
| Debtor. | ) | Honorable Eugene R. Wedoff |
| _____ | ) | |
| | ) | |
| BRENDA HELMS, not individually, but | ) | |
| solely as Chapter 7 trustee for Mollie | ) | |
| Enterprises, Inc., | ) | |
| Plaintiff, | ) | Adv. Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| CHARLES HANSON, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Brenda Helms, not individually, but solely as Chapter 7 trustee ("Trustee" or "Plaintiff") for the bankruptcy estate (the "Estate") of Mollie Enterprises, Inc. ("Debtor"), by and through her undersigned attorneys, states for her Complaint against Charles Hanson ("Hanson") as follows:

### NATURE OF THIS ACTION

1.      This is an adversary proceeding by the Trustee on behalf of the Estate to recover the sum of approximately $3,530,000.00 from Hanson.

2.      Hanson at all relevant times controlled the Debtor, was the Debtor's sole or majority owner, and was the Debtor's President.

---

[1] Jointly administered and substantively consolidated debtor Northwest Building Material of Illinois, Inc.'s case number is 12-37478.

3.    Beginning in or prior to 2002, and continuing thereafter, Hanson caused Debtor to make advances of the Debtor's monies to himself in the aggregate principal amount of at least approximately $2,500,000.00. Hanson has not repaid these monies to Debtor.

4.    Hanson has a legal obligation to repay these monies to Debtor, with interest. As set forth below, Hanson and Debtor had an oral agreement that all monies advanced by Debtor to Hanson would be a loan that Hanson would pay interest on that loan, and that Hanson would repay all amounts due under that loan, including interest, upon demand. Demand was made by Debtor, through the Trustee, on December 17, 2014. Nonetheless, Hanson failed and refused to repay the monies advanced to him by Debtor. Hanson's failure and refusal to repay is a clear violation of his contract with Debtor. It also amounts to a violation of the doctrine of promissory estoppel, unjust enrichment, a violation of the doctrine of account stated, and a wrongful conversion of Debtor's property.

5.    In addition, Hanson's transfer of millions of dollars from the Debtor to himself, as well as his refusal to cause Debtor to demand repayment and his refusal to repay these monies, constituted breaches of his fiduciary duties to Debtor, caused Debtor to be unable to pay its debts as they accrued and become insolvent, and caused Debtor's business to fail.

6.    Plaintiff therefore brings this action to recover property of the Estate being wrongfully withheld by Hanson, and to recover damages for Hanson's breaches.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it arises under title 11 of the United States Code in connection with the Debtor's chapter 7 case, *In re Mollie Enterprises, Inc.*, Case No. 12-20426 (the "Bankruptcy

Case"), pending in the United States Bankruptcy Court for the Northern District of Illinois (the "Court").

8.      Venue is proper in this District under 28 U.S.C. § 1409(a).

9.      This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E) and (O), and is related under 28 U.S.C. § 157(c)(1).

10.     This Court has the authority to enter the requested relief pursuant to Bankruptcy Code § 542(b), Federal Rule of Bankruptcy Procedure 7001(1), and 28 U.S.C. § 157(b)(2)(A), (E) and (O), and/or (c)(1).

## PARTIES

11.     Plaintiff is the duly appointed and qualified chapter 7 trustee of the Estate of the Debtor, as well as of the jointly administered and substantively consolidated debtor, Northwest Building Material of Illinois, Inc.

12.     Hanson is a natural person residing at 261 12th Street, Key Colony Beach, Florida.

13.     Hanson was at all relevant times the sole or majority owner of Debtor.

14.     Hanson was at all relevant times the President of Debtor.

## FACTUAL ALLEGATIONS

**A.      This Bankruptcy Proceeding**

15.     On May 18, 2012 (the "Petition Date"), petitioning creditors Lafarge North America, Inc., New NGC, Inc. and Laborer's Pension Fund filed an involuntary petition for relief with respect to Debtor under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), with the Court, commencing the above-captioned chapter 7 case.  An Order for Relief was entered in the Debtor's case on June 27, 2012.

{34400: 001: 01510666.DOC :4 }                    3

16.     On July 16, 2012, Plaintiff was duly appointed as Trustee for the Debtor and has acted in that capacity at all times since.

17.     On September 21, 2012, Lafarge North America, Inc., New NGC, Inc. and Expanded Metal Products Corp. filed an involuntary petition for relief with respect to Northwest Building Material of Illinois, Inc. ("Northwest") under chapter 7 of the Bankruptcy Code with the Court, commencing the affiliated chapter 7 case bearing case number 12-37478. An Order for Relief was entered in the Northwest case on October 31, 2012.

18.     On November 1, 2012, Plaintiff was duly appointed as trustee for Northwest and has acted in that capacity at all times since.

19.     By order of the Court dated July 24, 2013 [Bankr. Dkt. No. 61], the estates of the Debtor and Northwest were substantively consolidated, and their cases are now jointly administered under Case No. 12-20426.

**B.      Hanson Causes Debtor to Advance Him Millions of Dollars**

20.     Hanson has at all relevant times controlled Debtor and its actions.

21.     Beginning in or prior to 2002, and continuing over a period of numerous years, Hanson caused Debtor to make a series of uncollateralized advances of its monies to Hanson (collectively, the "Advances").

22.     Hanson and Debtor understood and agreed at all relevant times that all Advances would together be treated as a loan from Debtor to Hanson (the "Loan"), rather than as a taxable distribution to Hanson or in any other fashion.

23.    Hanson and Debtor understood and agreed at all relevant times that all amounts due under the Loan, including all principal and interest thereon, would be required to be repaid in full by Hanson upon demand by Debtor.

24.    Hanson and Debtor understood and agreed at all relevant times that the Loan would not bear interest for the period prior to January 1, 2002.

25.    Hanson and Debtor understood and agreed at all relevant times that, for all times after January 1, 2002, the Loan would bear interest at the Prime Rate less 0.5%.

26.    Hanson has admitted the existence of his substantial debt to Debtor, including, among other things, admitting in a personal financial statement that he submitted to Suburban Bank & Trust on or about May 31, 2009 that he owed Debtor the sum of $3,313,612 at that time.

27.    As of December 31, 2010, the outstanding unpaid balance on the Loan, including principal and accrued interest, amounted to at least approximately $3,249,225.37.

28.    As of December 31, 2010, the outstanding unpaid Advances amounted to at least approximately $2,470,498.37.

29.    As of December 31, 2010, the outstanding accrued and unpaid interest on the Loan amounted to at least approximately $778,727.00.

C.    **Debtor's Business Collapses and Fails**

30.    Upon information and belief, beginning in or about July 2009, and continuing thereafter, Debtor became unable to pay its bills as they accrued, and in fact did not pay its bills as they accrued.

31.    Upon information and belief, between approximately July 2009 and approximately February 2011, Debtor ordered and received certain goods (the "NGC Goods") from its creditor, National Gypsum (now known as New NGC, Inc. ("NGC")).

32.     Upon information and belief, Debtor failed to pay some or all of the invoices and/or credit memoranda from NGC for the NGC Goods.

33.     Upon information and belief, Debtor has at no time paid for the NGC Goods in full.

34.     Upon information and belief, between August 2009 and approximately February 2010, Debtor ordered and received certain goods (the "Continental Goods") from its creditor, LaFarge North America (now known as Continental Building Products LLC ("Continental")).

35.     Upon information and belief, Debtor failed to pay some or all of the invoices from Continental for the Continental Goods.

36.     Upon information and belief, Debtor has at no time paid for the Continental Goods in full.

37.     Upon information and belief, between June 1, 2010 and November 30, 2011, Debtor failed to pay certain benefit contributions, dues, late fees, audit costs and interest (the "Fund Debt") due and owing to the Laborer's Pension Fund and Laborer's Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council for Chicago and Vicinity (the "Fund").

38.     Upon information and belief, Debtor has at no time paid Fund Debt in full.

39.     Upon information and belief, Debtor also failed to pay amounts it owed to numerous other creditors from at least mid-2009 through the present date.

40.     Debtor's lacked sufficient funds to pay its debts as they accrued.

41.     Notwithstanding Debtor's precarious financial situation and its inability to pay its creditors, Hanson at no time caused Debtor to make demand upon Hanson to repay the Loan or any portion of the millions of dollars in Advances.

42.     Notwithstanding Debtor's precarious financial situation and its inability to pay its creditors, Hanson at no time repaid the Loan or Advances in full, including interest thereon.

**D.      Hanson Ignores Plaintiff's Demand for Repayment**

43.     Plaintiff, through her counsel, made written demand upon Hanson on December 17, 2014 to repay the Advances, the Loan, and all interest thereon (the "Demand Letter"). A true and accurate copy of the Demand Letter is attached hereto as Exhibit 1.

44.     As of December 17, 2014, Hanson owed Debtor the aggregate sum of at least approximately $3,530,000.00, representing the sum of at least approximately $2,470,498.37 in unpaid principal and the sum of at least approximately $1,059,501.63 in accrued and unpaid interest.

45.     Despite Plaintiff's demand in the Demand Letter, Hanson has failed and refused to make any repayment to Debtor of the Advances, the Loan or the interest thereon as demanded.

**COUNT I**

**BREACH OF CONTRACT**

46.     Plaintiff realleges and reincorporates the allegations of Paragraphs 1 through 45 as though fully set forth herein.

47.     Hanson and Debtor at all relevant times had an oral contract pursuant to which Debtor made the Loan to Hanson.

48.     Pursuant to their oral contract, Hanson and Debtor at all times understood and agreed that Hanson would repay all principal and accrued interest under the Loan upon demand by Debtor.

49.     Pursuant to their oral contract, Hanson and Debtor at all times understood that the Loan would accrue interest on and after January 1, 2002 at the Prime Rate less 0.5%.

50.     Consistent with the parties' oral contract, Debtor made Advances to Hanson in connection with the Loan in the aggregate of at least $2,470,498.37.

51.     Upon information and belief, as of December 15, 2014, the outstanding unpaid balance on the Loan amounted to at least approximately $3,530,000.00, representing the sum of at least approximately $2,470,498.37 in unpaid principal and the sum of at least approximately $1,059,501.63 in accrued and unpaid interest.

52.     By letter dated December 17, 2014, Plaintiff, as chapter 7 trustee of Debtor, made written demand upon Hanson for all amounts due under the Loan, including all principal and interest thereon.

53.     Despite such demand, Hanson has failed and refused to pay the amounts due and owing under the Loan as demanded.

54.     Hanson's refusal to repay the full amount of the Loan, including all principal and interest thereon, is a breach of his oral agreement with Debtor.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against Hanson: (a) in the amount of at least $3,530,000.00, plus additional pre-judgment interest at the rate agreed to in the Loan through the date of judgment, plus post-judgment interest and costs; and (b) for such other and further relief as the Court may deem just and appropriate.

## COUNT II
## PROMISSORY ESTOPPEL

55.     Plaintiff realleges and reincorporates the allegations of Paragraphs 1 through 45 as though fully set forth herein.

56.     Hanson promised Debtor that he would repay any and all Advances made to him by Debtor, including principal and interest, to Debtor upon demand.

57.    Hanson promised Debtor that he would pay interest on any and all Advances made to him by Debtor, beginning as of January 1, 2002 and continuing thereafter, at the Prime Rate less 0.5%.

58.    In reasonable reliance on Hanson's promises, Debtor made Advances to Hanson in the amount of at least approximately $2,470,498.37.

59.    Debtor's reliance on Hanson's promises was reasonable in light of the close relationship between Hanson and Debtor and Debtor's awareness of Hanson's financial ability to repay the Advances and interest thereon.

60.    Debtor's reliance on Hanson's promises was expected and foreseeable, as Hanson accepted millions of dollars of Advances from Debtor and was at all times aware that Debtor expected to be repaid all such Advances and interest thereon.

61.    Debtor relied on Hanson's promises to its detriment by making Advances to Hanson in the aggregate amount of at least approximately $2,470,498.37, which sum has not been repaid by Hanson despite his promise.

62.    Debtor further relied on Hanson's promises to its detriment by not using the Advances for other purposes and/or opportunities, including, without limitation, paying its legitimate creditors, supporting its failing business, and/or depositing such funds with a financial institution and earning reasonable interest thereon.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against Hanson: (a) in the amount of $2,470,498.37, plus pre-judgment interest thereon in an amount to be determined at trial, but no less than $1,059,501.63, plus post-judgment interest and costs; and (b) for such other and further relief as the Court may deem just and appropriate.

## COUNT III

## UNJUST ENRICHMENT

63.     Plaintiff realleges and reincorporates the allegations of Paragraphs 1 through 45 as though fully set forth herein.

64.     Between approximately at least 2000 and 2010, Debtor made Advances to Hanson in the aggregate of at least $2,470,498.37.

65.     At no time did Hanson reject any of the Advances or the benefit thereof.

66.     Hanson has benefitted substantially from the Advances and his use of millions of dollars of Debtor's monies over the course of more than a decade.

67.     Upon information and belief, as of December 17, 2014, Hanson still retains the sum of $2,470,498.37 in Advances from Debtor.

68.     Hanson has no legal right to withhold repaying the Advances to Debtor.

69.     Hanson would be unjustly enriched, to Debtor's detriment, if he was permitted to retain the benefit of the Advances without repaying those amounts, together with interest thereon, to Debtor.

70.     Hanson's retention of the Advances, and his failure to pay interest to Debtor thereon, violates the fundamental principles of justice, equity and good conscience.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against Hanson: (a) in the amount of $2,470,498.37, plus pre-judgment interest thereon in an amount to be determined at trial, but no less than $1,059,501.63, plus post-judgment interest and costs; and (b) for such other and further relief as the Court may deem just and appropriate.

## COUNT IV

## ACCOUNT STATED

71.     Plaintiff realleges and reincorporates the allegations of Paragraphs 1 through 45 as though fully set forth herein.

72.     Between approximately at least 2000 and 2010, Debtor made the Advances to Hanson pursuant to the Loan.

73.     Hanson and Debtor at all times understood and agreed that Hanson would repay all principal and accrued interest under the Loan upon demand by Debtor.

74.     Upon information and belief, in or about early 2009, Debtor's accountant, Miller Cooper & Co., Ltd., on Debtor's behalf, rendered to Hanson a "Consolidated Financial Statements and Independent Accountants' Report – December 31, 2008 and 2007" (the "Financial Report").

75.     Among other things, the Financial Report provided an accounting that:

> The Companies and Affiliates have uncollateralized advances to a stockholder of $3,325,153 and $3,313,612 as of December 31, 2008 and 2007, respectively.  Effective January 1, 2002, the advances bear interest at the prime rate (3.25% at December 31, 2008) minus 0.5%.  The note was noninterest-bearing prior to 2002.  Principal and interest are due on demand.

76.     Upon information and belief, the stockholder advances referred to in the Financial Report were the Advances.

77.     Upon information and belief, Hanson received the Financial Report, including, without limitation, the accounting therein that, as of December 31, 2007, he had a debt to Debtor in the amount of $3,313,612 in connection with the Advances and interest thereon.

78.     Upon information and belief, Hanson retained the Financial Report and has at no time made any objection thereto, or to the amount of his debt to Debtor in connection with the Advances and interest thereon stated therein, in whole or in part.

79.     To the contrary, Hanson agreed with and admitted this $3,313,612 debt to Debtor.

80.     In a Personal Financial Statement submitted by Hanson to Suburban Bank & Trust and signed by Hanson as of May 31, 2009 (the "Hanson Financial Statement"), Hanson explicitly admitted that he had a "current note payable" to Debtor in the amount of "$3,313,612."

81.     Hanson's retention of the Financial Report beyond a reasonable time, his failure to object thereto, and his admission of his debt in the Hanson Financial Statement constitute an acknowledgement and recognition of the correctness thereof.

82.     Notwithstanding Hanson's acknowledgement and recognition of the correctness of the accounting of his debt to Debtor in the Financial Report, Hanson has paid no portion of the sums that he has acknowledged that he owes Debtor.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against Hanson: (a) in the amount of at least $3,313,612.00, plus pre-judgment interest through the date of judgment, plus post-judgment interest and costs; and (b) for such other and further relief as the Court may deem just and appropriate.

## COUNT V
## CONVERSION

83.     Plaintiff realleges and reincorporates the allegations of Paragraphs 1 through 45 as though fully set forth herein.

84.     Between at least 2002 and 2010, Debtor made Advances to Hanson in the aggregate of at least $2,470,498.37.

85.     The Advances were at all times, and remain, Debtor's property.

86.     At all relevant times, Hanson and Debtor understood that all of the Advances belonged to Debtor, and that Hanson would be required to repay the Advances to Debtor upon demand by Debtor.

{34400: 001: 01510666.DOC :4 }                                        12

87.     By letter dated December 17, 2014, Plaintiff, as chapter 7 trustee of Debtor, made written demand upon Hanson for repayment of all Advances, in the sum of $2,470,498.37, plus interest thereon as previously agreed by Debtor and Hanson.

88.     Debtor has at all times had a right to immediate possession of the Advances upon and following the time of its December 17, 2014 demand.

89.     Despite such demand, Hanson has failed and refused to pay any portion of the $2,470,498.37 in Advances that are due and owing, or any portion of the accrued interest thereon.

90.     Hanson's refusal to repay the Advances to Debtor upon demand amounts to an unauthorized and wrongful assumption of control, dominion or ownership by Hanson over the Advances.

91.     Hanson has improperly converted the Advances.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against Hanson: (a) in the amount of $2,470,498.37, plus pre-judgment interest thereon in an amount to be determined at trial, but no less than $1,059,501.63, plus post-judgment interest and costs; (b) punitive damages in an amount to be determined at trial; and (c) for such other and further relief as the Court may deem just and appropriate.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

92.     Plaintiff realleges and reincorporates the allegations of Paragraphs 1 through 45 as though fully set forth herein.

93.     At all relevant times, including from at least 2002 through the present date, Hanson has owed and continues to owe fiduciary duties to Debtor due to his control of Debtor.

94.     At all relevant times, including from at least 2002 through the present date, Hanson has owed and continues to owe fiduciary duties to Debtor as its President.

95.     At all relevant times, including from at least 2002 through the present date, Hanson has owed and continues to owe fiduciary duties to Debtor as its sole and/or majority owner.

96.     Hanson has at all relevant times had a fiduciary duty of loyalty to Debtor.

97.     Hanson has at all relevant times had a fiduciary duty of care to Debtor.

98.     Hanson has at all relevant times had a fiduciary duty of good faith to Debtor.

99.     Hanson has at all relevant times had a fiduciary duty not to misappropriate the assets of Debtor.

100.    Hanson breached his fiduciary duties to Debtor, including, without limitation, his duty of loyalty to Debtor, his duty of care, his duty of good faith, and his duty not to misappropriate corporate assets, by causing or allowing Debtor to make the Advances.

101.    The Advances were not in the best interests of Debtor.

102.    The Advances were not made in good faith.

103.    Hanson had a conflict of interest in causing or allowing Debtor to make the Advances to himself.

104.    The Advances were a misappropriation of Debtor's assets by Hanson.

105.    Hanson's decision to cause and/or allow Debtor to make the Advances was grossly negligent and reckless.

106.    Hanson breached his fiduciary duties to Debtor, including, without limitation, his duty of loyalty to Debtor, his duty of care, his duty of good faith, and his duty not to misappropriate corporate assets, by not causing Debtor to demand repayment of the Advances.

107.    Hanson's failure to cause Debtor to demand repayment of the Advances was not in the best interests of Debtor.

108.    Hanson's failure to cause Debtor to demand repayment of the Advances was not in good faith.

109.    Hanson had a conflict of interest in failing to cause Debtor to demand repayment of the Advances.

110.    Hanson's failure to cause Debtor to demand repayment of the Advances amounted to a misappropriation of Debtor's assets by Hanson.

111.    Hanson's failure to cause Debtor to demand repayment of the Advances was grossly negligent and reckless.

112.    Hanson breached his fiduciary duties to Debtor by using Debtor's property, in the form of the Advances, for his own personal gain.

113.    Hanson breached his fiduciary duties to Debtor, including, without limitation, his duty of loyalty to Debtor, his duty of care, his duty of good faith, and his duty not to misappropriate corporate assets, by not repaying the Advances to Debtor.

114.    Hanson's failure to repay the Advances was not in the best interests of Debtor.

115.    Hanson's failure to repay the Advances was not in good faith.

116.    Hanson had a conflict of interest in failing to repay the Advances.

117.    Hanson's failure to repay the Advances amounted to a misappropriation of Debtor's assets by Hanson.

118.    Hanson's failure to repay the Advances was grossly negligent and reckless.

119.    Hanson's breaches of his fiduciary duties to Debtor were willful and wonton, intentional, and gross violations of his fiduciary duties.

120.    As a result of Hanson's breaches of fiduciary duties, Debtor was deprived of at least approximately $2,470,498.37 of its property.

121.    As a result of Hanson's breaches of fiduciary duties, Debtor was deprived of the opportunity to use at least approximately $2,470,498.37 in connection with its business and/or for investment.

122.    As a result of Hanson's breaches of fiduciary duties, Debtor became unable to pay its debts and other obligations as they came due.

123.    As a result of Hanson's breaches of his fiduciary duties, Debtor became insolvent.

124.    As a result of Hanson's breaches of his fiduciary duties, Debtor failed to pay amounts due to numerous of its creditors, and several of those creditors initiated the instant Bankruptcy Case by way of their involuntary petition herein.

125.    As a result of Hanson's breaches of his fiduciary duties, Debtor has been unable to pay any portion of the $4,580,416.38 in claims filed with respect to Debtor in this Bankruptcy Case.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against Hanson: (a) requiring Hanson to provide Plaintiff with an accounting of all monies and other assets of the Debtor, including, without limitation, the Advances, that he has possessed at any time from 2001 through the present; (b) imposing a constructive trust with respect to any and all assets of the Debtor currently in the possession and/or control of Hanson; (c) granting Plaintiff judgment against Hanson in the amount of at least $2,470,498.37, plus pre-judgment interest thereon in an amount to be determined at trial, but no less than $1,059,501.63, plus post-judgment interest and costs; (d) punitive damages in an amount to be determined at trial, including, without limitation, forfeiture of all compensation received by Hanson from Debtor

since the date of the first Advance; and (e) for such other and further relief as the Court may

deem just and appropriate.

**COUNT VII**

**TURNOVER**

126.    Plaintiff realleges and reincorporates the allegations of Paragraphs 1 through 45

as though fully set forth herein.

127.    The Advances belong to Debtor and are property of the Estate.

128.    Accrued interest on the Advances belongs to Debtor and is property of the Estate.

129.    Demand has been made of Hanson and Hanson has refused to return Debtor's

property, including, without limitation, the Advances and the accrued interest thereon.

130.    Pursuant to 11 U.S.C. § 542, Hanson must turnover to Debtor its property,

including, without limitation, the Advances and the accrued interest thereon.

WHEREFORE, Plaintiff prays for a judgment for Turnover of Debtor's property in the

amount of not less than $3,530,000.00 in her favor and against Hanson, for costs, attorneys' fees,

for pre-judgment and post-judgment interest, and for such other and further relief as the Court

may deem just and appropriate.

Dated: January 16, 2015

**BRENDA HELMS, not individually, but
solely as Chapter 7 trustee for the
bankruptcy estate of MOLLIE
ENTERPRISES, INC.**

By:    /s/ David L. Kane
        One of Her Attorneys

David L. Kane (ARDC No. 6277758)
Steven R. Rogovin (ARDC No. 6301409)
MELTZER, PURTILL & STELLE LLC
300 South Wacker Drive, Suite 3500
Chicago, Illinois 60606
(312) 987-9900
(312) 987-9854 (facsimile)

{34400: 001: 01510666.DOC :4 }

PLAINTIFF'S
EXHIBIT 2

F:\WP51\DOCS\KHENRY\6989.0015\00092552.DOC

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| MOLLIE ENTERPRISES, INC.,[1] | ) | Case No. 12-20426 (jointly administered) |
| | ) | |
| Debtor. | ) | Honorable Eugene R. Wedoff |
| | ) | |
| | ) | |
| BRENDA HELMS, not individually, but | ) | |
| solely as Chapter 7 trustee for Mollie | ) | |
| Enterprises, Inc., | ) | |
| Plaintiff, | ) | Adv. Case No. 15-00034 |
| | ) | |
| v. | ) | |
| | ) | |
| CHARLES HANSON, | ) | |
| | ) | |
| Defendant. | ) | |

## ANSWER AND
## AFFIRMATIVE DEFENSES

Now comes the Defendant, Charles Hanson ("Hanson" or "Defendant") by and through his

attorneys, Emalfarb, Swan & Bain, and for his answer and affirmative defenses to the adversary

complaint, states as follows:

### NATURE OF THIS ACTION

1.    This is an adversary proceeding by the Trustee on behalf of the Estate to recover

the sum of approximately $3,530,000.00 from Hanson.

Response:    Admitted

2.    Hanson at all relevant times controlled the Debtor, was the Debtor's sole or

majority owner, and was the Debtor's President.

Response:    Admitted as to majority stock ownership in the Debtor and as to being the

President of the Debtor, denied as to the legal conclusion that he "controlled" the Debtor.

3.    Beginning in or prior to 2002, and continuing thereafter, Hanson caused Debtor to make advances of the Debtor's monies to himself in the aggregate principal amount of at least approximately $2,500,000.00. Hanson has not repaid these monies to Debtor.

Response:    Denied.

4.    Hanson has a legal obligation to repay these monies to Debtor, with interest. As set forth below, Hanson and Debtor had an oral agreement that all monies advanced by Debtor to Hanson would be a loan that Hanson would pay interest on that loan, and that Hanson would repay all amounts due under that loan, including interest, upon demand. Demand was made by Debtor, through the Trustee, on December 17, 2014. Nonetheless, Hanson failed and refused to repay the monies advanced to him by Debtor. Hanson's failure and refusal to repay is a clear violation of his contract with Debtor. It also amounts to a violation of the doctrine of promissory estoppel, unjust enrichment, a violation of the doctrine of account stated, and a wrongful conversion of Debtor's property.

Response:    Denied

5.    In addition, Hanson's transfer of millions of dollars from the Debtor to himself, as well as his refusal to cause Debtor to demand repayment and his refusal to repay these monies, constituted breaches of his fiduciary duties to Debtor, caused Debtor to be unable to pay its debts as they accrued and become insolvent, and caused Debtor's business to fail.

Response:    Denied

2

6.    Plaintiff therefore brings this action to recover property of the Estate being wrongfully withheld by Hanson, and to recover damages for Hanson's breaches.

Response:    Denied

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.§ 1334(b) because it arises under title 11 of the United States Code in connection with the Debtor's chapter 7 case, *In re Mollie Enterprises, Inc.*, Case No. 12-20426 (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Northern District of Illinois (the "Court").

Response:    Admitted

8.    Venue is proper in this District under 28 U.S.C. § 1409(a).

Response:    Admitted

9.    This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E) and (O), and is related under 28 U.S.C. § 157(c)(1).

Response:    Admitted

10.    This Court has the authority to enter the requested relief pursuant to Bankruptcy Code § 542(b), Federal Rule of Bankruptcy Procedure 7001(1), and 28 U.S.C. § 157(b)(2)(A),(E) and (O), and/or (c)(1).

Response:    Admitted

## PARTIES

11.    Plaintiff is the duly appointed and qualified chapter 7 trustee of the Estate of the Debtor, as well as of the jointly administered and substantively

3

consolidated debtor, Northwest Building Material of Illinois, Inc.

Response:      Admitted

12.      Hanson is a natural person residing at 261 12th Street, Key Colony Beach,

Florida.

Response:      Admitted

13.      Hanson was at all relevant times the sole or majority owner of Debtor.

Response:      Admitted as to being the majority stock holder.

14.      Hanson was at all relevant times the President of Debtor.

Response:      Admitted

### FACTUAL ALLEGATIONS

**A.    This Bankruptcy Proceeding**

15.      On May 18, 2012 (the "Petition Date"), petitioning creditors Lafarge
North

America, Inc., New NGC, Inc. and Laborer's Pension Fund filed an involuntary

petition for relief with respect to Debtor under chapter 7 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), with

the Court, commencing the   above-captioned chapter 7 case. An Order for Relief

was entered in the Debtor's case on June 27, 2012.

Response:      Admitted

16.      On July 16, 2012, Plaintiff was duly appointed as Trustee for the Debtor

and has acted in that capacity at all times since.

Response:      Admitted

4

17.     On September 21, 2012, Lafarge North America, Inc., New NGC, Inc. and Expanded Metal Products Corp. filed an involuntary petition for relief with respect to Northwest Building Material of Illinois, Inc. ("Northwest") under chapter 7 of the Bankruptcy Code withthe Court, commencing the affiliated chapter 7 case bearing case number 12-37478. An Order for Relief was entered in the Northwest case on October 31, 2012.

Response:     Admitted

18.     On November 1, 2012, Plaintiff was duly appointed as trustee for Northwest and has acted in that capacity at all times since.

Response:     Admitted

19.     By order of the Court dated July 24, 2013 [Bankr. Dkt. No. 61], the estates of the Debtor and Northwest were substantively consolidated, and their cases are now jointly administered under Case No. 12-20426.

Response:     Admitted

**B.     Hanson Causes Debtor to Advance Him Millions of Dollars**

20.     Hanson has at all relevant times controlled Debtor and its actions.

Response:     Hanson admits to being the President of the Debtor and the majority shareholder, Hanson denied that he "controlled" the Debtor, and affirmatively asserts that the Debtor's lender and Unions also asserted control over the Debtor.

21.     Beginning in or prior to 2002, and continuing over a period of

5

numerous years, Hanson caused Debtor to make a series of uncollateralized advances of its monies to Hanson (collectively, the "Advances").

Response:   Denied.

22.   Hanson and Debtor understood and agreed at all relevant times that all Advances would together be treated as a loan from Debtor to Hanson (the "Loan"), rather than as a taxable distribution to Hanson or in any other fashion.

Response:   Denied.

23.   Hanson and Debtor understood and agreed at all relevant times that all amounts due under the Loan, including all principal and interest thereon, would be required to be repaid in full by Hanson upon demand by Debtor.

Response:   Denied

24.   Hanson and Debtor understood and agreed at all relevant times that the Loan would not bear interest for the period prior to January 1, 2002.

Response:   Denied.

25.   Hanson and Debtor understood and agreed at all relevant times that, for all times after January 1, 2002, the Loan would bear interest at the Prime Rate less 0.5%.

Response:   Denied.

26.   Hanson has admitted the existence of his substantial debt to Debtor, including, among other things, admitting in a personal financial statement that he submitted to Suburban Bank & Trust on or about May 31, 2009 that he owed Debtor the sum of $3,313,612 at that time.

6

Response:    Hanson has no present recollection of submitting a personal financial

statement to Suburban Bank & Trust on or about May 31, 2009, and therefore denied.

If such a document exists, then the document speaks for itself.

  27. As of December 31, 2010, the outstanding unpaid balance on the Loan,

including principal and accrued interest, amounted to at least approximately

$3,249,225.37.

Response:    Denied

  28. As of December 31, 2010, the outstanding unpaid Advances amounted

to at least approximately $2,470,498.37.

Response:    Denied

  29. As of December 31, 2010, the outstanding accrued and unpaid

interest on the Loan amounted to at least approximately $778,727.00.

Response:    Denied

**C. Debtor's Business Collapses and Fails**

  30. Upon information and belief, beginning in or about July 2009, and

continuing thereafter, Debtor became unable to pay its bills as they accrued, and in fact

did not pay its bills as they accrued.

Response:    At some point in time Hanson admits that the Debtor became unable to

pay its bills as they accrued.

  31. Upon information and belief, between approximately July 2009 and

approximately February 2011, Debtor ordered and received certain goods (the

"NGC Goods") from its creditor, National Gypsum (now known as New NGC, Inc.

("NGC")).

Response:   Hanson admits that the Debtor order goods from NGC.

32.   Upon information and belief, Debtor failed to pay some or all of the invoices and/or credit memoranda from NGC for the NGC Goods.

Response:   Hanson admits that the Debtor has not paid NGC for all goods that the Debtor received from NGC.

33.   Upon information and belief, Debtor has at no time paid for the NGC Goods in full.

Response:   Admitted

34.   Upon information and belief, between August 2009 and approximately February 2010, Debtor ordered and received certain goods (the "Continental Goods") from its creditor, LaFarge North America (now known as Continental Building Products LLC ("Continental")).

Response:   Admitted

35.   Upon information and belief, Debtor failed to pay some or all of the invoices from Continental for the Continental Goods.

Response:   Denied

36.   Upon information and belief, Debtor has at no time paid for the Continental Goods in full.

Response:   Denied

37.   Upon information and belief, between June 1, 2010 and November 30, 2011, Debtor failed to pay certain benefit contributions, dues, late fees, audit costs and interest (the "Fund Debt") due and owing to the Laborer's Pension Fund

8

and Laborer's Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council for Chicago and Vicinity (the 'Fund").

Response:    Denied

38.    Upon information and belief, Debtor has at no time paid Fund Debt in full.

Response:    Denied

39.    Upon information and belief, Debtor also failed to pay amounts it owed to numerous other creditors from at least mid-2009 through the present date.

Response:    Admitted as to not paying all debts.

40.    Debtor's lacked sufficient funds to pay its debts as they accrued.

Response:    Admitted that, at a point in time, the Debtor did lack sufficient liquid assets to pay all of its debts in full.

41.    Notwithstanding Debtor's precarious financial situation and its inability to pay its creditors, Hanson at no time caused Debtor to make demand upon Hanson to repay the Loan or any portion of the millions of dollars in Advances.

Response:    Denied

42.    Notwithstanding Debtor's precarious financial situation and its inability to pay its creditors, Hanson at no time repaid the Loan or Advances in full, including interest thereon.

Response:    Denied

9

**D.    Hanson Ignores Plaintiff's Demand for Repayment**

43.    Plaintiff, through her counsel, made written demand upon Hanson on December 17, 2014 to repay the Advances, the Loan, and all interest thereon (the "Demand Letter"). A true and accurate copy of the Demand Letter is attached hereto as Exhibit 1.

Response:    Admitted

44.    As of December 17, 2014, Hanson owed Debtor the aggregate sum of at least approximately $3,530,000.00, representing the sum of at least approximately $2,470,498.37 in unpaid principal and the sum of at least approximately $1,059,501.63 in accrued and unpaid interest.

Response:    Denied

45.    Despite Plaintiff's demand in the Demand Letter, Hanson has failed and refused to make any repayment to Debtor of the Advances, the Loan or the interest thereon as demanded.

Response:    Denied as to the existence of the alleged debt, admitted as to not paying anything to the Trustee.

## COUNT I – BREACH OF CONTRACT

46.    Plaintiff realleges and reincorporates the allegations of Paragraphs 1 through 45 as though fully set forth herein.

Response:    Hanson re-alleges herein his responses to paragraphs 1-45.

47.    Hanson and Debtor at all relevant times had an oral contract pursuant to which Debtor made the Loan to Hanson.

10

Response:    Denied.

48.    Pursuant to their oral contract, Hanson and Debtor at all times understood and agreed that Hanson would repay all principal and accrued interest under the Loan upon demand by Debtor.

Response:    Denied

49.    Pursuant to their oral contract, Hanson and Debtor at all times understood that the Loan would accrue interest on and after January 1, 2002 at the Prime Rate less 0.5%.

Response:    Denied

50.    Consistent with the parties' oral contract, Debtor made Advances to Hanson in connection with the Loan in the aggregate of at least $2,470,498.37.

Response:    Denied

51.    Upon information and belief, as of December 15, 2014, the outstanding unpaid balance on the Loan amounted to at least approximately $3,530,000.00, representing the sum of at least approximately $2,470,498.37 in unpaid principal and the sum of at least approximately

$1,059,501.63 in accrued and unpaid interest.

Response:    Denied

52.    By letter dated December 17, 2014, Plaintiff, as chapter 7 trustee of Debtor, made written demand upon Hanson for all amounts due under the Loan, including all principal and interest thereon.

Response:    Admitted as to receiving the letter, denied as to the existence of the debt.

11

53.     Despite such demand, Hanson has failed and refused to pay the amounts due and owing under the Loan as demanded.

Response:     Denied as to the existence of the debt, admitted as to not paying any sum to the Trustee.

54.     Hanson's refusal to repay the full amount of the Loan, including all principal and interest thereon, is a breach of his oral agreement with Debtor.

Response:     Denied

WHEREFORE, the Defendant prays that this Court dismiss Count I of this Complaint.

## COUNT II – PROMISSORY ESTOPPEL

55.     Plaintiff re-alleges and reincorporates the allegations of Paragraphs 1 through 45 as though fully set forth herein.

Response:     Hanson re-alleges his responses to paragraphs 1-45.

56.     Hanson promised Debtor that he would repay any and all Advances made to him by Debtor, including principal and interest, to Debtor upon demand.

Response:     Denied

57.     Hanson promised Debtor that he would pay interest on any and all Advances made to him by Debtor, beginning as of January 1, 2002 and continuing thereafter, at the Prime Rate less 0.5%.

Response:     Denied

58.     In reasonable reliance on Hanson's promises, Debtor made Advances to Hanson in the amount of at least approximately $2,470,498.37.

Response:     Denied

12

59.    Debtor's reliance on Hanson's promises was reasonable in light of the close relationship between Hanson and Debtor and Debtor's awareness of Hanson's financial ability to repay the Advances and interest thereon.

Response:    Denied as to making any representations.

60.    Debtor's reliance on Hanson's promises was expected and foreseeable, as Hanson accepted millions of dollars of Advances from Debtor and was at all times aware that Debtor expected to be repaid all such Advances and interest thereon.

Response:    Denied

61.    Debtor relied on Hanson's promises to its detriment by making Advances to Hanson in the aggregate amount of at least approximately $2,470,498.37, which sum has not been repaid by Hanson despite his promise.

Response:    Denied

62.    Debtor further relied on Hanson's promises to its detriment by not using the Advances for other purposes and/or opportunities, including, without limitation, paying its legitimate creditors, supporting its failing business, and/or depositing such funds with a financial institution and earning reasonable interest thereon.

Response:    Denied

WHEREFORE, for the foregoing reasons the Defendant prays that this Court dismiss Count II.

## COUNT III – UNJUST ENRICHMENT

63.    Plaintiff realleges and reincorporates the allegations of Paragraphs 1 through 45 as though fully set forth herein.

Response:   Hanson re-alleges his responses to paragraphs 1-45.

64.   Between approximately at least 2000 and 2010, Debtor made Advances to Hanson in the aggregate of at least $2,470,498.37.

Response:   Denied.

65.   At no time did Hanson reject any of the Advances or the benefit thereof.

Response:   Denied as to cash advances being made to Hanson.

66.   Hanson has benefitted substantially from the Advances and his use of millions of dollars of Debtor's monies over the course of more than a decade.

Response:   Denied

67.   Upon information and belief, as of December 17, 2014, Hanson still retains the sum of $2,470,498.37 in Advances from Debtor.

Response:   Denied

68.   Hanson has no legal right to withhold repaying the Advances to Debtor.

Response:   Hanson believe that he has repaid any cash advances that he received, and denies that he has any legal obligation to repay any advances paid to him.

Response:   Denied

69.   Hanson would be unjustly enriched, to Debtor's detriment, if he was permitted to retain the benefit of the Advances without repaying those amounts, together with interest thereon, to Debtor.

Response:   Denied

70.   Hanson's retention of the Advances, and his failure to pay interest to Debtor thereon, violates the fundamental principles of justice, equity and good conscience.

14

Response:     Denied

WHEREFORE, the Defendant prays that this Court dismiss Count III of Plaintiff's complaint.

## COUNT IV
## ACCOUNT
## STATED

71.     Plaintiff realleges and reincorporates the allegations of Paragraphs 1 through 45 as though fully set forth herein.

Response:     Hanson re-alleges his responses to paragraphs 1-45.

72.     Between approximately at least 2000 and 2010, Debtor made the Advances to Hanson pursuant to the Loan.

Response:     Denied

73.     Hanson and Debtor at all times understood and agreed that Hanson would repay all principal and accrued interest under the Loan upon demand by Debtor.

Response:     Denied

74.     Upon information and belief, in or about early 2009, Debtor's accountant, Miller Cooper & Co., Ltd., on Debtor's behalf, rendered to Hanson a "Consolidated Financial Statements and Independent Accountants' Report – December 31, 2008 and 2007" (the "Financial Report").

Response:     Hanson is not the author of the referenced Consolidated Financial Statement, and therefore has no knowledge as to its accuracy. Further, Hanson denies that the referenced document was rendered to Hanson.

75.    Among other things, the Financial Report provided an accounting that:

> The Companies and Affiliates have uncollateralized advances to a
> stockholder of $3,325,153 and $3,313,612 as of December 31, 2008
> and 2007, respectively. Effective January 1, 2002, the advances bear
> interest at the prime rate (3.25% at December 31, 2008) minus
> 0.5%. The note was noninterest-bearing prior to 2002. Principal
> and interest are due on demand.

Response:    Hanson is not the author of the referenced document and therefore

has no knowledge as to its accuracy, and therefore denies the accuracy of the

document. Hanson has no knowledge as to the existence of any "note", and denies

that any "note" exists. As the referenced document is not attached to the pleading,

and Hanson does not have a copy of the referenced document, Hanson is unable to

admit that paragraph 75 is an accurate quotation of the contents of the referenced

document.

76.    Upon information and belief, the stockholder advances referred to in the

Financial Report were the Advances.

Response:    Denied as to there being cash advances. Unknown whether the

references exist, whether the references are accurate, and therefore denied.

77.    Upon information and belief, Hanson received the Financial Report,

including, without limitation, the accounting therein that, as of December 31, 2007, he

had a debt to Debtor in the amount of $3,313,612 in connection with the Advances and

interest thereon.

Response:    Denied

78.    Upon information and belief, Hanson retained the Financial Report and

has at no time made any objection thereto, or to the amount of his debt to Debtor in

connection with the Advances and interest thereon stated therein, in whole or in part.

Response:    Hanson denies that he has retained the Financial Report, and denies that

he is indebted to the Debtor.

79.    To the contrary, Hanson agreed with and admitted this $3,313,612 debt to

Debtor.

Response:    Denied

80.    In a Personal Financial Statement submitted by Hanson to

Suburban Bank & Trust and signed by Hanson as of May 31, 2009 (the "Hanson

Financial Statement"), Hanson explicitly admitted that he had a "current note payable"

to Debtor in the amount of "$3,313,612."

Response:    Hanson has no personal recollection of submitting a personal financial

statement to Suburban Bank & Trust in 2009, and, if one exists, Hanson is unaware of

its contents. If the financial statement exists, then as a legal document it speaks for

itself.

81.    Hanson's retention of the Financial Report beyond a reasonable time,

his failure to object thereto, and his admission of his debt in the Hanson Financial

Statement constitute an acknowledgement and recognition of the correctness thereof.

Response:    Denied

82.    Notwithstanding Hanson's acknowledgement and recognition of the

correctness of the accounting of his debt to Debtor in the Financial Report, Hanson has

paid no portion of the sums that he has acknowledged that he owes Debtor.

Response:   Denied

WHEREFORE, for the foregoing reasons the Defendant prays that this Court dismiss Count IV of Plaintiff's complaint.

## COUNT V - CONVERSION

83.   Plaintiff realleges and reincorporates the allegations of Paragraphs 1 through 45 as though fully set forth herein.

Response:   Hanson re-alleges his responses to paragraphs 1-45.

84.   Between at least 2002 and 2010, Debtor made Advances to Hanson in the aggregate of at least $2,470,498.37.

Response:   Denied.

85.   The Advances were at all times, and remain, Debtor's property.

Response:   Denied

86.   At all relevant times, Hanson and Debtor understood that all of the Advances belonged to Debtor, and that Hanson would be required to repay the Advances to Debtor upon demand by Debtor.

Response:   Denied

87.   By letter dated December 17, 2014, Plaintiff, as chapter 7 trustee of Debtor, made written demand upon Hanson for repayment of all Advances, in the sum of $2,470,498.37, plus interest thereon as previously agreed by Debtor and Hanson.

Response:   Admitted as to the letter being sent, denied as to any debt being owed.

88.    Debtor has at all times had a right to immediate possession of the Advances upon and following the time of its December 17, 2014 demand.

Response:    Denied

89.    Despite such demand, Hanson has failed and refused to pay any portion of the$2,470,498.37 in Advances that are due and owing, or any portion of the accrued interest thereon.

Response:    Denied as to any amounts being due and owing.

90.    Hanson's refusal to repay the Advances to Debtor upon demand amounts to an unauthorized and wrongful assumption of control, dominion or ownership by Hanson over the Advances.

Response:    Denied

91.    Hanson has improperly converted the Advances.

Response:    Denied

WHEREFORE, the Defendant prays that this Court dismiss Count V.

COUNT VI

BREACH OF
FIDUCIARY DUTY

92.    Plaintiff realleges and reincorporates the allegations of Paragraphs 1 through 45 as though fully set forth herein.

Response:    Hanson re-alleges his responses to paragraphs 1-45.

93.    At all relevant times, including from at least 2002 through the present date, Hanson has owed and continues to owe fiduciary duties to Debtor due to his control of Debtor.

19

Response:    Paragraph 93 alleges a legal conclusion, and as such is an improper
allegation, which Hanson therefore denies.

94.    At all relevant times, including from at least 2002 through the present
date, Hanson has owed and continues to owe fiduciary duties to Debtor as its President.

Response:    Paragraph 94 alleges a legal conclusion, and as such is an improper
allegation, which Hanson therefore denies.

95.    At all relevant times, including from at least 2002 through the present
date, Hanson has owed and continues to owe fiduciary duties to Debtor as its sole
and/or majority owner.

Response:    Paragraph 95 alleges a legal conclusion, and as such is an improper
allegation, which Hanson therefore denies.

96.    Hanson has at all relevant times had a fiduciary duty of loyalty to
Debtor.

Response:    Paragraph 96 alleges a legal conclusion, and as such is an improper
allegation, which Hanson therefore denies.

97.    Hanson has at all relevant times had a fiduciary duty of care to Debtor.

Response:    Paragraph 97 alleges a legal conclusion, and as such is an improper
allegation, which Hanson therefore denies.

98.    Hanson has at all relevant times had a fiduciary duty of good faith to
Debtor.

Response:    Paragraph 98 alleges a legal conclusion, and as such is an improper
allegation, which Hanson therefore denies.

99.    Hanson has at all relevant times had a fiduciary duty not to

misappropriate the assets of Debtor.

Response:      Paragraph 99 alleges a legal conclusion, and as such is an improper

allegation, which Hanson therefore denies.

100.    Hanson breached his fiduciary duties to Debtor, including, without

limitation, his duty of loyalty to Debtor, his duty of care, his duty of good faith, and his

duty not to misappropriate corporate assets, by causing or allowing Debtor to make the

Advances.

Response:      Denied

101.    The Advances were not in the best interests of Debtor.

Response:      Denied

102.    The Advances were not made in good faith.

Response:      Denied

103.    Hanson had a conflict of interest in causing or allowing Debtor to

make the Advances to himself.

Response:      Denied

104.    The Advances were a misappropriation of Debtor's assets by Hanson.

Response:      Denied

105.    Hanson's decision to cause and/or allow Debtor to make the Advances

was grossly negligent and reckless.

Response:      Denied

106.    Hanson breached his fiduciary duties to Debtor, including, without

limitation, his duty of loyalty to Debtor, his duty of care, his duty of good faith, and his

duty not to misappropriate corporate assets, by not causing Debtor to demand

21

repayment of the Advances.

Response:     Denied

107.   Hanson's failure to cause Debtor to demand repayment of the Advances was not in the best interests of Debtor.

Response:     Denied

108.   Hanson's failure to cause Debtor to demand repayment of the Advances was not in good faith.

Response:     Denied

109.   Hanson had a conflict of interest in failing to cause Debtor to demand repayment of the Advances.

Response:     Denied

110.   Hanson's failure to cause Debtor to demand repayment of the Advances amounted to a misappropriation of Debtor's assets by Hanson.

Response:     Denied

111.   Hanson's failure to cause Debtor to demand repayment of the Advances was grossly negligent and reckless.

Response:     Denied

112.   Hanson breached his fiduciary duties to Debtor by using Debtor's property, in the form of the Advances, for his own personal gain.

Response:     Denied

113.   Hanson breached his fiduciary duties to Debtor, including, without limitation, his duty of loyalty to Debtor, his duty of care, his duty of good faith, and his duty not to misappropriate corporate assets, by not repaying the Advances to Debtor.

22

Response:     Denied

114.   Hanson's failure to repay the Advances was not in the best interests of Debtor.

Response:     Denied

115.   Hanson's failure to repay the Advances was not in good faith.

Response:     Denied

116.   Hanson had a conflict of interest in failing to repay the Advances.
Response:     Denied

117.   Hanson's failure to repay the Advances amounted to a misappropriation of Debtor's assets by Hanson.

Response:     Denied

118.   Hanson's failure to repay the Advances was grossly negligent and reckless.

Response:     Denied

119.   Hanson's breaches of his fiduciary duties to Debtor were willful and wonton, intentional, and gross violations of his fiduciary duties.

Response:     Denied

120.   As a result of Hanson's breaches of fiduciary duties, Debtor was deprived of at least approximately $2,470,498.37 of its property.

Response:     Denied

121.   As a result of Hanson's breaches of fiduciary duties, Debtor was deprived of the opportunity to use at least approximately $2,470,498.37 in connection with its business and/or for investment.

Response:     Denied

23

122.    As a result of Hanson's breaches of fiduciary duties, Debtor became unable to pay its debts and other obligations as they came due.

Response:    Denied

123.    As a result of Hanson's breaches of his fiduciary duties, Debtor became insolvent.

Response:    Denied

124.    As a result of Hanson's breaches of his fiduciary duties, Debtor failed to pay amounts due to numerous of its creditors, and several of those creditors initiated the instant Bankruptcy Case by way of their involuntary petition herein.

Response:    Denied

125.    As a result of Hanson's breaches of his fiduciary duties, Debtor has been unable to pay any portion of the $4,580,416.38 in claims filed with respect to Debtor in this Bankruptcy Case.

Response:    Denied

WHEREFORE, the Defendant prays that this Court dismiss Count VI of Plaintiff's complaint.

## COUNT VII - TURNOVER

126.    Plaintiff realleges and reincorporates the allegations of Paragraphs 1 through 45 as though fully set forth herein.

Response:    Hanson re-alleges his response to paragraphs 1-45.

127.    The Advances belong to Debtor and are property of the Estate.

Response:    Denied

24

128. Accrued interest on the Advances belongs to Debtor and is property of the Estate.

Response:    Denied

129.    Demand has been made of Hanson and Hanson has refused to return Debtor's property, including, without limitation, the Advances and the accrued interest thereon.

Response:    Admitted as to the demand, denied as to a debt being owed.

130.    Pursuant to 11 U.S.C. § 542, Hanson must turnover to Debtor its property, including, without limitation, the Advances and the accrued interest thereon.

Response:    Denied

WHEREFORE, the Defendant prays the this Court dismiss Count VII of Plaintiff's complaint.

## AFFIRMATIVE DEFENSES APPLICABLE TO ALL COUNTS

Affirmative Defense #1: Counts I through VII are barred by the failure to sue under each count within the applicable statute of limitations for each Count.

Affirmative Defense #2: Counts I through VII are barred by the Statute of Frauds, 740 ILCS 80/1.

Affirmative Defense #3: Counts I through VII are barred as the Plaintiff lacks standing to sue.

Affirmative Defense #4: Counts I through VII are barred by the doctrine of estoppel.

Affirmative Defense #5: Counts I through VII are barred as the Debtor has waived any claims for un-repaid cash advances to Hanson.

Respectfully Submitted

25

Charles Hanson

By: _____
EMALFARB, SWAN & BAIN
His Attorneys

Peter G. Swan
EMALFARB, SWAN & BAIN
440 Central Avenue
Highland Park, Illinois 60035
(847) 432-6900
Attorney # 6186883

## VERIFICATION

Under penalties of perjury as provided by law, and under the Power of Attorney granted to me by my father, Charles Hanson, the undersigned certified that the statements set forth in this instrument are true and correct, except as to matters herein stated to be on information and belief, and as to such matter, the undersigned certifies as aforesaid that she verily believes the same to be true.

Dated: March 5, 2015

_Kim Henry_
Katherine Henry

27

**PLAINTIFF'S EXHIBIT 3**

F:\WP51\DOCS\KHENRY\6989.0015\00094159.DOC

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| Mollie Enterprises, Inc. | ) | Case No. 12-20426 |
| | ) | |
| Debtor | ) | Honorable Eugene R. Wedoff |
| | ) | |
| | ) | |
| Brenda Helms, as Trustee | ) | |
| | ) | Adversary No. 15-00034 |
| Plaintiff | ) | |
| v. | ) | |
| Charles Hanson | ) | |
| | ) | |
| Defendant | ) | |

## HANSON'S RESPONSE TO PLAINTIFF'S REQUEST FOR PRODUCTION

Now comes the Adversary Defendant, Charles Hanson, and for his responses to Plaintiff's Production Request states as follows:

### REQUESTS FOR PRODUCTION

1. All documents in your possession and/or control which are the property of, or which otherwise reflect the property and/or business of, Mollie Enterprises.

**RESPONSE:** The Defendant does not have any documents responsive to this production request.

2. All documents in your possession and/or control which are the property of, or which otherwise reflect the property and/or business of, Northwest Building.

**RESPONSE:** The Defendant does not have any documents responsive to this production request.

3. All documents evidencing or otherwise relating to any and all ownership interests you have, or at any time during the Period had, with respect to Northwest Building.

**RESPONSE:** The Defendant does not have any documents responsive to this production request.

    4.    All documents evidencing or otherwise relating to any and all monies and/or other property transferred, distributed, paid and/or advanced to you or for your benefit by Mollie Enterprises, including, without limitation, all correspondence, demands, faxes, notes, files, receipts, bills, memos, bank deposits, checks, remittances and/or other payment records.

**RESPONSE:** The Defendant does not have any documents responsive to this production request, but believes that Suburban Bank & Trust Company and Miller Cooper Ltd., may have documentation responsive to this request.

    5.    All documents evidencing or otherwise relating to any and all monies and/or other property transferred, distributed, paid and/or advanced to you or for your benefit by Northwest Building, including, without limitation, all correspondence, demands, faxes, notes, files, receipts, bills, memos, bank deposits, checks, remittances and/or other payment records.

**RESPONSE:** The Defendant does not have any documents responsive to this production request, but believes that Suburban Bank & Trust Company and Miller Cooper Ltd., may have documentation responsive to this request.

    6.    All documents evidencing or otherwise relating to any and all debts or other amounts owed by you to Mollie Enterprises at any time during the Period, including, without limitation, all documents evidencing any and all repayment of same.

**RESPONSE:** The Defendant does not have any documents responsive to this request.

    7.    All documents evidencing or otherwise relating to any and all debts or other amounts owed by you to Northwest Building at any time during the Period, including, without limitation, all documents evidencing any and all repayment of same.

**RESPONSE:** The Defendant does not have any documents responsive to this request.

    8.    All documents evidencing or otherwise relating to any and all debts or other amounts owed to you by Mollie Enterprises at any time during the Period, including, without limitation, all documents evidencing any and all repayment of same.

**RESPONSE:** The Defendant does not have any documents responsive to this request.

    9.    All documents evidencing or otherwise relating to any and all debts or other amounts owed to you by Northwest Building at any time during the Period, including, without limitation, all documents evidencing any and all repayment of same.

**RESPONSE:** The Defendant will produce the documents relating to this request.

10. All documents evidencing or otherwise relating to any and all agreements between you and Mollie Enterprises during the Period, including, without limitation, any and all loan agreements.

**RESPONSE:** The Defendant does not have any documents responsive to this request.

11. All documents evidencing or otherwise relating to any and all agreements between you and Northwest Building during the Period, including, without limitation, any and all loan agreements.

**RESPONSE:** The Defendant does not have any documents responsive to this request.

12. All federal and State tax returns filed by you or on your behalf

**RESPONSE:** The Defendant objects to this request as it seeks irrelevant personal financial information.

13. All documents evidencing or otherwise relating to any and all bank and/or brokerage accounts held at any time during the Period by you or on your behalf, including, without limitation, all account statements and canceled checks.

**RESPONSE:** The Defendant objects to this request as it seeks irrelevant personal financial information and is overly broad.

14. All documents evidencing or otherwise relating to any and all bank and/or brokerage accounts held at any time during the Period by any and all trusts established by you or for your benefit, including, without limitation, all account statements and canceled checks.

**RESPONSE:** The Defendant objects to this request as it seeks irrelevant personal financial information and is overly broad.

15. All documents evidencing or otherwise relating to any and all bank and/or brokerage accounts held at any time during the Period by any and all trusts for which you are or were the trustee or co-trustee, including, without limitation, all account statements and canceled checks.

**RESPONSE:** The Defendant objects to this request as it seeks irrelevant personal financial information and is overly broad.

16.     All of your personal financial statements during the Period.

**RESPONSE:** The Defendant has no documentation responsive to this request.

I 7. All documents supporting, evidencing or otherwise relating to your contention in your Answer to Paragraph 20 of the Complaint in this adversary proceeding that "the Debtor'slender and Unions also asserted control over the Debtor."

**RESPONSE:** The Defendant has no documentation responsive to this request.

18.     All documents supporting, evidencing or otherwise relating to your denial in your Answer of Paragraphs 35 through 38 of the Complaint in this adversary proceeding.

**RESPONSE:** The Defendant has no documentation responsive to this request.

19.     All documents supporting, relating to and/or referred to in your Affirmative Defenses Applicable to All Counts in your Answer and Affirmative Defenses in this adversary proceeding.

**RESPONSE:** The Defendant will produce all documents responsive to this request.

20.     All documents that you intend lo introduce at trial in this proceeding.

**RESPONSE:** The Defendant will produce all documents responsive to this request.

21.     All statements of witnesses.

**RESPONSE:** None exist.

Charles Hanson

By: _____

Peter G. Swan
EMALFARB, SWAN & BAIN
440 Central Avenue
Highland Park, Illinois 60035
(847) 432-6900
Attorney # 6186883

4

## VERIFICATION

Under penalties of perjury as provided by law, and under the Power of Attorney granted to me by my father, Charles Hanson, the undersigned certified that the statements set forth in this instrument are true and correct, except as to matters herein stated to be on information and belief, and as to such matter, the undersigned certifies as aforesaid that she verily believes the same to be true.

Dated: April 17, 2015

Katherine Henry

6

4

**PLAINTIFF'S
EXHIBIT 4**

F:\WP51\DOCS\KHENRY\6989.0015\00094136.DOC

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| Mollie Enterprises, Inc. | ) | Case No. 12-20426 |
| | ) | |
| Debtor | ) | Honorable Eugene R. Wedoff |
| | ) | |
| | ) | |
| Brenda Helms, as Trustee | ) | |
| | ) | Adversary No. 15-00034 |
| Plaintiff | ) | |
| v. | ) | |
| Charles Hanson | ) | |
| | ) | |
| Defendant | ) | |

## HANSON'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Now comes the Adversary Defendant, Charles Hanson, and for his responses to Plaintiff's interrogatories states as follows:

## INTERROGATORIES

1 . State the identity of the person or persons answering or supplying information to answer these Interrogatories, including his/her name, address, and the specific Interrogatory that he/she answered or for which he/she provided information.

**RESPONSE:** Katharine Henry – 3009 E. Francis Circle, St. Charles, Illinois 60174

2.    Identify all persons with knowledge of the allegations of the Complaint in the above-captioned adversary proceeding, and for each such person provide a brief statement of that person 's relevant knowledge.

**RESPONSE:** Katharine Henry and Peter F. Cieslak of Miller & Cooper Ltd., 1751 Lake

1

Cook Road, Deerfield, IL 60015. They have knowledge of the finances of Mollie Enterprises and Northwest Building Materials, and the capital contributions made to these entities by Charles Hanson. Suburban Bank & Trust Company individuals may also have knowledge relating to the finances of the companies.

3. Identify all persons with knowledge of the assets, operations, finances, accounting and/or expenditures of Mollie Enterprises.

**RESPONSE:** See response to #2

4. Identify all persons with knowledge of the assets, operations, finances, accounting and/or expenditures of Northwest Building.

**RESPONSE:** See response to #2

5. Identify all bank and/or brokerage accounts held at any time during the Period by on behalf of Mollie Enterprises.

**RESPONSE:** All accounts were held at Suburban Bank & Trust Company

6. Identify all bank and/or brokerage accounts held at any time during the Period by on behalf of Northwest Building.

**RESPONSE:** All accounts were held at Suburban Bank & Trust Company

7. Identify all bank and/or brokerage accounts held at any time during the Period by you or on your behalf.

**RESPONSE:** Objection based upon lack of relevancy and the question being overly broad.

8.      Identify all bank and/or brokerage accounts held at any time during the Period by or on behalf any trust established by you or for your benefit.

**RESPONSE:** Objection based upon lack of relevancy and the question being overly broad.

9.      Identify all bank and/or brokerage accounts at any time held by or on behalf any trust for which you have at any time been a trustee or co-trustee.

**RESPONSE:** Objection based upon lack of relevancy and the question being overly broad.

10.      Identify all trusts existing at any time during the Period which were established by you or for your benefit, and identify the full name and address of the current trustee or trustees of such trusts.

**RESPONSE:** Objection based upon lack of relevancy and the question being overly broad.

11.      Identify all trusts existing at any time during the Period for which you have at any time been a trustee or co-trustee, and identify the full name and address of the current trustee or trustees of such trusts.

**RESPONSE:** Objection based upon lack of relevancy and the question being overly broad.

12.      Describe how "the Debtor's lender and Unions also asserted control over the Debtor," as alleged in Paragraph 20 of your Answer to the Complaint in this adversary proceeding.

**RESPONSE:** Suburban Bank & Trust controlled where the Debtor banked, how much money the Debtor had to pay the Bank on a monthly basis and from any sale of assets. The Unions controlled the Debtor as they dictated the amount paid to some of Debtors employees.

13. Identify all loans made by Mollie Enterprises which remained unpaid in full at any time during the Period, including, without limitation, the amount(s) of such loan(s), the date(s) of such loan(s), the borrower and/or recipient of any loaned monies, and any amounts repaid in connection with such loans and the date(s) of such repayments.

**RESPONSE:** None

14. Identify all loans made by Northwest Building which remained unpaid in full at any time during the Period, including, without limitation, the amount(s) of such loan(s), the date(s) of such loan(s), the borrower and/or recipient of any loaned monies, and any amounts repaid in connection with such loans and the date(s) of such repayments.

**RESPONSE:** None

15. Identify all conveyances and distributions of any asset, including, without limitation, monies, made by Mollie Enterprises to you or any person, entity or trust on your behalf or for your benefit, including, without limitation, the amount(s) of such conveyance(s), the date(s) of such conveyance(s), the purpose of such conveyance(s).

**RESPONSE:** None other than salary paid to Charles Hanson.

16. Identify all conveyances and distributions of any asset, including, without limitation, monies, made by Northwest Building to you or any person, entity or trust on your behalf or for your benefit, including, without limitation, the amount(s) of such conveyance(s), the date(s) of such conveyance(s), the purpose of such conveyance(s).

**RESPONSE:** None other than salary paid to Charles Hanson.


**1 7.** Identify the gross amount of all monies received by you from Mollie Enterprises in each calendar year of the Period, including, without limitation, all income, bonuses, distributions, advances, reimbursements and other compensation.

**RESPONSE:** Charles Hanson does not have information responsive to this interrogatory. It is believed that this information is maintained by Miller Cooper Ltd.


**18.** Identify the gross amount of all monies received by you from Northwest Building in each calendar year of the Period, including, without limitation, all income, bonuses, distributions, advances, reimbursements and other compensation.

**RESPONSE:** Charles Hanson does not have information responsive to this interrogatory. It is believed that this information is maintained by Miller Cooper Ltd.

Charles Hanson

By: _____
       EMALFARB, SWAN & BAIN
       His Attorneys

Peter G. Swan
EMALFARB, SWAN & BAIN
440 Central Avenue
Highland Park, Illinois 60035
(847) 432-6900
Attorney # 6186883

5

## VERIFICATION

Under penalties of perjury as provided by law, and under the Power of Attorney granted to me by my father, Charles Hanson, the undersigned certified that the statements set forth in this instrument are true and correct, except as to matters herein stated to be on information and belief, and as to such matter, the undersigned certifies as aforesaid that she verily believes the same to be true.
Dated: April 17, 2015

Katherine Henry

5

**PLAINTIFF'S
EXHIBIT 5**

CASE NAME:        IN RE:  MOLLIE ENTERPRISES, INC.

                          FIRST MEETING OF CREDITORS

CASE NO.:        12 B 29426

DATE:

        HEARING OFFICER:   This is the first meeting of creditors

of Mollie Enterprises and Case No. 12-20426 and Northwest

Building Material, 12-37478.

            Uhm, can we go around and say who's here for the

record.  Your name, for the record?

        FEMALE VOICE:  Catherine Henry.

        HEARING OFFICER:   All right.

        MALE VOICE:  Timothy Armstrong of Suburban Bank & Trust

Company.

        FEMALE VOICE:  Cara Douglas on behalf of (inaudible) and

Welfare Funds.

        MALE VOICE:  For Mollie, this, I'm Steve Rogan and I'm

here from Lefarge.

        HEARING OFFICER:   Okay.  All right.  Now, Ms. Henry, I

talked to Peter Swan.

        MS. HENRY: Yes.

        HEARING OFFICER:   Is he, are you expecting him to be here

today?

        MS. HENRY: No, he sent me.

        HEARING OFFICER:   All right.  And did you discuss with

him what's gonna happen today?

1

1    MS. HENRY: He told me what to do. He said if I had any

2  questions or didn't understand to call him.

3    HEARING OFFICER: Oh. All right. So can you raise your

4  right hand.

5    MS. HENRY: Sure.

6    HEARING OFFICER: Do you solemnly swear and affirm that

7  the testimony you're about to give here today is the truth, the

8  whole truth and nothing but the truth?

9    MS. HENRY: Yes.

10    HEARING OFFICER: And your name is?

11    MS. HENRY: Katherine?

12    HEARING OFFICER: Katherine Henry? Is that K or C?

13    MS. HENRY: K.

14    HEARING OFFICER: And what was your position with Mollie

15  Enterprises? Start with Mollie.

16    MS. HENRY: At the time I was CFO.

17    HEARING OFFICER: CFO. Did you have shares in the

18  company?

19    MS. HENRY: No.

20    HEARING OFFICER: Who, who were the shareholders?

21    MS. HENRY: Mr. Hanson.

22    HEARING OFFICER: Mr. Hanson. What's his first name?

23    MS. HENRY: Charles Hanson.

24    HEARING OFFICER: Charges Hanson. And how long, did you

25  work there? You must have, you were CFO, right?

2

1    MS. HENRY:   Yes.

2    HEARING OFFICER:   So, how long did you work there?

3    MS. HENRY:   20 years.

4    HEARING OFFICER:   Was he the shareholder for all those

5    years?

6    MS. HENRY:   Yes.

7    HEARING OFFICER:   Okay.  And Mr. Hanson, is he related to

8    you or...

9    MS. HENRY:   He's my father.

10    HEARING OFFICER:   Oh, okay, okay.  Got it.  So did he, he

11    founded the business?

12    MS. HENRY:   Yes, he did.

13    HEARING OFFICER:   And then you worked at it?

14    MS. HENRY:   Yes.

15    HEARING OFFICER:   Now, what is the difference between

16    Northwest Building Material of Illinois and Mollie Enterprises,

17    that's what I can't figure out?

18    MS. HENRY:   Mollie Enterprises was our former corporate,

19    what was considered corporate.

20    HEARING OFFICER:   Former corporate.  What did that mean?

21    What...

22    MS. HENRY:   It was the former Northwest Building Material

23    and Supply Co.

24    HEARING OFFICER:   So what's the difference between the

25    two of them?

3

1     MS. HENRY:  One was a corporate.

2     HEARING OFFICER:   Mollie?

3     MS. HENRY:  Yes.  And the other was an actual operation of

4  the drywall distribution operation.

5     HEARING OFFICER:   Okay.  So Mollie never hired people or

6  paid for material suppliers or anything like that, is that how

7  it worked?

8     MS. HENRY:  Correct.

9     HEARING OFFICER:   So it was like an umbrella?

10    MS. HENRY:  No, it's not an umbrella and if, this, if I

11  need to have representation for this...

12    HEARING OFFICER:   No, I'm just asking for, if you don't

13  know then that's fine.

14    MS. HENRY:  I don't know.

15    HEARING OFFICER:   I can't understand it either.  I'm just

16  asking.

17    MS. HENRY:  It's not an umbrella.

18    HEARING OFFICER:   Okay.  Huh, but they were separate

19  companies?

20    MS. HENRY:  They are separate companies.

21    HEARING OFFICER:   So who is the owner of Northwest, Mr.

22  Hanson again?

23    MS. HENRY:  Yes.

24    HEARING OFFICER:   Okay.  And he's a sole shareholder?

25    MS. HENRY:  Yes, he is.

4

1     HEARING OFFICER:   Are you the CFO of Northwest?

2     MS. HENRY:  Yes.

3     HEARING OFFICER:   Oh, okay.  Was there a president?

4     MS. HENRY:  I became the president toward the end in 2010.

5     HEARING OFFICER:   Okay.  And are both of them still in

6     business?

7     MS. HENRY:  No.

8     HEARING OFFICER:   Are they both out of business?

9     MS. HENRY:  Yes.

10    HEARING OFFICER:   Oh, okay.  Uhm, where are all the books

11    and records for these companies?

12    MS. HENRY:  In storage.

13    HEARING OFFICER:   And where is that storage?

14    MS. HENRY:  In Naperville.

15    HEARING OFFICER:   Okay.  Is it a storage facility, like

16    the one on Ogden Avenue there?

17    MS. HENRY:  Part of it is in storage facility in West

18    Chicago.

19    HEARING OFFICER:   In West, not in Naperville?

20    MS. HENRY:  Well, some of it is in Naperville at a

21    location there.

22    HEARING OFFICER:   Is it your house?

23    MS. HENRY:  No.

24    HEARING OFFICER:   Mr. Hanson's house?

25    MS. HENRY:  No.

5

1      HEARING OFFICER:  Where is that?

2      MS. HENRY:  It's, it's the building that the operation.

3      HEARING OFFICER:   Oh the building? Okay.

4      MS. HENRY:  Right.

5      HEARING OFFICER:   And what's the address there?  I know

6  they're doing an auction.

7      MS. HENRY:   31 W 524 Diehle Road.

8      HEARING OFFICER:   So there's books and records there and

9  there's books and records in West Chicago, right?

10      MS. HENRY:  Right.

11      HEARING OFFICER:   And whereabouts in West Chicago? Is

12  there a building there?

13      MS. HENRY:  A storage facility across from Pheasant Run.

14  I can't think of the name of it right now.

15      HEARING OFFICER:   Okay.  It's good enough, everybody

16  knows where Pheasant Run is.

17          So how long do they go back, do you know?  You're

18  the CFO so you have, there's canceled checks there and that kind

19  of thing, for years?

20      MS. HENRY:   Yes.

21      HEARING OFFICER:   Keeping them for IRS, I assume?

22      MS. HENRY:  Just, my accountant told me to keep everything

23  for the last seven years.

24      HEARING OFFICER:   Right. And who's your accountant?

25      MS. HENRY:  Pete Cieslak.

6

```
 1        HEARING OFFICER:   Cieslak?

 2        MS. HENRY:  Yes, C-i-e-s-l-a-k.

 3        HEARING OFFICER:   Okay.  Where's he located?

 4        MS. HENRY:  Northbrook.

 5        HEARING OFFICER:   Is he with a big firm?

 6        MS. HENRY:  Yes.

 7        HEARING OFFICER:   Which one, do you know?

 8        MS. HENRY:  Miller Cooper.

 9        HEARING OFFICER:   Who?

10        MS. HENRY:  Miller Cooper.

11        HEARING OFFICER:   Oh right, okay.

12             Now, did, so Mr. Hanson was the sole shareholder.

13   Did he owe money to the business at any time?

14        MS. HENRY:  No.

15        HEARING OFFICER:   There were no loans that he had out

16   from the business?

17        MS. HENRY:  I do not know.

18        HEARING OFFICER:   You don't know?  Who would know that?

19        MS. HENRY:  Pete Cieslak.

20        HEARING OFFICER:   Okay.  So he is the one that sort of

21   kept everything in ship shape?

22             As Chief Financial Officer, what did you do and then

23   president.  What was your job?

24        MS. HENRY:  Running the company.

25        HEARING OFFICER:   Okay.  Like getting the jobs, getting
                                                                7
```

1  the suppliers lined up, that kind of thing?

2      MS. HENRY:  Yes.

3      HEARING OFFICER:   I know I should have asked this

4  initially, but I didn't.  What do these companies do?  What kind

5  of...

6      MS. HENRY:  Material distribution.

7      HEARING OFFICER:   So you just distributed it?

8      MS. HENRY:  Correct.

9      HEARING OFFICER:   So like a customer would come to you

10  and say we're building a big, huge college or whatever and we

11  want you to get our supplies to us on time?

12      MS. HENRY:  Correct.

13      HEARING OFFICER:   Okay.  So you were like a general

14  contractor?

15      MS. HENRY:  No.

16      HEARING OFFICER:   No, okay.

17      MS. HENRY:  A supplier is a supplier. Contractors order

18  from suppliers.

19      HEARING OFFICER:   And you were a supplier?

20      MS. HENRY:  Yes.  Distributor of materials.  Building

21  material supplier.

22      HEARING OFFICER:   Okay.  So you would order from like ABC

23  Building Supply.

24      MS. HENRY:  No, they were competitors.  We would order

25  from certain vendors that produced the product...

                                                        8

1        HEARING OFFICER:    Like drywall.

2        MS. HENRY:  Yes.

3        HEARING OFFICER:    And then you sent it on to, so did you

4   keep like inventory?

5        MS. HENRY:  Yes, we did.

6        HEARING OFFICER:    So you had like an inventory of drywall

7   and then when you had somebody, a customer say they wanted to

8   build something and needed 100 feet of drywall, you would have

9   it there?

10       MS. HENRY:  Correct.

11       HEARING OFFICER:    And you could give it to them?

12       MS. HENRY:  Yes.

13       HEARING OFFICER:    Okay. But I don't understand what the

14  difference between that and the customer going right to the

15  drywall company?  Why wouldn't they do that?

16       MS. HENRY:  Because customers were set up to have the

17  customer come to building material distributors instead of the

18  manufacturers.

19       HEARING OFFICER:    Okay.  Okay.  I never heard of that

20  before.  Doesn't mean anything.

21            To these companies have many employees?

22       MS. HENRY:  A long time ago.

23       HEARING OFFICER:    They did?  Say the last three years,

24  were there like a lot of people employed?

25       MS. HENRY:  No.

                                          9

1        HEARING OFFICER:   No?  Like more than five?

2        MS. HENRY:  Five to six.

3        HEARING OFFICER:   Five to six.

4        MS. HENRY:  The last two.

5        HEARING OFFICER:   Okay.  All right.  Now, property deal

6    as you know 'cause your attorney and I just talked about it,

7    they get into an auction...

8        MS. HENRY:  Correct.

9        HEARING OFFICER:   ...on the 14th.  Now, apart from the,

10   are there any other assets, anything that's of value to either

11   Mollie or Northwest?

12       MS. HENRY:  No.

13       HEARING OFFICER:   There's nothing anywhere else, no

14   machinery or cash or...

15            What about bonds?  I suppose they didn't get bonds.

16   Did they apply for bonds?

17       MS. HENRY:  (Non-verbal.)

18       HEARING OFFICER:   No?  Okay.  And what happened to all

19   the inventory?

20       MS. HENRY:  It's being auctioned.

21       HEARING OFFICER:   Okay.  That's part of it too?  I knew

22   there was some equipment, but...

23            Now, who was, do you have a bank financing you?

24       MS. HENRY:  Yes.

25       HEARING OFFICER:   Okay.  And this is Mollie or Northwest?

                                                              10

1     MS. HENRY:  Both.

2     HEARING OFFICER:   Both?  And which bank was that?

3     MS. HENRY:  Suburban Bank & Trust.

4     HEARING OFFICER:   Okay.  And do you have any idea how

5  much you owe them right now?

6     MS. HENRY:  Somewhere in excess of $1 million possibly.

7     HEARING OFFICER:   Any other secured credits, like people

8  who might like finance a piece of equipment?

9     MS. HENRY:  No.

10    HEARING OFFICER:   Nothing?  Nobody else?  That was pretty

11  much it?

12         Okay.  Did you have any contracts or leases with

13  anybody?

14    MS. HENRY:  No.

15    HEARING OFFICER:   Now did you or your father guarantee

16  any of the debt from your suppliers or anything like that?  Or

17  union?

18    MS. HENRY:  No.

19    HEARING OFFICER:   No?  Okay.  Now you were a union

20  company, right?

21    MS. HENRY:  Yes.

22    HEARING OFFICER:   So was Mollie and Northwest both union

23  companies?

24    MS. HENRY:  Yes.

25    HEARING OFFICER:   So is there any, has there been an

                                                        11

1    audit for withdrawal liability or anything like that?

2         MS. HENRY:  No.

3         HEARING OFFICER:  That you're aware of?

4         MS. HENRY:  Not that I'm aware of.

5         HEARING OFFICER:  Okay.  So, I'm talking about Mollie

6    here, do you know how much they made in the last year they were

7    in business which would have been 2012?

8         MS. HENRY:  No.

9         HEARING OFFICER:  No...

10        MS. HENRY:  I don't recall.

11        HEARING OFFICER:  It would have been 2012, right, that

12   would be the last year they were in business?

13        MS. HENRY:  Mollie was not doing, wasn't really in

14   business for some time.

15        HEARING OFFICER:  A year?

16        MS. HENRY:  No, years, but I don't really know the answer

17   to that question.

18        HEARING OFFICER:  Okay.  All right.  And nobody, did

19   anybody owe Mollie any money?

20        MS. HENRY:  No.

21        HEARING OFFICER:  No?  Nobody?

22        MS. HENRY:  Again, not exactly sure, but no.

23        HEARING OFFICER:  Okay.  Were there any lawsuits pending

24   that you were involved in?

25        MS. HENRY:  Not that I recall.

                                                         12

```
 1        HEARING OFFICER:   Okay.  So why did you go out of

 2   business?

 3        MS. HENRY:  There was, there were no sales.

 4        HEARING OFFICER:   Okay.  So lack of customers?

 5        MS. HENRY:  The economy.

 6        HEARING OFFICER:   Okay.  Did you have any questions you

 7   wanted to ask?

 8        MALE VOICE:  Uhm, a couple.

 9        HEARING OFFICER:   Okay.

10        MR. ROGAN:  Hi, my name is Steven Rogan.  Uhm, the

11   property that you mentioned earlier at Diehl location.

12        MS. HENRY:  Yes.

13        MR. ROGAN:  Who owns the property?

14        MS. HENRY:  It's owned by a separate corporation.

15        MR. ROGAN:  Okay.  And what's the name of that

16   corporation?

17        MS. HENRY:  CS Realty, Inc.

18        MR. ROGAN:  And do you have any ownership interest in CS

19   Realty, Inc.?

20        MS. HENRY:  No, I don't.

21        MR. ROGAN:  Do you know who the owner is?

22        MS. HENRY:  Mr. Hanson.

23        MR. ROGAN:  Other than the Diehl location, did either

24   Mollie or Northwest operate at any other location in the last

25   five years or so?
```

                                                              13

| | |
|---|---|
| 1 | MS. HENRY:  Yes. |
| 2 | MR. ROGAN:  Where else did they operate? |
| 3 | MS. HENRY:  Prairieview, Illinois. |
| 4 | MR. ROGAN:  What was the address there? |
| 5 | MS. HENRY:  21775 North Weiland Road. |
| 6 | HEARING OFFICER:   Where's Prairieview? |
| 7 | MS. HENRY:  Near Lincolnshire. |
| 8 | HEARING OFFICER:   Oh really.  A little town, huh? |
| 9 | MR. ROGAN:  What was the address, 21775 North what? |
| 10 | MS. HENRY:  Weiland. |
| 11 | HEARING OFFICER:   Weiland. |
| 12 | MR. ROGAN:  Do you recall who co-owns that property? |
| 13 | MS. HENRY:  Property is sold. |
| 14 | MR. ROGAN:  Okay.  Who owned it at the time that you |
| 15 | operated there? |
| 16 | MS. HENRY:  Uh, another entity, real estate company. |
| 17 | MR. ROGAN:  What was that called? |
| 18 | MS. HENRY:  NW Realty. |
| 19 | MR. ROGAN:  Was Mr. Hanson an owner of that entity as |
| 20 | well? |
| 21 | MS. HENRY:  Yes. |
| 22 | MR. ROGAN:  And when was that property sold? |
| 23 | MS. HENRY:  2010. |
| 24 | MR. ROGAN:  Do you have a company called Sharma Realty? |
| 25 | MS. HENRY:  I've heard of it.  It hasn't been in existence |

14

1   for many, many years.

2          MR. ROGAN:  Okay.  Do you recall the last time it was in

3   existence?

4          MS. HENRY:  No.

5          MR. ROGAN:  Was Mr. Hanson an owner of that?

6          MS. HENRY:  I do not know.

7          MR. ROGAN:  Were you an owner of that?

8          MS. HENRY:  No, I was not.

9          MR. ROGAN:  That's probably it.

10         HEARING OFFICER:  Okay.  All I need is a contact person.

11         MS. HENRY:  That would be me, I guess.

12                                    (Multiple   people talking.)

13         FEMALE VOICE:  Our auditor will be in contact with you.

14         HEARING OFFICER:  Is that for the withdrawal?

15         FEMALE VOICE:  It's for a close-out on the company.

16  Usually when they just close their doors.

17         HEARING OFFICER:  Uh-huh.  Oh really.

18         FEMALE VOICE:  It will likely just be a closing audit. I

19  think the time is May 1st, 2010.

20         HEARING OFFICER:  What type of audit.

21         FEMALE VOICE:  I can give you a better list.

22         MS. HENRY:  Okay. I'll find out.

23         HEARING OFFICER:  Mr. Armstrong?

24         MALE VOICE:  Just to clarify, I'm fairly certain that the

25  Diehl Road property that is owned by a land trust.

                                                            15

1    MS. HENRY:  Thank you for correcting me.

2    MALE VOICE:   That is held in Suburban Bank & Trust.

3    HEARING OFFICER:   Oh, okay.

4    MALE VOICE:  And CS Realty is the beneficiary.

5    MS. HENRY:  That's correct, thank you.

6    HEARING OFFICER:   Oh.  Okay.  All right.  All right.  And

7    CS Realty is owned by Mr. Hanson, right?

8    MS. HENRY:  Yes.

9    HEARING OFFICER:   Okay.  Nobody owes either of these

10   entities any money, right? (Inaudible) to pay the creditors?

11   MS. HENRY:  I would have to speak with my attorney because

12   this is reaching an area that I'm not certain of.

13   HEARING OFFICER:   Okay.  All right.  Did you have any

14   questions that you wanted to ask about coming here today?

15   MS. HENRY:  No.

16   HEARING OFFICER:   Okay.  All right.

17   MALE VOICE:  I just want to say for the record...

18   HEARING OFFICER:   Sure.

19   MR. ROGAN:  ...we have gotten authorization from the

20   Bankruptcy Court Division (inaudible) with respect to both of

21   the entities as well as Mr. Hanson.  We do intend to do that, I

22   just want to make sure that it's clear we're not waiving that

23   right by asking the questions that I asked earlier.

24   HEARING OFFICER:   Well, discovery so far as what?

25   MR. ROGAN:  Insofar as in connection with the bankruptcy.

16

1     HEARING OFFICER:   Oh, okay.  (Inaudible)  What does that

2  all mean?

3     FEMALE VOICE:  That again, we just discovered.

4  (Inaudible)

5     HEARING OFFICER:   Okay.  Uhm, okay, well I guess we'll

6  wait for the auction and see what happens and take it from

7  there.

8     MR. ROGAN:  In terms of getting those documents, should a

9  request be made (inaudible)

10    HEARING OFFICER:   What documents, exactly?

11    MR. ROGAN:  The books and records that are probably being

12 held at two different locations.

13    HEARING OFFICER:   (Inaudible) do you have somewhere to

14 store?

15    MR. ROGAN:  We can buy the place.

16    HEARING OFFICER:   Okay.

17    MS. HENRY:  I'll get a list of documents that I have to

18 produce.

19    HEARING OFFICER:   Yeah, I guess, I can give you a list.

20 I don't know what you've got and what you don't have.  I guess,

21 I'm mostly looking at bank statements and...

22    MS. HENRY:  From what period?

23    FEMALE VOICE:  Three years?

24    MR. ROGAN:  Well, I think...

25    FEMALE VOICE:  Five?

                                                        17

1      MR. ROGAN:  Going back at least three years from the date

2      of the bankruptcy.

3      HEARING OFFICER:   2012 so...

4      MR. ROGAN:  Going back to I'd say...

5      HEARING OFFICER:   2009.

6      MR. ROGAN:  Yeah.

7      HEARING OFFICER:   Yeah.

8      MR. ROGAN:  May of 2009.

9      MS. HENRY:  Everything was sent for the bank so I will ask

10     them for (inaudible)

11     HEARING OFFICER:   Okay.

12     MR. ROGAN:  Well, it's not going to just be bank

13     statements.  I think we'd like to know what is there to the

14     extent that there are financial statements other things that may

15     be in connection with the finance of the company.  Anything like

16     that, we'd like to see that.

17     HEARING OFFICER:   All right.  Okay.  All right.  Why

18     don't I continue this until June 7th, both of these cases.  And

19     now here's my problem.  She'll be happy to send you a letter

20     with a list of all these, but I am tomorrow going out of town

21     for two weeks.  I won't be back until after Memorial Day.  So to

22     the extent that you can get bank statements and things like that

23     ready that would be great, then I can communicate with you

24     after...

25     MS. HENRY:  Where do I send those documents to you?

18

1     HEARING OFFICER:   Yeah, yeah.  What kind of volume do you

2  think we're looking at?

3     MS. HENRY:  I'm going to call Suburban Bank and if I have

4  (inaudible) those are the only two bank accounts, so one was

5  payroll and one was the journal account and I will ask for the

6  bank to prepare those...

7     HEARING OFFICER:   Okay.

8     MS. HENRY:  ...statements and send them to you.

9     MR. ROGAN:  Were those accounts for both Mollie and

10  Northwest?

11     MS. HENRY:  They were, yes, yes.

12     HEARING OFFICER:   Okay.  Yeah, that would be good and

13  then, yeah, send them to me at my address, you know what that

14  is, right, it's on the notice and everything.

15     MS. HENRY:  Okay.

16     HEARING OFFICER:   And yeah if I need anything else I'll

17  let you know.

18     MS. HENRY:  Okay.

19     HEARING OFFICER:   Okay?  Thank you.

20

21

22                        (End of hearing.)

23

24

25

1

2  Sally Analitis, do hereby certify or affirm that I have impartially

3  transcribed the foregoing from an audio wave file of the above

4  captioned proceedings to the best of my ability.

5

6  _____

7                          Transcribers Signature

8

9

10  Dated:  July 2, 2013

11

12

13

14

15

16

17

18

19

20

21

22

23

24

20

**A**

abc
8:22
ability
20:4
account
19:5
accountant
6:22,24
accounts
19:4,9
actual
4:3
address
6:5 14 4,9
19:13
affirm
2:6 20:2
ago
9:22
analitis
20:2
answer
12:16
anybody
11:13 12:19
apart
10:9
apply
10:16
area
16:12
armstrong
1:12 15:23
asked
8:3 16:23
asking
4:12,16 16:23
assets
10:10
assume
6:21
attorney
10:6 16:11
auction
6:6 10:7 17:6
auctioned
10:20
audio
20:3
audit
12:1 15:18,20
auditor
15:13
authorization
16:19
avenue
5:16
aware
12:3,4

**B**

b
1:3
back
6:17 18:1,4,21
bank
1:12 10:23
11:2,3 16:2
17:21 18:9
18:12,22
19:3,4,6
bankruptcy
16:20,25 18:2
behalf
1:14
beneficiary
16:4
best
20:4

better
15:21
big
7:5 8:10
bonds
10:15,15,16
books
5:10 6:8,9
17:11
build
9:8
building
1:7 3:16,22
6:2,3,12
8:10,20,23
9:17
business
3 11 5:6,8
7 13,16 12 7
12,14,14
13:2
buy
17:15

**C**

c
2:12
call
2:2 19:3
called
14:17,24
canceled
6:18
cant
3:17 4:15 6:14
captioned
20:4
cara
1:14
case
1:1,3,6
cases
18:18
cash
10:14
catherine
1:10
cause
10:6
certain
8:25 15:24
16:12
certify
20:2
cfo
2:16,17,25 5:1
6:18
charges
2:24
charles
2:23
checks
6:18
chicago
5:18 6:9,11
chief
7:22
cieslak
6:25 7:1,2,19
clarify
15:24
clear
16:22
close
15:16
closeout
15:15
closing
15:18
college
8:10

come
8:9 9:17
coming
16:14
communicate
18:23
companies
4:19,20 5:11
8:4 9:21
11:23
company
1:13 2:18 7:24
9:15 11:20
14:16,24
15:15 18:15
competitors
8:24
connection
16:25 18:15
considered
3:19
contact
15:10,13
continue
18:18
contractor
8:14
contractors
8:17
contracts
11:12
cooper
7:8,10
coowns
14:12
corporate
3:18,19,20 4:1
corporation
13:14,16
correct
4:8 8:8,12
9:10 10:8
16:5
correcting
16:1
couple
13:8
court
16:20
creditors
1:2,5 16:10
credits
11:7
cs
13:17,18 16:4
16:7
customer
8:9 9:7,14,17
customers
9:16 13:4

**D**

date
1:4 18:1
dated
20:10
day
16:21
deal
10:5
debt
11:16
didnt
2:2 8:4 10:15
diehl
13:11,23 15:25
diehle
6:7
difference
3:15,24 9:14
different

17:12
discovered
17:3
discovery
16:24
discuss
1:24
distributed
8:7
distribution
4:4 8:6
distributor
8:20
distributors
9:17
division
16:20
documents
17:8,10,17
18:25
doesnt
9:20
doing
6:6 12:13
dont
4:12,14 7:18
9:13 12:10
12:16 13:20
17:20,20
18:18
doors
15:16
douglas
1:14
drywall
4:4 9:1,6,8,15

**E**

earlier
13 11 16:23
economy
13:5
either
4:15 10:10
13:23 16:9
employed
9:24
employees
9:21
enterprises
1:1,6 2:15
3:16,18
entities
16:10,21
entity
14:16,19
equipment
10:22 11:8
estate
14:16
everybody
6:15
exactly
12:22 17:10
excess
11:6
existence
14:25 15:3
expecting
1:21
extent
18:14,22

**F**

facility
5:15,17 6:13
fairly
15:24
far
16:24

father
3:9 11:15
feet
9:8
female
1:10,14 15:13
15:15,18,21
17:3,23,25
figure
3:17
file
20:3
finance
11:8 18:15
financial
7:22 18:14
financing
10:23
find
15:22
fine
4:13
firm
7:5
first
1 2,5 2:22
7:20,25 8:3
8:7,9,13,16
6:19,22 9:1
9:3,6,11,13
9:19,23 10:1
10:3,5,9,13
10:16 21:25
11 2,4,7,10
11 15,19 22
11 25 12 3,5
12 18,21 23
13 1,4,6,9
14 6,8,11
15,10,14,17
15:20,23
16:3,6,9,13
16 16,18,24
17 1,5,10,13
17 16,19
18:3,5,7,11
18 17 19:1,7
19 12,16,19
19 22
held
16:2 17:12
henry
1:10,18,20,23
2:1,5,9,11
2:12,13,16
2:19,21,23
3:1,3,6,9,12
3:14,18,22
4 1,3,8,10
4:14,17,20
4:23,25 5:2
5:4,7,9,12
5:14,17,20
5:23,25 6:2
6:4,7,10,13
6:20,22,25
7:2,4,6,8,10
7:14,17,19
7:24 8:2,6,8
8:12 15,17
8:20 24 9:2
9:5,10,12,16
9 22,25 10:2
10:4,8,12,17
10:20,24
11:1,3,6,9
11:14,18,21
11:24 12:2,4
12:8,10,13
12:16,20,22
12:25 13:3,5

happens
17:6
happy
18:19
hasnt
14:25
heard
9:19 14:25
hearing
1:5,11,18,21
1:24 2:3,6
2:10,12,14
2:17,20,22
2:24 3:2,4,7
3:10,13,15
3:20,24 4:2
4:5,9,12,15
4:18,21,24
5:1,3,5,8,10
5:13,15,19
5:22,24 6:1
6:3,5,8,11
6 15,21,24
7 1,3,5,7,9
7:11,15,18
**G**

general
8:13
getting
7:25,25 17:8
give
2:7 9 11 15:21
17:19
go
1:8 6:17 13:1
going
9:14 18:1,4,12
18:20 19:3
gonna
1:25
good
6:15 19:12
gotten
16:19
great
18:23
guarantee
11:15
guess
15:11 17:5,19
17:20
**H**

hand
2:4
hanson
2:21,22,23,24
3:7 4:22
7:12 13:22
14:19 15:5
16:7,21
hansons
5:24
happen
1.25
happened
10:16

| | | | | | |
|---|---|---|---|---|---|
| 13.12,14,17<br>13.20,22<br>14.1,3,5,7<br>14.10,13,16<br>14.18,21.23<br>14.25 15.4,6<br>15.8,11,22<br>16.1,5,8,11<br>16 15 17 17<br>17 22 18 9<br>18 25 19 3,8<br>19 11.15,18<br>**heres**<br>18:19<br>**hes**<br>3:9 4:24<br>**hi**<br>13:10<br>**hired**<br>4:5<br>**house**<br>5:22,24<br>**huge**<br>8:10<br>**huh**<br>4:18 14:8<br><br>**I**<br>**id**<br>18:4<br>**idea**<br>11:4<br>**ill**<br>15:22 17:17<br>19:16<br>**illinois**<br>3:16 14:3<br>**im**<br>1:16,16 4:12<br>4:15 12:4,5<br>15:24 16:12<br>17:21 19:3<br>**impartially**<br>20:2<br>**inaudible**<br>1:14 16.10,20<br>17:1,4,9,13<br>18:10 19:4<br>**initially**<br>8:4<br>**insofar**<br>16:25<br>**intend**<br>16:21<br>**interest**<br>13.18<br>**inventory**<br>9:4,6 10:19<br>**involved**<br>12:24<br>**irs**<br>6:21<br>**ive**<br>14:25<br><br>**J**<br>**job**<br>7:23<br>**jobs**<br>7:25<br>**journal**<br>19:5<br>**july**<br>20:10<br>**june**<br>18:18<br><br>**K**<br>**k**<br>2:12,13 | **katherine**<br>2:11,12<br>**keep**<br>6:22 9:4<br>**keeping**<br>6:21<br>**kept**<br>7:21<br>**kind**<br>6:18 8:1,4<br>19:1<br>**knew**<br>10:21<br>**know**<br>4:13,14 6:5,17<br>7:7,17,18,18<br>8:3 10:6<br>12:6,16<br>13:21 15:6<br>17:20 18:13<br>19:13,17<br>**knows**<br>6:16<br><br>**L**<br>**lack**<br>13.4<br>**land**<br>15:25<br>**lawsuits**<br>12:23<br>**leases**<br>11:12<br>**lefarge**<br>1:17<br>**letter**<br>18:19<br>**liability**<br>12:1<br>**lincolnshire**<br>14:7<br>**lined**<br>8:1<br>**list**<br>15:21 17:17,19<br>18:20<br>**little**<br>14:8<br>**loans**<br>4:21 5:1<br>**located**<br>7:3<br>**location**<br>5:21 13 11.23<br>13:24<br>**locations**<br>17:12<br>**long**<br>2:24 3:2 6:17<br>9:22<br>**looking**<br>17:21 19:2<br>**lot**<br>9:24<br><br>**M**<br>**machinery**<br>10:14<br>**male**<br>1:12,16 13:8<br>15:24 16:2,4<br>16:17<br>**manufacturers**<br>9:18<br>**material**<br>1:7 3:16,22<br>4:6 8:6,21<br>9:17<br>**materials**<br>8:20 | **mean**<br>3:20 9:20 17:2<br>**meeting**<br>1:2,5<br>**memorial**<br>18:21<br>**mentioned**<br>13:11<br>**miller**<br>7:8,10<br>**million**<br>11:6<br>**mollie**<br>1:1,6,16 2:14<br>2:15 3:16,18<br>4:2,5 10:11<br>10:25 11:22<br>12:5,13,19<br>13:24 19:9<br>**money**<br>7:13 12:19<br>16:10<br>**multiple**<br>15:12<br><br>**N**<br>**name**<br>1:1,9 2:10,22<br>6:14 13:10<br>13:15<br>**naperville**<br>5:14,19,20<br>**near**<br>14:7<br>**need**<br>4:11 15:10<br>19:16<br>**needed**<br>9:8<br>**never**<br>4:5 9:19<br>**nonverbal**<br>10:17<br>**north**<br>14:5,9<br>**northbrook**<br>7:4<br>**northwest**<br>1:6 3:16,22<br>4:21 5:1<br>10:11,25<br>11:22 13:24<br>19:10<br>**notice**<br>19:14<br>**nw**<br>14:18<br><br>**O**<br>**officer**<br>1:5,11,18,21<br>1 24 2:3,6<br>2.10,12,14<br>2 17,20,22<br>2 24 3:2,4,7<br>3.10,13,15<br>3 20,24 4:2<br>4 5,9,12,15<br>4 18,21,24<br>5 1,3,5,8,10<br>5 13,15,19<br>5 22,24 6:1<br>6 3,5,8,11<br>6 15,21,24<br>7 1,3,5,7,9<br>7 11,15,18<br>7 20,22,25<br>8.3,7,9,13<br>8.16,19,22<br>9 1,3,6,11 | 9:13,19,23<br>10:1,3,5,9<br>10:13,18,21<br>10:25 11:2,4<br>11:7,10,15<br>11:19,22,25<br>12:3,5,9,11<br>12:15,18,21<br>12:23 13:1,4<br>13:6,9 14:6<br>14:8,11<br>15:10,14,17<br>15:20,23<br>16:3,6,9,13<br>16.16,18,24<br>17:1,5,10,13<br>17:16,19<br>18:3,5,7,11<br>18:17 19:1,7<br>19:12,16,19<br>**ogden**<br>5:16<br>**oh**<br>2 3 3:10 5:3<br>5:10 6:3<br>7:11 14:8<br>15:17 16:3,6<br>17:1<br>**okay**<br>1:18 3:7,10,10<br>4:5,18,24<br>5:3,5,10,15<br>6:3,15 7:3<br>7:11,20,25<br>8:13,16,22<br>9:13,19,19<br>10:5,18,21<br>10:25 11:4<br>11:12,19<br>12:5,18,23<br>13:1,4,6,9<br>13:15 14:14<br>15 2,10,22<br>16 3,6,9,13<br>16 16 17:1,5<br>17 5 16<br>18 11,17<br>19 7,12,15<br>19 16,19<br>**operate**<br>13:24 14:2<br>**operated**<br>14:15<br>**operation**<br>4 3,4 6:2<br>**order**<br>8:17,22,24<br>**owe**<br>7:13 11:5<br>12:19<br>**owes**<br>16:9<br>**owned**<br>13:14 14:14<br>15:25 16:7<br>**owner**<br>4:21 13:21<br>14:19 15 5,7<br>**ownership**<br>13:18<br>**owns**<br>13:13<br><br>**P**<br>**paid**<br>4:6<br>**part**<br>5:17 10:21<br>**pay**<br>16:10<br>**payroll** | 19:5<br>**pending**<br>12:23<br>**people**<br>4:5 9:24 11:7<br>15:12<br>**period**<br>17 22<br>**person**<br>15:10<br>**pete**<br>6:25 7:19<br>**peter**<br>1:19<br>**pheasant**<br>6:13,16<br>**piece**<br>11:8<br>**place**<br>17:15<br>**position**<br>2:14<br>**possibly**<br>11:6<br>**prairieview**<br>14:3,6<br>**prepare**<br>19:6<br>**president**<br>5:3,4 7:23<br>**pretty**<br>11:10<br>**probably**<br>15:9 17:11<br>**problem**<br>18:19<br>**proceedings**<br>20:4<br>**produce**<br>17:18<br>**produced**<br>8:25<br>**product**<br>8:25<br>**property**<br>10:5 13:11,13<br>14:12,13,22<br>15:25<br><br>**Q**<br>**question**<br>12:17<br>**questions**<br>2:2 13:6 16:14<br>16:23<br><br>**R**<br>**raise**<br>2:3<br>**reaching**<br>16:12<br>**ready**<br>18:23<br>**real**<br>14:16<br>**really**<br>12:13,16 14:8<br>15:17<br>**realty**<br>13:17,19 14:18<br>14:24 16:4,7<br>**recall**<br>12:10,25 14:12<br>15:2<br>**record**<br>1.9,9 16:17<br>**records**<br>5:11 6:8,9<br>17:11<br>**related** | 3:7<br>**representation**<br>4:11<br>**request**<br>17:9<br>**respect**<br>16:20<br>**right**<br>1:11,18,24 2:3<br>2:4,25 6:4,9<br>6:10,14,24<br>7:11 9:14<br>10:5 11:5,20<br>12:11,18<br>16:6,6,7,10<br>16:13,16,23<br>18:17,17<br>19:14<br>**road**<br>6:7 14:5 15:25<br>**rogan**<br>1:16 13:10,10<br>13:13,15,18<br>13:21,23<br>14:2,4,9,12<br>14:14,17,19<br>14:22,24<br>15:2,5,7,9<br>16:19,25<br>17:8,11,15<br>17:24 18:1,4<br>18:6,8,12<br>19:9<br>**run**<br>6:13,16<br>**running**<br>7:24<br><br>**S**<br>**sales**<br>13:3<br>**sally**<br>20:2<br>**secured**<br>11:7<br>**see**<br>17.6 18:16<br>**send**<br>18.19,25 19:8<br>**sent**<br>1:23 9:3 18:9<br>**separate**<br>4:18,20 13:14<br>9:16<br>**seven**<br>6:23<br>**shape**<br>7:21<br>**shareholder**<br>3:4 4:24 7:12<br>**shareholders**<br>2:20<br>**shares**<br>2:17<br>**sharma**<br>14:24<br>**shell**<br>18:19<br>**ship**<br>7:21<br>**signature**<br>20:7<br>**six**<br>10:2,3<br>**sold**<br>14:13,22<br>**sole**<br>4:24 7:12<br>**solemnly** |

```
   2:6                1:12              1:15               1:3
somebody           today             west
   9:7              1:22,25 2:7        5:17,19 6:9,11                  3
sort                  16:14          whats             31
   7:20             told              1:25 2:22 3:24    6:7
speak                2:1 6:22           6:5 13:15
   16:11            tomorrow          whereabouts                     4
start                18:20            6:11
   2:15             town              wheres
statements           14:8 18:20        7:3 14:6                       5
   17:21 18:13,14   transcribed       whos              524
     18:22 19:8      20:3             1:8 6:24          6:7
steve               transcribers      withdrawal
   1:16              20:7              12:1 15:14                      6
steven              trust             wont
   13:10             1:12 11:3        18:21                           7
storage               15:25 16:2      work
   5:12,13,15,17    truth             2:25 3:2          7th
     6:13            2:7,8,8          worked            18:18
store               two               3:13 4:7
   17:14             3:25 10:4        wouldnt                         8
suburban              17:12 18:21      9:15
   1:12 11:3 16:2    19:4                                             9
     19:3           type                   X
supplier             15:20
   8:17,17,19,21                           Y
suppliers                U
   4:6 8:1,18                         yeah
   11:16            uh                 17:19 18:6,7
supplies             14:16             19:1,1,12,13
   8:11             uhhuh              19 16
supply               15:17            year
   3:23 8:23        uhm               12:6,12,15
suppose              1:8 5:10 13:8    years
   10:15              13:10 17:5       3:3,5 6:19,23
sure                umbrella            9:23 12:16
   2:5 12:22         4:9,10,17         13:25 15:1
     16:18,22       understand         17:23 18:1
swan                 2:2 4:15 9:13    youre
   1:19             union              2:7 6:17 12:3
swear                11:17,19,22      youve
   2:6              usually            17:20
                     15:16
      T                                    Z
take                     V
   17:6            value                    0
talked               10:10
   1:19 10:6       vendors                  1
talking              8:25
   12:5 15:12      voice              1
terms                1:10,12,14,16     11:6
   17:8              13:8 15:13       100
testimony            15:15,18,21       9:8
   2:7               15:24 16:2,4     12
thank                16:17 17:3        1:3
   16:1,5 19:19      17:23,25         1220426
thats               volume             1:6
   3:17 4:13         19:1             1237478
     10:10,21                          1:7
     15:9 16:5           W            14th
theres                                 10:9
   6:8,9,18 10:13  w                  1st
theyre               6:7               15:19
   6:6             wait
thing                17:6                   2
   6:19 8:1        waiving
things               16:22            2
   18:14,21        want                20:10
think                8:11 16:17,22    20
   6:14 15:19      wanted               3:3
     17:24 18:13     9:7 13:7 16:14   2009
     19:2          wasnt               18:5,8
three                12:13            2010
   9:23 17:23      wave                5:4 14:23
     18:1            20:3               15:19
time               wed                2012
   2:16 7:13 8:11    18:13,16          12:7,11 18:3
     9:22 12:14    weeks              2013
     14:14 15:2      18:21             20:10
     15:19         welland            21775
timothy             14:5,10,11         14:5,9
                   welfare            29426
```

PLAINTIFF'S
EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


IN RE:                         )
  MOLLIE ENTERPRISES,          )
  INC.,                        )
        Debtor.               )
_____ ) Case No. 12-20426
BRENDA HELMS, not              )
individually, but solely       )
as Chapter 7 trustee for       )
Mollie Enterprises,            )
Inc.,                          )
        Plaintiff,            )
  vs.                          )
CHARLES HANSON,                )
        Defendant.            )

      The deposition of PETER CIESLAK, called for
examination pursuant to the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before CHRISTINE M. PINA, a Certified Shorthand

Reporter within and for the County of Cook and

State of Illinois, at 300 South Wacker Drive,

Suite 2300, Chicago, Illinois, on June 4, 2015 at

the hour of 2:00 o'clock p.m.

(Deposition concluded at 5:30 o'clock p.m.)


Reported by:  CHRISTINE M. PINA, CSR, RPR

License No.:  084-003785



CONTENTS

---

| | Page |
|---|---|
| INDEPENDENT ACCOUNTANTS' REPORT | 3 |
| COMBINED FINANCIAL STATEMENTS | |
| Balance Sheets | 4 - 5 |
| Statements of Income and Retained Earnings | 6 |
| Statements of Cash Flows | 7 |
| Notes to Combined Financial Statements | 8 - 17 |



# MILLER COOPER & Co.,Ltd

ACCOUNTANTS AND CONSULTANTS

## INDEPENDENT ACCOUNTANTS' REPORT

To the Board of Directors
Northwest Building Materials & Supply Co. and Affiliated Companies

We have reviewed the accompanying combined balance sheets of Northwest Building Materials & Supply Co. and Affiliated Companies as of December 31, 2003 and 2002, and the related combined statements of income and retained earnings and cash flows for the years then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. All of the information included in these combined financial statements is the representation of the management of Northwest Building Materials & Supply Co. and Affiliated Companies.

A review consists principally of inquiries of Company personnel and analytical procedures applied to financial data. It is substantially less in scope than an audit in accordance with auditing standards generally accepted in the United States of America, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to the accompanying combined financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America.

MILLER, COOPER & CO., LTD.

*Miller, Cooper & Co. Ltd.*

Certified Public Accountants

Northbrook, Illinois
February 20, 2004

650 DUNDEE ROAD, SUITE 250
NORTHBROOK, IL 60062-2759
PHONE 847/205-5000  FAX 847/205-1400
e-mail mccltd@millercooper.com

# Northwest Building Materials & Supply Co. and Affiliated Companies
COMBINED BALANCE SHEETS
December 31, 2003 and 2002
(See Independent Accountants' Report)

| ASSETS | | 2003 | | 2002 |
|---|---|---:|---|---:|
| **CURRENT ASSETS** | | | | |
| Cash and cash equivalents | $ | 76,990 | $ | 56,444 |
| Accounts receivable, net of allowance for doubtful accounts of $36,876 and $44,044 in 2003 and 2002, respectively | | 2,492,870 | | 2,351,383 |
| Inventories | | 1,377,787 | | 1,123,890 |
| Prepaid expenses and other | | 629,780 | | 439,332 |
| Total current assets | | 4,577,427 | | 3,971,049 |
| **NET ADVANCES TO UNCOMBINED AFFILIATES** | | 2,572,021 | | 2,528,711 |
| **PROPERTY AND EQUIPMENT** | | | | |
| Vehicles | | 2,331,419 | | 1,850,699 |
| Leasehold improvements | | 319,003 | | 319,002 |
| Office equipment | | 470,660 | | 505,090 |
| Yard equipment | | 295,257 | | 260,828 |
| Transportation equipment | | 307,268 | | 307,268 |
| | | 3,723,607 | | 3,242,887 |
| Less accumulated depreciation | | 2,737,412 | | 2,683,126 |
| | | 986,195 | | 559,761 |
| **DUE FROM STOCKHOLDER** | | 2,443,430 | | 2,127,556 |
| | $ | 10,579,073 | $ | 9,187,077 |

The accompanying notes are an integral part of these statements.

-4-

| LIABILITIES AND STOCKHOLDERS' EQUITY | 2003 | 2002 |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Note payable, bank | $ 2,073,358 | $ 1,686,858 |
| Current maturities of long-term debt | 197,699 | 345,313 |
| Accounts payable | 1,342,088 | 1,031,850 |
| Accrued expenses | 447,422 | 364,578 |
| Total current liabilities | 4,060,567 | 3,428,599 |
| **LONG-TERM OBLIGATIONS** | | |
| Long-term debt, net of current maturities | 591,044 | 129,923 |
| Notes payable, officers | 1,649,804 | 1,484,908 |
| | 2,240,848 | 1,614,831 |
| **STOCKHOLDERS' EQUITY** | | |
| Common stock, $1 par value; 16,200 shares authorized, issued and outstanding | 16,200 | 16,200 |
| Additional paid-in capital | 18,473 | 18,473 |
| Retained earnings | 4,242,985 | 4,108,974 |
| | 4,277,658 | 4,143,647 |
| | $ 10,579,073 | $ 9,187,077 |

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies

COMBINED STATEMENTS OF INCOME AND RETAINED EARNINGS

Years ended December 31, 2003 and 2002

(See Independent Accountants' Report)

|  | 2003 | 2002 |
|---|---|---|
| Net sales | $ 17,681,522 | $ 16,096,864 |
| Cost of goods sold | 13,279,904 | 11,405,646 |
| Gross profit | 4,401,618 | 4,691,218 |
| Operating expenses |  |  |
| Delivery and yard | 1,324,149 | 1,015,534 |
| Selling, general, and administrative | 2,823,456 | 3,278,851 |
|  | 4,147,605 | 4,294,385 |
| Operating income | 254,013 | 396,833 |
| Other income (expense) |  |  |
| Interest income | 75,469 | 75,625 |
| Interest expense | (206,808) | (189,783) |
| Other income, net | 11,337 | 5,645 |
|  | (120,002) | (108,513) |
| NET INCOME | 134,011 | 288,320 |
| Retained earnings at beginning of year | 4,108,974 | 3,832,404 |
| Dividends | - | (11,750) |
| Retained earnings at end of year | $ 4,242,985 | $ 4,108,974 |

The accompanying notes are an integral part of these statements.

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
COMBINED STATEMENTS OF CASH FLOWS
Years ended December 31, 2003 and 2002
(See Independent Accountants' Report)

|  | 2003 | 2002 |
|---|---|---|
| **Cash flows from operating activities** |  |  |
| Net income | $ 134,011 | $ 288,320 |
| Adjustments to reconcile net income to net cash provided by |  |  |
| (used in) operating activities |  |  |
| Depreciation | 54,286 | 65,391 |
| Bad debt recovery | (2,049) | - |
| (Increase) decrease in assets |  |  |
| Accounts receivable | (139,438) | (106,310) |
| Inventories | (253,897) | (321,733) |
| Prepaid expenses and other | (190,448) | (48,546) |
| Increase (decrease) in liabilities |  |  |
| Accounts payable | 310,238 | 194,135 |
| Accrued expenses | 82,844 | (8,424) |
| Net cash provided by (used in) operating activities | (4,453) | 62,833 |
| **Cash flows from investing activities** |  |  |
| Purchase of property and equipment | (480,720) | (12,674) |
| Due from stockholder | (315,874) | (146,174) |
| Net advances to uncombined affiliates | (43,310) | (233,174) |
| Net cash used in investing activities | (839,904) | (392,022) |
| **Cash flows from financing activities** |  |  |
| Bank overdraft | - | (249,563) |
| Net borrowings on note payable, bank | 386,500 | 629,520 |
| Repayments on long-term debt | (219,084) | (339,074) |
| Borrowings on long-term debt | 532,591 | - |
| Proceeds from notes payable, officers | 164,896 | 356,500 |
| Dividends paid to stockholders | - | (11,750) |
| Net cash provided by financing activities | 864,903 | 385,633 |
| INCREASE IN CASH AND CASH EQUIVALENTS | 20,546 | 56,444 |
| Cash and cash equivalents, beginning of year | 56,444 | - |
| Cash and cash equivalents, end of year | $ 76,990 | $ 56,444 |
| Supplemental disclosure of cash flow information: |  |  |
| Interest paid during the year | $ 206,808 | $ 189,783 |

The accompanying notes are an integral part of these statements.

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies

## NOTE A - NATURE OF BUSINESS, BASIS OF COMBINATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

1. Nature of Business

   The Companies primarily operate as distributors of building materials to various contractors. The Companies also operate retail locations for the sale of related building products.

2. Basis of Combination

   The combined financial statements include the accounts of the following entities (the "Companies") which are all under common control:

   Northwest Building Materials & Supply Co. (the Company)
   Northwest Building Materials of Illinois, Inc. (Prairieview and Naperville)
   Southport Lumber and Supply Company (Southport)
   B.M.D.I., Inc.

   All significant intercompany accounts and transactions have been eliminated in the combination of the Companies.

3. Cash and Cash Equivalents

   For purposes of the statements of cash flows, the Companies consider all highly liquid investments purchased with a maturity date of three months or less to be cash equivalents.

4. Receivables and Credit Policies

   Accounts receivable are uncollateralized customer obligations due under normal trade terms requiring payment within 30 days from the invoice date. Accounts receivable are stated at the amount billed to the customer. Customer account balances with invoices dated over 90 days old are considered delinquent. Interest is not charged on past due balances. Payments of accounts receivable are allocated to the specific invoices identified on the customer's remittance advice or, if unspecified, are applied to the earliest unpaid invoices.

-8-

# Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2003 and 2002
(See Independent Accountants' Report)

NOTE A - NATURE OF BUSINESS, BASIS OF COMBINATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

4. Receivables and Credit Policies (Continued)

The carrying amount of accounts receivable is reduced by a valuation allowance that reflects management's best estimate of the amounts that will not be collected. Management individually reviews all accounts receivable balances that exceed 90 days from the invoice date and, based on an assessment of current creditworthiness, estimates the portion, if any, of the balance that will not be collected.

5. Inventories

The inventories are stated at the lower of cost (first-in, first-out (FIFO) method) or market.

6. Property and Equipment

Property and equipment are stated at cost. Depreciation is provided by use of the straight-line method over the estimated useful lives of the related assets as follows:

| | |
|---|---|
| Vehicles | 3 - 6 years |
| Leasehold improvements | Life of leases |
| Office and yard equipment | 5 - 7 years |
| Transportation equipment | 5 - 7 years |

7. Income Taxes

The Companies have elected to be treated as "S" Corporations for income tax purposes. Under "S" Corporation status, federal and state taxes on income are payable by the individual stockholders. However, the Companies are subject to Illinois replacement taxes based on income.

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2003 and 2002
(See Independent Accountants' Report)

NOTE A - NATURE OF BUSINESS, BASIS OF COMBINATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

8. Use of Estimates

In preparing financial statements, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

9. Advertising

Advertising costs are expensed as incurred. Total advertising expenses were $22,984 and $21,904 for 2003 and 2002, respectively.

## NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES

The Companies have net advances to related entities which are owned and operated by one of the Companies' stockholders as follows:

|  | 2003 | 2002 |
|---|---|---|
| Real estate companies: | | |
| N.W. Realty of Illinois, Inc. | $ 28,101 | $ 26,840 |
| C.S. Realty, Inc. | 399,295 | 503,653 |
| Southport Real Estate Co. | 812,274 | 773,997 |
| Charmar Realty, Inc. | 802,703 | 773,173 |
| Badgerland Real Estate Co. | 76,500 | 76,500 |
| | 2,118,873 | 2,154,163 |

MILLER COOPER & CO., LTD.

## NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES (Continued)

| | | |
|---|---:|---:|
| Other companies: | | |
| Professional Leasing, Inc. | 226,831 | 146,601 |
| K & H Cartage Co. | 226,317 | 227,947 |
| | 453,148 | 374,548 |
| | $ 2,572,021 | $ 2,528,711 |

The above assets are secured by real estate owned by the above related entities.

In January 2003, the Financial Accounting Standards Board issued Interpretation No. 46, *Consolidation of Variable Interest Entities*. This interpretation establishes standards for identifying a variable interest entity and for determining under what circumstances a variable interest entity should be consolidated with its primary beneficiary. The requirements of Interpretation 46 apply to the Companies for the year ending December 31, 2005.

Until now, a company generally has included another entity in its consolidated financial statements only if it controlled the entity through voting interests. Interpretation 46 changes that by requiring a variable interest entity to be consolidated by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both.

It is reasonably possible that the Companies will consolidate the uncombined affiliates when this interpretation becomes effective. If the uncombined affiliates were combined with the related operating companies, the condensed combined balance sheets at December 31, 2003 and 2002 would be as follows:

# Northwest Building Materials & Supply Co. and Affiliated Companies

NOTES TO COMBINED FINANCIAL STATEMENTS

December 31, 2003 and 2002

(See Independent Accountants' Report)

NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES (Continued)

|  | | 2003 | | |
|  | | Operating Companies | Uncombined Affiliates | Total |
|---|---|---|---|---|
| Current assets | $ | 4,577,427 | $ 2,072,910 | $ 6,650,337 |
| Advances | | 2,572,021 | (2,572,021) | - |
| Property and equipment, net | | 986,195 | 2,312,601 | 3,298,796 |
| Due from stockholder | | 2,443,430 | - | 2,443,430 |
| Total | $ | 10,579,073 | $ 1,813,490 | $ 12,392,563 |
| Current liabilities | $ | 4,060,567 | $ 50,378 | $ 4,110,945 |
| Long-term obligations | | 2,240,848 | 1,408,383 | 3,649,231 |
| Stockholders' equity | | 4,277,658 | 354,729 | 4,632,387 |
| Total | $ | 10,579,073 | $ 1,813,490 | $ 12,392,563 |

|  | | 2002 | | |
|  | | Operating Companies | Uncombined Affiliates | Total |
|---|---|---|---|---|
| Current assets | $ | 3,971,049 | $ 2,390,568 | $ 6,361,617 |
| Advances | | 2,528,711 | (2,528,711) | - |
| Property and equipment, net | | 559,761 | 2,350,951 | 2,910,712 |
| Due from stockholder | | 2,127,556 | - | 2,127,556 |
| Total | $ | 9,187,077 | $ 2,212,808 | $ 11,399,885 |
| Current liabilities | $ | 4,913,507 | $ 26,029 | $ 4,939,536 |
| Long-term debt | | 129,923 | 1,662,558 | 1,792,481 |
| Stockholders' equity | | 4,143,647 | 524,221 | 4,667,868 |
| Total | $ | 9,187,077 | $ 2,212,808 | $ 11,399,885 |

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies

---

## NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES (Continued)

The uncombined affiliates reported the following for the year ended December 31, 2003:

| | | |
|---|---|---|
| Revenue | $ | 1,430,000 |
| Net income | | 116,000 |

Lease payments and lease commitments to these uncombined affiliates are included in Note H.

When Interpretation 46 becomes effective, the net amount added to the Companies' balance sheet must be recognized as the cumulative effect of an accounting change. Interpretation 46 must be applied by restating previously issued financial statements with a cumulative-effect adjustment as of the beginning of the first year restated. The Companies are not required to restate the financial statements and do not intend to do so. The impact that adoption of Interpretation 46 is expected to have on the Companies' financial statements is currently not known.

## NOTE C - DUE FROM STOCKHOLDER

The Companies have uncollateralized advances to one of its stockholders of $2,443,430 and $2,127,556 as of December 31, 2003 and 2002, respectively. Effective January 1, 2002, the advances bear interest at the prime rate (4.00% at December 31, 2003) minus 0.5%. The note was noninterest-bearing prior to 2002. Principal and interest are due on demand. The Companies are not expected to demand repayment within the next year; therefore, the balance has been classified as long-term on the accompanying balance sheet.

## NOTE D - NOTE PAYABLE, BANK

The note payable, bank consists of a revolving line of credit with interest at the prime rate (4.00% at December 31, 2003) plus 0.5%, expiring in December, 2004. The note is collateralized by a blanket lien on all business assets of the Companies and a personal guarantee by one of the Companies' stockholders. The outstanding balance was $2,073,358 and $1,686,858 as of December 31, 2003 and 2002, respectively. There was no availability on this line at December 31, 2003.

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2003 and 2002
(See Independent Accountants' Report)

## NOTE E - NOTES PAYABLE, OFFICERS

Unsecured notes payable to officers are due on demand and bear interest at the prime rate (4.00% at December 31, 2003). The balance was $1,649,804 and $1,484,908 as of December 31, 2003 and 2002, respectively. The officers are not expected to demand repayment during the next year; therefore, the notes have been classified as long-term on the accompanying balance sheet.

## NOTE F - LONG-TERM DEBT

|  | 2003 | 2002 |
|---|---|---|
| Note payable, bank, with monthly payments of $4,166 plus interest at the prime rate (4.00% at December 31, 2003) plus 0.5% through May, 2006. All business assets are pledged as collateral. | $ 120,843 | $ 169,572 |
| Note payable, bank, with monthly payments of $6,510 including interest at prime rate plus 1% through May, 2007. All business assets are pledged as collateral. | 240,845 | 305,664 |
| Note payable, bank, with monthly payments of $1,414 including interest at 6.00% through April, 2008. All business assets are pledged as collateral. | 64,452 | - |
| Notes payable, finance companies, with monthly payments ranging from $1,321 to $2,602 including interest ranging from 4.99% to 6.85% expiring at various dates through July, 2009. All business assets are pledged as collateral. | 362,603 | - |
|  | 788,743 | 475,236 |
| Less current maturities | 197,699 | 345,313 |
|  | $ 591,044 | $ 129,923 |

-14-

**Northwest Building Materials & Supply Co. and Affiliated Companies**
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2003 and 2002
(See Independent Accountants' Report)

NOTE F - LONG-TERM DEBT (Continued)

Maturities of long-term debt are as follows:

| | | |
|---|---|---:|
| 2004 | $ | 197,699 |
| 2005 | | 207,102 |
| 2006 | | 178,473 |
| 2007 | | 105,380 |
| 2008 | | 57,234 |
| Thereafter | | 42,855 |
| | $ | 788,743 |

NOTE G - EMPLOYEE BENEFIT PLANS

The Companies have a 401(k) profit sharing plan covering all nonunion employees. The Companies' contributions to the plan approximated $19,500 and $11,900 in 2003 and 2002, respectively.

The Companies also have a union-sponsored pension plan covering all union employees. The Companies' contributions to this plan approximated $318,400 and $262,900 in 2003 and 2002, respectively.

NOTE H - COMMITMENTS

The Companies lease four locations under operating leases from affiliated companies owned by one of the stockholders. Under the leases, the Companies are responsible for insurance, maintenance costs and real estate taxes. Monthly rent payments, which include various insurance and maintenance costs, approximated $27,000 in 2003 and 2002. The leases expire at various dates through December, 2013.

The Companies also lease transportation equipment from an affiliated company owned by one of the stockholders under an operating lease through December, 2004 with monthly rental payments of $36,000. Monthly rent payments approximated $21,000 in 2003 and 2002.

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies

NOTES TO COMBINED FINANCIAL STATEMENTS

December 31, 2003 and 2002

(See Independent Accountants' Report)

---

NOTE H - COMMITMENTS (Continued)

At December 31, 2003 future minimum rental payments under operating leases are as follows:

| | | |
|---|---|---:|
| 2004 | $ | 676,140 |
| 2005 | | 217,200 |
| 2006 | | 217,200 |
| 2007 | | 217,200 |
| 2008 | | 175,200 |
| Thereafter | | 700,800 |
| | $ | 2,203,740 |

Rent expense for the operating locations approximated $306,000 and $324,000 in 2003 and 2002, respectively. Rent expense for the transportation equipment approximated $255,000 in 2003 and 2002.

NOTE I - MAJOR CUSTOMERS

The Companies had one major customer with sales accounting for 14% and 12% of net sales for 2003 and 2002, respectively. The amount due from this customer was $249,854 and $27,809 at December 31, 2003 and 2002, respectively.

NOTE J - SUBSEQUENT EVENT

In January 2004, the one major customer referred to in Note I ceased business with the Companies. Management believes, however, that it can recover the sales lost from this customer without significant financial impact.

NOTE K - CONCENTRATIONS OF RISK

The Companies grant credit to most of their customers who are contractors. These contractors are primarily located in, but not limited to, the Midwest.

-16-

**Northwest Building Materials & Supply Co. and Affiliated Companies**
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2003 and 2002
<u>(See Independent Accountants' Report)</u>

<u>NOTE K</u> - <u>CONCENTRATIONS OF RISK</u> (Continued)

The Companies also maintain cash balances at several financial institutions located in Illinois and Wisconsin. Each individual Company's accounts at each institution are insured by the Federal Deposit Insurance Corporation up to $100,000 per institution. At December 31, 2003, uninsured balances approximated $69,000.

<u>NOTE L</u> - <u>RECLASSIFICATIONS</u>

Certain reclassifications have been made to the 2002 financial statements to conform to the 2003 presentation.

-17-

1    APPEARANCES:

2        MELTZER, PURTILL & STELLE, LLC

3        BY:   MR. STEVE R. ROGOVIN

4              MR. DAVID L. KANE

5        300 South Wacker Drive, Suite 2300

6        Chicago, Illinois 60606

7        (312) 987-9900

8        srogovin@mpslaw.com

9        dkane@mpslaw.com

10              on behalf of the Plaintiff;

11       EMALFARB, SWAN & BAIN

12       BY:   MR. PETER G. SWAN

13       440 Central Avenue

14       Highland Park, Illinois 60035

15       (847) 432-6900

16       peter@esb-law.com

17              on behalf of the Defendant;

18       LAW OFFICE OF ROBERT L. SABIN

19       BY:   MR. ROBERT L. SABIN

20       1751 Lake Cook Road, Suite 400

21       Deerfield, Illinois 60015-5286

22       (847) 205-5000

23       rsabin@millercooper.com

24              on behalf of the deponent.



1                    I N D E X

2    WITNESS                         EXAMINATION

3

4    PETER CIESLAK

5    By Mr. Rogovin                        6

6    By Mr. Swan                         127

7    Further By Mr. Rogovin              135

8                  E X H I B I T S

9

10   NUMBER                          MARKED FOR ID

11   CIESLAK Deposition

12      Exhibit No. 1                     32

13      Exhibit No. 2                     46

14      Exhibit No. 3                     49

15      Exhibit No. 4                     52

16      Exhibit No. 5                     55

17      Exhibit No. 6                     57

18      Exhibit No. 7                     62

19      Exhibit No. 8                     64

20      Exhibit No. 9                     69

21      Exhibit No. 10                    73

22      Exhibit No. 11                    78

23      Exhibit No. 12                    78

24      Exhibit No. 13                    78



I N D E X


E X H I B I T S


NUMBER                              MARKED FOR ID


CIESLAK Deposition


     Exhibit No. 14                      78

     Exhibit No. 15                      85

     Exhibit No. 16                      92

     Exhibit No. 17                      97

     Exhibit No. 18                     107

     Exhibit No. 19                     109

     Exhibit No. 20                     113

     Exhibit No. 21                     115

     Exhibit No. 22                     117

     Exhibit No. 23                     119

     Exhibit No. 24                     122

     Exhibit No. 25                     128

1                    (whereupon, the witness was

2                    duly sworn.)

3      MR. ROGOVIN:  Could you, please, state and

4   spell your name for the record?

5      THE WITNESS:  Peter Cieslak, C-i-e-s-l-a-k.

6      MR. ROGOVIN:  Please let the record reflect

7   that this is the deposition of Peter Cieslak of

8   Miller Cooper taken pursuant to a subpoena to

9   testify issued by Brenda Helms as Chapter 7 Trustee

10  of Mollie Enterprise, Inc.

11          Let me start by explaining some of the

12  basic rules for today's deposition.  I'm going to

13  be asking you a series of questions throughout the

14  day.  I'll ask that you respond to each question

15  verbally.  The court report reporter can't take

16  down nods or gestures or anything like that.  So,

17  if you have a verbal response, that's what we're

18  going to need.  And please make sure to speak

19  loudly enough that the reporter can hear you and

20  take down your testimony.  Please make sure to let

21  me finish my question before answering.  Sometimes

22  you may think I'm asking one thing and then I go in

23  another direction.  So, just if you could wait

24  until I finish my question, that would be great.



1   If there's a question you don't understand, let me

2   know, I can try to rephrase, do it in another way

3   so that it makes more sense.  And then, also, if

4   you don't know the answer to a question, you can

5   feel free to state that.  I'm not looking for you

6   to guess, I'm not looking for you to conjecture,

7   I'm just looking for your best understanding today

8   and your best recollection.  Do you understand each

9   of these rules and procedures?

10      THE WITNESS:  Yes.

11                      PETER CIESLAK,

12   having been first duly sworn, was examined and

13   testified as follows:

14                      EXAMINATION

15   BY MR. ROGOVIN:

16      Q.   Are you here today with Mr. Swan?

17      A.   No.

18      Q.   You're not.  So, Mr. Swan is not

19   representing you in connection with this

20   deposition?

21      A.   No.

22      Q.   Are you on any medication that might

23   affect your ability to testify today?

24      A.   No.

1      Q.   Have you had your deposition taken before?

2      A.   Yes.

3      Q.   How many times approximately?

4      A.   Four.

5      Q.   What were the circumstances of those

6   depositions?

7      A.   Divorce proceedings.

8      Q.   All four?

9      A.   Yes.

10     Q.   Were those personal divorce proceedings or

11  in connection with other parties?

12     A.   Personal.

13     MR. SABIN:  No, it's not your --

14     THE WITNESS:  I'm sorry.  Then I misunderstood

15  your question.

16     MR. ROGOVIN:  I'll rephrase then.

17     MR. SABIN:  He's on his fifth wife.

18     THE WITNESS:  That went a little north.

19  BY MR. ROGOVIN:

20     Q.   Were you testifying in connection with

21  accounting questions in those divorces?

22     A.   Yes.

23     Q.   Those were divorces not involving you

24  personally as a party?

```
 1       A.    Correct.
 2       Q.    Have you discussed your deposition here
 3    today with anyone?
 4       A.    Yes.
 5       Q.    who have you spoken with?
 6       A.    Robert Sabin.
 7       Q.    Anyone else?
 8       A.    No.
 9       Q.    Are you familiar with the lawsuit
10    underlying this deposition?
11       A.    No.
12       Q.    Have you had any discussions with anyone
13    regarding the lawsuit?
14       A.    Yes.
15       Q.    who?
16       A.    Kathy Henry.
17       Q.    Anyone else?
18       A.    No.
19       Q.    when have you spoken with Kathy Henry
20    regarding the litigation?
21       A.    I can't recall specifically.
22       Q.    Do you recall approximately how many
23    conversations?
24       A.    No.
```

1   Q.   What was the substance of those

2   conversations, if you recall?

3   A.   The discovery of assets.

4   Q.   So, in connection with the subpoenas that

5   were issued in this case?

6   A.   Yes.

7   Q.   Have you reviewed any documents in

8   preparation for today's deposition?

9   A.   A limited few.

10   Q.   Which documents did you review in

11   connection with today's deposition?

12   A.   Certain corporate tax filings and

13   individual tax filings.

14   Q.   Corporate for which entities?

15   A.   All those requested by the subpoena.

16   Q.   Which personal returns did you review?

17   A.   Charles and Marian Hanson.

18   Q.   For which years?

19   A.   The last few years.

20   Q.   Some general background questions for you.

21       What's your current home address?

22   A.   5616 Oakwood Road, Long Grove, Illinois.

23   Q.   What's your date of birth?

24   A.   November 30, 1951.



| | | |
|---|---|---|
| 1 | Q. | What's your highest level of education? |
| 2 | A. | I have a B.S. in Accountancy. |
| 3 | Q. | From where? |
| 4 | A. | Northern Illinois University. |
| 5 | Q. | When did you attain that degree? |
| 6 | A. | 1973. |
| 7 | Q. | Other than that, do you have any other |

8  degrees?

| | | |
|---|---|---|
| 9 | A. | No. |
| 10 | Q. | Do you have any professional licenses? |
| 11 | A. | Yes. |
| 12 | Q. | What licenses do you have? |
| 13 | A. | A license to practice public accounting. |
| 14 | Q. | When did you obtain that license? |
| 15 | A. | 1975. |
| 16 | Q. | Have you maintained it all at times since |

17  1975?

| | | |
|---|---|---|
| 18 | A. | Yes. |
| 19 | Q. | Are you currently employed? |
| 20 | A. | Yes. |
| 21 | Q. | By whom? |
| 22 | A. | Miller Cooper & Co. |
| 23 | Q. | How long have you been employed by Miller |

24  Cooper?

| | | |
|---|---|---|
| 1 | A. | Since 1990. |
| 2 | Q. | Has that been at all times from 1990 to |
| 3 | the present? | |
| 4 | A. | Yes. |
| 5 | Q. | What does Miller Cooper do? |
| 6 | A. | Miller Cooper is a public accounting firm. |
| 7 | Q. | Do you have a title with Miller Cooper? |
| 8 | A. | Yes. |
| 9 | Q. | What is that title? |
| 10 | A. | Principal. |
| 11 | Q. | How long have you had that title? |
| 12 | A. | 1990. |
| 13 | Q. | Have you had any other titles at |
| 14 | Miller Cooper while you've been there? | |
| 15 | A. | Yes. |
| 16 | Q. | What other titles? |
| 17 | A. | Treasurer. |
| 18 | Q. | When did you have that title? |
| 19 | A. | 2000. |
| 20 | Q. | Just for one year? |
| 21 | A. | Since 2000. |
| 22 | Q. | Through today? |
| 23 | A. | Yes. |
| 24 | Q. | Is there anyone at Miller Cooper that you |



1   report to?

2        A.   Yes.

3        Q.   Who is that?

4        A.   Ross Pearlstein.

5        Q.   Could you spell that for the record,

6   please?

7        A.   P-e-a-r-l-s-t-e-i-n.

8        Q.   What is Mr. Pearlstein's title?

9        A.   He is the Managing Principal.

10       Q.   What are your responsibilities at

11  Miller Cooper?

12       A.   My responsibilities are that of an audit

13  and accounting practice partner as well as

14  treasurer and handling internal accounting and tax

15  matters.

16       Q.   Prior to 1990, did you work anywhere else

17  in the accounting field?

18       A.   Yes.

19       Q.   Where was that?

20       A.   An accounting firm called Laventhol &

21  Horwath.

22       Q.   How long were you there?

23       A.   From 1983 through 1990.

24       Q.   What was your title there?

1      A.   Initially I was an Audit Manager from the

2   years '83 through '85; after that, I was a Partner

3   in the firm.

4      Q.   Are you familiar with Charles Hanson?

5      A.   Yes.

6      Q.   How are you familiar with him?

7      A.   He was a client of the firm for many

8   years.

9      Q.   Miller Cooper?

10     A.   Yes.

11     Q.   Did there come a time that you began doing

12  work for Mr. Hanson?

13     A.   Yes.

14     Q.   When was that?

15     A.   Around 1985.

16     Q.   That was with Miller Cooper?

17     A.   That would have been with Laventhol &

18  Horwath.

19     Q.   So, he was a client of the prior firm, the

20  Laventhol firm?

21     A.   Yes.

22     Q.   You did work for him while you were at

23  that prior firm?

24     A.   Yes.



1          Q.   What happened to the Laventhol firm; did

2     you leave, did it close?

3          A.   Laventhol & Horwath went out of business

4     in 1990 pursuant to bankruptcy filings.

5          Q.   Did there come a time that -- sorry.  Off

6     the record.

7                              (whereupon, a discussion was

8                               had off the record.)

9     BY MR. ROGOVIN:

10         Q.   Did there come a time that Mr. Hanson

11    became a client of the Miller Cooper firm?

12         A.   Yes.

13         Q.   When was that?

14         A.   In the transfer period when I moved from

15    Laventhol to Miller Cooper.

16         Q.   So, around 1990 approximately?

17         A.   Yes.

18         Q.   Has he been a client of Miller Cooper at

19    all time since 1990?

20         A.   Yes.

21         Q.   Are you familiar with Kathy Henry?

22         A.   Yes.

23         Q.   When did you first become familiar with

24    her?



A.   When she became involved in the business.

         Q.   Do you recall when that was?

         A.   No.

         Q.   Do you recall, was it in the last ten
years?

         A.   It was before the last ten years.

         Q.   Are you familiar with a company known as
Mollie Enterprises?

         A.   I have heard of the name.

         Q.   Are you familiar with an entity known as
Northwest Building Material & Supply Company?

         A.   Yes.

         Q.   Do you have any understanding as to
whether that Northwest entity that we just
mentioned changed its name at some point to become
Mollie Enterprises?

         A.   I am only aware of that through the
subpoena I received from you.

         Q.   Have you heard of Mollie Enterprises
outside of that subpoena?

         A.   Yes.

         Q.   Where did you hear it?

         A.   I recall Kathy mentioned it once, and that
was probably the only time I actually heard of it.



·1· · · ·MR. ROGOVIN:· Well, if I use the term Mollie

·2· ·during today's deposition -- I'll try not to given

·3· ·your testimony, but if I do use the term Mollie,

·4· ·I'm discussing the Northwest Building Material &

·5· ·Supply Company entity because, just for the record,

·6· ·it is our understanding based on the records in the

·7· ·State of State's website that there was a name

·8· ·change and that is the same entity.· So, I'll be

·9· ·referring to them today as the same entity just for

10· ·clarity.

11· ·BY MR. ROGOVIN:

12· · · ·Q.· ·When did you first become familiar with

13· ·Northwest Building Material & Supply Company?

14· · · ·A.· ·1985.

15· · · ·Q.· ·Did you become familiar with that entity

16· ·through Mr. Hanson?

17· · · ·A.· ·Yes.

18· · · ·Q.· ·Was Mr. Hanson an owner of that entity?

19· · · ·A.· ·Yes.

20· · · ·Q.· ·Do you know if there were any other

21· ·owners?

22· · · ·A.· ·In 1985, no.

23· · · ·Q.· ·No, there were not or no, you don't know?

24· · · ·A.· ·In 1985, there were no other owners.



1    Q.   Did that change over time?

2    A.   Yes.

3    Q.   To your recollection, who were some of the

4    other owners over time of that entity?

5    A.   Can you hold up a second?

6    MR. ROGOVIN:  Sure.

7                         (Whereupon, a discussion was

8                         had off the record.)

9    MR. ROGOVIN:  You're welcome -- we can piece

10   through that, that's fine.

11   THE WITNESS:  Okay.  Northwest Building

12   Material & Supply was a 100 percent owned entity by

13   Charles Hanson.  Some time during the '90s, there

14   was a corporate reorganization and other entities

15   were formed, some of which Charles Hanson's kids

16   got part ownership of.

17   BY MR. ROGOVIN:

18   Q.   After that reorganization, did the entity

19   that we were just talking about, Northwest Building

20   Material & Supply Company, did that continue to

21   function as an entity after that reorganization?

22   A.   Yes.

23   Q.   Am I correct that that entity essentially

24   became the corporate parent so to speak of the



1   various entities?

2        A.   It was not a parent company.  It was a

3   related company.

4        Q.   Was it ever referred to as the Corporate

5   entity?

6        A.   It was referred to as Corporate.

7        Q.   Staying on that specific corporate entity,

8   to your knowledge, after the reorganization, were

9   there any owners of that specific entity other than

10  Charles Hanson?

11       A.   To the best of my recollection,

12  Charles Hanson was the only owner of Northwest

13  Building Material & Supply.

14       Q.   Was Mr. Hanson an officer of that entity?

15       A.   Yes.

16       Q.   Were there any other officers?

17       A.   I don't recall.

18       Q.   Do you know if Kathy Henry was ever an

19  officer of that entity?

20       A.   I'm not sure what her title was if she

21  was.

22       Q.   Did she ever speak to you on behalf of

23  that entity?

24       A.   Yes.



1      Q.   I think you testified that you began doing
2   some work for the Northwest Building Material &
3   Supply Company in 1995, is that right?
4      A.   Yes.
5      Q.   You were doing accounting work for that
6   entity?
7      A.   Yes.
8      Q.   Again, staying with that entity, did you
9   continue to do accounting work for that entity into
10   the '90s --
11      A.   Yes.
12      Q.   -- and into the first decade of the 2000s?
13      A.   Yes.
14      Q.   Did there come a time that you ceased
15   doing accounting work for that entity?
16      A.   Yes.
17      Q.   When was that?
18      A.   It was somewhere on or about 2010.
19      Q.   Why did you cease doing work for that
20   entity?
21      A.   The company was out of business.
22      Q.   What exactly did your accounting services
23   entail for that entity?
24      A.   Prior to 2008, we were engaged to prepare



1    reviewed financial statements as well as prepare

2    business tax returns.

3        Q.   You mentioned a reorganization and some

4    additional entities that were created at some point

5    in the '90s, is that correct?

6        A.   Yes.

7        Q.   We'll get to some of the names here in a

8    little bit, but generally did you and Miller Cooper

9    do accounting services for those additional

10   entities as well?

11       A.   Yes.

12       Q.   The same type of services that you were

13   just describing for the corporate entity?

14       A.   Yes.

15       Q.   Other than yourself, was anyone else at

16   Miller Cooper involved in the accounting work for

17   these various entities?

18       A.   Yes.

19       Q.   Who else?

20       A.   Throughout the years, there have been

21   various staff accountants assigned to the

22   engagement.

23       Q.   Throughout that period, were you typically

24   the lead person on that account?



1      A.   Yes.

2      Q.   Are you familiar with Northwest Building

3   Material of Illinois, Incorporated?

4      A.   Yes.

5      Q.   Do you know, was that one of the entities

6   that was created at the time of the restructuring?

7      A.   Yes.

8      Q.   Do you know what the business of that

9   entity was?

10     A.   Yes.

11     Q.   What was that?

12     A.   It was in the business of selling material

13  for building suppliers and contractors.

14     Q.   Let's take a step back to Northwest

15  Building Material & Supply Company.  After the

16  reorganization, what was its business?

17     A.   It's business principally was to manage

18  banking relationships and cash management.

19     Q.   Cash management for the various related

20  entities --

21     A.   Yes.

22     Q.   -- and loans of the various related

23  entities?

24     A.   Yes.

1      Q.   Going back to the Northwest Building
2  Material of Illinois entity, do you know who owned
3  that entity?
4      A.   Yes.
5      Q.   Who was that?
6      A.   Chuck Hanson was one of the owners,
7  Chic Hanson, his son, Scott Hanson, his son, Kathy
8  Henry, his daughter.
9      Q.   By Chuck, you mean Charles Hanson, just
10  for clarity of the record?
11      A.   Yes.
12      Q.   Were you familiar with an entity referred
13  to as Prairie View?
14           I can rephrase that if you'd like.
15      A.   Please.
16      Q.   Are you familiar with a location of a
17  business -- one of the Hanson businesses in
18  Prairie View?
19      A.   Yes.
20      Q.   Was that location part of the Northwest
21  Building Material of Illinois entity?
22      A.   Yes.
23      Q.   Same question regarding Naperville, was
24  there a Naperville location?



```
 1      A.   Yes.

 2      Q.   Was that also part of the Northwest

 3   Building Material of Illinois entity?

 4      A.   Yes.

 5      Q.   Are you familiar with Southport Lumber &

 6   Supply Company?

 7      A.   Yes.

 8      Q.   Do you know what the business of that

 9   entity was?

10      A.   That was a retail store selling

11   contractors, supplies as well as lumber to other

12   contractors.

13      Q.   Do you know who the owners of that entity

14   were?

15      A.   Yes.

16      Q.   Who was that?

17      A.   Charles Hanson.

18      Q.   Just Charles?

19      A.   Yes.

20      Q.   Do you know who its principles were?

21      A.   I don't understand that question.

22      Q.   Did it have officers?

23      A.   Yes.

24      Q.   Who were the officers?
```

1     A.   I only know that Charles Hanson was the

2   President.

3     Q.   Going back to Northwest Building Material

4   of Illinois, do you know who the officers of that

5   entity were?

6     A.   I only know that Charles Hanson was the

7   President.

8     Q.   What about an entity known as Southport

9   Real Estate, have you heard of that entity?

10    A.   Yes.

11    Q.   What was the business of that entity?

12    A.   It owned and leased real property.

13    Q.   Do you know what property it owned?

14    A.   Yes.

15    Q.   What property was that?

16    A.   It was the real estate located in Kenosha,

17  Wisconsin.

18    Q.   Was there a business located on that

19  property?

20    A.   Yes.

21    Q.   What business was that?

22    A.   That business was known as Southport

23  Lumber & Supply.

24    Q.   Do you know who owned Southport Real



1    Estate?

2        A.    Yes.

3        Q.    Who was that?

4        A.    Charles Hanson.

5        Q.    Are you familiar with BMDI, Inc.?

6        A.    Repeat that, please.

7        Q.    Are you familiar with BMDI, Inc.?

8        A.    Yes.

9        Q.    What was the business of that entity?

10       A.    That business sold drywall as well as

11   contractors, materials, nails, guns, et cetera,

12   similar to that of Prairie View in Naperville.

13       Q.    Who owned that entity?

14       A.    Charles Hanson.

15       Q.    Did that entity cease to do business at

16   some point?

17       A.    Yes.

18       Q.    Do you know when that was?

19       A.    Approximately 2008.

20       Q.    Are you familiar with CS Realty, Inc.?

21       A.    Yes.

22       Q.    What was the business of that entity?

23       A.    It owned and leased real estate.

24       Q.    Do you know what real estate it owned?



1      A.   CS Realty, I believe, owned the Naperville
2  real estate.
3      Q.   Do you know who the owner of CS Realty
4  was?
5      A.   Yes.
6      Q.   who was that?
7      A.   Charles Hanson.
8      Q.   Are you familiar with N.W. Realty of
9  Illinois, Inc.?
10      A.   Yes.
11      Q.   what was the business of that entity?
12      A.   It owned and leased real estate.
13      Q.   which real estate was that?
14      A.   The Prairie View location.
15      Q.   was Charles Hanson the owner of that
16  entity?
17      A.   Yes.
18      Q.   Are you familiar with Charmar Realty,
19  Inc.?  Charmar Realty, Inc.?
20      A.   Yes.
21      Q.   what was the business of that entity?
22      A.   It owned real estate.
23      Q.   what real estate did it own?
24      A.   The real estate was located in Florida.



1      Q.   Was it a home used by Mr. Hanson in

2   Florida, to your recollection?

3      A.   Not to my recollection.

4      Q.   Do you know what the property was?

5      A.   Vacant real estate.

6      Q.   Was Charles Hanson the owner of

7   Charmar Realty?

8      A.   Yes.

9      Q.   Badgerland Real Estate Company, have you

10   heard of that entity?

11      A.   Yes.

12      Q.   What was its business?

13      A.   It owned and leased real estate.

14      Q.   What real estate was that?

15      A.   That real estate was located in Wisconsin,

16   I don't recall the town.

17      Q.   Was there a business on that property?

18      A.   Yes.

19      Q.   Which business?

20      A.   That was BMDI, Inc.

21      Q.   Was Charles Hanson the owner of Badgerland

22   Real Estate?

23      A.   Yes.

24      Q.   Are you familiar with Professional



1   Leasing, Inc.?

2       A.   Yes.

3       Q.   What was the business of that entity?

4       A.   It owned commercial trucks and trailers

5   and leased those to related entities.

6       Q.   Was Charles Hanson the owner of

7   Professional Leasing?

8       A.   Yes.

9       Q.   Are you familiar with K & H Cartage

10  company?

11      A.   Yes.

12      Q.   What was the business of that entity?

13      A.   Cartage.

14      Q.   Cartage meaning -- can you explain that a

15  little bit?

16      A.   It was a freight carrier.

17      Q.   Was that owned by Charles Hanson?

18      A.   No.

19      Q.   Who was the owner of that entity?

20      A.   Kathy Henry.

21      Q.   Aside from the various entities that we've

22  just gone through the last couple of minutes, to

23  your recollection, were there any other entities

24  owned by Charles Hanson during the period say from



1   approximately 2000 to 2010?

2        A.   No.

3        Q.   You mentioned the restructuring a little

4   while ago of the original Northwest entity into

5   some additional entities where there was some

6   ownership interest of the kids, is that correct?

7        A.   Yes.

8        Q.   Aside from the entities that we've just

9   discussed, were there any entities that resulted

10  from that restructuring?

11       A.   No.

12       Q.   Each of the entities that we just

13  discussed, did they typically have their own bank

14  accounts?

15       A.   Yes.

16       Q.   Did the corporate entity -- I'll refer to

17  Northwest Building Material & Supply also known as

18  Mollie, I'll sometimes refer to that as the

19  corporate entity.

20            Did the corporate entity have

21  decision-making power for the various entities that

22  we've discussed?

23       A.   Yes.

24       Q.   Did the corporate entity loan monies to



1  the various other entities?

2      A.   Yes.

3      Q.   Did the corporate entity pay expenses of

4  any of the other entities?

5      A.   Yes.

6      Q.   Did you at any time, and by you, I'm

7  referring to actually Miller Cooper now, do any

8  accounting work for Charles Hanson personally?

9      A.   No.

10     Q.   Did you prepare at any time tax returns

11  for Mr. Hanson?

12     A.   Yes.

13     Q.   Aside from preparing tax returns, was

14  there any other accounting work that would have

15  been done for Mr. Hanson personally?

16     A.   Not to my recollection.

17     Q.   Did Miller Cooper ever prepare financial

18  statements for Mr. Hanson?

19     A.   I believe so.

20     Q.   Would that have been involved in

21  connection with bank loans?

22     A.   Let me re-think that last answer.  I

23  believe we only -- we never created -- we never

24  issued any personal financial statements for



1  Charles Hanson.

2      Q.  We may touch on some of this in a bit, but

3  sticking with it now, did you assist Mr. Hanson in

4  his preparation of personal financial statements at

5  any time?

6      A.  He had never asked me to look at his

7  personal financial statement.

8      Q.  Did anyone ask you to look at his personal

9  financial statement?

10     A.  Yes.

11     Q.  who did?

12     A.  Kathy Henry.

13     Q.  Did you provide information to Kathy Henry

14  in connection with preparation of Mr. Hanson's

15  personal financial statements at any time?

16     A.  The only information we would have

17  provided her were equity values that were included

18  in reviewed financial statements.

19     Q.  Has Miller Cooper done any accounting work

20  for Kathy Henry personally?

21     A.  No.

22     Q.  Has Miller Cooper prepared tax returns for

23  Mrs. Henry or Miss Henry personally?

24     A.  Yes.



1      Q.   Has Miller Cooper prepared any financial

2  statements for Miss Henry?

3      A.   No.

4      Q.   Has Miller Cooper done any work of any

5  kind with respect to any trusts related to the

6  Hanson family?

7      A.   Not to my knowledge.

8      Q.   Are you aware of the existence of trusts

9  related to the Hanson family?

10     A.   I'm aware of a life insurance trust.

11     Q.   That's it?

12     A.   That's the only trust I'm aware of.

13     Q.   Do you know who the beneficiary of that

14  trust is?

15     A.   I believe it was -- the beneficiaries were

16  the children.

17     MR. ROGOVIN:  Let's go ahead and mark this

18  Exhibit 1.

19                          (whereupon, Cieslak Deposition

20                          Exhibit No. 1 was marked for

21                          identification.)

22  BY MR. ROGOVIN:

23     Q.   I ask you to take a quick look at it.  You

24  don't need to look too in-depth at this point.



1          Have you seen this document before?

2      A.   Yes.

3      Q.   What is this document?

4      A.   This document is the Combined Financial

5  Statement and Independent Accountants' Report For

6  Northwest Building Material & Supply Company and

7  related entities for the years ended 31, 2003 and

8  2002.

9      Q.   Did you prepare this document?

10     A.   Miller Cooper prepared this document.

11     Q.   Were you personally involved in the

12  preparation of this document, to your recollection?

13     A.   At some point, yes.

14     Q.   Do you know who else might have been

15  involved at Miller Cooper in preparing this

16  document?

17     A.   The staff accountants assigned to this

18  engagement.

19     Q.   Would you have had to have signed off or

20  approved it before it was finalized?

21     A.   Yes.

22     Q.   Is this an audited report?

23     A.   This is not an audited report.

24     Q.   If you turn to Page 8, and the numbers are

1  on the bottom there, Paragraph 2 says basis of

2  combination and it identifies four companies.  It

3  says the combined financial statements include the

4  accounts of the following entities, and it

5  identifies Northwest Building Material & Supply

6  Company, Northwest Building Material of Illinois,

7  Inc., Southport Lumber & Supply Company, and BMDI,

8  Inc.; do you see that?

9      A.   Yes.

10     Q.   Why were combined financials prepared for

11 those four companies?

12     A.   Because they would be more meaningful.

13     Q.   Why would they be more meaningful?

14     A.   Due to the nature of the intercompany

15 accounts, the transactions when put back together

16 more reflected the operations of the company.

17     Q.   The various other entities that we've

18 discussed this morning, some of the real estate

19 companies and so on and so forth, were those

20 included in this report?

21     A.   No.

22     Q.   Was that because it wouldn't have been as

23 helpful as combining the four as you just

24 described?



1    A.    Correct.

2    Q.    The information that's reflected in this

3    document, where would that information have come

4    from?

5    A.    They would come from the books and records

6    of the company.

7    Q.    Do you know who maintained the books and

8    records for the four companies listed that we just

9    looked at?

10    A.    There were individual controllers at those

11    companies that would have supplied us with that

12    information.

13    Q.    So, Miller Cooper itself did not maintain

14    books and records for these companies?

15    A.    We did not.

16    Q.    If you look at Page 10 at the bottom and

17    then, also, on the top of the next page, it lists

18    some of those other entities we were discussing

19    earlier.  And at the bottom of Page 10, it states

20    the companies have net advances to related entities

21    which are owned and operated by one of the

22    company's stockholders as follows, and then, it

23    shows some numbers at the bottom of Page 10 and

24    continues on to Page 11.  So, were there also



·1· transfers of assets of monies between the four

·2· companies represented in this statement and the

·3· additional entities listed on Pages 10 and 11?

·4· · · A.· ·There were transactions between these

·5· entities and the four combined entities in this

·6· report during the year.

·7· · · Q.· ·Go ahead and turn to Page 13, look at note

·8· C due from stockholder.· The first sentence reads

·9· the companies have uncollateralized advances to one

10· of its stockholders of $2,443,430 and $2,127,556 as

11· of December 31, 2003 and 2002 respectively.· Do you

12· see that?

13· · · A.· ·Yes.

14· · · Q.· ·Do you know which of the stockholders this

15· refers to?

16· · · A.· ·Charles Hanson.

17· · · Q.· ·Does this indicate that there were

18· advances of money by the companies to Mr. Hanson?

19· · · A.· ·This states that the company has

20· uncollateralized advances to one of its

21· stockholders.

22· · · Q.· ·To your knowledge, did the companies

23· advance money to Mr. Hanson?

24· · · A.· ·Yes.



1    Q.   Do you know what the purpose of those

2   advances were?

3    A.   It varied throughout the years.

4    Q.   What were some of the purposes?

5    A.   Some of the purposes were to buy real

6   estate, some of the purposes were as a result of

7   interest charged, not necessarily advances that are

8   included in these numbers.

9    Q.   Can you explain that?

10   A.   And other factors I would not be aware of.

11   Q.   When you say interest charged, interest

12  charged on what?

13   A.   On the principal balance.

14   Q.   So, it was being added to the total?

15   A.   Yes.

16   Q.   When you say that some of these advances

17  were to buy real estate, these were advances from

18  Mr. Hanson to buy real estate for himself?

19   A.   These were advances for Mr. Hanson to buy

20  some of the related real estate that is disclosed

21  elsewhere in this report.

22   Q.   Some of the real estate owned by the real

23  estate entities we were discussing earlier?

24   A.   Yes.



1      Q.   So, this report is looking in 2002 and

2   2003.  In either of those years, were there any

3   distributions by the companies to owners?

4      A.   Yes.

5      Q.   What page are you looking at, sir?

6      A.   Page 7.

7      Q.   When you say yes, so where are you looking

8   specifically?

9      A.   Towards the bottom of the page where it

10  says dividends paid to stockholders, $11,750 paid

11  in 2002.

12     Q.   So, even though there's brackets around

13  that, there were $11,750 of dividends paid to

14  stockholders in 2002?

15     A.   Yes.

16     Q.   Would that have been paid to Mr. Hanson?

17     A.   I don't recall.

18     Q.   Could it have been paid to someone else?

19     A.   It could only have been paid to the

20  stockholders.

21     Q.   Did Mr. Hanson ever take an advance of

22  money instead of taking a distribution from the

23  company?

24     A.   If Mr. Hanson took money, it would be



1  recorded as an advance distribution.  In these

2  particular years, there were no distributions in

3  2003 and there were only 11,000 in 2002.

4     Q.  So, was it Mr. Hanson's option when taking

5  money from the company account to treat it as

6  either a distribution or an advance?

7     A.  Mr. Hanson typically would not arbitrarily

8  take distributions.

9         The change in this year for the

10  shareholder advance, I would be interested to look

11  at.  That may just merely be interest added to the

12  advance.

13    Q.  You're looking at Page 4?

14    A.  On Page 4.  There was an increase in the

15  advance.

16    Q.  Right.  In the due from stockholder line?

17    A.  Yes.  I don't have the information to tell

18  you what that change resulted from.

19    Q.  That's fine.  I think my question is more

20  from a general standpoint in terms of management of

21  the entity.  Would it have been Mr. Hanson's

22  decision whether to treat a payment from the entity

23  either as a distribution or as an advance?

24    A.  He would do that in conjunction with the



1    financial stability of the company.

2        Q.   How would the financial stability of the

3    company affect that decision, to your knowledge?

4        A.   Charles Hanson was more concerned about

5    paying loans and vendors than trying to take money

6    out of the business.

7        Q.   So, going back to Page 13, the second

8    sentence under note C, it states effective

9    January 1, 2002 the advances bare interest at the

10   prime rate, and then, in parentheses, it says four

11   percent at December 31, 2003, close paren, minus

12   0.5 percent.  Do you see that?

13       A.   Yes.

14       Q.   To your knowledge, was there ever a

15   written agreement reflecting these terms?

16       A.   I'm not aware of one.

17       Q.   How did Miller Cooper become aware of

18   those terms?

19       A.   Through verbal communication.

20       Q.   From whom?

21       A.   Charles Hanson.

22       Q.   Do you know whether or not Mr. Hanson ever

23   paid interest on these advances?

24       A.   I'm not aware of any payments.



1      Q.   You testified a moment ago that there were

2   reasons from the corporate standpoint to take

3   either a distribution or to do an advance.  Setting

4   that aside, from Mr. Hanson's personal perspective,

5   was there a difference to his personal bottom-line

6   whether he took money out as an advance or a

7   distribution?

8      A.   There was no impact on Mr. Hanson's

9   personal bottom-line.  Let me rephrase that --

10  could you restate your question?

11     Q.   Sure.  If Mr. Hanson had taken advances in

12  2002 -- taken that money instead of an advance,

13  taken it as a distribution, would that distribution

14  have been taxable in 2002?

15     A.   No.

16     Q.   When would it have been taxable?

17     A.   It would not be taxable.

18     Q.   If he had taken the money as an advance or

19  a loan pursuant to the terms as discussed here,

20  would that have been taxable?

21     A.   That would not have been taxable.

22     Q.   You stated a moment ago that you were not

23  aware whether Mr. Hanson had ever paid interest on

24  these advances, is that correct?



1    A.   Yes.

2    Q.   Do you know if that interest was ever

3    forgiven by the entities?

4    A.   I have no recollection of any forgiveness.

5    Q.   Staying on Page 13 real quick, the first

6    part of note C, it stated that the companies have

7    uncollateralized advances and it capitalizes the

8    word companies.  Do you know which companies in

9    particular had the advances to Mr. Hanson?

10    A.   No, I do not.

11    Q.   Do you know whether one of the companies

12    was the corporate entity?

13    A.   I know corporate was one of the entities.

14    Q.   And, again, I apologize if this has been

15    asked and answered.  The numbers and the

16    information that you had regarding the advances

17    that went into this report, where did that

18    information come from?

19    A.   Those would have come from corporate books

20    and records.

21    Q.   Just if you turn back to Page 4, I think

22    you identified you were looking at the line due

23    from stockholder at the bottom there, is that

24    right?

1      A.   Yes.

2      Q.   Those numbers match up with note C that we

3   were just looking at on Page 13?

4      A.   Yes.

5      Q.   Page 4 is a page listing assets as part of

6   a combined balance sheet to the entities?

7      A.   Yes.

8      Q.   The terms that we discussed in note C with

9   respect to the prime rate minus .5 percent, do you

10  know who set those terms?

11     A.   Charles Hanson would have.

12     Q.   And he informed Miller Cooper of those

13  terms?

14     A.   Yes.

15     Q.   If you turn to Page 14, note E, notes

16  payable, officers, the first couple of sentences

17  read unsecured notes payable to officers are due on

18  demand and bare interest at the prime rate, and

19  then, in parentheses, four percent at December 31,

20  2003, close parentheses, period.  The balance was

21  $1,649,804 and $1,484,908 as of December 31, 2003

22  and 2002 respectively.  Do you see that?

23     A.   Yes.

24     MR. SWAN:  What page are you on again?



1    MR. ROGOVIN:  Page 14.

2  BY MR. ROGOVIN:

3    Q.  Do you know which officers that language

4  refers to?

5    A.  Yes.

6    Q.  which officers?

7    A.  The three kids.

8    Q.  So, that would be Charles, Jr., Kathy,

9  and, I'm sorry, who was the third?

10    A.  Scott.

11    Q.  So, these notes payable reflected on this

12  Page 14 are not referring to any note payable to

13  Charles Hanson, Sr.?

14    A.  No, they are not.

15    Q.  The document uses the term unsecured

16  notes.  To your knowledge, was there any written

17  promissory note or other agreement reflecting these

18  amounts of this debt?

19    A.  I do not recall seeing one.

20    Q.  And so this information would have come

21  directly from the entities?

22    A.  Yes.

23    Q.  Do you know why the entities owed the sums

24  that we just looked at in note E to



1  Charles Hanson's children?

2      A.  Yes.

3      Q.  Why was that?

4      A.  These were the result when the company had

5  very profitable years previous to 2002, bonuses

6  were paid to the children.  The net checks after

7  payroll withholding of taxes for federal and state

8  were required by Charles Hanson to be reinvested

9  back into the company.

10     Q.  And so that would be treated as a loan or

11  a capital contribution?

12     A.  We treated them as a loan due to the

13  interest-bearing nature of the loans.

14     Q.  Were you instructed to treat them as a

15  loan?

16     A.  Yes.

17     Q.  By whom?

18     A.  Charles Hanson.

19     Q.  Do you have any understanding as to why

20  the advances from Mr. Hanson that we looked at

21  under note D accrued interest at the prime rate

22  minus half a percent, but the monies from the

23  children accrued interest at prime rate with no

24  deduction; do you have any understanding as to why



1   that is?

2       A.   It was his choice.

3       Q.   It was Mr. Hanson's decision?

4       A.   Yes.

5       Q.   If you turn back to Page 5, Page 5 is

6   still part of the combined balance sheets, is that

7   correct?

8       A.   Yes.

9       Q.   The line notes payable officers, the

10  numbers on that line, they match up to what we were

11  just looking at in note E, is that right?

12      A.   Yes.

13                        (Whereupon, Cieslak Deposition

14                        Exhibit No. 2 was marked for

15                        identification.)

16  BY MR. ROGOVIN:

17      Q.   Have you seen this document before?

18      A.   Yes.

19      Q.   Is this the same type of combined

20  financial statement and report that we were just

21  looking at but for years 2003 and 2004 this time?

22      A.   Yes.

23      Q.   Were you involved in the preparation of

24  this document?



1      A.   Yes.

2      Q.   Let's turn to Page 13 and, again, note C,

3  first sentence reads the companies have

4  uncollateralized advances to a stockholder of

5  $2,726,060 and $2,443,430 as of December 31, 2004

6  and 2003 respectively.  Do you see that?

7      A.   Yes.

8      Q.   Is that still referring to advances to

9  Charles Hanson?

10     A.   Yes.

11     Q.   Do you have any understanding as to why

12  this number went up by approximately $300,000 in

13  2004?

14     A.   The result should mostly be from the

15  result of charging him interest on the previous

16  balance.

17     Q.   Do you have any knowledge as to whether or

18  not there would have been additional new actual

19  advances of money aside from interest?

20     A.   I could not tell from this report.

21     Q.   Do you have any recollection yourself

22  outside of this report?

23     A.   No, I do not.

24     Q.   And then a little bit further down the



1   page, notes payable, officers, under note E; do you
2   see that?
3       A.   Yes.
4       Q.   The second sentence says the balance was
5   $1,899,844 and $1,649,804 as of December 31, 2004
6   and 2003 respectively; do you see that?
7       A.   Yes.
8       Q.   Are these still referring to debts to
9   Charles Hanson's children?
10      A.   Yes.
11      Q.   And, again, do you have any understanding
12  as to why this would have gone up about $250,000 in
13  2004?
14      A.   The only change would result from
15  additional interest unpaid or a bonus which
16  followed the same trend as in previous years.
17      Q.   To your recollection, was interest paid to
18  Mr. Hanson's kids on these notes?
19      A.   I believe interest was paid to certain of
20  the kids.
21      Q.   Was interest ever paid to Mr. Hanson
22  personally?
23      A.   Interest was not due to Mr. Hanson.
24      Q.   But was interest ever paid to him?



1        I understand your distinction.  Whether or

2   not it was owed to him, my question is whether or

3   not interest payments that may have been owed to

4   someone else were paid instead to Mr. Hanson?

5        A.   I am not aware of any such payment to

6   Mr. Hanson.

7                        (Whereupon, Cieslak Deposition

8                         Exhibit No. 3 was marked for

9                         identification.)

10  BY MR. ROGOVIN:

11       Q.   I'll represent for the record that this

12  appears to be Combined Financial Statements and

13  Independent Accountants' report for December 31,

14  2005 and 2004.  Have you seen this document before?

15       A.   Yes.

16       Q.   Was this document prepared by

17  Miller Cooper?

18       A.   Yes.

19       Q.   Was this the same type of report that

20  we've been looking at but for 2004 and 2005?

21       A.   Yes.

22       Q.   Most or all of the pages have a stamp on

23  them that says Preliminary Draft; do you see that?

24       A.   Yes.



1      Q.   Do you know whether a final draft or a

2   subsequent draft was created after what we're

3   looking at here, Exhibit 3?

4      A.   Yes.

5      Q.   Yes, it was?

6      A.   Yes, it was.

7      MR. ROGOVIN:  That hasn't been produced.  I

8   would ask that it be produced.  This is all that

9   we've got for 2004 and 2005.

10  BY MR. ROGOVIN:

11     Q.   If you turn to Page 13, going back to

12  note C again due from stockholder, looking at the

13  first line, it looks like the advance figure in

14  2005 went down compared to 2004, is that correct?

15     A.   Yes.

16     Q.   Do you have any understanding as to why

17  that would be?

18     A.   During certain years when the company was

19  not having positive results, Charles Hanson would

20  lend money to the company which would have been

21  recorded as a reduction of a due from

22  Charles Hanson.

23     Q.   So, that would not have been treated as a

24  separate new note due and owing to Mr. Hanson; it

1   would have, instead, come as a deduction from the
2   advances?
3       A.   Yes.
4       Q.   Do you have any recollection as to whether
5   or not that's what happened in 2005 or this is just
6   your general recollection?
7       A.   This is my general recollection.
8       Q.   But, again, the stockholder on note C,
9   this is still Charles Hanson that's being referred
10  to here?
11      A.   Yes.
12      Q.   Would you have seen any documentation from
13  the entities to support this reduction that's shown
14  in note C?
15      A.   Yes.
16      Q.   What would you have seen?
17      A.   We would have seen the general ledger
18  activity indicating the source of the change.
19      Q.   And the total dollar amount?
20      A.   Yes.
21      Q.   Staying on the same page going under note
22  E, again, it looks like for notes payable officers
23  the balance went up about $58,000 or so in 2005, is
24  that correct?



1    A.   Yes.

2    Q.   And, again, is it accurate to say that the

3    notes payable reflected here in note E, these are

4    still notes payable to Charles Hanson's children?

5    A.   Yes.

6                      (Whereupon, Cieslak Deposition

7                      Exhibit No. 4 was marked for

8                      identification.)

9    BY MR. ROGOVIN:

10   Q.   I'll ask you to take a look at it, but

11   while you do that, I will represent for the record

12   that this appears to be another Consolidated

13   Financial Statement and Independent Accountants'

14   Report, but this time dated just December 31, 2005,

15   is that correct?

16   A.   Yes.

17   Q.   You mentioned a moment ago that you

18   believe that there would have been another version

19   or versions beyond the preliminary draft we looked

20   at in Exhibit 3.  Do you know whether this

21   Exhibit 4 would be that document or would it have

22   been another document?

23   A.   Now that I have seen this exhibit, the

24   previous preliminary draft exhibit would not have



1   been issued, only prepared as a preliminary draft,

2   and that is because in 2005, the general accepted

3   accounting principles would have required --

4   required us to include the real estate entities

5   that we previously had not included in the report.

6   So, scratch that off.

7       MR. SABIN:  Scratch it off because it doesn't

8   exist.

9       MR. ROGOVIN:  Very good.  Well, thank you, I

10  appreciate the clarification.

11  BY MR. ROGOVIN:

12      Q.  So, in connection with what you were just

13  saying, if you look at Page 9 under Paragraph 2,

14  basis of consolidation, it now lists several

15  additional and defines as the defined term

16  companies Northwest Building Materials & Supply

17  Company, Northwest Building Materials of Illinois,

18  Southport Lumber, and BMDI, but then goes on to

19  identify as affiliates CS Realty, MW Realty, and

20  Southport Real Estate.  Is that what you were just

21  saying that because of the, I guess, changes in

22  2005, those real estate entities needed to be

23  included in the report?

24      A.  Yes.



1      Q.   Were you involved in the preparation of
2    this Exhibit 4?
3      A.   Yes.
4      Q.   And, again, all of the information in
5    Exhibit 4 would have come from the entities, is
6    that correct?
7      A.   Yes.
8      Q.   Including the real estate entities?
9      A.   Yes.
10      Q.   If you turn to Page 12, note C, due from
11   stockholder, the first sentence states that the
12   companies and affiliates of uncollateralized
13   advances to a stockholder of $3,149,680 as of
14   December 31, 2005; do you see that?
15      A.   Yes.
16      Q.   Does this refer to Charles Hanson?
17      A.   Yes.
18      Q.   Now, this number is about $600,000
19   approximately higher than what was shown in
20   Exhibit 3, is that correct?
21      A.   Yes.
22      Q.   Would this have been because there were
23   additional companies involved in the report that
24   may have had advances to Mr. Hanson?



1      A.   Yes.

2      Q.   So, some or all of that additional

3   $600,000 would have been advances from these real

4   estate companies?

5      A.   Without the backup supporting that, I

6   could not answer that.

7      Q.   Note E, notes payable officers, it shows a

8   balance there of $1,957,304 as of December 31,

9   2005; do you see that?

10     A.   Yes.

11     Q.   This still would have been the balance of

12  notes payable to Mr. Hanson's children?

13     A.   Yes.

14                         (Whereupon, Cieslak Deposition

15                         Exhibit No. 5 was marked for

16                         identification.)

17  BY MR. ROGOVIN:

18     Q.   Have you seen this document before?

19     A.   Yes.

20     Q.   Is this the same form of Combined

21  Financial Statement and Report that we've been

22  looking at but for 2005 and 2006?

23     A.   Yes.

24     Q.   Were you involved in the preparation of

1    Exhibit 5?

2        A.   Yes.

3        Q.   If you turn to Page 12, note C, again, due

4    from stockholder, it appears to represent that the

5    companies and affiliates have uncollateralized

6    advances to a stockholder of $3,359,029 and that

7    number, I'm paraphrasing, would have been as of

8    December 31, 2006, is that correct?

9        A.   Yes.

10       Q.   Does that still refer to Charles Hanson?

11       A.   Yes.

12       Q.   Now, again, compared to what we just

13   looked at in Exhibit 4, this seems to be an

14   increase of about $200,000.  Do you have any

15   understanding as to what that difference would be?

16       A.   Principally, interest.

17       Q.   Is that based on specific knowledge of

18   2006 or just general knowledge as to how these

19   things were accruing?

20       A.   Specific knowledge.

21       Q.   So, in 2006, aside from interest, there

22   were no other advances to Mr. Hanson?

23       A.   As I stated, the principal change is

24   interest.  If there was other activity, I would



1   need to review and look at other work papers.

2       Q.   So, it may be correct?

3       A.   Yes.

4       Q.   Turn to the next page, note E, notes

5   payable officers, that seems to reflect a balance

6   for end of year 2006 of $1,945,604; do you see

7   that?

8       A.   Yes.

9       Q.   Again, does this refer to notes payable to

10  Charles Hanson's children?

11      A.   Yes.

12      Q.   This figure seems to have gone down about

13  $12,000 between end of year 2005 and end of year

14  2006.  Do you have any understanding as to why that

15  would be?

16      A.   No, I do not.

17      Q.   Do you recall whether or not any payments

18  were made to any of Mr. Hanson's children with

19  respect to this debt in 2006?

20      A.   I don't recall.

21                      (Whereupon, Cieslak Deposition

22                      Exhibit No. 6 was marked for

23                      identification.)

24



1   BY MR. ROGOVIN:
2       Q.   Please take a look at that and let me know
3   if you've seen it before?
4       A.   Yes, I have.
5       Q.   Do you know who created this document?
6       A.   These are created from the books and
7   records of the company.
8       Q.   Would the company have created it or could
9   Miller Cooper have created it from the books and
10  records?
11      A.   This was prepared and created by the
12  company.
13      Q.   Is it correct that this is a Balance Sheet
14  for Northwest Building Materials Corporate as of
15  December 31, 2006?
16      A.   Yes.
17      Q.   The document states, as we just discussed,
18  Northwest Building Materials Corporate.  Do you
19  have any understanding as to whether this document
20  is giving specific balance sheet information solely
21  for the corporate entity or for multiple of the
22  entities controlled by Mr. Hanson?
23      A.   This document is specifically for
24  Northwest Building Materials & Supply Company known



1   as Corporate.

2       Q.   If you turn to Page 3, Line 263.

3       A.   I don't know what Line No. 263 is.

4       Q.   I'm sorry.  On the left -- okay.  Account

5   No. 263.  Sorry.  It states officer notes payable;

6   do you see that?

7       A.   Yes.

8       Q.   There's two columns.  The first column

9   says current year $1,945,603.54; do you see that?

10      A.   Yes.

11      Q.   If you look back on Exhibit 5, Page 13,

12  this appears to be the same number that's listed in

13  that report for yearend 2006, is that right?

14      A.   Yes.

15      Q.   So, would it be correct to say that the

16  information included in the report came at least in

17  part from Exhibit 6?

18      A.   Yes.

19      Q.   Who would have provided Exhibit 6 to you?

20      A.   The controller at corporate.

21      Q.   Who was that?

22      A.   I do not recall her name.

23      Q.   At least from 2000 to 2010 or so, was it

24  the same person during that period or did it



1   change?

2       A.   It changed.

3       Q.   Do you know any of the other people who

4   held that title?

5       A.   I don't recall their names.

6       Q.   Did Kathy Henry ever hold that title?

7       A.   Kathy Henry did not, to the best of my

8   knowledge, ever have the title Controller.

9       Q.   Do you know what her title would have

10  been, if any?

11      A.   I would not recall.

12      Q.   Was she ever CFO?

13      A.   She may have been referred to as that.

14      Q.   If you turn to Page 1 of Exhibit 6,

15  account 124, it says officer receivable corp, and

16  then, for current year it says $2,589,342.10; do

17  you see that?

18      A.   Yes.

19      Q.   Again, if you go back to Exhibit 5 on

20  Page 12, it appears to be a different number that

21  is shown in note C.  I think we discussed that in

22  note C for end of year 2006 it showed

23  uncollateralized advances to stockholder of just

24  over 3.3 million dollars.  Do you have any



1  understanding as to the difference between these

2  two numbers in Exhibit 5 and Exhibit 6?

3      A.   I would need to refer to the combining

4  report which would arrive at the disclosed report

5  on the financial statement.

6      Q.   Is it possible that that difference is

7  because Exhibit 5, the report, included multiple

8  entities whereas Exhibit 6 was just a single

9  entity?

10     A.   Yes.

11     Q.   Staying with Exhibit 6 on Page 2, account

12  190, under other assets, deferred other expense,

13  and then, there's two columns there and it's the

14  same number in both columns, $393,084.  Was this an

15  interest figure for interest accruing on the

16  officer receivable?

17     A.   I don't recall.

18     Q.   Could it have been?

19     A.   I don't recall.

20     Q.   Based on your experience in the accounting

21  field, just general accounting experience, is it

22  possible that interest component of an officer

23  receivable could be listed as a deferred other

24  expense?

1      A.    The interest on a deferred officer

2   receivable would not be an expense.

3      Q.    Where would it be typically listed?

4      A.    As a receivable.

5      Q.    Were you involved in creating Exhibit 6?

6      A.    No.

7                          (Whereupon, Cieslak Deposition

8                          Exhibit No. 7 was marked for

9                          identification.)

10  BY MR. ROGOVIN:

11     Q.    Have you seen this before, sir?

12     A.    Yes.

13     Q.    Is this a Combined Financial Statement and

14  Report created by Miller Cooper for the companies

15  we've been talking about for years ending 2007 and

16  2006?

17     A.    Yes.

18     Q.    On Page 12 under note C from stockholder,

19  it lists as of December 31, 2007 uncollateral

20  advances to a stockholder of $3,313,612.  Were

21  those advances to Charles Hanson?

22     A.    Yes.

23     Q.    On the next page, note E, notes payable

24  officers, it shows a balance at the end of 2007 of



1   $2,133,650.  Was that a balance due and payable to

2   Charles Hanson's children?

3       A.   In 2007, Charles Hanson may be included in

4   this number.

5       Q.   Why would that be?

6       A.   I believe in 2007 he loaned the company

7   $190,000.

8       Q.   Which company did he loan that to?

9       A.   I'm not certain.

10      Q.   Would there be a way to find out?

11      A.   Yes.

12      MR. ROGOVIN:  I will formally request any

13   information you have in that regard as to which

14   entity if it's not discernable from the documents

15   already in front of you.

16      THE WITNESS:  It would be discernable from

17   other balance sheets of other entities for that

18   year.  It would be a separate line item.

19   BY MR. ROGOVIN:

20      Q.   And so you were just looking at the 2006

21   Balance Sheet for Northwest, the Corporate, right?

22      A.   Yes.

23      MR. ROGOVIN:  I think we're going to look at

24   the 2007 balance sheet here.  Why don't we go ahead



1   and do that.
2                        (whereupon, Cieslak Deposition
3                        Exhibit No. 8 was marked for
4                        identification.)
5   BY MR. ROGOVIN:
6       Q.   Have you seen Exhibit 8 before?
7       A.   Yes.
8       Q.   Is this a Balance Sheet for the Corporate
9   entity as of December 31, 2007?
10      A.   Yes.
11      Q.   Looking at this document, are you able to
12  see whether or not the $190,000 loan from 2007 was
13  made by Charles to the corporate entity?
14      A.   Yes.
15      Q.   Yes, you can tell or yes, it was?
16      A.   Yes, I can tell.
17      Q.   was the loan made to the corporate entity?
18      A.   Yes, it was.
19      Q.   where are you looking to see that?
20      A.   Look at account No. 229 on Page 3.
21      Q.   Florida loan?  Florida loan?
22      A.   Is that a question?
23      Q.   Yes.  Are you referring to the line that
24  says Florida loan?



1      A.   Yes.

2      Q.   Okay.  Thank you.  What does Florida loan

3  mean or why was it called that?

4      A.   Charles Hanson was residing in Florida,

5  and the controller named this account a Florida

6  loan.

7      Q.   I think you testified earlier that when

8  Mr. Hanson would put money back into the companies,

9  it would be shown by decreasing the amount of the

10  advances rather than as a new note, is that

11  correct?

12      A.   For the year we were referring to, that

13  was correct.

14      Q.   So, that changed in 2007?

15      A.   Yes.

16      Q.   Why did that change?

17      A.   I have no answer for that.

18      Q.   Were you instructed to do it that way?

19      A.   No, we were not.

20      Q.   So, the numbers came to you from the

21  companies, and you just reported what the numbers

22  said in your reports?

23      A.   Yes.

24      Q.   So, is it your understanding that because

1   that $190,000 was treated as a note as a loan to
2   the entities that Mr. Hanson would then have been
3   due interest at the prime rate on that amount?
4        A.   That I don't recall.
5        Q.   Well, looking at Exhibit 7, note E, the
6   first sentence states unsecured notes payable to
7   officers are due on demand and bare interest at the
8   prime rate, and then, in parentheses, 7.25 percent
9   at December 31, 2007, close paren.  Do you see
10  that?
11       A.   Yes.
12       Q.   I think it was your testimony that you
13  thought that this 2.13 million dollar number shown
14  here now included for the first time some portion
15  owed to Mr. Hanson, Charles Hanson, is that
16  correct?
17       A.   Yes.
18       Q.   So, based on this, is it your
19  understanding that Mr. Hanson's note would have
20  accrued interest at the prime rate?
21       A.   I don't have a recollection if it did.
22       Q.   This document states that it would have
23  though, correct?
24       A.   This document states that it should have.



1   I don't know if it actually did.

2       Q.   Exhibit 8, would this document have been

3   created by the corporate entity or someone at the

4   corporate entity?

5       A.   Yes.

6       Q.   If you turn to Page 3, account 263, for

7   current year it shows officer notes payable of

8   $1,943,649.53; do you see that?

9       A.   Yes.

10      Q.   Again, if you compare that number to

11  Exhibit 7, Page 13, note E, that number states --

12  I'm sorry.

13          Specifically the number in Exhibit 8 for

14  current year seems to be identical to the number

15  for the prior year listed in Exhibit 7; do you see

16  that?  Specifically I'm saying for Exhibit 8

17  current year, account 263, $1,943,649.53, current

18  year being 2007.  Exhibit 7 shows that for end of

19  year 2006 $1,943,650; do you see that?

20      A.   No.

21      Q.   You do not?  Okay.  What am I getting

22  wrong?

23      A.   I think you got that backwards.

24      Q.   Okay.

1      A.   The officer note payable for the year

2   ended 2006 of 1,945,603 agrees with Exhibit 7.

3      Q.   603.  So, 1,945,603 which is Exhibit 8,

4   account 263 under the column for last year agrees

5   with -- where are you looking?

6      A.   Look at Page 5 of Exhibit 7.

7      Q.   For 2006.  Okay, I do see that.

8      A.   Now, if we move to 2007 --

9      Q.   Right.

10      A.   -- take the balance in the account 263 and

11   add the 190,000.

12      Q.   Okay.  Do you have any understanding why

13   the 190 would have been treated separately in

14   Exhibit 8?

15      A.   I do not have a recollection as to why.

16      Q.   Staying with Exhibit 8, Page 1, account

17   124, officer receivable corp., it states that for

18   current year $2,355,988.18; do you see that?

19      A.   Yes.

20      Q.   To your understanding, would that have

21   been an officer receivable from Charles Hanson?

22      A.   Yes.

23      Q.   And then, again, comparing that to

24   Exhibit 7, Page 12, note C for yearend 2007, there



1   appears to be approximately a million dollar

2   difference; do you see that?

3       A.   Yes.

4       Q.   Do you have any understanding as to what

5   that million dollar difference is?

6       A.   No.

7       Q.   Staying with Exhibit 8, again, on Page 2,

8   account 190, do you have any understanding as to

9   what that figure is, the $581,790?

10      A.   Not without my work papers.

11      Q.   Would that be reflected in your work

12  papers?

13      A.   Yes.

14      MR. ROGOVIN:  Well, I would ask either that a

15  copy of your work papers be produced or that -- if

16  it's simpler that information be provided just as

17  to what that figure is.

18      THE WITNESS:  Okay.

19      MR. ROGOVIN:  Thank you.

20      MR. SABIN:  Which account?

21      MR. ROGOVIN:  Account 190.

22                        (Whereupon, Cieslak Deposition

23                         Exhibit No. 9 was marked for

24                         identification.)



1  BY MR. ROGOVIN:

2      Q.  Handing you a document we marked as

3  Exhibit 9.  Have you seen this before, sir?

4      A.  Yes.

5      Q.  This document, again, each of the pages

6  appears to be stamped with Preliminary Draft, is

7  that right?

8      A.  Yes.

9      Q.  Would this have been a Preliminary Draft

10 produced -- created by Miller Cooper with respect

11 to a Consolidated Financial Statements and

12 Independent Accountants' Report for 2008 and 2007?

13     A.  Yes.

14     Q.  Do you have any recollection as to whether

15 or not any additional versions or final versions of

16 this document were created?

17     A.  A final version was not created.

18     Q.  Why was that?

19     A.  The company was no longer in business.

20     Q.  When would this Exhibit 9 that we're

21 looking at here specifically have been created?

22     A.  Some time during 2009.

23     Q.  So, some time during 2009 the company

24 ceased to do business and you were asked not to



1    produce a final document?

2        A.    Some time during 2009, the company was in

3    such terrible shape there was no need for this

4    document.

5        Q.    Typically what would the need for this

6    document have been; would it have been for lenders,

7    would it have been for internal use, some other use

8    by the companies?

9        A.    This statement was produced for the

10   benefit of the bank.

11       Q.    Suburban Bank?

12       A.    Yes.

13       Q.    Were there still discussions going on with

14   Suburban Bank in 2009 between the companies and

15   Suburban regarding the loan facility?

16       A.    There were discussions with Suburban Bank

17   going on continuously.

18       Q.    Did those conversations continue into

19   2010?

20       A.    The conversations with Suburban Bank

21   continued until they were paid off.

22       Q.    But Suburban didn't need to see any

23   further reports like Exhibit 9 during that period?

24       A.    Suburban Bank had other information that

1  would have given them the same conclusion.

2      Q.   Conclusion being?

3      A.   The financial difficulty of the company.

4      Q.   So, staying with Exhibit 9, Page 13,

5  note C, due from stockholder appears to indicate

6  the companies and affiliates of uncollateralized

7  advances to a stockholder of $3,325,153 and that,

8  again paraphrasing, as of December 31, 2008.  Would

9  that have been an amount of advances to

10  Charles Hanson?

11      A.   Yes.

12      Q.   And then further down the page under

13  note E, it shows a balance of notes payable to

14  officers of $2,111,552 as of December 31, 2008; do

15  you see that?

16      A.   Yes.

17      Q.   Would that have included Charles Hanson

18  and his three children?

19      A.   Yes.

20      Q.   Aside from the $190,000 Florida loan that

21  we looked at a few moments ago, do you know whether

22  or not that figure, the 2,111,000 figure, we're

23  looking at now would include any other amounts due

24  and owing to Charles Hanson?



1      A.   I would need to see the balance sheet as

2    prepared by the company --

3      Q.   For 2008?

4      A.   -- but that's what it appears.

5      MR. ROGOVIN:  Let's see if we have it.

6                         (whereupon, Cieslak Deposition

7                          Exhibit No. 10 was marked for

8                          identification.)

9    BY MR. ROGOVIN:

10     Q.   Have you seen Exhibit 10 before, sir?

11     A.   Yes.

12     Q.   Is this a balance sheet and a current year

13   comparison spreadsheet for the corporate entity for

14   year ending 2008?

15     A.   Yes.

16     Q.   Looking at Exhibit 10, can you tell

17   whether or not the $2,111,552 note payable officer

18   that we were just looking at in Exhibit 9, what

19   portion of that would have been due and owing to

20   Charles Hanson, Sr.?

21     A.   Yes.

22     Q.   How much?

23     A.   190,000.

24     Q.   So, just the Florida loan?

1      A.   Yes.

2      Q.   Can you tell that by seeing that there are

3   no additional line items -- new line items year

4   over year compared to what we looked at before?

5      A.   well, I concluded that when you add

6   account 263 and you add account 229, the total sums

7   to these balances.

8      Q.   It's your understanding that account 263

9   did not include any amounts due and owing to

10  Charles Hanson?

11     A.   Yes.

12     Q.   So, staying with Exhibit 10, sorry,

13  account 263, the figure there for current year, and

14  current year being I believe 2008, is

15  $1,921,551.53, is that right?

16     A.   Yes.

17     Q.   And that would have been monies owed to

18  Charles Hanson's children?

19     A.   Yes.

20     Q.   On Page 1, account 124, officer receivable

21  corp shows a figure of $2,367,529.05; do you see

22  that?

23     A.   Yes.

24     Q.   would that have been an officer receivable

1   from Charles Hanson?

2      A.   Yes.

3      Q.   To the corporate entity?

4      A.   Yes.

5      Q.   Then on Page 2, account 190, again,

6   basically the same question as before.  It shows a

7   current year figure of $778,727.  Do you know what

8   that figure was?

9      A.   Again, I would prefer to refer to our work

10  papers.

11     Q.   Setting aside the work papers, do you have

12  any understanding sitting here today as to what

13  that number is?

14     A.   I would prefer to quote -- to cite my work

15  papers rather than speculate.

16     MR. ROGOVIN:  That's fine.  I don't want you to

17  speculate.

18        So, in connection with the request from

19  earlier, frankly, I would be more concerned

20  specifically about this figure, the 778 figure, in

21  Exhibit 10 than the prior ones because I believe

22  this is the latest balance sheet that we have, I

23  think, for the companies.  And certainly that's the

24  highest figure I think that we've seen account 190



1  go to.  So, that would be the number I would like
2  to see what the basis and what the components of
3  that number are.
4      THE WITNESS:  Okay.
5  BY MR. ROGOVIN:
6      Q.  So, all of the reports that we've looked
7  at, the Combined Financial Statement and
8  Independent Accountants' Reports which I think were
9  Exhibits 1, 2, 3, 4, 5, 7, and 9 -- or at least the
10  ones that were final versions because I know there
11  were a couple in there that were preliminary
12  versions.  In terms of the final versions of those
13  documents after being produced by Miller Cooper,
14  who would they have been produced to?
15      A.  They would have been given to the company.
16      Q.  To Charles Hanson or to just someone else,
17  the controller or someone else at the company?
18      A.  To Charles Hanson.
19      Q.  So, for example, if we look at -- well,
20  let's just look at Exhibit 9 which was a
21  preliminary draft.  Would that preliminary draft
22  have been given to Charles Hanson?
23      A.  I do not recall this report being given to
24  Charles Hanson.



1        Q.   How about Exhibit 7 which was the report
2    for 2006 and 2007?
3        A.   Yes, that would have been given to
4    Charles Hanson.
5        Q.   Did Mr. Hanson ever raise any questions or
6    concerns that the numbers in this document were
7    incorrect?  I'm talking about Exhibit 7.
8        A.   I have no knowledge of that.
9        Q.   Did Mr. Hanson ever indicate that the
10   advances shown to him, note C due from stockholder,
11   were in any way incorrect?
12       A.   I have no knowledge of that.
13       Q.   Would anyone else at Miller Cooper know if
14   that were the case?
15       A.   I would not know that.
16       Q.   But you have no knowledge that Mr. Hanson
17   ever claimed that the numbers were incorrect?
18       A.   I have no knowledge that he ever claimed
19   that.
20       Q.   Did Kathy Henry ever raise any concerns
21   about the numbers in these documents?
22       A.   Not to my knowledge.
23       Q.   Do you know, would copies of these reports
24   have been turned over to Kathy Henry as well?

1    A.   She would have had access to them.

2    Q.   You had indicated earlier that the reports

3    we've been looking at were created really mainly

4    for the benefit of Suburban Bank.  Would

5    Miller Cooper have produced them directly to the

6    bank or would the companies have produced them to

7    the bank?

8    A.   The company would have done that.

9    MR. ROGOVIN:  Off the record.

10                          (Whereupon, a short break was

11                          taken.)

12                          (Whereupon, Cieslak Deposition

13                          Exhibit Nos. 11 - 14 were

14                          marked for identification.)

15   BY MR. ROGOVIN:

16   Q.   I'll represent, while you're looking at

17   these, these appear to be personal financial

18   statements for Charles Hanson and his wife Marian

19   that were produced to us by Suburban Bank & Trust

20   in connection with a subpoena in this case.  I will

21   also mention for the record that we've redacted

22   these pretty broadly and only left information with

23   respect to a couple of the issues we're going to be

24   asking specific questions about.



1           For Exhibits 11 through 14, have you seen
2     any of these documents before?
3          A.   To the best of my knowledge, no.
4          Q.   Between 2006 and 2009, you were aware that
5     Suburban Bank was a lender to one or more of the
6     entities related to Charles Hanson?
7          A.   Yes.
8          Q.   Were you aware during that time that
9     Mr. Hanson was required to provide personal
10    financial statements to Suburban Bank?
11         A.   Yes.
12         Q.   I think you testified earlier that you may
13    have spoken with Kathy Henry with respect to some
14    issues in connection with some personal financial
15    statements, is that right?
16         A.   Yes.
17         Q.   Do you have any understanding sitting here
18    today whether or not the information you would have
19    discussed with Kathy would have been in connection
20    with any of Exhibits 11 through 14?
21         A.   No.
22         Q.   That's fine.  Did you at any time have
23    direct conversations with Suburban Bank?
24         A.   Over the years, to the best of my



1   recollection, probably.

2       Q.   What would those conversations have

3   involved?

4       A.   They would have been in the company of

5   Chuck and/or Kathy at a meeting at the bank.

6       Q.   Would those have involved information

7   regarding an accounting for the companies and

8   financial questions?

9       A.   Yes.

10      Q.   Did any of those meetings involve

11  Mr. Charles Hanson's personal finances at all?

12      A.   No.

13      Q.   If you look at Exhibit 12 which appears to

14  be a personal financial statement dated June 30,

15  2007; do you see that?

16      A.   Yes.

17      Q.   If you look at the last page, Schedule

18  8 --

19      MR. SWAN:  Exhibit 12?

20      MR. ROGOVIN:  Exhibit 12, that's right.

21      MR. SWAN:  That's the '08.

22      MR. ROGOVIN:  Schedule 8, the last page, the

23  only part of that page that's not redacted.

24      MR. KANE:  That's this one, the '07.

1    MR. SWAN:  '07, okay.

2  BY MR. ROGOVIN:

3    Q.  Schedule 8 says that it's current notes

4  payable bank and others, and then, the unredacted

5  portion states Northwest Building Material & Supply

6  Company, name in which account is carried

7  shareholder and current balance of $3,350,000; do

8  you see that?

9    A.  Yes.

10   Q.  If you look at Exhibit 7, again, Page 12,

11  this is pretty much the same number that's listed

12  in note C, although in note C it has a number of

13  $3,350,029 as of December 31, 2006; do you see

14  that?

15   A.  Yes.

16   Q.  But it appears to be essentially the same

17  number?

18   A.  It appears to be.

19   Q.  Are you familiar with personal financial

20  statements?

21   A.  Yes, I am.

22   Q.  And so based on your understanding looking

23  at that Schedule 8 on Exhibit 12, would it be your

24  understanding that Mr. Hanson was representing that



1   he had a debt -- a note due to the corporate entity

2   of $3,350,000?

3        A.   This is what Schedule 8 of the form

4   indicates.

5        Q.   Have you ever seen Mr. Hanson's signature

6   before?

7        A.   Yes.

8        Q.   If you look at the bottom of the page on

9   the last page of Exhibit 12, the first line with

10  the signature on it, it appears to read Charles

11  Hanson.  Do you recognize that as Charles Hanson's

12  signature?

13       A.   Yes, I do.

14       Q.   Let's go to Exhibit 13, and, again, let's

15  look at the last page, Schedule 8 again, still

16  lists Northwest Building Material & Supply Company,

17  that's handwritten in there.  Do you recognize that

18  handwriting at all where it says Northwest Building

19  Material & Supply Company on Schedule 8?

20       A.   I'm not a handwriting expert.

21       Q.   That's fine.  I'm just asking if you

22  happen to recognize it from dealing with some of

23  the folks over time.

24       A.   I really don't have any opinion on that.



1      Q.   That's fine.  Schedule 8 appears to

2   indicate a current balance from Mr. Hanson to the

3   corporate entity of $3,313,612; is that what that

4   states?

5      A.   Yes.

6      Q.   And then let's look back at Exhibit 9

7   again, Page 13.  That exact number is right there

8   in note C, right, shown as being for December 31,

9   2007 due from stockholder?

10     A.   Yes.

11     Q.   And so, again, sticking with Exhibit 13,

12  the signature at the bottom that appears to say

13  C. Hanson.  Again, just based on your recollection

14  and knowledge, does that look like Charles Hanson's

15  signature to you?

16     A.   Yes.

17     Q.   Let's look at Exhibit 14, Schedule 8

18  again.  It lists current note Northwest Building

19  Material & Supply Company again.  I think it's the

20  same number we just looked at, $3,313,612, is that

21  right?

22     A.   Yes.

23     Q.   You know, staying on this one, let's look

24  at Page 2 on Exhibit 14 here.



1    A.   Page 2.

2    Q.   Under Section 3, it appears to be a bit of

3  a -- sort of a version of the balance sheet with

4  assets on the left and liabilities on the right.

5  On the left, the unredacted portion, it says loans

6  receivable attach schedule NWBM 500,000; do you see

7  that?

8    A.   Yes, I do.

9    Q.   Do you have any understanding as to what

10  NWBM was?

11    A.   That was a common usage for Northwest

12  Building Material.

13    Q.   By Northwest Building Material, is that

14  Northwest Building Material of Illinois, Inc.?

15    A.   It was commonly used for Corporate.

16    Q.   For Corporate, okay.  So, this document

17  here, Exhibit 14, on the first page appears to be

18  dated May 31, 2009 on the first page.  Do you have

19  any understanding -- I think we had discussed

20  earlier and you had looked at some of the

21  documents, the Florida loan for about $190,000

22  being due and owing to Mr. Hanson from the

23  corporate entity, and that was all you could recall

24  at the time, and then, that's all that you saw on

1  the document.  Do you have any understanding as to

2  where an additional $310,000 debt from the

3  corporate entity to Mr. Hanson would have come from

4  in May of 2009?

5      A.   No, I do not.

6      Q.   If you look on the right-hand side of that

7  page, the amounts payable to others, it shows

8  $3,313,612; do you see that?

9      A.   Yes.

10     Q.   And that's the same number that we saw in

11  Schedule 8 of this document, is that right?

12     A.   Yes.

13     Q.   Staying with Exhibit 14, same question as

14  before.  The signature at the bottom, it seems to

15  say C. Hanson.  Do you recognize that as

16  Charles Hanson's signature?

17     A.   Yes.

18                      (Whereupon, Cieslak Deposition

19                       Exhibit No. 15 was marked for

20                       identification.)

21  BY MR. ROGOVIN:

22     Q.   Have you seen this document before?

23     A.   Yes.

24     Q.   This appears to be a Trial Balance Report



1   for Northwest Building & Materials Yearend
2   December 31, 2009, is that right?
3       A.   Yes.
4       Q.   Do you know who created this document?
5       A.   Yes.
6       Q.   Who was that?
7       A.   Staff at Miller Cooper.
8       Q.   Were you involved in the creation of this
9   document?
10      A.   No.
11      Q.   Would you have reviewed this document
12  after it was created by staff?
13      A.   I would have read this document.
14      Q.   Would this document have been produced to
15  anyone, to the client, to Mr. Hanson, to the bank,
16  anyone else?
17      A.   I have no recollection of it being
18  produced for any other purpose other than internal.
19      Q.   Looking at the top, there's a row starting
20  with account number and then description, and then,
21  there's some abbreviations.  The first one, CP, is
22  that corporate?
23      A.   Yes.
24      Q.   And BMDI is the BMDI entity we were



1   talking about earlier?

2        A.   Yes.

3        Q.   Is PV the Prairie View location?

4        A.   Yes.

5        Q.   Is NV the Naperville location?

6        A.   Yes.

7        Q.   Is SP the Southport entity?

8        A.   Yes.

9        Q.   That would be the Southport, the retail

10  entity?

11       A.   Yes.

12       Q.   SRE, is that Southport Real Estate?

13       A.   Yes.

14       Q.   CSR, is that CS Realty?

15       A.   Yes.

16       Q.   NWR, is that NW Realty?

17       A.   Yes.

18       Q.   And then the total column would total

19  everything up for all the individual entities we

20  just looked at?

21       A.   Yes.

22       Q.   Now, you indicated before I think that the

23  Prairie View location and the Naperville location

24  were both under -- were locations owned by the



1   Northwest Building Material of Illinois, Inc.
2   entity, is that right?
3       A.   Yes.
4       Q.   Was there a reason for accounting purposes
5   that they were broken out by location as opposed to
6   entity?
7       A.   Yes.
8       Q.   What was that?
9       A.   Managerial purposes.
10      Q.   You were asked to do that by the company?
11      A.   We were not asked to do it.  The company
12  wanted to do it to make sure that the yard
13  operations were better analyzed.
14      Q.   So, Page 1 at the very bottom,
15  account 124, it shows officer receivable, and then,
16  in the first column there under what I think you
17  and I identified as the corporate column it shows
18  $2,486,084; do you see that?
19      A.   Yes.
20      Q.   So, is this document saying that as of
21  December 31, 2009, there was an officer receivable
22  from Charles Hanson in the amount of $2,486,084?
23      A.   Yes.
24      Q.   Going over a few columns, let's look at



1   the SP column.  It shows in parentheses -- sorry,
2   we're still in account 124 -- 528,276 in
3   parentheses; do you see that?
4       A.   Yes, I do.
5       Q.   Would that have been money owed by
6   Mr. Hanson to the Southport entity?
7       A.   That would be money owed by the entity to
8   Mr. Hanson.
9       Q.   Thank you.  If you turn to the next page,
10  account 190, interest receivable.  The first column
11  under CP for Corporate, it shows $778,727; do you
12  see that?
13      A.   Yes.
14      Q.   And so the next line down, I guess,
15  account 2501 due from officer has a number of
16  $3,264,811, is that right?
17      A.   Yes.  Yes.
18      Q.   It's account No. 2501.  Okay.  That
19  3.2 million dollar number, is that a combination of
20  the 778,000 in account 190 and the 2.4 million
21  approximately in account 124?
22      A.   Yes.
23      Q.   So, does this indicate that there was an
24  amount of $778,727 of interest due from



1  Charles Hanson to the corporate entity as of

2  December 31, 2009?

3      A.   Yes.

4      Q.   And so there was a grand total of

5  $3,264,811 due from Charles Hanson to the corporate

6  entity as of December 31, 2009?

7      A.   Yes.

8      Q.   Okay.  Thank you.  If you turn to Page 4,

9  account 263, officer notes payable, again, just

10  looking at the column for CP, the corporate

11  entity -- well, strike that.

12         Let's look at account 229, Florida loan,

13  under the CP column, it shows $161,914; do you see

14  that?

15     A.   Yes.

16     Q.   Does that indicate that as of the end of

17  2009 the corporate entity owed Charles Hanson

18  $161,914 in connection with the Florida loan?

19     A.   Yes.

20     Q.   The previous document we looked at showed

21  a total of 190,000, is that right?

22     A.   Yes.

23     Q.   Do you have any understanding that prior

24  to December 31, 2009, the date of this Exhibit 15,



1  some payments had been made by the corporate entity

2  to Charles Hanson to pay down a portion of that

3  amount?

4      A.   All I know based on this document is that

5  the balance changed from 190 to 161 from 12-31 of

6  '08 to 12-31 of '09.

7      Q.   Outside of the document, do you have any

8  recollection, any personal knowledge as to why that

9  number changed?

10     A.   No, I do not.

11     Q.   And then the next line down, account 263,

12 officer notes payable showed $1,929,552; do you see

13 that?

14     A.   Yes.

15     Q.   Was that amount owed to Charles Hanson's

16 children?

17     A.   Yes.

18     Q.   Was any portion of that 1.9 million dollar

19 amount owed to Charles Hanson?

20     A.   No.

21     Q.   So, if you go back to Exhibit 10 which

22 would have been, I suspect, a balance sheet -- did

23 you find it?

24     A.   Yes.



1      Q.   So, Exhibit 10, Page 2, account 190, does

2   what we looked at in Exhibit 15 refresh your

3   recollection as to whether or not account 190

4   listed in Exhibit 10 was an interest amount due

5   from Charles Hanson to the corporate entity?

6      A.   Yes, it does refresh my recollection and

7   they are, in fact, the same numbers.

8      MR. ROGOVIN:  Very good.  Thank you.

9                         (Whereupon, Cieslak Deposition

10                        Exhibit No. 16 was marked for

11                        identification.)

12  BY MR. ROGOVIN:

13     Q.   Take a look and let me know if you've seen

14  this document before?

15     A.   Yes.

16     Q.   There's a good deal of handwriting on this

17  document.  Do you recognize any of the handwriting?

18     A.   Yes.

19     Q.   Whose handwriting is that?

20     A.   It is my handwriting.

21     Q.   Do you know who created this document

22  aside from the handwriting?

23     A.   This document is coming from the books and

24  records of the company.



1    Q.   So, this would have been provided to you
2    by the company?
3    A.   Yes.
4    Q.   This document, this is a balance sheet for
5    the corporate entity as of December 31, 2010, is
6    that correct?
7    A.   Yes.
8    Q.   So, account 263, officer notes payable for
9    current year, it shows $1,931,551.53; do you see
10   that?
11   A.   Yes.
12   Q.   Would this have been amounts owed by the
13   corporate entity to Charles Hanson's children as of
14   the end of 2010?
15   A.   Yes.
16   Q.   And, again, was any portion of that figure
17   owed to Charles Hanson personally?
18   A.   No.
19   Q.   A little bit further up on the page,
20   account 229, Florida loan, it seems to indicate
21   current year $147,943.52; do you see that?
22   A.   Yes.
23   Q.   Was that 147,000 figure the amount owed by
24   the corporate entity to Charles Hanson on the

1   Florida loan as of December 31, 2010?

2       A.   Yes.

3       Q.   If you turn back to Page 1, account 124,

4   it appears that should be circled, officer

5   receivable corp., $2,470,498.37; do you see that?

6       A.   Yes.

7       Q.   Would that have been an officer receivable

8   due from Charles Hanson to the corporate entity as

9   of December 31, 2010?

10      A.   Yes.

11      Q.   You indicated earlier that the handwriting

12  here is yours.  Can you tell me -- there's some

13  math off to the side here to get to the 2.4 million

14  dollar number which I can't read all of it

15  necessarily.  The 461,340 is in brackets.  What

16  does it say next to that to the right?

17      A.   It says a prior year adjusting journal

18  entry.

19      Q.   For 2006?

20      A.   Yes.

21      Q.   So, there would have been a journal entry

22  showing an increase in the officer receivable of

23  about $461,000 from 2006?

24      A.   Well, this actually shows a decrease.



1    Q.   A decrease, okay, from 2006, okay.  So, is
2  this indicating that you were discovering a journal
3  entry from 2006 and 2010?
4    A.   These are attempting to tie out to the
5  federal income tax return, and that was what the
6  purpose of these reconciliations were for.
7    Q.   We'll come back to that, actually.  We'll
8  look at the returns a little bit later.  We'll keep
9  this out.
10          If you turn to Page 2 of Exhibit 16,
11  account 190, again, deferred other expense in the
12  amount of $778,727; do you see that?
13    A.   Yes.
14    Q.   Does that indicate that that 778,000
15  figure was due from Charles Hanson to the corporate
16  entity as of December 31, 2010?
17    A.   Yes.
18    Q.   We looked earlier at the reports that
19  indicated that the officer receivable was going to
20  accrue interest at prime less a half a percent; do
21  you recall that?
22    A.   Yes.
23    Q.   Looking at this document, can you tell
24  whether or not that officer receivable was accruing

1  interest year over year at prime less a half

2  percent?

3      A.   This report indicates the interest from

4  2009 is the same as 2010 which would lead me to say

5  that interest was not accrued.

6      Q.   Thank you.  So, would it be accurate --

7  and I'm not going to make you do the math now, but

8  would it be accurate to say that if you added

9  account 124 with account 190, that would give you a

10  total of what Charles Hanson owed to the corporate

11  entity in connection with the officer receivable as

12  of December 31, 2010?

13      A.   Yes.

14      Q.   I think you indicated earlier that the

15  companies were having financial difficulties at

16  least by 2009, is that right?

17      A.   Yes.

18      Q.   Was that all of the companies that still

19  existed at that point?

20      A.   Yes.

21      Q.   And so that would have included the

22  corporate entity?

23      A.   Yes.

24      Q.   Do you recall when the corporate entity



1   formally ceased to do business?

2       A.   The corporate entity would have ceased to

3   do business when the operating companies ceased to

4   do business.

5       Q.   Do you recall when that would have been?

6       A.   No, I don't recall, but we're circling the

7   wagons in 2009 or 2010.

8                        (Whereupon, Cieslak Deposition

9                         Exhibit No. 17 was marked for

10                        identification.)

11  BY MR. ROGOVIN:

12      Q.   I'll ask you to take a quick look and let

13  me know if you've seen this document before?

14      A.   Yes, I have.

15      Q.   Is this the 2010 U.S. Income Tax Return

16  for the corporate entity?

17      A.   Yes.

18      Q.   The first couple of pages appear to be a

19  cover letter from Miller Cooper, is that correct?

20      A.   Yes.

21      Q.   At the bottom of the first page, it

22  identifies, it says sincerely Ricky L. Max,

23  Principal.  Who is Ricky Max?

24      A.   Ricky Max is my tax partner.



1      Q.   Would he have been the person to prepare

2    this tax return?

3      A.   Yes.

4      Q.   Were you involved in preparing the tax

5    return at all?

6      A.   No.

7      Q.   Would he have consulted with you in

8    preparing the tax return or looking for numbers or

9    anything along those lines?

10      A.   More than likely.

11      Q.   Do you have any recollection of him doing

12    so?

13      A.   The recollection would be that he would

14    have received trial balance information from the

15    accounting group in order for them to prepare this

16    return.

17      Q.   Did he typically come to you and ask

18    questions if he had questions about what he

19    received from the accounting group?

20      A.   Yes.

21      Q.   If you turn to Page 4 of the return,

22    Schedule L, Page 4 in the upper right-hand corner,

23    and you look at Line 7, loan to shareholders; do

24    you see that?



1     A.   Yes.

2     Q.   It shows beginning of the tax year

3   $2,024,744; do you see that?

4     A.   Yes.

5     Q.   So, this would have been at the beginning

6   of 2010, is that right?

7     A.   That would have been for 12-31, 2009.

8     Q.   Right.  Okay.  So, if we go back and we

9   look at Exhibit 15, I don't know if you want to

10  refer to it, and specifically if you want to look

11  at Page 2, account 2501, Page 2, I think we

12  discussed earlier, you testified earlier that the

13  total amount due and owing from Charles Hanson to

14  the corporate entity as of December 31, 2009 was a

15  little bit over 3.2 million dollars as shown in

16  account 2501, is that right?

17    A.   Yes.

18    Q.   Can you explain, what would be the

19  difference between Exhibit 17 where it showed

20  beginning of tax year loan to shareholder of just a

21  hair over 2 million and then this due from officer

22  amount of over 3.2 million in Exhibit 15?

23    A.   Yes.

24    Q.   Okay.  Can you explain that?



1    A.   Yes.

2    Q.   Would you do so, please?

3    A.   If you flip back to Statement 4 --

4    MR. SWAN:  Which exhibit are we on?

5    MR. ROGOVIN:  Exhibit 17.

6    THE WITNESS:  We're on Exhibit 17.  So,

7    somewhere in the middle there of Exhibit 4 --

8    MR. ROGOVIN:  Statement 4?

9    MR. SABIN:  Statement 4.

10    THE WITNESS:  Statement 4.  I'm sorry.  You'll

11    see up above where it says other asset --

12    MR. ROGOVIN:  Yes.

13    THE WITNESS:  -- and you'll see the 778,727.

14    MR. ROGOVIN:  I do.

15    THE WITNESS:  That was on both years.  So, for

16    the return, that was separately stated and you'll

17    also see on Exhibit 15 the 778.727.

18    MR. ROGOVIN:  Right.

19    THE WITNESS:  It's just a classification for

20    that amount.

21    MR. ROGOVIN:  Okay.  Well, that's helpful.

22    BY MR. ROGOVIN:

23    Q.   The principal number itself still seems to

24    be off though, right?

1    A.   And then we need to go back to

2  Exhibit 16 --

3    Q.   Okay.

4    A.   -- and go back to the manual references.

5    Q.   Your handwriting?

6    A.   My handwriting.  And take the 2,470,000

7  less the 461,000 is 2 million -- is one of the

8  principal differences.  To get the 2,488,000 down

9  to the 2,024,000, I would need to recall the -- or

10  get the work papers Ricky Max used to prepare

11  this --

12    Q.   Exhibit 17.

13    A.   -- Exhibit 17 to come down to that number

14  which we certainly have.

15    Q.   Well, tell me this.  I understand that --

16  and I'll preface that I'm just an attorney, not an

17  accountant so, I don't understand some of this

18  clearly as well as you do.

19         I think you had indicated earlier that

20  Exhibit 16 indicated that Charles Hanson owed an

21  officer receivable to the corporate entity, I'm

22  looking at 16, account 124 now, of $2,470,498.37 as

23  of December 31, 2010, is that right?

24    A.   Yes.



1    Q.   From an accounting perspective, why would

2   that number then when you look at Exhibit 17 for

3   end of tax year 2010, it shows a loan to

4   shareholder of $77,676 and that seems to match up

5   or very close to your handwriting?  So, I guess the

6   question here being why would the number reflected

7   in the tax return not be the actual amount owed by

8   Mr. Hanson?

9    A.   At the time of 2009 and 2010, they had

10  very few people in the accounting office.  So,

11  there may have been yearend entries not recorded at

12  the time, and so we would sometimes record those

13  manually to make sure that our carry forward in

14  years for tax return purposes were consistent.  I

15  need to -- and part of this reconciliation was to

16  get me to the 77,606 in 2010 versus the internally

17  prepared books and records.  So, this provided a

18  track for what our tax folks used to reflect the

19  information on Schedule L.

20   Q.   Let's stick with 16 for a second,

21  Exhibit 16.  In your handwritten column that's on

22  Page 1 off to the right, there's in brackets

23  $1,931,551 and there's some writing off to the

24  side.  What does that writing say?

1     A.   Could you point that out to me?

2     Q.   Sure.  It's 1,931,551, and then, there's

3   some handwriting right to the side.

4     A.   Re-class liability, and that liability

5   is -- what the preparer of this return did is took

6   the obligation in account 263.

7     Q.   On what page?

8     A.   On Page 3 of Exhibit 16 and netted the

9   number on this balance sheet.

10    Q.   Okay.  Thank you.  But you testified

11  earlier that account 263 was a payable to

12  Mr. Hanson's kids.

13    A.   I also testified I did not prepare this

14  return.

15    Q.   No.  That's --

16    A.   It's a classification difference.  This is

17  what -- it's not anything other than if you

18  increase an asset, you could increase a liability,

19  its presentation is that we're referring to.  Why

20  it was done that way is, again, just factually what

21  occurred and how I reconciled to it after-the-fact.

22    MR. ROGOVIN:  Off the record.

23                        (Whereupon, a discussion was

24                         had off the record.)



1      MR. ROGOVIN:  So, staying on Exhibit 16 off to

2    the right, the $461,000 figure there that you said

3    had come from the journal entry from 2006 --

4      THE WITNESS:  Yes.

5      MR. ROGOVIN:  -- I would ask that that be

6    produced, any evidence of that journal entry or

7    information about that.  I don't think we've seen

8    that to some -- just whatever the basis for that

9    deduction was.

10      THE WITNESS:  Yes.

11      MR. ROGOVIN:  Thank you.

12    BY MR. ROGOVIN:

13      Q.   So, staying with Exhibit 17 -- actually,

14    let's have 16 and 17 side by side.  I think you've

15    already testified to this, but I just want to be

16    clear for the record.  It's your understanding

17    having not prepared Exhibit 17 that the 77,606

18    figure shown as end of year Line 7 loan to

19    shareholder, that number resulted from the

20    handwritten math on Exhibit 16 by taking those

21    numbers together, that's how you reached that 77

22    figure in Exhibit 17?

23      A.   Yes.

24      Q.   So, the 77,606 figure shown on the tax

1  return, is that a number that's for presentation
2  only or did he, in fact -- he being Charles
3  Hanson -- still actually owe the more than
4  2 million dollars or more than 3 million dollars
5  depending how you calculate that interest figure to
6  the company?
7      A.  He still owes the larger number to the
8  company.
9      Q.  The larger number being the multi-million
10  dollar number that we looked at earlier?
11      A.  Yes.
12      Q.  If you turn to the third to last page of
13  Exhibit 17, I think it's -- yes.  It says Page 3 up
14  in the upper right-hand corner, but it's the third
15  to last page, so Page 3 of whatever that schedule
16  is.
17      A.  That's the same page as the original
18  letter 20.  It's just an attachment to the Illinois
19  return.
20      Q.  You're right.  So, we're looking at the
21  same thing.  Line 16-E towards the bottom, it shows
22  repayment of loans from shareholders; do you see
23  that?
24      A.  Yes.



1    Q.   It shows $2,083,466; do you see that?

2    A.   Yes.

3    Q.   Do you know what that number reflects?

4    A.   I would have to refer back to the tax work

5    papers to how they arrived at that.

6        MR. ROGOVIN:  Well, again, I would ask for any

7    information, any documentation you have as to what

8    that number is and how that's calculated.

9        THE WITNESS:  Okay.  Write that down.

10       MR. SABIN:  Okay.

11   BY MR. ROGOVIN:

12       Q.   Do you have any recollection as to whether

13   or not Mr. Charles Hanson made a payment of more

14   than 2 million dollars to the corporate entity?

15       A.   Not a chance.

16       Q.   So, he did not?

17       A.   He did not.

18       Q.   Do you know whether anyone else made a

19   payment on his behalf to the corporate entity in

20   the amount of 2 million dollars?

21       A.   I have no knowledge.

22       Q.   Do you have any understanding at all as to

23   what that 2 million number is?

24       A.   I would prefer not to speculate.  It must

1   have to do though with this, the reclassification.

2       Q.   You're pointing to?

3       A.   The million 931.

4       Q.   In Exhibit 16?

5       A.   Yes.

6       MR. ROGOVIN:  Off the record.

7                        (Whereupon, a discussion was

8                         had off the record.)

9                        (Whereupon, Cieslak Deposition

10                        Exhibit No. 18 was marked for

11                        identification.)

12  BY MR. ROGOVIN:

13      Q.   I ask you to take a look and let me know

14  if you've seen this before.  And while you're

15  looking, I'll represent for the record that this

16  appears to be an email from Kathy Henry to

17  Clay Belongia and CC-ing Mr. Cieslak dated

18  August 26 of 2010 with a trail of emails below it.

19  Have you seen this before?

20      A.   I don't recall.

21      Q.   In the second sentence of what appears to

22  be Kathy's email says I spoke to my accountant.  It

23  is Mr. Hanson, myself, and C. Hanson, Jr.  The

24  amount is on the trial balance for $2,083,466 and



1   interest only payment have been suspended; do you

2   see that?

3       A.   Yes.

4       Q.   If you look below, I'm probably butchering

5   his name, but Mr. Belongia's email dated August 25

6   states no, we were asking about the shareholder

7   debt under financial statement; do you see that?

8       A.   Yes.

9       Q.   Is it your understanding looking at this

10  that, as you and I discussed earlier, the amount

11  shown on the trial balance of the company as being

12  payable to officers was to Charles Hanson, Kathy

13  Henry, and Charles Hanson, Jr.?

14      A.   Yes.

15      Q.   I think you testified earlier that another

16  of the children at least at one time was also owed

17  money in that officer payable, is that right?

18      A.   In the officer payable were three children

19  and eventually Chuck.

20      Q.   I apologize.  Who was the third child

21  besides Kathy and Charles, Jr.?

22      A.   Scott.

23      Q.   Scott.  Did there come a time when Scott

24  was paid in full?



1      A.    Yes.

2      Q.    When was that?

3      A.    When he was no longer employed by the

4   company.

5      Q.    Was he paid as part of a parting?

6      A.    There was a transaction that went on that

7   had to do with his termination and the nonpayment

8   to whatever balance was due him, and I would have

9   to look at when that transaction happened and see

10  how that -- if I, in fact, even have how that

11  transaction was recorded.

12     Q.    Is it your understanding sitting here

13  today that as of August of 2010 Scott was no longer

14  owed anything by the company?

15     A.    That is correct.

16                    (Whereupon, Cieslak Deposition

17                     Exhibit No. 19 was marked for

18                     identification.)

19  BY MR. ROGOVIN:

20     Q.    Let's take a look at 19, and I'll

21  represent for the record that this appears to be

22  U.S. Individual Income Tax Return for Charles

23  Hanson and Marian Hanson for year 2008.  Have you

24  seen this before?



1      A.   Yes.

2      Q.   Just for clarity of the record, there's

3   also some Illinois State tax documents at the back

4   as well.

5           Did Miller Cooper prepare this document?

6      A.   Yes.

7      Q.   Would you personally have been involved in

8   preparing this personal return that we're looking

9   at, Exhibit 19?

10     A.   Yes.

11     Q.   You were, okay.  Was Mr. Max involved?

12     A.   No.

13     Q.   So, did you prepare it yourself?

14     A.   Yes, with the assistance of other

15  individuals in my firm.

16     Q.   You're pointing on the bottom of Page 3.

17  Is that your signature?

18     A.   Yes, it is.

19     Q.   Great.  Thank you.  So, if you go to the

20  fifth page which is Schedule B, in Part 1 it shows

21  interest and it appears to be interest payments

22  during the year.  And the last line down says N.W.

23  Building Material & Supply Company and the amount

24  of $118,787; do you see that?

1     A.   Yes.

2     Q.   Does that indicate that Charles Hanson

3  received 118,000 or so in interest payments from

4  the corporate entity in 2008?

5     A.   Northwest Building Material & Supply is a

6  pass-through entity.  So, this has to reflect the

7  K-1 for Charles Hanson.  And if we look at the

8  building income tax return -- or Northwest Builders

9  income tax return for that year, there is a

10  component that's referred to as interest income

11  that he has to report the same way the corporation

12  reports.  The corporation is on an accrual basis,

13  not a cash basis.  This is one of those little

14  reporting quirks that -- this does not mean that he

15  received the money, but he has to report the K-1,

16  how it's reported to the government on his personal

17  return.

18     Q.   I understand.  Okay.  Thank you.  That

19  explains that.

20          So, just for absolute clarity, this was

21  not in connection with any portion of the Florida

22  loan; this would not have been interest on the

23  Florida loan from Charles Hanson?

24     A.   Again, this just refers to the K-1 that

1  Mr. Hanson has to pick up as a result of that

2  filing into his personal return.  The source -- I'm

3  not aware of what the sources were.

4      Q.  Do you have any knowledge or recollection

5  whether or not Charles Hanson was paid interest in

6  connection with the Florida loan?

7      A.  I have no knowledge.

8      Q.  I think you indicated earlier that you did

9  not believe that Mr. Hanson had made a 2 million

10  dollar payment towards the officer receivable, is

11  that correct?

12      A.  That is correct.

13      Q.  Sitting here today, do you have any

14  understanding as to at any point through the

15  present day whether Mr. Hanson Charles Hanson ever

16  repaid the more than 3 million dollar officer

17  receivable that we saw in the documents earlier?

18      A.  Mr. Hanson did not repay the 3 million

19  dollars.

20      Q.  Was that money repaid by anyone?

21      A.  I have no knowledge that it was ever

22  repaid.

23      Q.  With respect to the Florida loan, I think

24  the last document we saw -- I'm not going to make



1   you look for it -- was that Charles Hanson was

2   still owed somewhere in the mid 100,000 range; is

3   that your recollection?

4        A.   Yes.

5        Q.   Do you know if the remainder of that loan

6   was ever repaid to Charles Hanson?

7        A.   I have no knowledge of that.

8                         (Whereupon, Cieslak Deposition

9                         Exhibit No. 20 was marked for

10                        identification.)

11  BY MR. ROGOVIN:

12       Q.   I'll ask you to take a look at it, and

13  while you do that, I'll represent for the record

14  this appears to be an email from Kathy Henry to you

15  and to, I think, Tom McGuire of the Arnstein law

16  firm dated October 26 of 2011.  Have you seen this

17  before?

18       A.   I don't recall.

19       Q.   In the portion at the top which appears to

20  be Kathy's email, the second -- well, we'll read

21  the first couple of sentences.  The first sentence

22  says will you please help me with this?  The

23  lawyers, paralegal want to know about the monies

24  dad loaned to Northwest.  Everything is on the



1  balance sheet, then in parentheses, not everything,
2  close parentheses, comma, we don't have any formal
3  agreements regarding repayment.  Do you see that?
4      A.   Yes.
5      Q.   Do you have any understanding what Kathy
6  might have meant when she said that not everything
7  was on the balance sheet?
8      A.   No, I do not.
9      Q.   Had you ever encountered an issue in
10  reviewing the documents provided by the companies
11  that they were not full and complete?
12      A.   I would have no knowledge as to that.
13      Q.   If you look a little bit further down in
14  the email chain on this page, it seems to have
15  started with an e-mail from Sharon Tomac at the
16  Chitkowski law firm to Kathy.  It seems to discuss
17  the subject is Clark Western versus Charles Hanson;
18  do you see that?
19      A.   Yes.
20      Q.   Do you know what Clark Western is?
21      A.   They were a vendor.
22      Q.   Did they have, to your recollection, a
23  judgment against Charles Hanson personally?
24      A.   I do not know.



1    Q.   Do you recall whether or not Clark Western
2   served a citation on Mr. Hanson for information
3   regarding his finances?
4    A.   I'm not a -- I don't have recollection of
5   that.
6                        (Whereupon, Cieslak Deposition
7                        Exhibit No. 21 was marked for
8                        identification.)
9   BY MR. ROGOVIN:
10   Q.   I'll ask you to take a look at that, and
11  as you're reviewing it, I'll represent for the
12  record that this appears to be an email from
13  Kathy Henry dated August 26 of 2011 to Thomas
14  McGuire of the Arnstein law firm and CC-ing you,
15  Mr. Cieslak.  After you've had a chance to review
16  it, please let me know if you've seen this before?
17   A.   No, I don't recall.
18   Q.   I'll read part of her e-mail here for the
19  record.  Hi, Tom.  I left you a V mail.  I copied
20  P. Cieslak, our accountant, on this as he might
21  have some ideas.  We have to do something fast to
22  get these corps out of my father's name, I think.
23  I don't want anything to be at risk for my father
24  with the Clark judgement and their pending

1   discovery to the Citation To Discover Assets.

2          Reading this, do you have any recollection

3   as to whether or not Kathy Henry was interested in

4   moving assets of her father to avoid a judgment?

5       A.   I would have no recollection of that.

6       Q.   This language, again, she said we have to

7   do something fast to get these corps out of my

8   father's name, I think.  Do you recall whether or

9   not any of the companies in or about 2011 or after

10  changed their ownership structure?

11      A.   We stopped doing work for all of the

12  businesses, so I would not have information on

13  that.

14      Q.   When did you stop doing work for the

15  businesses?

16      A.   Right around this period of time.

17      Q.   So, while you were still doing work for

18  them, you have no knowledge of the corporate

19  ownership changing?

20      A.   We stopped doing the corporate returns, I

21  believe the last ones were 2010, so I would not

22  have -- we would not have inquired as to any change

23  because that would have required K-1 differences.

24  I don't recall doing anything in that regard.

1      Q.   Did you do Charles Hanson's personal tax
2   returns for 2011?
3      A.   what year is that?
4      MR. SWAN:  This is '10.
5      THE WITNESS:  I don't recall if 2011 was the
6   last year or not.  2011 may have been the last
7   year.
8      MR. ROGOVIN:  I don't have the year with me.  I
9   can probably find it, I think it does exist, but
10  okay.  Off the record.
11                          (whereupon, a discussion was
12                          had off the record.)
13  BY MR. ROGOVIN:
14     Q.   Looking at Exhibit 21 again, do you recall
15  whether or not you responded to this email in any
16  way?
17     A.   I have no recollection of responding to
18  this.
19                          (whereupon, Cieslak Deposition
20                          Exhibit No. 22 was marked for
21                          identification.)
22  BY MR. ROGOVIN:
23     Q.   I'll ask you to take a look at that again,
24  and as you're doing that, I'll represent for the



1  record this appears to be an e-mail from Thomas
2  McGuire of the Arnstein law firm to Kathy Henry
3  CC-ing you, Mr. Cieslak, dated August 26, 2011.
4  Have you seen this before?
5      A.   I don't recall.
6      Q.   At the top of the email, he addresses it
7  to Kathy and Pete and he says I don't think gift
8  works at this point due to fraudulent conveyance
9  issues.  I'm thinking that perhaps an installment
10 sale of the stock of the two corporations to a
11 trust might work.  Do you have any recollection or
12 knowledge as to whether or not such an installment
13 sale took place?
14     A.   I have no recollection.
15     Q.   Towards the bottom of Mr. McGuire's email,
16 it's the fifth paragraph down, he says Pete, any
17 thoughts on this or any alternatives, question
18 mark.  Do you recall responding to this at all?
19     A.   I do not recall responding to this.
20     Q.   Do you recall having any conversations
21 either with Kathy or Thomas McGuire about moving
22 ownership of the corporations?
23     A.   I don't recall.
24     Q.   Do you know which corporations were

1  specifically being discussed in this email?

2      A.   No, I do not.

3      Q.   Going back to the line we looked at a

4  minute ago that said I'm thinking perhaps an

5  installment sale of the two corporations to a trust

6  might work, do you know what trusts existed in

7  2011?

8      A.   I'm not aware of any trusts.

9      Q.   Did Miller Cooper ever do tax work for any

10 trusts related to or in any way affiliated with the

11 Hanson family?

12     A.   We would have to do a search on that.  I

13 just don't recall.

14     MR. ROGOVIN:  I'll ask that you please let me

15 know if you did.

16     THE WITNESS:  Certainly.

17     MR. ROGOVIN:  And if so, which trusts you did

18 work for.

19     THE WITNESS:  Okay.

20     MR. ROGOVIN:  Thank you.

21                     (Whereupon, Cieslak Deposition

22                      Exhibit No. 23 was marked for

23                      identification.)

24



1  BY MR. ROGOVIN:

2     Q.  I'll ask you to take a look at this, if

3  you could.  I'll represent for the record while

4  you're looking this appears to be an email from

5  you, Mr. Cieslak, to Kathy Henry dated October 20

6  of 2011 with a couple of emails further down the

7  chain also on the document.  Do you recall writing

8  this email?

9     A.  No, I do not.

10     Q.  If you go down to the bottom of the page,

11  it seems to have started with an email from Sharon

12  Tomac of the Chitkowski law firm, again, subject

13  Clark Western versus Charles Hanson.  Then it says

14  Jason Loebach and I have received the documents

15  which you provided relative to the citation against

16  it looks like your father, although the your is cut

17  off, and at the end it says please provide all

18  information documents within the next week.  A

19  little bit further up the page there appears to be

20  an email from Kathy dated October 20 of 2011 saying

21  guys, could you help me out with this, please.  Do

22  I list Scott Hanson who owes both of my parents

23  money, do I list the loans the company owes my

24  father, what the heck do I do about jewelry and

1   furnishings?  Thank you, Kathy Henry.  Do you see

2   that?

3       A.   Yes, I do.

4       Q.   And then looking at the document, it looks

5   as your response to her would be none would be the

6   best answer; do you see that?

7       A.   Yes.

8       Q.   You don't recall writing that?

9       A.   This is what it says.

10      Q.   Do you have any understanding why you

11  would have indicated to Kathy that she shouldn't

12  list Scott Hanson's debts to his parents or the

13  other debts that she identified in her email?

14      A.   I think the statement stands on itself.

15      MR. ROGOVIN:  Very good.  All right.  Give me

16  five or ten minutes to take a look at that and see

17  if I can find 2011.

18      THE WITNESS:  I just don't recall.  We stopped

19  doing a lot of stuff, but I think -- I don't know

20  if that was the last one or not.  If you have 1 or,

21  if not, we can search again.

22      MR. ROGOVIN:  Sure.  Okay, great, I appreciate

23  that.

24      THE WITNESS:  I mean that's not a problem.



| 1 | (Whereupon, a short break was |
| 2 | taken.) |
| 3 | (Whereupon, Cieslak Deposition |
| 4 | Exhibit No. 24 was marked for |
| 5 | identification.) |

6  BY MR. ROGOVIN:

7  Q.  Take a quick look at this, and I'll say

8  for the record it appears to be personal tax return

9  for Charles and Marian Hanson for the year 2011

10  with a couple of pages up front of a cover letter

11  and then a two-year comparison sheet; do you see

12  that?

13  A.  Yes.

14  Q.  Is this the tax return for Charles and

15  Marian Hanson for 2011?

16  A.  Yes.

17  Q.  Was this prepared by Miller Cooper?

18  A.  Yes.

19  Q.  Did you personally prepare it?

20  A.  I did not personally prepare it, but I

21  approved it.

22  Q.  Looking at this document a little bit

23  further back, as you'll see, there are a number

24  of -- towards the back supplements to Form 6198 for



1  various entities, BMDI, Inc., Southport Lumber, a

2  bunch of the other entities that we've discussed;

3  do you see that?

4     A.   Do you have a statement number at the

5  bottom?

6     Q.   We'll just take an example.  Statement 9

7  for Northwest Building -- actually, that's a --

8  yes, Northwest Building Material & Supply Company,

9  Statement 9.

10    A.   Yes.  Okay, yes.

11    Q.   Are the figures listed on that page that

12 we're looking at, Schedule 9, were those numbers

13 for 2011?

14    A.   If you go to Page 7 -- I'm sorry,

15 Statement 7, they appear to be all carryovers from

16 previous years.

17    Q.   If you look at Schedule 5 --

18    A.   Schedule or statement?

19    Q.   Sorry.  Statement 5.  Is that consistent

20 with that?  It shows none for non-passive income,

21 there's nothing else listed there.  Is that

22 consistent with everything being a carryover?

23    A.   Yes.

24    Q.   Do you know whether any of these entities



1  filed 2011 tax returns?

2      A.    I could find that by looking through our

3  files.  I think most of them did not.

4      Q.    To your recollection, the entities listed

5  on Statement 5, did any of them issue K-1s in 2011?

6      A.    Only if they filed a return.

7      Q.    Is there any way to look at this tax

8  return, Exhibit 24, and see if it is based on K-1s?

9      A.    You would go to Page 2 of Schedule E which

10  refers you back to Statement 5 as you received, and

11  the only way I could confirm that would be to look

12  at our files, but I think in 2011 no one filed

13  income tax returns and none was just a prudent way

14  of getting his personal return done.

15      Q.    So, on the first page of his return which

16  shows, Line 22, income of negative 1.8 million or

17  so approximately, would that have been largely

18  based on the passive losses, the carryovers?

19      A.    They would have been based on

20  Statement 3 which were active losses creating a net

21  operating loss that he could not use.

22      MR. ROGOVIN:  I think that's all I have about

23  that.

24

1  BY MR. ROGOVIN:

2    Q.  I just wanted to clarify one thing.  I

3  think you testified to this earlier, but I just

4  want to make sure it's clear on the record.  We've

5  looked at a bunch of documents today, we looked at

6  a bunch of the financial reports that were prepared

7  by Miller Cooper, we looked at a number of the

8  balance statements that you testified came from the

9  entities, and we looked at several of the tax

10 returns.  Is it fair to say that the accurate debt,

11 the actual amount owed, by Charles Hanson to the

12 corporate entity is that that has been reflected in

13 the balance statements from the companies

14 themselves?

15    A.  That has been reflected in the company

16 statements through the date where they actually had

17 a controller present to pursue any adjustments

18 necessary.  There was a moment when they didn't

19 have a controller there and certain adjustments may

20 not have been made.  So, probably through 2007 that

21 should have been done, but I would have to review

22 other files to confirm that.

23    MR. KANE:  Would those adjustments -- what kind

24 of adjustments do you mean?



·1· · · ·THE WITNESS:· One of the examples was that

·2· ·461,000 that we're going to be providing you to

·3· ·you.· It appears that that was not recorded on

·4· ·their books and records because someone probably

·5· ·wasn't -- someone wasn't there to prepare that

·6· ·journal entry and make that adjustment.· So, we did

·7· ·it as a worksheet adjustment rolling forward

·8· ·retained earnings for tax purposes.

·9· ·BY MR. ROGOVIN:

10· · · ·Q.· So, is it your testimony that the 400,000

11· ·approximate figure that you're just discussing

12· ·would not have been owed by Charles Hanson to the

13· ·corporate entity as of the end of 2010?

14· · · ·A.· I would like to delay until we get you

15· ·what the adjustment -- how it was arrived at, if

16· ·you don't mind.

17· · · ·Q.· Okay.· So, it's fair to say you can't

18· ·answer that today?

19· · · ·A.· I would prefer not answering it today

20· ·because I don't have --

21· · · ·Q.· Well --

22· · · ·A.· I don't have the information, I don't have

23· ·the support to make a proper statement.

24· · · ·MR. SABIN:· You can't answer it today.



1    THE WITNESS:  I can't answer it today.

2    MR. ROGOVIN:  Is that it?

3    MR. KANE:  Yes.

4    MR. ROGOVIN:  That's all we have.  I don't know

5   if you have any?

6    MR. SWAN:  Yes, I just have a couple of things.

7                    EXAMINATION

8   BY MR. SWAN:

9    Q.   So, the monies that are listed as loans,

10   do you know when those funds -- I think the

11   furthest back we looked was 2001 was it -- 2003,

12   right, Consolidated Financial Statement, that was

13   Exhibit 1, right?  Am I getting my numbers right

14   here?

15    MR. ROGOVIN:  Just for clarity, when you say

16   loans, which direction, are you talking the loans,

17   the officer receivable?

18   BY MR. SWAN:

19    Q.   Yes.  I think the first one was Exhibit 1

20   we looked at, that was 2003 and 2002 Combined

21   Financial Statement, right?  It showed due from

22   stockholder and payable to stockholders, right?

23   And it showed -- do you have that document in front

24   of you?

1      A.   Yes, I do.

2      Q.   So, on Page 4 it shows due from

3   stockholder.  What is your understanding of how

4   that due from stockholder came to be?

5      A.   That developed over many years as far back

6   as -- I don't necessarily know when the initial

7   advance took place, but this is something that

8   accumulated over many years.

9      Q.   Back a decade prior to this Exhibit 1

10  we're looking at?

11     A.   I don't have knowledge as to the specific

12  dates.

13     Q.   But it was clearly before 2003 because it

14  shows a balance in 2003, correct?

15     A.   Yes.

16     Q.   Directing your attention to -- we'll mark

17  this the next exhibit.

18                        (Whereupon, Cieslak Deposition

19                         Exhibit No. 25 was marked for

20                         identification.)

21     MR. ROGOVIN:  2006 return?

22     MR. SWAN:  Yes.  I had one question on this.

23  BY MR. SWAN:

24     Q.   The fourth page of Exhibit 25 going down

1   to Line 7 on Schedule L; do you see that?

2       A.   Yes, I do.

3       Q.   It shows beginning of the tax year there

4   was loans to shareholders in the amount of 115,301;

5   do you see that?

6       A.   Yes.

7       Q.   It shows at the end of the tax year there

8   were loans of 2,709,792, correct?

9       A.   Yes.

10      Q.   Above that, it also lists other current

11  assets in Schedule L, Line 6, of 3,940,586,

12  correct, beginning year?

13      A.   Yes.

14      Q.   Now, Statement 5 is referenced and that's

15  attached, correct, to the return?

16      A.   Yes.

17      Q.   Let me just find Statement 5.  Are you at

18  Statement 5?

19      A.   Yes.

20      Q.   It shows, Line 6, other current assets,

21  and it shows due from affiliates of beginning

22  balance 3,585,544 and then ending balance of

23  3,504,253, correct?

24      A.   Yes.



1      Q.   And then it shows under Line 18 on the

2   same page due from officer and it has 248,991 and

3   then an ending balance of 1,945,604, correct?

4      A.   Yes.

5      Q.   That's due to officer, correct?

6      A.   Yes.

7      Q.   Is there in this schedule a line item for

8   loan due from officer in this schedule?

9      A.   No.

10      Q.   So, as of this '06 return, there was no

11   line item of loans due from officer except for this

12   notation on Page 4 of the tax return under

13   Schedule L-6 of an increase from 115,301 to

14   2,709,792, is that correct, that's where the

15   increase is reflected?

16      A.   Would you repeat the question?

17      Q.   I'm just saying that's there's no separate

18   line item in the schedule that we looked at that

19   references Statement 5 for the loan to shareholders

20   except there's a reference to loan to shareholders

21   on Schedule L, Page 4, that's where it's reflected,

22   right?

23      A.   Yes.

24      Q.   The document that was referenced as



1  Consolidated Financial Statements and particularly

2  the one, I guess, that's relevant here is the one

3  for 2006 year ending --

4      MR. ROGOVIN:  Exhibit 5.

5      MR. SWAN:  That's Exhibit 5?

6      MR. ROGOVIN:  Right.

7  BY MR. SWAN:

8      Q.   So, Exhibit 5, Page 12 showed -- I'll hand

9  it to you if you want.

10     MR. ROGOVIN:  No.  It's here.

11  BY MR. SWAN:

12     Q.   -- advances to the stockholder of

13  3,350,029 and 3,149,680 as of December 31, 2006 and

14  2005 respectively.  So, that due from stockholder

15  is not reflected -- the same numbers are not

16  reflected on the tax return which is Exhibit 25,

17  Schedule L, is that fair to say?

18     A.   You're making a combined statement to an

19  individual tax return, they will not agree.

20     Q.   They don't agree.  So, the difference is

21  one is combined and one is individual?

22     A.   Correct.  For clarity, there's

23  classification differences between the financial

24  statement and the individual tax return that I'm



1   sure we have to tie out how we got from whatever is

2   included in the financial statement through the tax

3   return, it's a netting issue in 2006 and increase

4   in presentation issue, that's all.

5        Q.   Right.  But my question from this

6   paragraph is it doesn't appear from 2005 to 2006

7   there wasn't a change in what is listed due from

8   stockholder except perhaps an interest adjustment,

9   it looks like it went up a couple hundred thousand;

10  do you see what I'm saying?

11       A.   Yes.

12       Q.   Yet, in the Schedule L, it looks like

13  there's an increase of over 2.5 million dollars.

14  Is it fair to say that there was not 2 point --

15       MR. ROGOVIN:  Schedule L?

16       MR. SWAN:  Schedule L on the tax return,

17  Exhibit 25.

18       MR. ROGOVIN:  Okay.

19       MR. SABIN:  Page 4.

20       MR. ROGOVIN:  Got it.

21  BY MR. SWAN:

22       Q.   Is it fair to say that there wasn't a loan

23  made that tax year, 2006, in excess of 2.6 million

24  dollars to the shareholders?



1    A.   That's a correct statement.

2    Q.   So, there would have been a

3  reclassification perhaps, is that the way to state

4  it?

5    A.   Yes.

6    Q.   And that would have been a

7  reclassification of a prior advance that had been

8  done, is that fair to say?

9    A.   It's a reclassification of accounts which

10  we would need to go back to the trial balance for

11  this entity and show you the combinations to

12  reflect what the '05 balance represented.

13    Q.   But from reading the consolidated

14  financial statements, it looks like that money had

15  been advanced previous to that 2006 tax year?

16    A.   Yes.

17    Q.   Now, with regard to the distinction

18  between loans and advances, counsel asked you a

19  question on that.  With regard to this corporation

20  Northwest Building Material & Supply Company, was

21  this a Subchapter S company?

22    A.   Yes.

23    Q.   So, if the principal shareholder took an

24  advance at the end of the year from earnings, did



1   that have tax implications to them?

2        A.   No.

3        Q.   Is that because the taxes had already been

4   paid on those earnings?

5        A.   Yes.

6        Q.   So, a Subchapter S corporation, the

7   liability flows to the individual for profits,

8   correct?

9        A.   Yes.

10        Q.   And then he pays taxes on those profits?

11        A.   Yes.

12        Q.   And then if you draw from retained

13   earnings, you don't have to pay taxes again on that

14   draw?

15        A.   Correct.

16        Q.   So, there would not be a tax advantage to

17   taking a loan as compared to taking just a cash

18   advance, is that fair to say, to the primary

19   stockholder?

20        A.   Yes.

21        Q.   Now, with regard to the consolidated

22   financial statements that we reviewed that were

23   given to the bank you said you primarily prepared

24   for the lender?



1     A.   Yes.

2     Q.   Listing the advances as loans, would that

3  have the net affect of increasing the receivables

4  of the corporation?

5     A.   Yes.

6     Q.   By increasing those receivables, it would

7  show greater assets of the corporation?

8     A.   Yes.

9     MR. SWAN:  I don't have any further questions.

10    MR. ROGOVIN:  A couple real quick questions

11  just on this Exhibit 25, if we could.

12                FURTHER EXAMINATION

13  BY MR. ROGOVIN:

14    Q.   Statement 5, I just want to clarify a

15  couple items that counsel raised.  Under Line 6,

16  due from affiliate, beginning and ending numbers

17  are both in the mid 3 million figures; do you see

18  that?

19    A.   Yes.

20    Q.   Are those amounts that would have been due

21  to the corporate entity Northwest Building Material

22  & Supply from one or more of the other entities

23  that we discussed earlier?

24    A.   Yes.



1    Q.   So, that would not have been due from

2    Charles Hanson?

3    A.   As I responded previously, rather than --

4    I can't make an assumption, but I do have

5    supporting documents to demonstrate what that

6    consists of.

7    MR. ROGOVIN:  Well, I would ask again if you

8    could produce that.

9    THE WITNESS:  That's for 2005.

10   BY MR. ROGOVIN:

11   Q.   And then stay on the same page under

12   Line 18 towards the bottom, due to officer, that

13   figure where at the beginning of the year it's in

14   the 200,000s, at the end of the year it's 1.9 or

15   so.  If you look back at Exhibit 5, Page 13, we

16   discussed this earlier, it showed that the

17   unsecured notes payable to officers at the end of

18   2006 was $1,945,604 and that's the same number that

19   shows on the tax return, right?

20   A.   Yes.

21   Q.   You testified earlier that those were

22   amounts in 2006 that were owed to Charles Hanson's

23   children?

24   A.   Yes.



1   MR. ROGOVIN:  I think that's everything I have.

2   THE WITNESS:  All right.  Thank you.

3   MR. SABIN:  Reserve.

4         (FURTHER DEPONENT SAITH NOT.)

5                   (Whereupon the deposition

6                   concluded at 5:30 o'clock p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



IN THE UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF ILLINOIS

3                        EASTERN DIVISION

4     BRENDA HELMS,                    )

5            Plaintiff,                )

6      vs.                            ) Case No. 12-20426

7     CHARLES HANSON,                  )

8            Defendant.                )

9

10          I, PETER CIESLAK, being first duly sworn,

11    on oath say that I am the deponent in the aforesaid

12    deposition taken on June 4, 2015; that I have read

13    the foregoing transcript of my deposition,

14    consisting of pages 1 through 140 inclusive, and

15    affix my signature to same.

16                      _____
                             PETER CIESLAK
17
      Subscribed and sworn to
18    before me this          day
      of            , 2015.
19

20    _____
      Notary Public
21

22

23

24



1   STATE OF ILLINOIS  )
2                      )   SS:
3   COUNTY OF C O O K  )

4          I, CHRISTINE M. PINA, do hereby certify
5   that heretofore, to-wit, on June 4, 2015,
6   personally appeared before me, at 300 South Wacker
7   Drive, Suite 2300, Chicago, Illinois, PETER
8   CIESLAK, in a cause now pending and undetermined in
9   the United States District Court, Northern District
10  of Illinois, wherein BRENDA HELMS is the Plaintiff,
11  and CHARLES HANSON is the Defendant.

12         I further certify that the said PETER
13  CIESLAK was first duly sworn to testify the truth,
14  the whole truth and nothing but the truth in the
15  cause aforesaid; that the testimony then given by
16  said witness was reported stenographically by me in
17  the presence of the said witness, and afterwards
18  reduced to typewriting by Computer-Aided
19  Transcription, and the foregoing is a true and
20  correct transcript of the testimony so given by
21  said witness as aforesaid.

22         I further certify that the signature to
23  the foregoing deposition was reserved by counsel
24  for the respective parties.



1          I further certify that the taking of this

2    deposition was pursuant to subpoena and that there

3    were present at the deposition the attorneys

4    hereinbefore mentioned.

5          I further certify that I am not counsel

6    for nor in any way related to the parties to this

7    suit, nor am I in any way interested in the outcome

8    thereof.

9

10         IN TESTIMONY WHEREOF:  I have hereunto set

11   my hand this 10th day of June, 2015.

12

13                 *Christine M. Lina*

14

15                 CERTIFIED SHORTHAND REPORTER

16                 LICENSE NO. 084-003785

17

18

19

20

21

22

23

24

1          McCorkle Litigation Services, Inc.
           200 N. LaSalle Street, Suite 2900
2              Chicago, Illinois 60601-1014

3   CERTIFIED MAIL

4   June 10, 2015

5   Mr. Peter Cieslak
    5616 Oakwood Road
6   Long Grove, Illinois 60047

7
    Dear Mr. Cieslak:
8
    Your deposition in the above-entitled cause is now
9   ready for reading and signing as required by law.

10  Please call the Signature Department upon receipt
    of this letter to schedule an appointment to come
11  to the above address to read and sign your
    deposition.  You have 28 days from the date of this
12  correspondence in which to appear for reading and
    signing.
13
    If you fail to appear or notify us so that we may
14  make arrangements for another appointment, your
    deposition will be completed and forwarded to the
15  attorneys and will be "... used as fully as though
    signed."
16
    _____ Procedure outlined in Rule 207 (a) of
17          the Illinois Supreme Court Rules

18  _____ Procedure outlined in Rule 30 (e) of
            the Rules of Civil Procedure for the
19          U.S. District Courts

20  Sincerely,

21
    Margaret Setina              Court Reporter:
22  Signature Department         Christy Pina

23  cc:  Mr. Rogovin

24



## Exhibits

**Cieslak Exhibit 1**
3:12 32:18,20
127:13,19 128:8
**Cieslak Exhibit 10**
3:21 73:7,10,16
74:12 75:21 91:21
92:1,4
**Cieslak Exhibit 11**
3:22
**Cieslak Exhibit 12**
3:23 60:13,19,20
81:23 82:9
**Cieslak Exhibit 13**
3:24 82:14 83:11
**Cieslak Exhibit 14**
4:11 83:17,24 84:17
85:13
**Cieslak Exhibit 15**
4:12 85:19 90:24
92:2 99:9,22 100:17
**Cieslak Exhibit 16**
4:13 92:10 95:10
101:2,20 102:21
103:6 104:1,20
107:4
**Cieslak Exhibit 17**
4:14 97:9 99:19
100:5,6 101:12,13
102:2 104:13,17,22
105:13
**Cieslak Exhibit 18**
4:15 107:10
**Cieslak Exhibit 19**
4:16 109:17 110:9
**Cieslak Exhibit 2**
3:13 46:14
**Cieslak Exhibit 20**
4:17 113:9
**Cieslak Exhibit 21**
4:18 115:7 117:14
**Cieslak Exhibit 22**
4:19 117:20
**Cieslak Exhibit 23**
4:20 119:22
**Cieslak Exhibit 24**
4:21 122:4 124:8
**Cieslak Exhibit 25**
4:22 128:19,24
131:16 132:17
135:11
**Cieslak Exhibit 3**
3:14 49:8 50:3 52:20
54:20
**Cieslak Exhibit 4**
3:15 52:7,21 54:2,5
56:13 100:7
**Cieslak Exhibit 5**
3:16 55:15 56:1
59:11 60:19 61:2,7
131:4,5,8 136:15
**Cieslak Exhibit 6**
3:17 57:22 59:17,19
60:14 61:2,8,11 62:5
**Cieslak Exhibit 7**
3:18 62:8 66:5
67:11,15,18 68:2,6,
24 77:1,7 81:10
**Cieslak Exhibit 8**
3:19 64:3,6 67:2,13,
16 68:3,14,16 69:7
**Cieslak Exhibit 9**
3:20 69:23 70:3,20
71:23 72:4 73:18
76:20 83:6

## $

**$1,484,908**
43:21
**$1,649,804**
43:21 48:5
**$1,899,844**
48:5
**$1,921,551.53**
74:15
**$1,929,552**
91:12
**$1,931,551**
102:23
**$1,931,551.53**
93:9
**$1,943,849.53**
67:6,17
**$1,943,850**
67:19
**$1,945,603.54**
99:9
**$1,945,604**
57:6 136:18
**$1,957,304**
55:8
**$11,750**
36:10,13
**$118,787**
110:24
**$12,000**
57:13
**$147,943.52**
93:21
**$161,914**
90:13,18
**$190,000**
63:7 64:12 66:1
72:20 84:21
**$2,024,744**
99:3
**$2,083,466**
106:1 107:24
**$2,111,552**
72:14 73:17
**$2,127,556**
74:24
**$2,133,650**
83:1
**$2,355,988.18**
68:18
**$2,367,529.05**
74:21
**$2,443,430**
36:10 47:5
**$2,470,498.37**
94:5 101:22
**$2,486,084**
88:18,22
**$2,589,342.10**
60:16
**$2,726,060**
47:5
**$200,000**
56:14
**$250,000**
48:12
**$3,149,680**
54:13
**$3,264,811**
89:16 90:5
**$3,313,612**
62:20 83:3,20 85:8
**$3,325,153**
72:7
**$3,350,000**
81:7 82:2
**$3,350,029**
81:13

**$3,359,029**
56:6
**$300,000**
47:12
**$310,000**
85:2
**$393,084**
61:14
**$461,000**
94:23 104:2
**$58,000**
51:23
**$581,790**
69:9
**$600,000**
54:18 55:3
**$77,676**
102:4
**$778,727**
75:7 89:11,24 95:12

## 0

**0.5**
40:12
**05**
133:12
**06**
130:10
**07**
80:24 81:1
**08**
80:21 91:6
**09**
91:6

## 1

**1**
32:18,20 40:9 60:14
68:16 74:20 76:9
88:14 94:3 102:22
110:20 121:20
127:13,19 128:9
**1,931,551**
103:2
**1,945,603**
68:2,3
**1,945,604**
130:3
**1.8**
124:16
**1.9**
91:18 136:14
**10**
35:16,19,23 36:3
73:7,10,16 74:12
75:21 91:21 92:1,4
117:4
**100**
17:12
**100,000**
113:2
**11**
35:24 36:3 78:13
79:1,20
**11,000**
39:3
**115,301**
128:4 130:13
**118,000**
111:3
**12**
54:10 56:3 60:20
62:18 68:24 80:13,
19,20 81:10,23 82:9
131:8
**12-31**
91:5,6 99:7

**124**
60:15 68:17 74:20
88:15 89:2,21 94:3
96:9 101:22
**13**
36:7 40:7 42:5 43:3
47:2 50:11 59:11
67:11 72:4 82:14
83:7,11 136:15
**14**
43:15 44:1,12 78:13
79:1,20 83:17,24
84:17 85:13
**147,000**
93:23
**15**
85:19 90:24 92:2
99:9,22 100:17
**16**
92:10 95:10 101:2,
20,22 102:20,21
103:6 104:1,14,20
107:4
**16-E**
105:21
**161**
91:5
**17**
97:9 99:19 100:5,6
101:12,13 102:2
104:13,14,17,22
105:13
**18**
107:10 130:1 136:12
**19**
109:17,20 110:9
**190**
61:12 68:13 69:8,21
75:5,24 89:10,20
91:5 92:1,3 95:11
**190,000**
68:11 73:23 90:21
**1951**
9:24
**1973**
10:6
**1975**
10:15,17
**1983**
12:23
**1985**
13:15 16:14,22,24
**1990**
11:1,2,12 12:16,23
14:4,16,19
**1995**
19:3

## 2

**2**
34:1 46:14 53:13
61:11 65:7 75:5 76:9
83:24 84:1 92:1
95:10 99:11,21
101:7 105:4 106:14,
20,23 112:9 124:9
132:14
**2,024,000**
10:8
**2,111,000**
72:22
**2,470,000**
101:6
**2,488,000**
101:8
**2,709,792**
129:6 130:14
**2.13**
66:13

**2.4**
89:20 94:13
**2.5**
132:13
**2.6**
132:23
**20**
105:18 113:9 120:5,
20
**200,000s**
136:14
**2000**
11:19,21 29:1 59:23
**2000s**
19:12
**2001**
127:11
**2002**
33:8 36:11 38:1,11,
14 39:3 40:9 41:12,
14 43:22 45:5
127:20
**2003**
33:7 36:11 38:2 39:3
40:11 43:20,21
46:21 47:6 48:6
127:1,20 128:13,14
**2004**
46:21 47:5,13 48:5,
13 49:14,20 50:9,14
**2005**
49:14,20 50:9,14
51:5,23 52:14 53:2,
12,22 54:14 55:9,22
57:13 131:14 132:6
136:9
**2006**
55:22 56:8,18,21
57:6,14,19 58:15
59:13 60:22 62:16
63:20 67:19 68:2,7
77:2 79:4 81:13
84:19,23 95:1,3
104:3 128:21 131:3,
13 132:3,6,23
133:15 136:18,22
**2007**
62:15,19,24 63:3,6,
24 84:9,12 65:14
66:9 67:16 68:8,24
70:12 77:2 80:15
83:9 125:20
**2008**
19:24 25:19 70:12
72:8,14 73:3,14
74:14 109:23 111:4
**2009**
70:22,23 71:2,14
79:4 84:18 85:4 86:2
88:21 90:2,6,17,24
96:4,16 97:7 99:7,14
101:23 131:13
**2010**
19:18 29:1 59:23
71:19 63:5,14 94:1,9
95:3,16 96:4,12
97:7,15 99:6 101:23
102:3,9,16 107:18
108:13 116:21
126:13
**2011**
113:16 115:13 116:9
117:2,5,8 118:3
119:7 120:6,20
121:17 122:9,15
122:23 124:1,5,12
**21**
115:7 117:14
**22**
117:20 124:16

**229**
64:20 74:6 90:12
93:20
**23**
119:22
**24**
122:4 124:8
**248,991**
130:2
**25**
108:5 128:19,24
131:16 132:17
135:11
**2501**
89:15,18 99:11,16
115:13 118:3
**26**
107:18 113:18
115:13 118:3
**263**
59:2,3,5 67:6,17
66:4,10 74:6,8,13
90:9 91:11 93:8
103:6,11

## 3

**3**
49:8 50:3 52:20
54:20 59:2 64:20
67:6 76:9 84:2 103:8
105:4,13,15 110:16
112:16,18 124:20
135:17
**3,149,680**
54:13
**3,350,029**
131:13
**3,504,253**
129:23
**3,585,544**
129:22
**3,940,586**
129:11
**3.2**
89:19 99:15,22
**3.3**
60:24
**30**
9:24 80:14
**31**
33:7 36:11 40:11
43:19,21 47:5 48:5
49:13 52:14 54:14
55:8 56:8 58:15
62:19 64:9 66:9
72:8,14 81:1,3 83:8
84:18 86:2 88:21
90:2,6,24 93:5 94:1,
9 95:16 96:12 99:14
101:23 131:13

## 4

**4**
39:13,14 42:21 43:5
52:7,21 54:2,5 56:13
76:9 90:8 98:21,22
100:3,7,6,9,10 128:2
130:12,21 132:19
**400,000**
128:10
**461,000**
101:7 126:2
**461,340**
94:15

## 5

**5**
43:9 46:5 55:15 56:1
59:11 60:19 61:2,7



68:6 76:9 123:17,19
124:5,10 129:14,17,
18 130:19 131:4,5,6
135:14 136:15

**500,000**
84:6

**528,276**
89:2

**5616**
9:22

**5:30**
137:8

---

**6**

**6**
57:22 59:17,19
60:14 61:2,8,11 62:5
129:11,20 135:15

**603**
68:3

**6198**
122:24

---

**7**

**7**
5:9 38:6 62:8 66:5
67:11,15,18 68:2,6,
24 76:9 77:1,7 81:10
98:23 104:18
124:14,15 129:1

**7.25**
66:8

**77**
104:21

**77,606**
102:16 104:17,24

**778**
75:20

**778,000**
89:20 95:14

**778.727**
100:13

**778.727**
100:17

---

**8**

**8**
33:24 64:3,6 67:2,
13,16 68:3,14,16
69:7 80:18,22 81:3,
23 82:3,15,19 83:1,
17 85:11

**83**
13:2

**85**
13:2

---

**9**

**9**
53:13 69:23 70:3,20
71:23 72:4 73:18
76:9,20 83:6 123:6,
9,12

**90s**
17:13 19:10 20:5

**931**
107:3

---

**A**

**abbreviations**
86:21

**ability**
6:23

**absolute**
111:20

**accepted**
53:2

**access**
78:1

**account**
20:24 39:5 59:4
60:15 61:11 64:20
65:5 67:6,17 66:4,
10,16 69:8,20,21
74:6,8,13,20 75:5,24
81:6 86:20 88:15
88:2,10,15,18,20,21
90:9,12 91:11 92:1,3
93:8,20 94:3 95:11
98:9 99:11,16
101:22 103:6,11

**Accountancy**
10:2

**accountant**
101:17 107:22
115:20

**accountants**
20:21 33:17

**Accountants'**
33:5 49:13 52:13
70:12 76:8

**accounting**
7:21 10:13 11:6
12:13,14,17,20 19:5,
9,15,22 20:8,16
30:8,14 31:19 53:3
61:20,21 80:7 88:4
98:15,19 102:1,10

**accounts**
29:14 34:4,15 133:9

**accrual**
111:12

**accrue**
95:20

**accrued**
45:21,23 66:20 96:5

**accruing**
59:19 6` 15 95:24

**accumulated**
128:6

**accurate**
52:2 65:6,8 125:10

**active**
124:20

**activity**
51:18 56:24

**actual**
47:18 102:7 125:11

**add**
68:11 74:5,6

**added**
37:14 39:11 96:8

**additional**
20:4,9 29:5 36:3
47:18 48:15 53:15
54:23 55:2 70:15
74:3 85:2

**address**
8:21

**addresses**
118:6

**adjusting**
94:17

**adjustment**
126:6,7,15 132:8

**adjustments**
125:17 19,23,24

**advance**
38:23 38:21 39:1,6,
10,12,15,23 41:3,6,
12,18 50:13 128:7
133:7,24 134:18

**advanced**
133:15

**advances**
35:20 36:9,18,20

---

37:2,7,16,17,19
40:9,23 41:11,24
42:7,9,16 45:20
47:4,8,19 51:2
54:13,24 55:3 56:6,
22 60:23 62:20,21
65:10 72:7,9 77:10
131:12 133.18 135:2

**advantage**
134:16

**affect**
6:23 40:3 135:3

**affiliate**
135:16

**affiliated**
119:10

**affiliates**
53:19 54:12 56:5
72:6 129:21

**after-the-fact**
103:21

**agree**
131:19,20

**agreement**
40:15 44:17

**agreements**
114:3

**agrees**
68:2,4

**ahead**
32:17 36:7 63:24

**alternatives**
118:17

**amount**
51:19 65:9 88:3 72:9
88:22 89:24 91:3,15,
19 92:4 93:23 95:12
99:13,22 100:20
102:7 106:20 107:24
108:10 110:23
125:11 129:4

**amounts**
44:18 72:23 74:9
85:7 93:12 135:20
136:22

**analyzed**
88:13

**and/or**
80:5

**answering**
5:21 126.19

**apologize**
42:14 108:20

**appears**
49:12 52:12 56:4
59:12 60:20 69:1
70:6 72:5 73:4 80.13
81:16,18 82:10 83:1,
12 84:2,17 85:24
84:4 107:16,21
109:21 110:21
113:14,19 115:12
118:1 120:4,19
122:6 126:3

**approved**
33:20 122:21

**approximate**
126:11

**approximately**
7:3 8:22 14:16 25:19
29:1 47:12 54:19
66:1 89:21 124:17

**arbitrarily**
99:7

**Arnstein**
113:15 115.14 118:2

**arrive**
61:4

**arrived**
106:5 126:15

---

**asset**
100:11 103:18

**assets**
9:3 36:1 43:5 61:12
84:4 116:1,4 129:11,
20 135:7

**assigned**
20:21 33:17

**assist**
31:3

**assistance**
110:14

**assumption**
136:4

**attach**
84:6

**attached**
129:15

**attachment**
105:18

**attain**
10:5

**attempting**
95:4

**attention**
128:16

**attorney**
101:16

**audit**
12:12 13:1

**audited**
33:22,23

**August**
107:18 108:5 109:13
115:13 118:3

**avoid**
118:4

**aware**
15:17 32:8,10,12
37:10 40:16,17,24
41:23 49:5 79:4,8
112:3 119.8

---

**B**

**B.S.**
10:2

**back**
21:14 22:1 24:3
34:15 40.7 42:21
45:9 46:5 50.11
58:11 60:19 65:8
83:6 91:21 94:3 95:7
98:8 100:3 101:1,4
106:4 110:3 119:3
122:23,24 124:10
127:11 128:5,9
133.10 136.15

**background**
9:20

**backup**
55:5

**backwards**
67:23

**Badgerland**
27:9,21

**balance**
37:13 43:6,20 46:8
47:16 48:4 51:23
55:8,11 57:5 58:13,
20 62:24 63:1,17,21,
24 64:8 68:10 72:13
73:1,12 75.22 81:7
83:2 84:3 85:24
91:5,22 93:4 98.14
105:9 107:24 108:11
109:8 114:1,7 125:8,
13 128:14 129:22
130.3 133:10,12

**balances**
74:7

---

**bank**
29:13 30:21 71:10,
11,14,18,20,24 78:4,
6,7,19 79:5,10,23
80:5 81:4 86:15
134:23

**banking**
21:18

**bankruptcy**
14:4

**bare**
40:9 43:18 86:7

**based**
18:6 56:17 61:20
86:18 81:22 83:13
81:4 124:8,18,19

**basic**
5:12

**basically**
75:6

**basis**
34:1 53:14 76:2
104.8 111:12,13

**began**
13:11 19:1

**beginning**
99:2,5,20 129.3,12,
21 135:16 136:13

**behalf**
18:22 106:19

**Belongia**
107.17

**Belongia's**
108:5

**beneficiaries**
32:15

**beneficiary**
32:13

**benefit**
71:10 78:4

**birth**
9:23

**bit**
20:8 26:15 31:2
47:24 64:2 93:19
95:8 99:15 114:13
120.19 122:22

**B.M.D.I.**
25:5,7 27:20 54:7
53:18 66:24 123:1

**bonus**
48:15

**bonuses**
45:5

**books**
35:5,7,14 42:19
58:6,9 92:23 102:17
126:4

**bottom**
34:1 35:16,19,23
38:9 42:23 82:8
83:12 85:14 86:14
97.21 105:21 110.16
118:15 120:10 123:5
136:12

**bottom-line**
41:5,9

**brackets**
38.12 84:15 102:22

**break**
78.10 122.1

**Brenda**
5:9

**broadly**
78.22

**broken**
88.5

**Builders**
111:8

**building**
15:11 16:4,13 17:11,

---

19 18:13 19:2 21:2,
13,15 22:1,21 23:3
24:3 29:17 33.6
34:5,6 53.16,17
58:14,18,24 81:5
82:16,18 83:18
84:12,13,14 86:1
88:1 110:23 111:5,8
123:7,8 133:20
135:21

**bunch**
123.2 125:5,6

**business**
14:3 15:1 19:21 20:2
21:8,12,16,17 22:17
23:8 24:11,18,21,22
25:9,10,15,22 28:11,
21 27:12,17,19 28:3,
12 40:6 70:19,24
97:1,3,4

**businesses**
22:17 116.12,15

**butchering**
108.4

**buy**
37:5,17,18,19

---

**C**

**C-i-e-s-l-a-k**
5:5

**calculate**
105:5

**calculated**
106.8

**called**
12:20 65:3

**capital**
45:11

**capitalizes**
42:7

**carried**
81:6

**carrier**
28:16

**carry**
102:13

**carryover**
123:22

**carryovers**
123:15 124:18

**Cartage**
28:9,13,14

**case**
9:5 77:14 78:20

**cash**
21:18,19 111:13
134.17

**CC-ING**
107.17 115:14 118:3

**cease**
19:16 25:15

**ceased**
19:14 20:24 97:1,2,3

**cetera**
25.11

**CFO**
60:12

**chain**
114.14 120:7

**chance**
106.15 115:15

**change**
16:8 17:1 39:9,18
48:14 51:16 56:23
60:1 65:16 116:22
132:7

**changed**
15:15 60:2 65:14
91:5,9 116 10

---



changing
116:19
Chapter
5:9
charged
37:7,11,12
charging
47:15
Charles
9:17 13:4 17:13,15
18:10,12 22:9 23:17,
18 24:1,6 25:4,14
26:7,15 27:6,21
28:6,17,24 30:8 31:1
36:16 40:4,21 43:11
44:8,13 45:1,8,16
47:9 48:9 50:19,22
51:9 52:4 54:16
56:10 57:10 62:21
63:2,3 64:13 65:4
68:15 68:21 72:10,
17,24 73:20 74:10,
18 75:1 76:16,18,22,
24 77:4 78:18 79:6
80:11 82:10,11
83:14 85:16 88:22
90:1,5,17 91:2,15,19
92:5 93:13,17,24
94:8 95:15 96:10
99:13 101:20 105:2
106:13 108:12,13,21
109:22 111:2,7,23
112:5,15 113:1,6
114:17,23 117:1
120:13 122:9,14
125:11 126:12
136:2,22
Charmar
26:18,19 27:7
checks
45:6
Chic
22:7
child
106:20
children
32:16 45:1,6,23 48:9
52:4 55:12 57:10,18
63:2 72:18 74:18
91:16 93:13 108:16,
18 136:23
Chitkowski
114:16 120:12
choice
46:2
Chuck
22:6,9 80:5 108:19
Cieslak
5:5,7 8:11 32:19
46:13 49:7 52:6
55:14 57:21 62:7
64:2 69:22 73:6
78:12 85:18 92:9
97:8 107:9,17
109:16 113:8 115:6,
15,20 117:19 118:3
119:21 120:5 122:3
128:18
circled
84:4
circling
97:6
circumstances
7:5
citation
115:2 116:1 120:15
cite
75:14
claimed
77:17,18

clarification
53:10
clarify
125:2 135:14
clarity
16:10 22:10 110:2
111:20 127:15
131:22
Ciark
114:17,20 115:1,24
120:13
classification
100:19 103:16
131:23
Clay
107:17
clear
104:18 125:4
client
13:7,19 14:11,18
86:15
close
14:2 40:11 43:20
86:9 102:5 114:2
column
59:8 66:4 87:18
88:16,17 89:1,10
90:10,13 102:21
columns
59:8 61:13,14 88:24
combination
34:2 89:19
combinations
133:11
combined
33:4 34:3,10 36:5
43:6 46:6,19 49:12
55:20 62:13 76:7
127:20 131:18,21
combining
34 23 61.3
comma
114:2
commercial
28:4
common
84:11
commonly
84:15
communication
40:19
companies
34:2,11,19 35:8,11,
14,20 36:2,9,18,22
38:3 42:6,8,11 47:3
53:18 54:12,22 55:4
56:5 62:14 65:8,21
71:8,14 72:6 75:23
79:6 80:7 96:15,18
97:3 114:10 116:9
125:13
company
15:7,11 16:5,13
17:20 18:2,3 19:3,21
21:15 23:6 27:9
28:10 33:6 34:6,7,16
35:6 36:19 38:23
39:5 40:1,3 45:4,9
50:18,20 53:17 58:7,
8,12,24 63:6,8
70:19,23 71:2 72:3
73:2 78:15,17 78:8
80:4 81:6 82:16,19
83:19 88:10,11
92:24 93:2 105:6,8
108:11 109:4,14
110:23 120:23 123:8
125:15 133:20,21
company's
35:22

compare
67:10
compared
50:14 56:12 74:4
134:17
comparing
68:23
comparison
73:13 122:11
complete
114:11
component
61:22 111:10
components
76:2
concerned
40:4 75:19
concerns
77:6,20
concluded
74:5 137:6
conclusion
72:1,2
confirm
124:11 125:22
conjecture
6:6
conjunction
39:24
connection
6:19 7:11,20 9:4,11
30:21 31:14 53:12
75:18 76:20 79:14,
19 90:16 96:11
111:21 112:6
consistent
102:14 123:19,22
consists
136:6
consolidated
52:12 70:11 127:12
131:1 133:15 134:21
consolidation
53:14
consulted
98:7
continue
17:20 19:9 71:18
continued
71:21
continues
35:24
continuously
71:17
contractors
21:13 23:11,12
25:11
contribution
45:11
controlled
58:22
controller
59:20 60:8 65:5
72:15 127:17,19
controllers
35:10
conversations
8:23 9:2 71:18,20
79:23 80:2 118:20
conveyance
118:8
Cooper
5:8 10:22,24 11:5,8,
7,14,24 12:11 13:9,
16 14:11,15,18 20:8,
18 30:7,17 31:19,22
32:1,4 33:10,15
35:13 40:17 43:12
49:17 58:9 62:14
70:10 76:13 77:13
78:5 86:7 97:19

110:5 119:9 122:17
125:7
copied
115:19
copies
77:23
copy
89:15
corner
98:22 105:14
corp
60:15 68:17 74:21
94:5
corporate
8:12,14 17:14,24
18:4,6,7 20:13
29:16,19,20,24 30:3
41:2 42:12,13,19
58:14,18,21 59:1,20
63:21 64:9,13,17
67:3,4 73:13 76:3
82:1 83:3 84:15,16,
23 85:3 86:22 88:17
89:11 90:1,5,10,17
91:1 92:5 93:5,13,24
94:8 95:15 66:10,22,
24 97:2,16 99:14
101:21 106:14,19
111:4 116:18,20
112:12 126:13
135:21
corporation
111:11,12 133:19
134:6 135:4,7
corporations
118:10,22,24 119:5
corps
115:22 116:7
correct
8:1 17:23 20:5 29:6
35:1 41:24 46:7
50:14 51 24 52:15
54:6,20 56:8 57:2
58:13 59:5 65:11,
13 66:16,23 93:6
97:19 109 15
1:2 11:12 128:14
129:8,12,15,22
130:3,5,14 131:22
133:1 134:8,15
counsel
133:18 135:15
couple
28:22 43:16 76:11
78:23 97:18 113:21
120:6 122 10 127:6
132:9 135:10,15
court
5:15
cover
97:19 122:10
CP
86:21 89:11 90:10,
13
created
20:4 21:6 30:23 59:2
58:5,6,8,9,11 62:14
67:3 70:10,16,17,21
78:3 86:4,12 92:21
creating
62:5 124:20
creation
86:8
CS
25:20 26:1,3 53:19
87:14
CSR
87:14
current
9:21 59:9 60:18
67:7,14,17 68:18

73:12 74:13,14 75:7
81:3,7 83:2,18 93:9,
21 129:10,20
cut
120:16

--          D

dad
113:24
date
9:23 90:24 125:16
dated
52:14 80:14 84:18
107:17 108:5 113:16
115:13 118:3 120:5,
20
dates
128:12
daughter
22:8
day
5:14 112:15
deal
92:16
dealing
82:22
debt
44:18 57:19 82:1
85:2 108:7 125:10
debts
48:8 121:12,13
decade
19:12 128:9
December
36:11 40:11 43:19,
21 47:5 48:5 49:13
52:14 54:14 55:8
56:6 58:15 62:18
64:9 66:9 72:8,14
81:13 83:8 86:2
88:21 90:2,6,24 93:5
94:1 9 95:16 96:12
99:14 101:23 131:13
decision
39:22 40:3 46:3
decision-making
29:21
decrease
84:24 95:1
decreasing
85:9
deduction
45:24 51:1 104:9
deferred
61:12,23 62:1 95:11
defined
53:15
defines
53:15
degree
10:5
degrees
10:8
delay
126:14
demand
43:18 66:7
demonstrate
136:5
depending
105:5
DEPONENT
137:4
deposition
5:7,12 6:20 7:1 8:2,
10 9:8,11 16:2 32:19
46:13 49:7 52:6
55:14 57:21 62:7
64:2 69:22 73:6

78:12 85:18 92:9
97:8 107:9 109:16
113:8 115:6 117:19
118:21 122:3 128:18
137:5
depositions
7:6
describing
20:13
description
86:20
developed
128:5
difference
41:5 56:15 61:1,6
69 2,5 99:19 103:16
131:20
differences
101:8 116:23 131:23
difficulties
96:15
difficulty
72:3
direct
79:23
Directing
128:16
direction
5:23 127:16
directly
44:21 78:5
discernable
63:14,18
disclosed
37:20 61:4
Discover
118:1
discovering
95:2
discovery
9:3 116:1
discuss
114:16
discussed
8:2 29:9,13,22 34:18
41:19 43:8 58:17
60:21 78:19 84:19
99:12 108:10 119:1
123:2 135:23 136:16
discussing
16:4 35:18 37:23
126:11
discussion
14:7 17 7 103:23
107:7 117:11
discussions
8:12 71:13,16
distinction
49:1 133:17
distribution
38:22 39:1,6,23
41:3,7,13
distributions
38:3 39 2,8
dividends
38:10,13
divorce
7:7,10
divorces
7:21,23
document
33:1,3,4,9,10,12,16
35:3 44:15 46:17,24
40:14,16 52:21,22
55:18 58:5,17,19,23
64:11 66:22,24 67:2
70:2,5,16 71:1,4,6
77:6 84:16 85:1,11,
22 86:4,9,11,13,14
88:20 90:20 91:4,7
92:14,17,21,23 93:4



95:23 97:13 110:5
112:24 120:7 121:4
122:22 127:23
130:24
**documentation**
51:12 106:7
**documents**
9:7,10 63:14 76:13
77:21 79:2 84:21
110:3 112:17 114:10
120:14,18 125:5
136:5
**dollar**
51:19 86:13 69:1,5
89:19 91:18 94:14
105:10 112:10,16
**dollars**
60:24 99:15 105:4
106:14,20 112:19
132:13,24
**draft**
49:23 50:1,2 52:19,
24 53:1 70:6,9 76:21
**draw**
134:12,14
**drywall**
25:10
**due**
34:14 36:8 39:16
42:22 43:17 45:12
48:23 50:12,21,24
54:10 56:3 63:1
68:3,7 72:5,23 73:19
74:9 77:10 82:1 83:9
84:22 69:15,24 80:5
92:4 94:8 95:15
99:13,21 109:8
118:8 127:21 128:2,
4 129:21 130:2,5,8,
11 131:14 132:7
135:16,20 136:1,12
**duly**
5:2 6:12

---
### E

**e-mail**
114:15 115:18 118:1
**earlier**
35:19 37:23 65:7
75:19 78:2 79:12
84:20 87:1 94:11
95:18 96:14 99:12
101:19 103:11
105:10 108:10,15
112:8,17 125:3
135:23 '36.16,21
**earnings**
'26:8 133:24 134:4,
13
**education**
10:1
**effective**
40:8
**email**
107:16,22 108:5
113:14,20 1'4:14
115:12 117:15
118:6,15 119:1
120:4,8,11,20
121:13
**emails**
107:18 120:6
**employed**
10:19,23 109:3
**encountered**
114:9
**end**
57:6,13 60:22 82:24
87:18 90:16 93:14
102:3 104:18 120:17

---
126:13 129:7 133:24
136:14,17
**ended**
33:7 66:2
**ending**
62:15 73:14 129:22
130:3 131:3 135:16
**engaged**
59:24
**engagement**
20:22 33:18
**entail**
19:23
**Enterprise**
5:10
**Enterprises**
15:8,16,19
**entities**
9:14 17:14 18:1
20:4,10,17 21:5,20,
23 28:5,21,23 29:5,
8,9,12,21 30:1,4
33:7 34:4,17 35:18,
20 36:3,5 37:23
42:3,13 43:8 44:21,
23 51:13 53:4,22
54:5,8 58:22 61:8
63:17 66:2 79:8
87:18 123:1,2,24
124:4 125:9 135:22
**entity**
15:10,14 16:5,8,9,
15,16 17:4,12,18,21,
23 18:5,7,9,14,19,23
19:6,8,9,15,20,23
20:13 21:9 22:2,3,
12,21 23:3,9,13
24:5,8,9,11 25:9,13,
15,22 26:11,16,21
27:10 28:3,12,19
29:4,16,10,20,24
30:3 39:21,22 42:12
58:21 61:9 63:14
64:8,13,17 67:3,4
73:13 75:3 82:1 83:3
84:23 85:3 86:24
87:7,10 88:2,6 89:6,
7 90:1,6,11,17 91:1
92:5 93:5,13,24 94:8
95:18 96:11,22,24
97:2,16 99:14
101:21 105:14,19
111:4,8 125:12
126:13 133:11
135:21
**entries**
102:11
**entry**
94:18,21 95:3 104:3,
6 126:8
**equity**
31:17
**essentially**
17:23 81:16
**estate**
24:9,16 25:1,23,24
26:2,12,13,22,23,24
27:5,9,13,14,15,22
34:18 37:6,17,18,20,
22,23 53:4,20,22
54:6 55:4 67:12
**eventually**
108:19
**evidence**
104:6
**exact**
83:7
**EXAMINATION**
6:14 127:7 135:12
**examined**
8:12

---
**examples**
126:1
**excess**
132:23
**exhibit**
32:18,20 46:14 49:6
50:3 52:7,20,21,23,
24 54:2,5,20 55:15
58:1,13 57:22 59:11,
17,19 60:14,19 61:2,
7,8,11 62:5,8 64:3,6
66:5 67:2,11,13,15,
16,18 68:2,3,6,14,
16,24 69:7,23 70:3,
20 71:23 72:4 73:7,
10,16,18 74:12
75:21 78:20 77:1,7
78:13 80:13,19,20
81:10,23 82:9,14
83:6,11,17,24 84:17
85:13,19 90:24
91:21 92:1,2,4,10
95:10 97:9 99:9,19,
22 100:4,5,6,7,17
101:2,12,13,20
102:2,21 103:8
104:1,13,17,20,22
105:13 107:4,10
109:17 110:9 113:9
115:7 117:14,20
119:22 122:4 124:8
127:13,19 128:9,17,
19,24 131:4,5,8,16
132:17 135:11
136:15
**Exhibits**
76:9 79:1,20
**exist**
53:8 117:9
**existed**
86:19 119:6
**existence**
32:8
**expense**
61:12,24 62:2 95:11
**expenses**
30:3
**experience**
81:20,21
**expert**
82:20
**explain**
28:14 37:9 98:18,24
**explaining**
5:11
**explains**
111:19

---
### F

**facility**
71:15
**fact**
92:7 105:2 109:10
**factors**
37:10
**factually**
103:20
**fair**
125:10 126:17
131:17 132:14,22
133:8 134:18
**familiar**
8:9 13:4,6 14:21,23
15:7,10 18:12,15
21:2 22:12,16 23:5
25:5,7,20 26:6,18
27:24 28:9 81:19
**family**
32:6,9 119:11

---
**fast**
115:21 116:7
**father**
115:23 116:4
120:18,24
**father's**
115:22 116:8
**federal**
45:7 95:5
**feel**
6:5
**field**
12:17 61:21
**figure**
50:13 57:12 61:15
69:8,17 72:22 74:13,
21 75:7,8,20,24
93:16,23 95:15
104:2,18,22,24
105:5 126:11 136:13
**figures**
123:11 135:17
**filed**
124:1,6,12
**files**
124:3,12 125:22
**filing**
112:2
**filings**
9:12,13 14:4
**final**
50:1 70:15,17 71:1
76:10,12
**finalized**
33:20
**finances**
80:11 115:3
**financial**
20:1 30:17,24 31:4,
7,9,15,18 32:1 33:4
34:3 40:1,2 46:20
49:12 52:13 55:21
61:5 62:13 70:11
72:3 76:7 78:17
79:10,14 80:8,14
81:19 98:15 108:7
'25:5 127:12,21
'31:1,23 132:2
'33:14 134:22
**financials**
34:10
**find**
63:10 91:23 117:9
121:17 124:2 129:17
**fine**
17:10 39:19 75:16
79:22 82:21 83:1
**finish**
5:21,24
**firm**
11:6 12:20 12:3,7,
19,20,23 14:1,11
110:15 113:16
114:16 115:14 118:2
120:12
**flip**
100:3
**Florida**
26:24 27:2 64:21,24
65:2,4,5 72:20 73:24
84:21 90:12,18
93:20 94:1 111:21,
23 112:6,23
**flows**
134:7
**folks**
82:23 102:15
**forgiven**
42:3
**forgiveness**
42:4

---
**form**
55:20 82:3 122:24
**formal**
114:2
**formally**
63:12 97:1
**formed**
17:15
**forward**
102:13 126:7
**fourth**
128:24
**frankly**
75:19
**fraudulent**
118:8
**free**
6:5
**freight**
26:16
**front**
63:15 122:10 127:23
**full**
106:24 114:11
**function**
17:21
**funds**
127:10
**furnishings**
121:1
**furthest**
127:11

---
### G

**general**
9:20 39:20 51:6,7,17
53:2 58:18 61:21
**generally**
20:8
**gestures**
20:8
**gift**
118:7
**give**
96:9 121:15
**giving**
58:20
**good**
53:9 92:8,16 121:15
**government**
111:16
**grand**
90:4
**great**
5:24 110:19 121:22
**greater**
135:7
**group**
98:15,19
**Grove**
9:22
**guess**
6:6 63:21 89:14
102:5 131:2
**guns**
25:11
**guys**
120:2'

---
### H

**hair**
99:21
**half**
45:22 95:20 96:1
**hand**
131:8
**Handing**
70:2

---
**handling**
12:14
**handwriting**
82:18,20 92:16,17,
19,20,22 94:11
101:5,6 102:5 103:3
**handwritten**
82:17 102:21 104:20
**Hanson**
9:17 13:4,12 14:10
16:16,18 17:13
18:10,12,14 22:6,7,
9,17 23:17 24:1,6
25:4,14 26:7,15
27:1,6,21 26:6,17,24
30:8,11,15,18 31:1,3
32:6,9 36:16,18,23
37:18,19 38:16,21,
24 39:7 40:4,21,22
41:11,23 42:9 43:11
44:13 45:8,18,20
47:9 48:21,23 49:4,6
50:19,22,24 51:9
54:16,24 56:10,22
58:22 62:21 63:3
65:4,8 86:2,15 68:21
72:10,17,24 73:20
74:10 75:1 76:16,18,
22,24 77:4,5,9,16
78:18 79,6,9 81:24
82:11 83:2,13 84:22
85:3,15 86:15 88:22
89:6,8 90:1,5,17
91:2,19 92:5 93:17,
24 94:8 95:15 96:10
99:13 101:20 102:6
105:3 105:13 107:23
108:12,13 109:23
111:2,7,23 112:1,5,
9,15,18 113:1,6
114:17,23 115:2
119:11 120:13,22
122:0,15 125:11
126:12 136:2
**Hanson's**
17:15 31:14 39:4,21
41:4,8 45:1 46:3
48:9,18 52:4 55:12
57:10,18 63:2 66:19
74:18 80:11 82:5,11
83:14 85:16 91:15
93:13 103:12 117:1
121:12 136:22
**happen**
82:22
**happened**
14:1 51:5 109:9
**hear**
5:19 15:22
**heard**
15:9,19,24 24:9
27:10
**heck**
120.24
**held**
60:4
**Heims**
5:9
**helpful**
34.23 100:21
**Henry**
8:16,19 14:21 18:18
22:8 28:20 31:12,13,
20,23 32:2 60:6,7
77:20,24 79:13
107:16 108:13
113:14 115:13 116:3
118:2 120:5 121:1
**higher**
54:19
**highest**
10:1 75:24

---


hold
17:5 60:6
home
9:21 27:1
Horwath
12:21 13:18 14:3
hundred
132:9

**I**

ideas
115:21
identical
67:14
identification
32:21 46:15 49:9
52:8 55:16 57:23
62:9 64:4 89:24 73:8
78:14 85:20 92:11
97:10 107:11 109:18
113:10 115:8 117:21
119:23 122:5 128:20
identified
42:22 88:17 121:13
identifies
34:2,5 97:22
identify
53:19
Illinois
9:22 10:4 21:3 22:2,
21 23:3 24:4 26:9
34:6 53:17 84:14
88:1 105:18 110:3
impact
41:8
implications
134:1
in-depth
33:24
include
34:3 53:4 72:23 74:9
included
31:17 34:20 37:8
53:5,23 58:16 61:7
63:3 66:14 72:17
96:21 132:2
including
54:8
income
95:5 97:15 109:22
111:8,9,10 123:20
124:13,16
incorporated
21:3
incorrect
77:7,'1:17
increase
39:14 56:14 94:22
103:18 130:13,15
132:3,13
increasing
135:3,6
independent
33:5 49:13 52:13
70:12 76:8
indicating
51:18 95:2
individual
8:13 35:10 87:19
109:22 131:19,21,24
134:7
individuals
110:15
information
31:13,16 35:2,3,12
39:17 42:16,18
44:20 54:14 58:20
59:16 63:13 69:16
71:24 78:22 79::18
80:6 98:14 102:19

104:7 106:7 115:2
116:12 120:18
126:22
informed
43:12
initial
128:6
initially
13:1
inquired
116:22
installment
'18:9,12 119:5
instructed
45:14 65:18
insurance
32:10
intercompany
34:14
interest
29:6 37:7,11 39:11
40:9,23 41:23 42:2
43:18 45:21,23
47:15,19 48:15,17,
19,21,23,24 49:3
56:16,21,24 61:15,
22 62:1 66:3,7,20
89:10,24 92:4 95:20
96:1,3,5 105:5 108:1
110:21 111:3,10,22
112:5 132:6
interest-bearing
45:13
interested
39:10 116:3
internal
12:14 71:7 86:18
internally
102:16
involve
80:10
involved
15:1 20:16 30:20
33:11,15 46:23 54:1,
23 55:24 62:5 80:3,6
86:8 98:4 110:7,11
involving
7:23
issue
114:9 124:5 132:3,4
issued
5:9 9:5 30:24 53:1
issues
78:23 79:14 118:9
item
63:18 130:7,11,18
items
74:3 135 15

**J**

January
40:9
Jason
120:14
jewelry
120:24
journal
94:17,21 95:2 104:3,
6 126:6
Jr
44:8 107:23 108:13,
21
judgement
1'5:24
judgment
114 23 116:4
June
80:'4

**K**

K-1
111:7,15,24 115:23
K-1s
124:5,8
KANE
80:24 125:23 127:3
Kathy
8:16,19 14:21 15:23
18:18 22:7 28:20
31:12,13,20 44:8
60:6,7 77:20,24
79:13,19 80:5
107:18 108:12,21
113:14 114:5,16
115:13 116:3 118:2,
7,21 120:5,20 121:1,
11
Kathy's
107:22 113:20
Kenosha
24:16
kids
17:15 29:6 44:7
48:18,20 103:12
kind
32:5 125,23
knowledge
18:8 32:7 36:22
40:3,14 44:18 47:17
56:17,18 20 60:8
77:8,12,18,18,22
79:3 83:14 91:8
106:21 112:4,7,21
113:7 114:12 118:18
118:12 128:11

**L**

L-6
130:13
language
44:3 116:6
largely
124:17
larger
105:7,9
latest
75:22
Laventhol
12:20 13:17,20 14:1,
3,15
law
113:15 114:16
115:14 118:2 120:12
lawsuit
8:9,13
lawyers
113:23
lead
20:24 95:4
leased
24:12 25,23 26:12
27:13 28:5
Leasing
28:1,7
leave
14:2
ledger
51:17
left
58:4 78:22 84:4,5
115:19
lend
50:20
lender
79:5 134:24

lenders
71:6
letter
97:19 105:18 122:10
level
10:1
liabilities
84:4
liability
103:4,18 134.7
license
10:13,14
licenses
10:10,12
life
32:10
limited
9:9
lines
98:9
list
120:22,23 121:12
listed
35:8 36:3 59:12
61:23 62:3 67:15
81:11 92:4 123.11,
21 124:4 127:9
132:7
listing
43:5 135:2
lists
35:17 53:14 62:19
82:16 83:18 129:10
litigation
8:20
loan
29:24 41:18 45:10,
12,15 63:8 64:12,17,
21,24 65:2,6 66:1
71:15 72:20 73:24
84:21 90:12,18
93:20 94:1 98:23
99:20 102:3 104:18
111:22,23 112:6,23
113:5 130:8,19,20
132:22 134:17
loaned
63:6 113:24
loans
21:22 30 21 40:5
45:13 84:5 105:22
120:23 127:9:16
129:4,8 130:11
133:18 135:2
located
24:16,18 26:24
27:15
location
22:16,20,24 26:14
87:3,5,23 88:5
locations
87:24
Loebach
120:14
long
9:22 10:23 11:11
12:22
longer
70:19 109:3,13
looked
35:9 44:24 45:20
52:19 56:13 72:21
74:4 76:6 83:20
84:20 87:20 90:20
92:2 95:18 105:10
118:3 125:5,7,9
127:11,20 130:18
loss
124:21
losses
124:18,20

lot
121:19
loudly
5:19
lumber
23:5,11 24:23 34:7
53:18 123:1

**M**

made
57:18 64:13,17 91:1
106:13,18 112:6
125:20 132:23
mail
115:19
maintain
35:13
maintained
10:16 35:7
make
5:18,20 88:12 96:7
102:13 112:24 125:4
128:6,23 136:4
makes
6:3
making
131:18
manage
21:17
management
21:18,19 39:20
Manager
13:1
Managerial
88:9
Managing
12:9
manual
'01:4
manually
'02:13
Marian
9:17 78:18 109:23
122:9,15
mark
32:17 118:18 128:16
marked
32:20 46:14 49:8
52:7 55,15 57:22
62:8 64:3 69:23 70:2
73:7 78:14 85:19
92:10 97 8 107:10
109:17 113:8 115:7
117:20 119:22 122:4
126:19
match
43:2 46:10 102:4
material
15:11 16 4,13 17:12,
20 18:13 19:2 21:3,
12:15 22:2,21 23:3
24:3 29:17 33:6
34:5,6 81:5 82:16,19
83:19 84:12,13,14
88:1 110:23 111:5
120:8 133 20 135:21
materials
25:11 53:16,17
58:14,18,24 86:1
math
94:13 96:7 104:20
matters
12:15
Max
97:22 23,24 101:10
110.11
Mcguire
113:15 115:14
118:2,21

Mcguire's
118:15
meaning
28:14
meaningful
34:12,13
meant
114:6
medication
6:22
meeting
80:5
meetings
80:10
mention
78:21
mentioned
15:15,23 20:3 29:3
52:17
mid
113:2 135:17
middle
100:7
Miller
5:8 10:22,23 11:5,6,
7,14,24 12:11 13:9,
16 14:11,15,18 20:8,
16 30:7,17 31:10,22
32:1,4 33:10,15
35:13 40:17 43:12
49:17 58:9 62:14
70:10 76:13 77:13
78:5 86:7 97:19
110:5 1'9:9 122:17
125:7
million
50:24 66:13 69:1,5
99:19,20 91:18
94:13 99:15,21,22
101:7 105:4 106:14,
20,23 107:3 112:9,
16,18 124:16
132:13,23 135:17
mind
126:16
minus
40:11 43:9 45:22
minute
118:4
minutes
28:22 121:16
misunderstood
7:14
Mollie
5:10 15:8,16,19
16:1,3 29:18
moment
41:1,22 52:17
125:16
moments
72:21
money
36:16,23 38:22,24
39:5 40:5 41:6,12,16
47:18 50:20 65:8
89:5,7 108:17
111:15 112:20
120:23 133:14
monies
29:24 36:1 45:22
74:17 113:23 127:9
morning
34:18
move
88:8
moved
14:14
moving
116:4 118:21
multi-million
105:9



multiple
58:21 61:7

**MW**
53:19

# N

**N.W.**
26:8 110:22

nails
25:11

named
65:5

names
20:7 60:5

Naperville
22:23 24 25:12 26:1
87:5 23

nature
34:14 45:13

necessarily
37:7 94:15 128:6

needed
53:22

negative
124:16

net
35:20 45:6 124.20
135.3

netted
103:8

netting
132.3

nods
5:16

non-passive
123.20

nonpayment
109:7

north
7:18

Northern
10:4

Northwest
15:11,14 15:4,13
17:11,19 18.12 19:2
21:2,14 22:1,20 23:2
24:3 29:4,17 33:6
34:5,6 53:16,17
58:14,18,24 63:21
61:5 82:18,18 83:18
84:11,13,14 86:1
88:1 111:5,8 112:24
123:7,8 133:20
135:21

Nos
78:13

notation
130:12

note
36:7 40:8 42:6 43:2,
8,15 44:12,17,24
45:21 46:11 47:2
48:1 50:12,24 51:8,
14,21 52:3 54:10
55:7 56:3 57:4
60:21,22 62:18,23
66:1, 5,19
67:11 68:1,24 72:5,
13 73:17 77:10
81:12 62:1 83:8,18

notes
43:15,17 44:11,16
46:9 48:1,15 51:22
52:3,4 55:7,12 57:4,
9 59:5 62:23 66:6
67:7 72:13 81:3 90:9
91:12 93:8 136:17

November
9:24

number
47:12 54:18 56:7
59:12 60:20 61:14
63:4 66.13 67.10.11,
13,14 75.1,6 76:1,3
81:11,12,17 83:7,20
85:10 86:20 89:15,
19 91:9 94:14
100.23 101:13
102.2,6 103:9
104.19 105.1,7,9,10
106:3,8,23 122:23
123:4 125:7 136:18

numbers
33:24 35:23 37:8
42:15 43:2 48:10
61:2 65:20 21 77:6,
17,21 92:7 98:8
104:21 123:12
127:13 131:15
135:16

NV
67:5

NW
87:16

NWBM
84:6,10

NWR
87:16

# O

Oakwood
9:22

obligation
103:6

obtain
10.14

occurred
103.21

October
113.16 120:5,20

office
102:10

officer
18:14,19 59:5 60:15
61:16,22 62:1 67:7
68:1,17,21 73.17
74:20,24 88:15,21
89:15 90:9 91:12
93:8 94:4,7,22
95:19,24 96:11
99:21 101:21
108:17,18 112:10,16
127:17 130:2,5,8,11
136.12

officers
18:19,23 22:24 24:4
43:16,17 44:3,6 46:9
48.1 51:22 55:7 57:5
62:24 66:7 72:14
108:12 136:17

operated
35:21

operating
97:3 124:21

operations
34:16 88:13

opinion
82:24

opposed
88:5

option
39.4

order
98.15

original
29:4 105:17

owe
105.3

owed
44:23 49:2,3 66:15
74:17 89:5,7 90:17
91:15,19 93:12,17,
23 96:10 101:20
102:7 108.16 109:14
113:2 125:11 126:12
136.22

owes
105:7 120:22,23

owing
50:24 72:24 73:19
74:3 84:22 99:13

owned
17:12 22:22 24:12,13,
24 25:13,23,24 26:1,
12,22 27:13 28:4,17,
24 35:21 37:22
87:24

owner
16:18 18:12 26:3,15
27:6,21 28:6,19

owners
16:21,24 17:4 18:9
22:6 23:13 38:3

ownership
17:16 29:8 116:10,
19 118:22

# P

P-e-a-r-l-s-t-e-i-n
12:7

p.m.
137:6

pages
36:3 49:22 70:5
97:18 122:10

paid
38:10 13,16,18,19
40:23 41:23 45:6
46.17,19,21,24 49:4
71:21 100.24 109:5
112:5 134:4

papers
57:1 69:10,12,15
75:10,11,15 101.10
106:5

paragraph
34:1 53.13 118:16
132:6

paralegal
113.23

paraphrasing
56:7 72:8

paren
40:11 66:9

parent
17.24 18:2

parentheses
40:10 43.19,20 66:8
69:1,3 114:1,2

parents
120:22 121:12

part
17:16 22.20 23.2
42:6 43:5 45:6 59:17
60:23 102:15 109:5
110:20 115:18

parties
7:11

parting
109:5

partner
12:13 13:2 97:24

party
7:24

pass-through
111.6

passive
124:18

pay
30:3 91:2 134:13

payable
43:16,17 44:11,12
46:9 48:1 51:22
52:3,4 55:7,12 57:5,
9 59 5 62:23 63:1
66:6 67:7 68:1 72:13
73:17 81:4 85:7 90:9
91:12 93:8 103:11
108:12 17,18 127:22
136:17

paying
40:5

payment
39:22 49:5 106:13.
19 108:1 112:10

payments
40:24 49:3 57 17
91:1 110:21 111:3

payroll
45:7

pays
134:10

Pearlstein
12:4

Pearlstein's
12:4

pending
115.24

people
80:3 102:10

percent
17:12 40:11,12 43:9,
19 45:22 66:8 95:20
98:2

period
14:14 20:23 28:24
43:20 59:24 71:23
116:16

person
20:24 59:24 98:1

personal
7:10,12 8:16 30:24
31:4,7,8,15 41:4,5,9
78:17 79:9,14 85:2,7
14 81:19 91:8 110:8
111.16 112,2 117:1
122:8 124:14

personally
7:24 30:8,15 31:20,
23 33:11 48:22
93:17 110:7 114:23
122:19,20

perspective
41:4 102:1

Pete
118.7,18

Peter
5:7 6:11

pick
112.1

piece
17:9

place
1:18,13 128:7

point
15:15 20.4 25:16
32:24 33:13 96:19
103:1 112:14 118:8
132:14

pointing
107:2 110:16

portion
66:14 73.19 81:5
84:5 91:2,18 93:16
111:21 113:19

positive
50:19

power
29:21

practice
10:13 12:13

Prairie
22:13,18 25:12
26:14 87:3,23

preface
101:18

prefer
75.9,14 106:24
126:19

preliminary
49:23 52:19,24 53:1
70:6,9 76:11,21

preparation
9:8 31:4,14 33:12
46:23 54:1 55:24

prepare
19:24 20:1 30:10,17
33:9 98:1,15 101:10
103:13 110.5,13
122:19,20 126:5

prepared
31:22 32:1 33:10
34.10 49.16 53:1
58:11 73:2 102:17
104:17 122:17 125:8
134:23

preparer
103:5

preparing
30.13 33:15 96:4,8
110.8

present
11.3 1:12,15 125:17

presentation
103:19 105:1 132:4

President
24:2,7

pretty
78:22 81:11

previous
45:5 47:15 48:16
52:24 90:20 123:16
133:15

previously
53.5 136.3

primarily
134:23

primary
134.18

prime
40:10 43:9,18 45:21,
23 68:3,8,20 95:20
96:1

principal
11 10 12:9 37:13
56 23 97.23 100:23
101:8 133:23

principally
21:17 56:16

principles
23.20 53.3

prior
12:16 13.19,23
19.24 67.15 75.21
90:23 94:17 128:9
133:7

problem
121.24

procedures
6.9

proceedings
7.7,10

produce
71:1 136:8

produced
50:7,8 69.15 70.10
71:9 76:13,14 78:5,
6,19 86:14,18 104:6

professional
10:10 27:24 28.7

profitable
45:5

profits
134:7,10

promissory
44 17

proper
126:23

property
24,12,13,15,19 27:4,
17

provide
31:13 79:9 120:17

provided
31:17 59:19 69:16
93:1 102:17 114:10
120.15

providing
126:2

prudent
124:13

public
10:13 11:6

purpose
37:1 86:18 95:6

purposes
37:4,5,6 88:4,9
102:14 126.8

pursuant
5:8 14:4 41:19

pursue
125:17

put
34:15 65:8

PV
87:3

# Q

question
5.14,21,24 6:1,4
7.15 22:23 23:21
39:19 41:10 49:2
64:22 75:6 85:13
102:6 118:17 128:22
130:16 132:5 133:18

questions
5.13 7:21 9.20 77:5
78:24 80:8 98:18
135:9,10

quick
32:23 42:5 97:12
122:7 135:10

quirks
111:14

quote
75:14

# R

raise
77:5,20

raised
135:15

range
113:2

rate
40:10 43:9,18 45 21,
23 66:3,8,20

Re-class
103:4

re-think
30:22

reached
104.21

read
43:17 82.10 86:13
94:14 113:20 115:18

reading
116:2 133:13



reads
36:8 47:3
real
24:9,12,18,24 25:23,
24 26:2,12,13,22,23,
24 27:5,9,13,14,15,
22 34:18 37:5,17,18,
20,22 42:5 53:4,20,
22 54:8 55:3 87:12
135:10
Realty
25:20 26:1,3,8,18,19
27:7 53:19 87:14,16
reason
88:4
reasons
41:2
recall
8:21,22 9:2 15:2,4,
23 18:17 27:16
38:17 44:19 57:17,
20 59:22 60:5,11
61:17,19 66:4 76:23
84:23 95:21 96:24
97:5,6 101:9 107:20
113:18 115:1,17
116:8,24 117:5,14
118:5,18,19,20,23
119:13 120:7 121:8,
18
receivable
60:15 61:16,23 62:2,
4 68:17,21 74:20,24
84:6 88:15,21 89:10
94:5,7,22 95:19,24
96:11 101:21
112:10,17 127.17
receivables
135:3,6
received
15:18 98:14,19
111:3,15 120:14
124:10
reclassification
107:1 133:3,7,9
recognize
82:11,17,22 85:15
92:17
recollection
6:8 17:3 18:11 27:2,
3 28:23 30:16 33:12
42:4 47:21 48:17
51:4,6,7 66:21 68:15
70:14 80:1 83:13
86:17 91:8 92:3,6
98:11,13 106:12
112:4 113:3 114:22
115:4 116:2,5
117:17 118:11,14
124:4
reconciled
103:21
reconciliation
102:15
reconciliations
95:6
record
5:4,6 12:5 14:6,8
16:5 17:8 22:10
49:11 52:11 78:9,21
102:12 103:22,24
104:16 107:6,8,15
109:21 110:2 113:13
115:12,19 117:10,12
118:1 120:3 122:8
125:4
recorded
38:1 50:21 102:11
109:11 126.3
records
16:6 35:5,8,14 42:20
58:7,10 92:24

102:17 126:4
redacted
78:21 80:23
reduction
50:21 51:13
refer
29:16,18 54:16
56:10 57:9 61:3 75:9
89:10 106:4
reference
130:20
referenced
129:14 130:24
references
101:4 130:19
referred
18:4,6 22:12 51:9
60:13 111:10
referring
16:9 30:7 44:12 47:8
48:8 64.23 65.12
103:19
refers
56:15 44.4 111:24
124:10
reflect
5:6 57:5 102.18
111:6 133:12
reflected
34:16 35:2 44:11
52:3 69:11 102:6
125:12,15 130.15,21
131:15,16
reflecting
40:15 44:17
reflects
106:3
refresh
92:2,6
regard
63:13 116:24
133:17,19 134.21
reinvested
45:8
related
18:3 21:19,22 28:5
32:5,9 33:7 35,20
37:20 79:6 119:10
relationships
21:18
relative
120:15
relevant
131:2
remainder
113:5
reorganization
17.14,18,21 18:8
20.3 21:16
repaid
112.16,20,22 113:6
repay
112:18
repayment
105.22 114:3
repeat
25:6 130.16
rephrase
6:2 7:18 22:14 41:9
report
5:15 12 1 53:22,23
34.20 36:6 37:21
38:1 42:17 46:20
47:20,22 49,13,19
52:14 53:5,23 54:23
55:21 59:13,16 61:4,
7 62:14 70:12 78:23
77:1 85:24 96:3
111 11,15
reported
65:21 111:18

reporter
5:15,19
reporting
111:14
reports
65:22 71 23 76.6,8
77.23 78:2 95:16
111:12 125:6
represent
49:11 52:11 56:4
78.16 107:15 109:21
113:13 115:11
117:24 120:3
represented
36:2 133:12
representing
6:19 81:24
request
63:12 75:18
requested
9:15
required
45:8 53:3,4 79:9
1:16:23
Reserve
137:3
residing
65:4
respect
32:5 43:9 57:19
70.10 76.23 79:13
1:12:23
respond
5.14
responded
117:15 136:3
responding
117:17 118:18,19
response
5:17 121:5
responsibilities
12:10,12
restate
41:10
restructuring
21:6 29,3,10
result
37:6 45:4 47:14,15
48:14 112.1
resulted
29:9 39:18 104:19
results
50:19
retail
23:10 87:9
retained
126:8 134:12
return
95:5 97:15 98:2,5,8,
18,21 100:18 102:7,
14 103:5,14 105:1,
19 109:22 119:8
111:8,9,17 112:2
122:8,14 124:6,8,14,
15 128:21 129:15
130:10,12 131:16,
19,24 132:3,16
136:19
returns
9:16 20:2 30:10,13
31:22 95:8 116:20
117:2 124:1,13
125:10
review
9:10,16 57:1 115 15
125:21
reviewed
9:7 20:1 31:18 86.11
134:22
reviewing
114:10 115:11

Ricky
97:22,23,24 101:10
right-hand
85:6 98:22 105:14
risk
115:23
Road
9:22
Robert
8:6
ROGOVIN
5:3,6 6:15 7:16,19
14:9 16:1,11 17:6,9,
17 32:17,22 44:1,2
48:16 49:10 50:7,10
52:9 53:9,11 55.17
58:1 62.10 63 12,19,
23 64:5 69:14,19,21
70:1 73:5,9 75.16
76:5 78:9,15 80.20,
22 81:2 85.21 92:8,
12 97:11 100:5,8,12,
14,18,21,22 103:22
104:1,5,11,12 106:6,
11 107:6,12 109:19
113:11 115:9 117:8,
10,12,24 118:2,10
120:1 121:15,22
122:6 124:22 125:1
128:9 127:2,4,15
128.21 131:4,6,10
132:15,18,20
135:10 13 136:7,10
137:1
rolling
126:7
Ross
12:4
row
86:10
rules
5:12 6:9

S

Sabin
7:13,17 8:6 53:7
69:20 100:9 106:10
126 24 132:19 137:3
SAITH
137:4
sale
118:10.13 119:5
schedule
80:17,22 81:3,23
82:3,15,19 83:1,17
84 6 85:11 98:22
102:19 105:15
110:20 123:12,17,18
124:9 129:1,11
130.7,8,13,18,21
131:1-7 132:12,15,16
21 130:1 136:19
side
85:6 94:13 102:24
103:3 104:14
signature
82:5,10,12 83:12,15
85:14,18 110:17
signed
32:19
similar
25:12
simpler
69:16
sincerely
97:22
single
61:8
sir
38:5 62:11 70:3
73:10
sitting
75:12 79:17 109:12

sentences
43:16 113:21
separate
50:24 63:18 130:17
separately
68:13 100:16
series
5:13
served
115:2
services
19:22 20:9,12
set
43:10
Setting
41:3 75:11
shape
71:3
shareholder
39:10 61:7 99:20
102:4 104:19 108:6
133:23
shareholders
18:23 105:22 129:4
130:19,20 132:24
Sharon
114:15 120:11
sheet
43:6 58:13,20 63:21,
24 84:8 73:1,12
75:22 84:3 99:22
93.4 103:9 114:1,7
122:11
sheets
46:6 63.17
short
78:10 122:1
show
133:11 135:7
showed
60:22 90:20 91:12
99:19 127.21,23
131:8 136:16
showing
94:22
shown
51:13 54:19 60:21
65:9 66:13 77:10
83:8 99:15 104:18,
24 108:11
shows
35:23 55:7 62:24
67:7,18 72:13 74:21
75:6 85:7 88:15,17
89:1,11 90:13 93:9
94:24 99:2 102:3
105:21 106.1 110:20
123:20 124:16
126:2,14 129:3,7,20,
21 130:1 136:19
side
85:6 94:13 102:24
103.3 104:14
signature
82:5,10,12 83:12,15
85:14,18 110:17
signed
32:19
similar
25:12
simpler
69:16
sincerely
97:22
single
61:8
sir
38:5 62:11 70:3
73:10
sitting
75:12 79:17 109:12

112:13
sold
25:10
solely
58:20
son
22:7
sort
84:3
source
51:16 112:2
sources
112:3
Southport
23:5 24:8,22,24 34:7
53:18,20 87:7,9,12
89:6 123:1
SP
87:7 89:1
speak
5:18 17:24 18:22
specific
18:7,9 58:17,20
58:20 78:24 128:11
specifically
8:21 38:8 58:23
67:13,16 70:21
75:20 99:10 119:1
speculate
75:15,17 106.24
spell
5:4 12:5
spoke
107:22
spoken
8.5,19 79:13
spreadsheet
73:15
Sr
44:13 73:20
SRE
87.12
stability
40:1,2
staff
20:21 33.17 86:7,12
stamp
49:22
stamped
70:6
standpoint
39:20 41.2
stands
121 14
start
5:11
started
1:14:15 120:11
starting
86.19
state
5:3 6:5 16:7 45:7
110:3 133:3
State's
16:7
stated
41:22 42:6 56:23
100.16
statement
31:7 8 33.5 36:2
46:20 52 13 55,21
61:5 62:15 71:9 76:7
80:14 100:3,8,9,10
108:7 121:14 123:4,
6,9,15,18,19 124:5,
10,20 126:23
127:12,21 129:14,
17,18 130:19
131:18,24 132:2
133:1 135:14

statements
20.1 30:18,24 31:4,
15,18 32:2 34:3
49:12 70:11 78:18
79:10,15 81:20
125:8,13,16 131:1
133:14 134:22
states
35:19 36:19 40.8
54:11 58:17 59:5
66:6,22,24 67:11
68:17 81:5 83 4
108:6
stay
136:11
staying
18:7 19:8 42:5 51:21
61:11 88:16 69.7
72:4 74:12 83:23
85:13 104:1,13
step
21:14
stick
102.20
sticking
31:3 83:11
stock
118.10
stockholder
36:8 39:16 42:23
47.4 50:12 51:8
54:11,13 56:4,6
60:23 62:18,20 72:5,
7 77:10 83:9 127:22
128:3,4 131:12,14
132:8 134:19
stockholders
35:22 36.10,14,21
38:10,14,20 127:22
stop
116:14
stopped
116:11,20 121 18
store
23:10
strike
90:11
structure
1'6.10
stuff
121:19
Subchapter
133:21 134:6
subject
1'4.17 120:12
subpoena
5:8 9:15 15:18,20
78:20
subpoenas
9.4
subsequent
50:2
substance
9:1
Suburban
7:1:11,14,15,16,20,
22,24 78:4,19 79:5,
10,23
sums
44:23 74.6
supplements
122:24
supplied
35:11
suppliers
21:13
supplies
23.11
Supply
15:11 16:5,13 17:12,
20 18:13 19:3 21:15

23:6 24:23 29:17
33:6 34:5,7 53:16
58:24 81:5 82:16,19
83:19 110.23 :111.5
123:8 133:20 135:22
support
51:13 126:23
supporting
55:5 136:5
suspect
91:22
suspended
108:1
Swan
6:16,18 43:24 80,19,
21 81:1 100:4 117:4
127:6,8,18 128:22,
23 131:5,7,11
132:16,21 135:9
sworn
5:2 6:12

## T

taking
38:22 39:4 104:20
134:17
talking
17:18 62:15 77:7
87:1 127.16
tax
9:12,13 12:14 20:2
30:10, 13 31:22 95.5
97:15,24 98:2,4,8
99:2,20 102:3,7,14.
18 104:24 106.4
109:22 110.3 111:8,
9 117:1 119:9 122:8,
14 124:1,7,13 125:9
126:8 129.3,7
130:12 131.16,19,24
132:2,16,23 133:15
134:1,16 136:19
taxable
41:14,16,17,20,21
taxes
45:7 134:3,10,13
ten
15.4,6 121:16
term
16:1,3 44:15 53.15
termination
109:7
terms
39:20 4C:15,18
41:19 43.8,10,13
76:12
terrible
71:3
testified
6:13 19:1 41.1 65:7
79:12 99:12 103:10,
13 104:15 108:15
125:3,8 136:21
testify
5:9 6:23
testifying
7:20
testimony
5:20 16:3 66.12
126.10
thing
5:22 105.21 125:2
things
56:18 127:6
thinking
116:9 119:4
Thomas
115:13 118:1,21
thought
66:13

thoughts
118:17
thousand
132:9
tie
95:4 132:1
time
13:11 14:5,10,10
15:24 17:1,4,13
19:14 21:6 30:6,10
31:5,15 46:21 52:14
66:14 70:22,23 71:2
79:8,22 82:23 84:24
102:9,12 108:16,23
116:16
times
7:3 10:16 11:2
title
11:7,9,11,18 12:8,24
18:20 60:4,6,8,9
titles
11:13,16
today
6:7,16,23 8:3 11:22
16:9 75:12 79:18
109:13 112:13 125:5
126:18,19,24 127:1
today's
5:12 9:8,11 16:2
Tom
113:15 115:19
Tomac
114:15 120:12
top
35.17 86:19 113:19
total
37:14 51:19 74:6
87:18 90:4,21 96:10
99:13
touch
31:2
town
27:16
track
102:18
trail
107:18
trailers
28:4
transaction
108:8,9,11
transactions
34:15 36:4
transfer
14:14
transfers
36:1
treasurer
11:17 12:14
treat
39.5,22 45:14
treated
45:10,12 50:23 66:1
68:13
trend
48.16
tria
85:24 98:14 107:24
108:11 133.10
trucks
28.4
trust
32:10,12,14 78:19
118:11 119.5
Trustee
5:9
trusts
32:5,8 119:6,8,10,17

turn
33:24 36:7 42:21
43:15 46.5 47.2
50:11 54:10 56:3
57:4 59:2 60:14 67:6
86:8 90:8 94:3 95.10
98:21 105:12
turned
77:24
two-year
122:11
type
20:12 46:19 49 19
typically
20:23 29.13 39.7
62:3 71:5 98:17

## U

U.S.
97.15 109.22
uncollateral
62:19
uncollateralized
36:9,20 42:7 47:4
54:12 56:5 60:23
72:6
underlying
8:10
understand
6.1,8 23:21 49:1
101:15,17 111:18
understanding
6:7 15:13 10:6
45:19,24 47:11
48:11 50:16 58:15
57:14 58:19 61:1
65:24 66.19 68:12,
20 69:4,8 74:8 75:12
79:17 81:22,24 84:9,
19 85:1 90:23
104:15 106:22 108:9
109:12 112:14 114:5
121:10 128:3
University
10:4
unpaid
48:15
unredacted
81:4 84:5
unsecured
43:17 44:15 66:6
136.17
upper
98:22 105.14
usage
84:11

## V

Vacant
27:5
values
31:17
varied
37.3
vendor
114 21
vendors
40:5
verbal
5:17 40:19
verbally
5.15
version
52:18 70:17 84:3
versions
52.19 70:15 76:10,
12

versus
102:16 114:17
120:13
View
22:13,18 25:12
26:14 87.3,23

## W

wagons
97:7
wait
5:23
wanted
88:12 125:2
website
16:7
week
120:18
Western
114:17,20 115:1
120:13
wife
7:17 78:18
Wisconsin
24:17 27:15
withholding
45:7
word
42:8
work
12:16 13:12,22 19:2.
5,9,15,19 20:16
30:8,14 31:19 32:4
57:1 60.10,11,15
75:9,11,14 101:10
106:4 116:11,14,17
118:11 119:6,9,18
works
118:6
worksheet
126.7
Write
106:9
writing
102:23,24 120:7
121:8
writter
40:15 44:16
wrong
67:22

## Y

yard
88:12
year
11:20 36:6 39:9
57:6,13 59:9 60:16,
22 63:18 65:12 67:7,
14 15,17,18,19 68:1,
4,18 73:12,14 74:3,
4,13,14 75:7 93:9,21
94:17 96:1 99:2,20
102:3 104,18 109:23
110:22 111:9 117:3,
6,7,8 122:9 129.3,7,
12 131:3 132:23
133:15,24 136:13,14
yearend
59:13 68:24 88:1
'02.11
years
9:18,19 13:2,8 15:5,
6,20,20 33:7 37.3
38:2 39:2 45:5 46:21
48:16 50:18 62:15
79:24 100:15 102:14
'23:16 128:5,8

# Northwest Building Materials & Supply Co. and Affiliated Companies

## Combined Financial Statements and Independent Accountants' Report

### December 31, 2003 and 2002



SEP 1 7 2004



EXHIBIT

Cieslak #1

Corp 6-4-15

PENGAD 800-631-6989

MILLER COOPER & CO., LTD.

## CONTENTS

|  | Page |
|---|---|
| INDEPENDENT ACCOUNTANTS' REPORT | 3 |
| COMBINED FINANCIAL STATEMENTS | |
| Balance Sheets | 4 - 5 |
| Statements of Income and Retained Earnings | 6 |
| Statements of Cash Flows | 7 |
| Notes to Combined Financial Statements | 8 - 17 |



**MILLER COOPER &Co.,Ltd**

ACCOUNTANTS AND CONSULTANTS

## INDEPENDENT ACCOUNTANTS' REPORT

To the Board of Directors
Northwest Building Materials & Supply Co. and Affiliated Companies

We have reviewed the accompanying combined balance sheets of Northwest Building Materials & Supply Co. and Affiliated Companies as of December 31, 2003 and 2002, and the related combined statements of income and retained earnings and cash flows for the years then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. All of the information included in these combined financial statements is the representation of the management of Northwest Building Materials & Supply Co. and Affiliated Companies.

A review consists principally of inquiries of Company personnel and analytical procedures applied to financial data. It is substantially less in scope than an audit in accordance with auditing standards generally accepted in the United States of America, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to the accompanying combined financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America.

MILLER, COOPER & CO., LTD.

*Miller, Cooper & Co. Ltd.*

Certified Public Accountants

Northbrook, Illinois
February 20, 2004

# Northwest Building Materials & Supply Co. and Affiliated Companies
COMBINED BALANCE SHEETS
December 31, 2003 and 2002
(See Independent Accountants' Report)

| ASSETS | | 2003 | | 2002 |
|---|---|---:|---|---:|
| CURRENT ASSETS | | | | |
| Cash and cash equivalents | $ | 76,990 | $ | 56,444 |
| Accounts receivable, net of allowance for doubtful accounts | | | | |
| of $36,876 and $44,044 in 2003 and 2002, respectively | | 2,492,870 | | 2,351,383 |
| Inventories | | 1,377,787 | | 1,123,890 |
| Prepaid expenses and other | | 629,780 | | 439,332 |
| Total current assets | | 4,577,427 | | 3,971,049 |
| NET ADVANCES TO UNCOMBINED AFFILIATES | | 2,572,021 | | 2,528,711 |
| PROPERTY AND EQUIPMENT | | | | |
| Vehicles | | 2,331,419 | | 1,850,699 |
| Leasehold improvements | | 319,003 | | 319,002 |
| Office equipment | | 470,660 | | 505,090 |
| Yard equipment | | 295,257 | | 260,828 |
| Transportation equipment | | 307,268 | | 307,268 |
| | | 3,723,607 | | 3,242,887 |
| Less accumulated depreciation | | 2,737,412 | | 2,683,126 |
| | | 986,195 | | 559,761 |
| DUE FROM STOCKHOLDER | | 2,443,430 | | 2,127,556 |
| | $ | 10,579,073 | $ | 9,187,077 |

The accompanying notes are an integral part of these statements.

| LIABILITIES AND STOCKHOLDERS' EQUITY | 2003 | 2002 |
|---|---|---|
| CURRENT LIABILITIES | | |
| Note payable, bank | $ 2,073,358 | $ 1,686,858 |
| Current maturities of long-term debt | 197,699 | 345,313 |
| Accounts payable | 1,342,088 | 1,031,850 |
| Accrued expenses | 447,422 | 364,578 |
| Total current liabilities | 4,060,567 | 3,428,599 |
| LONG-TERM OBLIGATIONS | | |
| Long-term debt, net of current maturities | 591,044 | 129,923 |
| Notes payable, officers | 1,649,804 | 1,484,908 |
| | 2,240,848 | 1,614,831 |
| STOCKHOLDERS' EQUITY | | |
| Common stock, $1 par value; 16,200 shares authorized, | | |
| issued and outstanding | 16,200 | 16,200 |
| Additional paid-in capital | 18,473 | 18,473 |
| Retained earnings | 4,242,985 | 4,108,974 |
| | 4,277,658 | 4,143,647 |
| | $ 10,579,073 | $ 9,187,077 |

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies

COMBINED STATEMENTS OF INCOME AND RETAINED EARNINGS
Years ended December 31, 2003 and 2002
(See Independent Accountants' Report)

|  | 2003 | 2002 |
|---|---|---|
| Net sales | $ 17,681,522 | $ 16,096,864 |
| Cost of goods sold | 13,279,904 | 11,405,646 |
| Gross profit | 4,401,618 | 4,691,218 |
| Operating expenses | | |
| Delivery and yard | 1,324,149 | 1,015,534 |
| Selling, general, and administrative | 2,823,456 | 3,278,851 |
|  | 4,147,605 | 4,294,385 |
| Operating income | 254,013 | 396,833 |
| Other income (expense) | | |
| Interest income | 75,469 | 75,625 |
| Interest expense | (206,808) | (189,783) |
| Other income, net | 11,337 | 5,645 |
|  | (120,002) | (108,513) |
| NET INCOME | 134,011 | 288,320 |
| Retained earnings at beginning of year | 4,108,974 | 3,832,404 |
| Dividends | - | (11,750) |
| Retained earnings at end of year | $ 4,242,985 | $ 4,108,974 |

The accompanying notes are an integral part of these statements.

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
COMBINED STATEMENTS OF CASH FLOWS
Years ended December 31, 2003 and 2002
(See Independent Accountants' Report)

|  | 2003 | 2002 |
|---|---|---|
| Cash flows from operating activities |  |  |
| Net income | $ 134,011 | $ 288,320 |
| Adjustments to reconcile net income to net cash provided by |  |  |
| (used in) operating activities |  |  |
| Depreciation | 54,286 | 65,391 |
| Bad debt recovery | (2,049) | - |
| (Increase) decrease in assets |  |  |
| Accounts receivable | (139,438) | (106,310) |
| Inventories | (253,897) | (321,733) |
| Prepaid expenses and other | (190,448) | (48,546) |
| Increase (decrease) in liabilities |  |  |
| Accounts payable | 310,238 | 194,135 |
| Accrued expenses | 82,844 | (8,424) |
| Net cash provided by (used in) operating activities | (4,453) | 62,833 |
| Cash flows from investing activities |  |  |
| Purchase of property and equipment | (480,720) | (12,674) |
| Due from stockholder | (315,874) | (146,174) |
| Net advances to uncombined affiliates | (43,310) | (233,174) |
| Net cash used in investing activities | (839,904) | (392,022) |
| Cash flows from financing activities |  |  |
| Bank overdraft | - | (249,563) |
| Net borrowings on note payable, bank | 386,500 | 629,520 |
| Repayments on long-term debt | (219,084) | (339,074) |
| Borrowings on long-term debt | 532,591 | - |
| Proceeds from notes payable, officers | 164,896 | 356,500 |
| Dividends paid to stockholders | - | (11,750) |
| Net cash provided by financing activities | 864,903 | 385,633 |
| INCREASE IN CASH AND CASH EQUIVALENTS | 20,546 | 56,444 |
| Cash and cash equivalents, beginning of year | 56,444 | - |
| Cash and cash equivalents, end of year | $ 76,990 | $ 56,444 |
| Supplemental disclosure of cash flow information: |  |  |
| Interest paid during the year | $ 206,808 | $ 189,783 |

The accompanying notes are an integral part of these statements.

-7-

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2003 and 2002
(See Independent Accountants' Report)

## NOTE A - NATURE OF BUSINESS, BASIS OF COMBINATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

1.  Nature of Business

    The Companies primarily operate as distributors of building materials to various contractors. The Companies also operate retail locations for the sale of related building products.

2.  Basis of Combination

    The combined financial statements include the accounts of the following entities (the "Companies") which are all under common control:

    Northwest Building Materials & Supply Co. (the Company)
    Northwest Building Materials of Illinois, Inc. (Prairieview and Naperville)
    Southport Lumber and Supply Company (Southport)
    B.M.D.I., Inc.

    All significant intercompany accounts and transactions have been eliminated in the combination of the Companies.

3.  Cash and Cash Equivalents

    For purposes of the statements of cash flows, the Companies consider all highly liquid investments purchased with a maturity date of three months or less to be cash equivalents.

4.  Receivables and Credit Policies

    Accounts receivable are uncollateralized customer obligations due under normal trade terms requiring payment within 30 days from the invoice date. Accounts receivable are stated at the amount billed to the customer. Customer account balances with invoices dated over 90 days old are considered delinquent. Interest is not charged on past due balances. Payments of accounts receivable are allocated to the specific invoices identified on the customer's remittance advice or, if unspecified, are applied to the earliest unpaid invoices.

-8-

Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2003 and 2002
(See Independent Accountants' Report)

NOTE A - NATURE OF BUSINESS, BASIS OF COMBINATION AND SUMMARY OF
SIGNIFICANT ACCOUNTING POLICIES (Continued)

4. Receivables and Credit Policies (Continued)

The carrying amount of accounts receivable is reduced by a valuation allowance that reflects management's best estimate of the amounts that will not be collected. Management individually reviews all accounts receivable balances that exceed 90 days from the invoice date and, based on an assessment of current creditworthiness, estimates the portion, if any, of the balance that will not be collected.

5. Inventories

The inventories are stated at the lower of cost (first-in, first-out (FIFO) method) or market.

6. Property and Equipment

Property and equipment are stated at cost. Depreciation is provided by use of the straight-line method over the estimated useful lives of the related assets as follows:

| Vehicles | 3 - 6 years |
| Leasehold improvements | Life of leases |
| Office and yard equipment | 5 - 7 years |
| Transportation equipment | 5 - 7 years |

7. Income Taxes

The Companies have elected to be treated as "S" Corporations for income tax purposes. Under "S" Corporation status, federal and state taxes on income are payable by the individual stockholders. However, the Companies are subject to Illinois replacement taxes based on income.

MILLER COOPER & CO., LTD.

NOTE A - NATURE OF BUSINESS, BASIS OF COMBINATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

8.  Use of Estimates

    In preparing financial statements, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

9.  Advertising

    Advertising costs are expensed as incurred. Total advertising expenses were $22,984 and $21,904 for 2003 and 2002, respectively.

NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES

The Companies have net advances to related entities which are owned and operated by one of the Companies' stockholders as follows:

|  | 2003 | 2002 |
|---|---|---|
| Real estate companies: |  |  |
| N.W. Realty of Illinois, Inc. | $ 28,101 | $ 26,840 |
| C.S. Realty, Inc. | 399,295 | 503,653 |
| Southport Real Estate Co. | 812,274 | 773,997 |
| Charmar Realty, Inc. | 802,703 | 773,173 |
| Badgerland Real Estate Co. | 76,500 | 76,500 |
|  | 2,118,873 | 2,154,163 |

MILLER COOPER & CO., LTD.

## NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES (Continued)

| | | |
|---|---:|---:|
| Other companies: | | |
| Professional Leasing, Inc. | 226,831 | 146,601 |
| K & H Cartage Co. | 226,317 | 227,947 |
| | 453,148 | 374,548 |
| | $ 2,572,021 | $ 2,528,711 |

The above assets are secured by real estate owned by the above related entities.

In January 2003, the Financial Accounting Standards Board issued Interpretation No. 46, *Consolidation of Variable Interest Entities*. This interpretation establishes standards for identifying a variable interest entity and for determining under what circumstances a variable interest entity should be consolidated with its primary beneficiary. The requirements of Interpretation 46 apply to the Companies for the year ending December 31, 2005.

Until now, a company generally has included another entity in its consolidated financial statements only if it controlled the entity through voting interests. Interpretation 46 changes that by requiring a variable interest entity to be consolidated by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both.

It is reasonably possible that the Companies will consolidate the uncombined affiliates when this interpretation becomes effective. If the uncombined affiliates were combined with the related operating companies, the condensed combined balance sheets at December 31, 2003 and 2002 would be as follows:

# Northwest Building Materials & Supply Co. and Affiliated Companies

NOTES TO COMBINED FINANCIAL STATEMENTS

December 31, 2003 and 2002

(See Independent Accountants' Report)

NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES (Continued)

|  | | 2003 | | | | |
|---|---|---|---|---|---|---|
|  | | Operating Companies | | Uncombined Affiliates | | Total |
| Current assets | $ | 4,577,427 | $ | 2,072,910 | $ | 6,650,337 |
| Advances | | 2,572,021 | | (2,572,021) | | - |
| Property and equipment, net | | 986,195 | | 2,312,601 | | 3,298,796 |
| Due from stockholder | | 2,443,430 | | - | | 2,443,430 |
| Total | $ | 10,579,073 | $ | 1,813,490 | $ | 12,392,563 |
| Current liabilities | $ | 4,060,567 | $ | 50,378 | $ | 4,110,945 |
| Long-term obligations | | 2,240,848 | | 1,408,383 | | 3,649,231 |
| Stockholders' equity | | 4,277,658 | | 354,729 | | 4,632,387 |
| Total | $ | 10,579,073 | $ | 1,813,490 | $ | 12,392,563 |

|  | | 2002 | | | | |
|---|---|---|---|---|---|---|
|  | | Operating Companies | | Uncombined Affiliates | | Total |
| Current assets | $ | 3,971,049 | $ | 2,390,568 | $ | 6,361,617 |
| Advances | | 2,528,711 | | (2,528,711) | | - |
| Property and equipment, net | | 559,761 | | 2,350,951 | | 2,910,712 |
| Due from stockholder | | 2,127,556 | | - | | 2,127,556 |
| Total | $ | 9,187,077 | $ | 2,212,808 | $ | 11,399,885 |
| Current liabilities | $ | 4,913,507 | $ | 26,029 | $ | 4,939,536 |
| Long-term debt | | 129,923 | | 1,662,558 | | 1,792,481 |
| Stockholders' equity | | 4,143,647 | | 524,221 | | 4,667,868 |
| Total | $ | 9,187,077 | $ | 2,212,808 | $ | 11,399,885 |

-12-

NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES (Continued)

The uncombined affiliates reported the following for the year ended December 31, 2003:

| | | |
|---|---|---|
| Revenue | $ | 1,430,000 |
| Net income | | 116,000 |

Lease payments and lease commitments to these uncombined affiliates are included in Note H.

When Interpretation 46 becomes effective, the net amount added to the Companies' balance sheet must be recognized as the cumulative effect of an accounting change. Interpretation 46 must be applied by restating previously issued financial statements with a cumulative-effect adjustment as of the beginning of the first year restated. The Companies are not required to restate the financial statements and do not intend to do so. The impact that adoption of Interpretation 46 is expected to have on the Companies' financial statements is currently not known.

NOTE C – DUE FROM STOCKHOLDER

The Companies have uncollateralized advances to one of its stockholders of $2,443,430 and $2,127,556 as of December 31, 2003 and 2002, respectively. Effective January 1, 2002, the advances bear interest at the prime rate (4.00% at December 31, 2003) minus 0.5%. The note was noninterest-bearing prior to 2002. Principal and interest are due on demand. The Companies are not expected to demand repayment within the next year; therefore, the balance has been classified as long-term on the accompanying balance sheet.

NOTE D - NOTE PAYABLE, BANK

The note payable, bank consists of a revolving line of credit with interest at the prime rate (4.00% at December 31, 2003) plus 0.5%, expiring in December, 2004. The note is collateralized by a blanket lien on all business assets of the Companies and a personal guarantee by one of the Companies' stockholders. The outstanding balance was $2,073,358 and $1,686,858 as of December 31, 2003 and 2002, respectively. There was no availability on this line at December 31, 2003.

-13-

# Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2003 and 2002
(See Independent Accountants' Report)

## NOTE E - NOTES PAYABLE, OFFICERS

Unsecured notes payable to officers are due on demand and bear interest at the prime rate (4.00% at December 31, 2003). The balance was $1,649,804 and $1,484,908 as of December 31, 2003 and 2002, respectively. The officers are not expected to demand repayment during the next year; therefore, the notes have been classified as long-term on the accompanying balance sheet.

## NOTE F - LONG-TERM DEBT

|  | 2003 | 2002 |
|---|---|---|
| Note payable, bank, with monthly payments of $4,166 plus interest at the prime rate (4.00% at December 31, 2003) plus 0.5% through May, 2006. All business assets are pledged as collateral. | $ 120,843 | $ 169,572 |
| Note payable, bank, with monthly payments of $6,510 including interest at prime rate plus 1% through May, 2007. All business assets are pledged as collateral. | 240,845 | 305,664 |
| Note payable, bank, with monthly payments of $1,414 including interest at 6.00% through April, 2008. All business assets are pledged as collateral. | 64,452 | - |
| Notes payable, finance companies, with monthly payments ranging from $1,321 to $2,602 including interest ranging from 4.99% to 6.85% expiring at various dates through July, 2009. All business assets are pledged as collateral. | 362,603 | - |
|  | 788,743 | 475,236 |
| Less current maturities | 197,699 | 345,313 |
|  | $ 591,044 | $ 129,923 |

-14-

## NOTE F - LONG-TERM DEBT (Continued)

Maturities of long-term debt are as follows:

| | |
|---|---:|
| 2004 | $ 197,699 |
| 2005 | 207,102 |
| 2006 | 178,473 |
| 2007 | 105,380 |
| 2008 | 57,234 |
| Thereafter | 42,855 |
| | $ 788,743 |

## NOTE G - EMPLOYEE BENEFIT PLANS

The Companies have a 401(k) profit sharing plan covering all nonunion employees. The Companies' contributions to the plan approximated $19,500 and $11,900 in 2003 and 2002, respectively.

The Companies also have a union-sponsored pension plan covering all union employees. The Companies' contributions to this plan approximated $318,400 and $262,900 in 2003 and 2002, respectively.

## NOTE H - COMMITMENTS

The Companies lease four locations under operating leases from affiliated companies owned by one of the stockholders. Under the leases, the Companies are responsible for insurance, maintenance costs and real estate taxes. Monthly rent payments, which include various insurance and maintenance costs, approximated $27,000 in 2003 and 2002. The leases expire at various dates through December, 2013.

The Companies also lease transportation equipment from an affiliated company owned by one of the stockholders under an operating lease through December, 2004 with monthly rental payments of $36,000. Monthly rent payments approximated $21,000 in 2003 and 2002.

MILLER COOPER & CO., LTD.

## Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2003 and 2002
(See Independent Accountants' Report)

NOTE H - COMMITMENTS (Continued)

At December 31, 2003 future minimum rental payments under operating leases are as follows:

| | | |
|---|---|---:|
| 2004 | $ | 676,140 |
| 2005 | | 217,200 |
| 2006 | | 217,200 |
| 2007 | | 217,200 |
| 2008 | | 175,200 |
| Thereafter | | 700,800 |
| | $ | 2,203,740 |

Rent expense for the operating locations approximated $306,000 and $324,000 in 2003 and 2002, respectively. Rent expense for the transportation equipment approximated $255,000 in 2003 and 2002.

NOTE I - MAJOR CUSTOMERS

The Companies had one major customer with sales accounting for 14% and 12% of net sales for 2003 and 2002, respectively. The amount due from this customer was $249,854 and $27,809 at December 31, 2003 and 2002, respectively.

NOTE J - SUBSEQUENT EVENT

In January 2004, the one major customer referred to in Note I ceased business with the Companies. Management believes, however, that it can recover the sales lost from this customer without significant financial impact.

NOTE K - CONCENTRATIONS OF RISK

The Companies grant credit to most of their customers who are contractors. These contractors are primarily located in, but not limited to, the Midwest.

MILLER COOPER & CO., LTD.

## NOTE K - CONCENTRATIONS OF RISK (Continued)

The Companies also maintain cash balances at several financial institutions located in Illinois and Wisconsin. Each individual Company's accounts at each institution are insured by the Federal Deposit Insurance Corporation up to $100,000 per institution. At December 31, 2003, uninsured balances approximated $69,000.

## NOTE L - RECLASSIFICATIONS

Certain reclassifications have been made to the 2002 financial statements to conform to the 2003 presentation.

MILLER COOPER & CO., LTD.

#2888001

P 600101

SCANNED
AT 11/34/06



# Northwest Building Materials & Supply Co. and Affiliated Companies

### Combined Financial Statements and Independent Accountants' Report

### December 31, 2004 and 2003

Final



EXHIBIT

PENGAD 800-631-6989

Cieslik #2
cml 6-4-15

Miller Cooper & Co., Ltd.

# CONTENTS

|                                                    | Page   |
|----------------------------------------------------|--------|
| INDEPENDENT ACCOUNTANTS' REPORT                    | 3      |
| COMBINED FINANCIAL STATEMENTS                       |        |
| Balance Sheets                                     | 4 - 5  |
| Statements of Income and Retained Earnings         | 6      |
| Statements of Cash Flows                           | 7      |
| Notes to Combined Financial Statements             | 8 - 16 |

Miller Cooper & Co., Ltd.

# Northwest Building Materials & Supply Co. and Affiliated Companies

COMBINED BALANCE SHEETS
December 31, 2004 and 2003
(See Independent Accountants' Report)

| ASSETS | 2004 | 2003 |
|---|---:|---:|
| CURRENT ASSETS | | |
| Cash | $              - | $    76,990 |
| Accounts receivable, net of allowance for doubtful | | |
| accounts of $75,000 in 2004 and $37,000 in 2003 | 3,530,062 | 2,492,870 |
| Inventories | 2,324,744 | 1,377,787 |
| Prepaid expenses and other | 584,367 | 675,784 |
| Total current assets | 6,439,173 | 4,623,431 |
| NET ADVANCES TO UNCOMBINED AFFILIATES | 2,126,092 | 2,572,021 |
| PROPERTY AND EQUIPMENT | | |
| Vehicles | 2,389,927 | 2,331,419 |
| Leasehold improvements | 341,264 | 319,003 |
| Office equipment | 474,446 | 470,660 |
| Yard equipment | 297,922 | 295,257 |
| Transportation equipment | 307,268 | 307,268 |
| | 3,810,827 | 3,723,607 |
| Less accumulated depreciation | 2,851,877 | 2,737,412 |
| | 958,950 | 986,195 |
| DUE FROM STOCKHOLDER | 2,726,060 | 2,443,430 |
| | $  12,250,275 | $  10,625,077 |

The accompanying notes are an integral part of these statements.

-4-

PAGE 07          N          8476341683     11/21/2006  10:30

| LIABILITIES AND STOCKHOLDERS' EQUITY | 2004 | 2003 |
|---|---|---|
| CURRENT LIABILITIES | | |
| Cash overdraft | $ 67,831 $ | - |
| Notes payable, bank | 2,650,000 | 2,073,358 |
| Current maturities of long-term debt | 301,983 | 197,699 |
| Accounts payable | 1,610,041 | 1,342,088 |
| Accrued expenses | 453,855 | 447,422 |
| Customer deposits | 34,444 | 46,004 |
| Total current liabilities | 5,118,154 | 4,106,571 |
| LONG-TERM OBLIGATIONS | | |
| Long-term debt, net of current maturities | 759,174 | 591,044 |
| Notes payable, officers | 1,899,804 | 1,649,804 |
| | 2,658,978 | 2,240,848 |
| STOCKHOLDERS' EQUITY | | |
| Common stock, $1 par value; 16,200 shares authorized, | | |
| issued and outstanding | 16,200 | 16,200 |
| Additional paid-in capital | 18,473 | 18,473 |
| Retained earnings | 4,438,470 | 4,242,985 |
| | 4,473,143 | 4,277,658 |
| | $ 12,250,275 $ | 10,625,077 |

-5-

## Northwest Building Materials & Supply Co. and Affiliated Companies
COMBINED STATEMENTS OF INCOME AND RETAINED EARNINGS
Years ended December 31, 2004 and 2003
(See Independent Accountants' Report)

|  | 2004 | 2003 |
|---|---|---|
| Net sales | $ 22,457,741 | $ 17,681,522 |
| Cost of goods sold | 17,138,235 | 13,279,904 |
| Gross profit | 5,319,506 | 4,401,618 |
| Operating expenses | | |
| Delivery and yard | 1,581,102 | 1,324,149 |
| Selling, general, and administrative | 3,149,433 | 2,823,456 |
|  | 4,730,535 | 4,147,605 |
| Operating income | 588,971 | 254,013 |
| Other income (expense) | | |
| Interest income | 57,360 | 75,469 |
| Interest expense | (266,241) | (206,808) |
| Other income (expense), net | (78,511) | 11,337 |
|  | (287,392) | (120,002) |
| NET INCOME | 301,579 | 134,011 |
| Retained earnings, beginning of year | 4,242,985 | 4,108,974 |
| Dividends to stockholders | (106,094) | - |
| Retained earnings, end of year | $ 4,438,470 | $ 4,242,985 |

The accompanying notes are an integral part of these statements.

-6-

Miller Cooper & Co., Ltd.

# Northwest Building Materials & Supply Co. and Affiliated Companies
## COMBINED STATEMENTS OF CASH FLOWS
Years ended December 31, 2004 and 2003
(See Independent Accountants' Report)

|  | 2004 | 2003 |
|---|---|---|
| Cash flows from operating activities |  |  |
| Net income | $ 301,579 | $ 134,011 |
| Adjustments to reconcile net income to net cash used in operating activities |  |  |
| Depreciation | 114,465 | 54,286 |
| Bad debt expense (recovery) | 37,657 | (2,049) |
| (Increase) decrease in assets |  |  |
| Accounts receivable | (1,074,849) | (139,438) |
| Inventories | (946,957) | (253,897) |
| Prepaid expenses and other | 91,417 | (190,448) |
| Increase (decrease) in liabilities |  |  |
| Accounts payable | 267,953 | 310,238 |
| Accrued expenses | 6,433 | 82,844 |
| Customer deposits | (11,560) | - |
| Net cash used in operating activities | (1,213,862) | (4,453) |
| Cash flows from investing activities |  |  |
| Purchases of property and equipment | (87,220) | (480,720) |
| Advances to stockholder | (282,630) | (315,874) |
| Net advances from (to) uncombined affiliates | 445,929 | (43,310) |
| Net cash provided by (used in) investing activities | 76,079 | (839,904) |
| Cash flows from financing activities |  |  |
| Cash overdraft | 67,831 | - |
| Net borrowings on notes payable, bank | 576,642 | 386,500 |
| Repayments on long-term debt | (165,086) | (219,084) |
| Borrowings on long-term debt | 437,500 | 532,591 |
| Proceeds from notes payable, officers | 250,000 | 164,896 |
| Dividends to stockholders | (106,094) | - |
| Net cash provided by financing activities | 1,060,793 | 864,903 |
| INCREASE (DECREASE) IN CASH | (76,990) | 20,546 |
| Cash, beginning of year | 76,990 | 56,444 |
| Cash, end of year | $ - | $ 76,990 |
| Supplemental disclosure of cash flow information: |  |  |
| Interest paid during the year | $ 245,059 | $ 206,808 |

The accompanying notes are an integral part of these statements.

-7-

Miller Cooper & Co., Ltd.

## NOTE A - NATURE OF BUSINESS, BASIS OF COMBINATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

1. Nature of Business

    The Companies primarily operate as distributors of building materials to various contractors. The Companies also operate retail locations for the sale of related building products.

2. Basis of Combination

    The combined financial statements include the accounts of the following entities (the "Companies") which are all under common control:

    Northwest Building Materials & Supply Co. (the Company)
    Northwest Building Materials of Illinois, Inc. (Prairieview and Naperville)
    Southport Lumber and Supply Company (Southport)
    B.M.D.I., Inc.

    All significant intercompany accounts and transactions have been eliminated in the combination of the Companies.

3. Receivables and Credit Policies

    Accounts receivable are uncollateralized customer obligations due under normal trade terms requiring payment within thirty days from the invoice date. Accounts receivable are stated at the amounts billed to the customers. Customer account balances with invoices dated over ninety days old are considered delinquent. Interest is not charged on past due balances. Payments of accounts receivable are allocated to the specific invoices identified on the customer's remittance advice or, if unspecified, are applied to the earliest unpaid invoices.

    The carrying amount of accounts receivable is reduced by a valuation allowance that reflects management's best estimate of the amounts that will not be collected. Management individually reviews all accounts receivable balances that exceed 90 days from the invoice date and, based on an assessment of current creditworthiness, estimates the portion, if any, of the balance that will not be collected.

-8-

**Northwest Building Materials & Supply Co. and Affiliated Companies**
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2004 and 2003
(See Independent Accountants' Report)

NOTE A - NATURE OF BUSINESS, BASIS OF COMBINATION, AND SUMMARY OF
SIGNIFICANT ACCOUNTING POLICIES (Continued)

4.  Inventories

    Inventories consist of lumber, retail goods, and other construction inventories and are stated at the
    lower of cost (first-in, first-out) (FIFO) basis or market.

5.  Property and Equipment

    Property and equipment are stated at cost. Depreciation of property and equipment is provided
    using the straight-line method over the estimated useful lives of the respective assets. Estimated
    useful lives are as follows:

    |                          | Years          |
    |--------------------------|----------------|
    | Vehicles                 | 3 - 6 years    |
    | Leasehold improvements   | Life of leases |
    | Office and yard equipment| 5 - 7 years    |
    | Transportation equipment | 5 - 7 years    |

6.  Income Taxes

    The Companies have elected to be S Corporations for federal income tax purposes under the Internal
    Revenue Code. In lieu of corporate income taxes, the stockholders of an S Corporation are taxed on
    their proportionate shares of the Company's taxable income. Therefore, no liability or provision for
    federal income taxes has been included in these combined financial statements. The Companies are
    subject to certain state taxes.

7.  Use of Estimates

    In preparing financial statements, management is required to make estimates and assumptions that
    affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at
    the date of the financial statements, and the reported amounts of revenues and expenses during the
    reporting period. Actual results could differ from those estimates.

-9-

## NOTE A - NATURE OF BUSINESS, BASIS OF COMBINATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

8. Advertising

Advertising costs are expensed as incurred. Total advertising expense was $28,680 and $22,984 for 2004 and 2003, respectively.

## NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES

The Companies have net advances (borrowings) to (from) related entities which are owned and operated by one of the Companies' stockholders as follows:

|  | 2004 | 2003 |
|---|---|---|
| Real estate companies |  |  |
| N.W. Realty of Illinois, Inc. | $ 48,038 | $ 104,601 |
| C.S. Realty, Inc. | 91,643 | 399,295 |
| Southport Real Estate Co. | 763,997 | 812,274 |
| Charmar Realty, Inc. | 785,583 | 802,703 |
|  | 1,689,261 | 2,118,873 |
| Other companies |  |  |
| Professional Leasing, Inc. | 174,730 | 226,831 |
| K & H Cartage Co. | 262,101 | 226,317 |
|  | 436,831 | 453,148 |
|  | $ 2,126,092 | $ 2,572,021 |

The above assets are secured by real estate owned by the above related entities.

-10-

NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES (Continued)

In January 2003, the Financial Accounting Standards Board (FASB) issued FASB Interpretation No. 46, *Consideration of Variable Interest Entities* (FIN 46) and its amendment FIN 46R. This interpretation clarifies existing accounting principles related to the preparation of consolidated financial statements when the equity investors in an entity do not have the characteristics of a controlling financial interest or when the equity at risk is not sufficient for the entity to finance its activities without additional subordinated financial support. FIN 46R requires a company to evaluate all existing arrangements to identify situations where a company has a "variable interest" in a "variable interest entity" and further determine when such variable interests require a company to consolidate the variable interest entities' financial statement with its own. The requirements of Interpretation 46 apply to the Company for its year ending December 31, 2005.

It is reasonably possible that the Companies will consolidate the uncombined affiliates when this Interpretation becomes effective. If the uncombined affiliates were combined with the related operating companies, the condensed combined balance sheets at December 31, 2004 and 2003 would be as follows:

|  | 2004 | | |
|  | Operating Companies | Uncombined Affiliates | Total |
|---|---|---|---|
| Current assets | $ 6,439,173 | $ 387,454 | $ 6,826,627 |
| Advances | 2,126,092 | (2,126,092) | - |
| Property and equipment, net | 958,950 | 2,043,314 | 3,002,264 |
| Due from stockholder | 2,726,060 | 1,552,912 | 4,278,972 |
| Total | $ 12,250,275 | $ 1,857,588 | $ 14,107,863 |
| Current liabilities | $ 5,118,154 | $ 42,112 | $ 5,160,266 |
| Long-term obligations | 2,658,978 | 1,566,888 | 4,225,866 |
| Stockholders' equity | 4,473,143 | 248,588 | 4,721,731 |
| Total | $ 12,250,275 | $ 1,857,588 | $ 14,107,863 |

Miller Cooper & Co., Ltd.

NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES (Continued)

|  | | 2003 | | | | |
|---|---|---|---|---|---|---|
|  | | Operating Companies | | Uncombined Affiliates | | Total |
| Current assets | $ | 4,623,431 | $ | 467,871 | $ | 5,091,302 |
| Advances | | 2,572,021 | | (2,572,021) | | - |
| Property and equipment, net | | 986,195 | | 2,312,601 | | 3,298,796 |
| Due from stockholder | | 2,443,430 | | 1,605,039 | | 4,048,469 |
| Total | $ | 10,625,077 | $ | 1,813,490 | $ | 12,438,567 |
| Current liabilities | $ | 4,106,571 | $ | 50,378 | $ | 4,156,949 |
| Long-term debt | | 2,240,848 | | 1,408,383 | | 3,649,231 |
| Stockholders' equity | | 4,277,658 | | 354,729 | | 4,632,387 |
| Total | $ | 10,625,077 | $ | 1,813,490 | $ | 12,438,567 |

The unaudited financial statements of the uncombined affiliates for the year ended December 31, 2004 included the following:

| Revenue | $ | 1,476,345 |
|---|---|---|
| Net loss | | (48,006) |

When FASB Interpretation 46R becomes effective, the net amount added to the Companies' balance sheet must be recognized as the cumulative effect of an accounting change. FASB Interpretation 46R may be applied by restating previously issued financial statements with a cumulative-effect adjustment as of the beginning of the first year restated. The Companies are not required to restate their financial statements and do not intend to do so. See additional information in Note H.

Miller Cooper & Co., Ltd.

# Northwest Building Materials & Supply Co. and Affiliated Companies

## NOTE C – DUE FROM STOCKHOLDER

The Companies have uncollateralized advances to a stockholder of $2,726,060 and $2,443,430 as of December 31, 2004 and 2003, respectively. Effective January 1, 2002, the advances bear interest at the prime rate (5.25% at December 31, 2004) minus 0.5%. The note was noninterest-bearing prior to 2002. Principal and interest are due on demand. The Companies are not expected to demand repayment within the next year; therefore, the balance has been classified as long-term on the accompanying combined balance sheets.

## NOTE D - NOTES PAYABLE, BANK

The notes payable, bank consists of two revolving lines of credit with interest at the prime rate (5.25% at December 31, 2004) plus 0.5%, both expiring in November, 2005. The notes are collateralized by various business assets of the Companies and a personal guarantee by one of the Companies' stockholders. The outstanding balance was $2,650,000 and $2,073,358 as of December 31, 2004 and 2003, respectively. There was no availability on these lines at December 31, 2004.

## NOTE E - NOTES PAYABLE, OFFICERS

Unsecured notes payable to officers are due on demand and bear interest at the prime rate (5.25% at December 31, 2004). The balance was $1,899,804 and $1,649,804 as of December 31, 2004 and 2003, respectively. The officers are not expected to demand repayment during the next year; therefore, the notes have been classified as long-term on the accompanying combined balance sheet.

## NOTE F - LONG-TERM DEBT

|  | 2004 | 2003 |
|---|---|---|
| Bank note, payable in monthly installments of $6,944 plus interest at the prime rate (5.25% at December 31, 2004) plus 0.5% through March, 2010. The note is collateralized by real estate owned by one of the Companies' stockholders. | $ 437,500 | $ – |
| Bank note, payable in monthly installments of $4,167 plus interest at the prime rate plus 0.5% through May, 2006. All business assets are pledged as collateral. | 70,843 | 120,843 |

-13-

NOTE F - LONG-TERM DEBT (Continued)

|  | 2004 | 2003 |
|---|---|---|
| Bank note, payable in monthly installments of $6,510 including interest at the prime rate plus 1% through May, 2007. All business assets are pledged as collateral. | $ 172,915 | $ 240,845 |
| Bank note, payable in monthly installments of $1,414 including interest at 6.00% through April, 2008. All business assets are pledged as collateral. | 50,376 | 64,452 |
| Notes payable, finance companies, with monthly installments ranging from $1,321 to $2,602 including interest ranging from 4.99% to 6.85% expiring at various dates through July, 2009. All business assets are pledged as collateral. | 329,523 | 362,603 |
|  | 1,061,157 | 788,743 |
| Less current maturities | 301,983 | 197,699 |
|  | $ 759,174 | $ 591,044 |

Maturities of long-term debt are as follows:

| | |
|---|---|
| 2005 | $ 301,983 |
| 2006 | 274,588 |
| 2007 | 191,920 |
| 2008 | 144,709 |
| 2009 | 127,097 |
| Thereafter | 20,860 |
|  | $ 1,061,157 |

-14-

Miller Cooper & Co., Ltd.

## NOTE G - EMPLOYEE BENEFIT PLANS

The Companies have a 401(k) profit sharing plan covering all nonunion employees. The Companies' contributions to the plan approximated $11,700 and $19,500 in 2004 and 2003, respectively.

Additionally, in accordance with a collective bargaining agreement, the Companies have a union-sponsored pension plan covering all union employees. The contributions to this plan was approximately $363,700 and $318,400 in 2004 and 2003, respectively. The plan is administered by representatives of the trade union. Accordingly, the Companies have no knowledge or control over the funding assumptions and methods employed. If the Companies were to withdraw from the plan or should the plan terminate, the Companies would be required to contribute an amount equal to its portion of any unfunded liability. The Companies' liability, if any, is not presently determinable; therefore, no amount has been recorded for any contingent unfunded liability.

## NOTE H - COMMITMENTS

The Companies lease four locations under operating leases from affiliated companies owned by one of the stockholders. Under the leases, the Companies are responsible for insurance, maintenance costs, and real estate taxes. Monthly rent payments, which include various insurance and maintenance costs, approximated $25,000 and $27,000 in 2004 and 2003, respectively. The leases expire at various dates through December, 2013.

The Companies also lease transportation equipment from an affiliated company owned by one of the stockholders under an operating lease through December, 2005 with monthly rental payments of $36,000. Monthly rent payments approximated $21,000 in 2004 and 2003.

At December 31, 2004 future minimum rental payments under operating leases are as follows:

| | | |
|---|---|---|
| 2005 | $ | 396,000 |
| 2006 | | 327,600 |
| 2007 | | 304,800 |
| 2008 | | 262,800 |
| 2009 | | 262,800 |
| Thereafter | | 788,400 |
| | $ | 2,342,400 |

Miller Cooper & Co., Ltd.

NOTE H - COMMITMENTS (Continued)

Rent expense for the operating locations approximated $305,000 and $306,000 in 2004 and 2003, respectively. Rent expense for the transportation equipment approximated $252,000 in 2004 and 2003.

NOTE I - MAJOR CUSTOMER

The Companies had no major customers in 2004. In 2003, sales from a customer approximated 14% of sales. The amount receivable from this customer was approximately $250,000 at December 31, 2003.

NOTE J - CONCENTRATIONS OF RISK

The Companies grant credit to most of their customers who are contractors. These contractors are primarily located in, but not limited to, the Midwest.

The Companies also maintain cash balances at several financial institutions located in Illinois and Wisconsin. Each individual Company's accounts at each institution are insured by the Federal Deposit Insurance Corporation up to $100,000 per institution. At December 31, 2004, uninsured balances approximated $11,800.

NOTE K - RECLASSIFICATIONS

Certain reclassifications have been made to the 2003 combined financial statements to conform to the 2004 presentation.

Miller Cooper & Co., Ltd.

#2888 α
P 60010

SCANNED
AT 6/29/06?

# Northwest Building Materials
# & Supply Co. and
# Affiliated Companies

### Combined Financial Statements and
### Independent Accountants' Report

### December 31, 2005 and 2004

## PRELIMINARY DRAFT


PENGAD 800-631-6989

EXHIBIT
Cieslak#3
Comp 6-4-15

CONTENTS

|                                                    | Page   |
|----------------------------------------------------|--------|
| INDEPENDENT ACCOUNTANTS' REPORT                    | 3      |
| COMBINED FINANCIAL STATEMENTS                      |        |
|   Balance Sheets                         | 4 - 5  |
|   Statements of Income and Retained Earnings | 6  |
|   Statements of Cash Flows               | 7      |
|   Notes to Combined Financial Statements | 8 - 16 |

PRELIMINARY DRAFT

# Northwest Building Materials & Supply Co. and Affiliated Companies
## COMBINED BALANCE SHEETS
### December 31, 2005 and 2004
#### (See Independent Accountants' Report)

| ASSETS | 2005 | 2004 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash | $ 9,533 | $ - |
| Accounts receivable, net of allowance for doubtful accounts of $73,000 in 2005 and $75,000 in 2004 | 3,690,291 | 3,530,062 |
| Inventories | 2,074,460 | 2,324,744 |
| Prepaid expenses and other | 517,031 | 584,367 |
| Total current assets | 6,291,315 | 6,439,173 |
| **NET ADVANCES TO UNCOMBINED AFFILIATES** | 2,217,175 | 2,126,092 |
| **PROPERTY AND EQUIPMENT** | | |
| Vehicles | 2,422,105 | 2,389,927 |
| Leasehold improvements | 341,264 | 341,264 |
| Office equipment | 474,446 | 474,446 |
| Yard equipment | 305,715 | 297,922 |
| Transportation equipment | 307,268 | 307,268 |
| | 3,850,798 | 3,810,827 |
| Less accumulated depreciation | 2,975,453 | 2,851,877 |
| | 875,345 | 958,950 |
| **DUE FROM STOCKHOLDER** | 2,478,638 | 2,726,060 |
| | $ 11,862,473 | $ 12,250,275 |

PRELIMINARY DRAFT

The accompanying notes are an integral part of these statements.

-4-

| LIABILITIES AND STOCKHOLDERS' EQUITY | 2005 | 2004 |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Cash overdraft | $ - | $ 67,831 |
| Notes payable, bank | 1,500,000 | 2,650,000 |
| Current maturities of long-term debt | 330,949 | 301,983 |
| Accounts payable | 1,773,053 | 1,610,041 |
| Accrued expenses | 347,093 | 453,855 |
| Customer deposits | 29,749 | 34,444 |
| Total current liabilities | 3,980,844 | 5,118,154 |
| **LONG-TERM OBLIGATIONS** | | |
| Long-term debt, net of current maturities | 1,798,827 | 759,174 |
| Notes payable, officers | 1,957,304 | 1,899,804 |
| | 3,756,131 | 2,658,978 |
| **STOCKHOLDERS' EQUITY** | | |
| Common stock, $1 par value; 16,200 shares authorized, issued and outstanding | 16,200 | 16,200 |
| Additional paid-in capital | 18,473 | 18,473 |
| Retained earnings | 4,090,825 | 4,438,470 |
| | 4,125,498 | 4,473,143 |
| | $ 11,862,473 | $ 12,250,275 |

PRELIMINARY DRAFT

# Northwest Building Materials & Supply Co. and Affiliated Companies
COMBINED STATEMENTS OF INCOME AND RETAINED EARNINGS
Years ended December 31, 2005 and 2004
(See Independent Accountants' Report)

|  | 2005 | 2004 |
|---|---|---|
| Net sales | $ 25,087,371 | $ 22,457,741 |
| Cost of goods sold | 19,497,162 | 17,138,235 |
| Gross profit | 5,590,209 | 5,319,506 |
| Operating expenses |  |  |
| Delivery and yard | 1,841,032 | 1,581,102 |
| Selling, general, and administrative | 3,816,831 | 3,149,433 |
|  | 5,657,863 | 4,730,535 |
| Operating income (loss) | (67,654) | 588,971 |
| Other income (expense) |  |  |
| Interest income | 144,630 | 57,360 |
| Interest expense | (314,115) | (266,241) |
| Other income (expense), net | 4,795 | (78,511) |
|  | (164,690) | (287,392) |
| NET INCOME (LOSS) | (232,344) | 301,579 |
| Retained earnings, beginning of year | 4,438,470 | 4,242,985 |
| Dividends to stockholders | (115,301) | (106,094) |
| Retained earnings, end of year | $ 4,090,825 | $ 4,438,470 |

PRELIMINARY DRAFT

The accompanying notes are an integral part of these statements.

# Northwest Building Materials & Supply Co. and Affiliated Companies
## COMBINED STATEMENTS OF CASH FLOWS
### Years ended December 31, 2005 and 2004
### (See Independent Accountants' Report)

|  | 2005 | 2004 |
|---|---|---|
| Cash flows from operating activities |  |  |
| Net income (loss) | $ (232,344) | $ 301,579 |
| Adjustments to reconcile net income to net cash used in operating activities |  |  |
| Depreciation | 123,576 | 114,465 |
| Bad debt expense | - | 37,657 |
| (Increase) decrease in assets |  |  |
| Accounts receivable | (160,229) | (1,074,849) |
| Inventories | 250,284 | (946,957) |
| Prepaid expenses and other | 67,336 | 91,417 |
| Increase (decrease) in liabilities |  |  |
| Accounts payable | 163,012 | 267,953 |
| Accrued expenses | (106,762) | 6,433 |
| Customer deposits | (4,695) | (11,560) |
| Net cash provided by (used in) operating activities | 100,178 | (1,213,862) |
| Cash flows from investing activities |  |  |
| Purchases of property and equipment | (39,971) | (87,220) |
| Repayments from (advances to) stockholder | 247,422 | (282,630) |
| Net advances from (to) uncombined affiliates | (91,083) | 445,929 |
| Net cash provided by investing activities | 116,368 | 76,079 |
| Cash flows from financing activities |  |  |
| Cash overdraft | (67,831) | 67,831 |
| Net borrowings (repayments) on notes payable, bank | (1,150,000) | 576,642 |
| Repayments on long-term debt | (431,381) | (165,086) |
| Borrowings on long-term debt | 1,500,000 | 437,500 |
| Proceeds from notes payable, officers | 57,500 | 250,000 |
| Dividends to stockholders | (115,301) | (106,094) |
| Net cash provided by financing activities | (207,013) | 1,060,793 |
| INCREASE (DECREASE) IN CASH | 9,533 | (76,990) |
| Cash, beginning of year | - | 76,990 |
| Cash, end of year | $ 9,533 | $ - |
| Supplemental disclosure of cash flow information: |  |  |
| Interest paid during the year | $ 314,115 | $ 245,059 |

PRELIMINARY DRAFT

The accompanying notes are an integral part of these statements.

# Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2005 and 2004
(See Independent Accountants' Report)

## NOTE A - NATURE OF BUSINESS, BASIS OF COMBINATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

1. Nature of Business

   The Companies primarily operate as distributors of building materials to various contractors. The Companies also operate retail locations for the sale of related building products.

2. Basis of Combination

   The combined financial statements include the accounts of the following entities (the "Companies") which are all under common control:

   Northwest Building Materials & Supply Co. (the Company)
   Northwest Building Materials of Illinois, Inc. (Prairieview and Naperville)
   Southport Lumber and Supply Company (Southport)
   B.M.D.I., Inc.

   All significant intercompany accounts and transactions have been eliminated in the combination of the Companies.

3. Receivables and Credit Policies

   Accounts receivable are uncollateralized customer obligations due under normal trade terms requiring payment within thirty days from the invoice date. Accounts receivable are stated at the amounts billed to the customers. Customer account balances with invoices dated over ninety days old are considered delinquent. Interest is charged on past due balances at an annual percentage rate of 18%. Payments of accounts receivable are allocated to the specific invoices identified on the customer's remittance advice or, if unspecified, are applied to the earliest unpaid invoices.

   The carrying amount of accounts receivable is reduced by a valuation allowance that reflects management's best estimate of the amounts that will not be collected. Management individually reviews all accounts receivable balances that exceed 90 days from the invoice date and, based on an assessment of current creditworthiness, estimates the portion, if any, of the balance that will not be collected.

PRELIMINARY DRAFT

NOTE A - NATURE OF BUSINESS, BASIS OF COMBINATION, AND SUMMARY OF
SIGNIFICANT ACCOUNTING POLICIES (Continued)

4.  Inventories

    Inventories consist of lumber, retail goods, and other construction inventories and are stated at the
    lower of cost (first-in, first-out) (FIFO) basis or market.

5.  Property and Equipment

    Property and equipment are stated at cost. Depreciation of property and equipment is provided
    using the straight-line method over the estimated useful lives of the respective assets. Estimated
    useful lives are as follows:

    |                           | Years           |
    |---------------------------|-----------------|
    | Vehicles                  | 3 - 6 years     |
    | Leasehold improvements    | Life of leases  |
    | Office and yard equipment | 5 - 7 years     |
    | Transportation equipment  | 5 - 7 years     |

6.  Income Taxes

    The Companies have elected to be S Corporations for federal income tax purposes under the Internal
    Revenue Code. In lieu of corporate income taxes, the stockholders of an S Corporation are taxed on
    their proportionate shares of the Company's taxable income. Therefore, no liability or provision for
    federal income taxes has been included in these combined financial statements. The Companies are
    subject to certain state taxes.

7.  Use of Estimates

    In preparing financial statements, management is required to make estimates and assumptions that
    affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at
    the date of the financial statements, and the reported amounts of revenues and expenses during the
    reporting period. Actual results could differ from those estimates.

PRELIMINARY DRAFT

-9-

# Northwest Building Materials & Supply Co. and Affiliated Companies

## NOTE A - NATURE OF BUSINESS, BASIS OF COMBINATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

8. Advertising

Advertising costs are expensed as incurred. Total advertising expense was $36,133 and $28,680 for 2005 and 2004, respectively.

## NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES

The Companies have net advances (borrowings) to (from) related entities which are owned and operated by one of the Companies' stockholders as follows:

|  | 2005 | 2004 |
|---|---|---|
| Real estate companies |  |  |
| N.W. Realty of Illinois, Inc. | $ | $ 48,038 |
| C.S. Realty, Inc. |  | 91,643 |
| Southport Real Estate Co. |  | 763,997 |
| Charmar Realty, Inc. |  | 785,583 |
|  | - | 1,689,261 |
| Other companies |  |  |
| Professional Leasing, Inc. |  | 174,730 |
| K & H Cartage Co. |  | 262,101 |
|  | - | 436,831 |
|  | $ - | $ 2,126,092 |

The above assets are secured by real estate owned by the above related entities.

PRELIMINARY DRAFT

NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES (Continued)

In January 2003, the Financial Accounting Standards Board (FASB) issued FASB Interpretation No. 46, *Consideration of Variable Interest Entities* (FIN 46) and its amendment FIN 46R. This interpretation clarifies existing accounting principles related to the preparation of consolidated financial statements when the equity investors in an entity do not have the characteristics of a controlling financial interest or when the equity at risk is not sufficient for the entity to finance its activities without additional subordinated financial support. FIN 46R requires a company to evaluate all existing arrangements to identify situations where a company has a "variable interest" in a "variable interest entity" and further determine when such variable interests require a company to consolidate the variable interest entities' financial statement with its own. The requirements of Interpretation 46 apply to the Company for its year ending December 31, 2005.

It is reasonably possible that the Companies will consolidate the uncombined affiliates when this Interpretation becomes effective. If the uncombined affiliates were combined with the related operating companies, the condensed combined balance sheets at December 31, 2005 and 20043 would be as

|  | 2005 | | |
|  | Operating Companies | Uncombined Affiliates | Total |
| --- | --- | --- | --- |
| Current assets | $ 6,291,315 | $ | $ 6,291,315 |
| Advances | 2,217,175 | | 2,217,175 |
| Property and equipment, net | 875,345 | | 875,345 |
| Due from stockholder | 2,478,638 | | 2,478,638 |
| Total | $ 11,862,473 | $ — | $ 11,862,473 |
| Current liabilities | $ 3,980,844 | $ | $ 3,980,844 |
| Long-term obligations | 3,756,131 | | 3,756,131 |
| Stockholders' equity | 4,125,498 | | 4,125,498 |
| Total | $ 11,862,473 | $ — | $ 11,862,473 |

PRELIMINARY DRAFT

## NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCOMBINED AFFILIATES (Continued)

|  | | 2004 | | | | |
|---|---|---|---|---|---|---|
|  | | Operating Companies | | Uncombined Affiliates | | Total |
| Current assets | $ | 6,439,173 | $ | 387,454 | $ | 6,826,627 |
| Advances | | 2,126,092 | | (2,126,092) | | - |
| Property and equipment, net | | 958,950 | | 2,043,314 | | 3,002,264 |
| Due from stockholder | | 2,726,060 | | 1,552,912 | | 4,278,972 |
| Total | $ | 12,250,275 | $ | 1,857,588 | $ | 14,107,863 |
| Current liabilities | $ | 5,118,154 | $ | 42,112 | $ | 5,160,266 |
| Long-term obligations | | 2,658,978 | | 1,566,888 | | 4,225,866 |
| Stockholders' equity | | 4,473,143 | | 248,588 | | 4,721,731 |
| Total | $ | 12,250,275 | $ | 1,857,588 | $ | 14,107,863 |

The unaudited financial statements of the uncombined affiliates for the year ended December 31, 2005 included the following:

| | | |
|---|---|---|
| Revenue | $ | 1,476,345 |
| Net loss | | (48,006) |

When FASB Interpretation 46R becomes effective, the net amount added to the Companies' balance sheet must be recognized as the cumulative effect of an accounting change. FASB Interpretation 46R may be applied by restating previously issued financial statements with a cumulative-effect adjustment as of the beginning of the first year restated. The Companies are not required to restate their financial statements and do not intend to do so. See additional information in Note H.

PRELIMINARY DRAFT

# Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2005 and 2004
(See Independent Accountants' Report)

## NOTE C – DUE FROM STOCKHOLDER

The Companies have uncollateralized advances to a stockholder of $2,549,813 and $2,726,060 as of December 31, 2005 and 2004, respectively. Effective January 1, 2002, the advances bear interest at the prime rate (7.25% at December 31, 2005) minus 0.5%. The note was noninterest-bearing prior to 2002. Principal and interest are due on demand. The Companies are not expected to demand repayment within the next year; therefore, the balance has been classified as long-term on the accompanying combined balance sheets.

## NOTE D - NOTES PAYABLE, BANK

The notes payable, bank consists of one revolving line of credit with interest at the prime rate (7.25% at December 31, 2005) plus 0.5%, expiring in November, 2006. At December 31, 2004, the notes payable,

The notes are collateralized by various business assets of the Companies and personal guarantees by the Companies' stockholders and an affiliate. The outstanding balance was $1,500,000 and $2,650,000 as of December 31, 2005 and 2004, respectively. There was no availability on this line of credit at December 31, 2005.

## NOTE E - NOTES PAYABLE, OFFICERS

Unsecured notes payable to officers are due on demand and bear interest at the prime rate (7.25% at December 31, 2005). The balance was $1,957,304 and $1,899,804 as of December 31, 2005 and 2004, respectively. The officers are not expected to demand repayment during the next year; therefore, the notes have been classified as long-term on the accompanying combined balance sheet.

## NOTE F - LONG-TERM DEBT

|  | 2005 | 2004 |
|---|---|---|
| Bank note, payable in monthly installments of $6,944 plus interest at the prime rate (7.25% at December 31, 2005) plus 0.5% through March, 2010. The note is collateralized by real estate owned by one of the Companies' stockholders. | $ 354,167 | $ 437,500 |

PRELIMINARY DRAFT

NOTE F - LONG-TERM DEBT (Continued)

| | | |
|---|---:|---:|
| Bank note, payable in monthly installments of $23,099 including interest at 7.50% through January 1, 2011. The note is collateralized by real estate owned by one of the Companies' stockholders. | $ 1,500,000 | $ - |
| Bank note, payable in monthly installments of $4,167 plus interest at the prime rate plus 0.5%. The note was fully repaid on December 29, 2005. All business assets were pledged as collateral. | - | 70,843 |
| Bank note, payable in monthly installments of $6,510 including interest at the prime rate plus 1%. The note was fully repaid on December 29, 2005. All business assets were pledged as collateral. | - | 172,915 |
| Bank note, payable in monthly installments of $1,414 including interest at 6.00% through April, 2008. All business assets are pledged as collateral. | 36,855 | 50,376 |
| Notes payable, finance companies, with monthly installments ranging from $1,321 to $2,602 including interest ranging from 4.99% to 6.85% expiring at various dates through July, 2009. All business assets are pledged as collateral. | 238,754 | 329,523 |
| | 2,129,776 | 1,061,157 |
| Less current maturities | 330,949 | 301,983 |
| | $ 1,798,827 | $ 759,174 |

PRELIMINARY DRAFT

**Northwest Building Materials & Supply Co. and Affiliated Companies**
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2005 and 2004
(See Independent Accountants' Report)

---

NOTE F - LONG-TERM DEBT (Continued)

Maturities of long-term debt are as follows:

|  |  |  |
|---|---|---:|
| 2006 | $ | 330,949 |
| 2007 | | 349,422 |
| 2008 | | 336,274 |
| 2009 | | 338,094 |
| 2010 | | 249,220 |
| Thereafter | | 525,817 |
|  | $ | 2,129,776 |

NOTE G - EMPLOYEE BENEFIT PLANS

The Companies have a 401(k) profit sharing plan covering all nonunion employees. The Companies' contributions to the plan were $14,340 and $11,679 in 2005 and 2004, respectively.

Additionally, in accordance with a collective bargaining agreement, the Companies have a union-sponsored pension plan covering all union employees. The contributions to this plan was approximately $448,239 and $363,706 in 2005 and 2004, respectively. The plan is administered by representatives of the trade union. Accordingly, the Companies have no knowledge or control over the funding assumptions and methods employed. If the Companies were to withdraw from the plan or should the plan terminate, the Companies would be required to contribute an amount equal to its portion of any unfunded liability. The Companies' liability, if any, is not presently determinable; therefore, no amount has been recorded for any contingent unfunded liability.

NOTE H - COMMITMENTS

The Companies lease three locations under operating leases from affiliated companies owned by one of the stockholders. Under the leases, the Companies are responsible for insurance, maintenance costs, and real estate taxes. Monthly rent payments, which include various insurance and maintenance costs, was $25,400 for both 2005 and 2004, respectively. The leases expire at various dates through January, 2013.

PRELIMINARY DRAFT

NOTE H - COMMITMENTS (Continued)

B.M.D.I., Inc. also leases a location under an operating lease from an unrelated party. Under the lease, B.M.D.I., Inc. is responsible for insurance, maintenance costs, and real estate taxes. Monthly rent payments, which include various insurance and maintenance costs, was $7,600 in 2005 and 2004, respectively. The lease expires in April, 2006.

Rent expense for the operating locations was $307,549 and $304,673 in 2005 and 2004, respectively.

At December 31, 2005 future minimum rental payments under operating leases are as follows:

| | |
|---|---:|
| 2006 | $ 327,600 |
| 2007 | 304,800 |
| 2008 | 262,800 |
| 2009 | 262,800 |
| 2010 | 262,800 |
| Thereafter | 525,600 |
| | $ 1,946,400 |

NOTE I - CONCENTRATIONS OF RISK

1. General

   The Companies grant credit to most of their customers who are contractors. These contractors are primarily located in, but not limited to, the Midwest.

2. Uninsured Cash

   The Companies also maintain cash balances at several financial institutions located in Illinois and Wisconsin. Each individual Company's accounts at each institution are insured by the Federal Deposit Insurance Corporation up to $100,000 per institution. At December 31, 2005, uninsured balances approximated $20,600.

PRELIMINARY DRAFT

## NOTE J - RECLASSIFICATIONS

Certain reclassifications have been made to the 2004 combined financial statements to conform to the 2005 presentation.

PRELIMINARY DRAFT

#2888001  P600101

# Northwest Building Materials & Supply Co. and Affiliated Companies

## Consolidated Financial Statements and Independent Accountants' Report

### December 31, 2005



EXHIBIT

Teslak #4

cvnPb-4-75

MILLER COOPER & CO., LTD.

# CONTENTS

|  | Page |
|---|---|
| INDEPENDENT ACCOUNTANTS' REPORT | 3 |
| CONSOLIDATED FINANCIAL STATEMENTS | |
| Consolidated Balance Sheet | 4 - 5 |
| Consolidated Statement of Operations | 6 |
| Consolidated Statement of Equity | 7 |
| Consolidated Statement of Cash Flows | 8 |
| Notes to Consolidated Financial Statements | 9 - 16 |
| SUPPLEMENTAL INFORMATION | |
| Consolidating Balance Sheet | 18 - 19 |
| Consolidating Statement of Operations | 20 |



MILLER
C(OO)PER
&Co.,Ltd

ACCOUNTANTS AND CONSULTANTS

## INDEPENDENT ACCOUNTANTS' REPORT

To the Board of Directors
Northwest Building Materials & Supply Co. and Affiliated Companies

We have reviewed the accompanying consolidated balance sheet of Northwest Building Materials & Supply Co. and Affiliated Companies as of December 31, 2005, and the related consolidated statements of operations, equity, and cash flows for the year then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. All of the information included in these consolidated financial statements is the representation of the management of Northwest Building Materials & Supply Co. and Affiliated Companies.

A review consists principally of inquiries of Company personnel and analytical procedures applied to financial data. It is substantially less in scope than an audit in accordance with auditing standards generally accepted in the United States of America, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to the accompanying consolidated financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note J to the consolidated financial statements, Northwest Building Materials & Supply Co. and Affiliated Companies adopted Financial Accounting Standards Board Interpretation No. 46, *Consolidation of Variable Interest Entities,* and its amendment, Interpretation 46R, as of the beginning of 2005.

Our review was made for the purpose of expressing limited assurance that there are no material modifications that should be made to the basic financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America. The supplemental information on pages 18 through 20 is presented for purposes of additional analysis and is not a required part of the basic financial statements. Such information has been subjected to the inquiry and analytical procedures applied in the review of the basic financial statements and we did not become aware of any material modifications that should be made to such information.

MILLER, COOPER & CO., LTD.

*Miller Cooper & Co., Ltd.*

Certified Public Accountants

Northbrook, Illinois
January 15, 2007

650 DUNDEE ROAD, SUITE 250 • NORTHBROOK, IL 60062-2767
PHONE 847.205.5000 • FAX 847.205.1400 • e-mail mccltd@millercooper.com

FINANCIAL STATEMENTS

# Northwest Building Materials & Supply Co. and Affiliated Companies
CONSOLIDATED BALANCE SHEET
December 31, 2005
(See Independent Accountants' Report)

### ASSETS

| | | |
|---|---|--:|
| **CURRENT ASSETS** | | |
| Cash | $ | 54,350 |
| Accounts receivable, net of allowance for doubtful accounts of $73,000 | | 3,471,047 |
| Inventories | | 2,074,460 |
| Prepaid expenses and other | | 781,302 |
| Total current assets | | 6,381,159 |
| | | |
| **NET ADVANCES TO UNCONSOLIDATED AFFILIATES** | | 1,377,575 |
| | | |
| **PROPERTY AND EQUIPMENT** | | |
| Land | | 516,653 |
| Buildings | | 1,707,818 |
| Vehicles | | 2,422,105 |
| Leasehold improvements | | 341,264 |
| Office equipment | | 474,446 |
| Yard equipment | | 305,715 |
| Transportation equipment | | 307,268 |
| | | 6,075,269 |
| Less accumulated depreciation | | 4,066,877 |
| | | 2,008,392 |
| | | |
| **DUE FROM STOCKHOLDER** | | 3,149,680 |
| | $ | 12,916,806 |

The accompanying notes are an integral part of this statement.

## LIABILITIES AND STOCKHOLDERS' EQUITY

CURRENT LIABILITIES
| | |
|---|---:|
| Note payable, bank | $ 1,500,000 |
| Current maturities of long-term debt | 450,826 |
| Accounts payable | 1,773,053 |
| Accrued expenses | 349,209 |
| Customer deposits | 29,749 |
| Total current liabilities | 4,102,837 |

LONG-TERM OBLIGATIONS
| | |
|---|---:|
| Long-term debt, net of current maturities | 2,437,911 |
| Notes payable, officers | 1,957,304 |
| | 4,395,215 |

STOCKHOLDERS' EQUITY
| | |
|---|---:|
| Common stock, $1 par value, 18,300 shares authorized, issued, and outstanding | 16,200 |
| Additional paid-in capital | 20,573 |
| Retained earnings | 4,381,981 |
| | 4,418,754 |
| | $ 12,916,806 |

MILLER COOPER & CO. LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
## CONSOLIDATED STATEMENT OF OPERATIONS
### Year ended December 31, 2005
#### (See Independent Accountants' Report)

| | | |
|---|---|---:|
| Net sales | $ | 25,087,371 |
| Cost of goods sold | | 19,916,112 |
| Gross profit | | 5,171,259 |
| Operating expenses | | |
| Delivery and yard | | 1,595,058 |
| Selling, general, and administrative | | 3,533,881 |
| | | 5,128,939 |
| Operating income | | 42,320 |
| Other income (expense) | | |
| Interest income | | 144,630 |
| Interest expense | | (367,997) |
| Other income, net | | 293 |
| | | (223,074) |
| NET LOSS | $ | (180,754) |

The accompanying notes are an integral part of this statement.

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies

CONSOLIDATED STATEMENT OF EQUITY
Year ended December 31, 2005
(See Independent Accountants' Report)

| | Common Stock | Additional Paid-In Capital | Retained Earnings | Total Equity |
|---|---|---|---|---|
| Balance at December 31, 2004, as previously stated | $ 16,200 | $ 18,473 | $ 4,438,470 | $ 4,473,143 |
| Cumulative effect of change in accounting principle | 2,100 | - | 278,565 | 280,665 |
| Balance at December 31, 2004, as restated | 18,300 | 18,473 | 4,717,035 | 4,753,808 |
| Dividends | - | - | (154,300) | (154,300) |
| Net loss | - | - | (180,754) | (180,754) |
| Balance at December 31, 2005 | $ 18,300 | $ 18,473 | $ 4,381,981 | $ 4,418,754 |

The accompanying notes are an integral part of this statement.

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies

CONSOLIDATED STATEMENT OF CASH FLOWS
Year ended December 31, 2005
(See Independent Accountants' Report)

| | |
|---|---:|
| **Cash flows from operating activities** | |
| Net loss | $ (180,754) |
| Adjustments to reconcile net loss to net cash provided by operating activities | |
| Depreciation | 172,438 |
| Bad debt recoveries | (1,781) |
| Proceeds from condemnation award | 53,700 |
| (Increase) decrease in assets | |
| Accounts receivable | 60,796 |
| Inventories | 250,284 |
| Prepaid expenses and other | (148,760) |
| Increase (decrease) in liabilities | |
| Accounts payable | 163,012 |
| Accrued expenses | (106,762) |
| Customer deposits | (4,695) |
| Net cash provided by operating activities | 257,478 |
| | |
| **Cash flows from investing activities** | |
| Purchases of equipment | (39,971) |
| Repayments from stockholder | 201,297 |
| Net advances to unconsolidated affiliates | (47,247) |
| Net cash provided by investing activities | 114,079 |
| | |
| **Cash flows from financing activities** | |
| Cash overdraft | (22,497) |
| Net repayments on note payable, bank | (1,150,000) |
| Repayments on long-term debt | (547,910) |
| Borrowings on long-term debt | 1,500,000 |
| Proceeds from notes payable, officers | 57,500 |
| Dividends to stockholders | (154,300) |
| Net cash used in financing activities | (317,207) |
| | |
| INCREASE IN CASH | 54,350 |
| | |
| Cash, beginning of year | - |
| | |
| Cash, end of year | $ 54,350 |
| | |
| Supplemental disclosure of cash flow information | |
| Interest paid during the year | $ 367,997 |

The accompanying notes are an integral part of this statement.

-8-

## NOTE A - NATURE OF BUSINESS, BASIS OF CONSOLIDATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

1.  Nature of Business

    The Companies primarily operate as distributors of building materials to various contractors. The Companies also operate retail locations for the sale of related building products. The consolidated affiliated companies lease operating facilities to the Companies.

2.  Basis of Consolidation

    The consolidated financial statements include the following entities (collectively, the Companies): Northwest Building Materials & Supply Co. (the Company), Northwest Building Materials of Illinois, Inc. (Prairie View and Naperville), Southport Lumber and Supply Company (Southport), and B.M.D.I., Inc., which are all under common control.

    The consolidated financial statements also include the following entities (collectively, the Affiliates): C.S. Realty, Inc., N.W. Realty of Illinois, Inc., and Southport Real Estate Co., each of which has been identified as a variable interest entity (VIE), with the Companies as primary beneficiary. Therefore, these entities have been consolidated in these financial statements (see Note J).

    All significant intercompany accounts and transactions have been eliminated in consolidation.

3.  Receivables and Credit Policies

    Accounts receivable are uncollateralized customer obligations due under normal trade terms requiring payment within thirty days from the invoice date. Accounts receivable are stated at the amounts billed to the customers. Customer account balances with invoices dated over ninety days old are considered delinquent. Interest is charged on past due balances at an annual percentage rate of 18%. Payments of accounts receivable are allocated to the specific invoices identified on the customer's remittance advice or, if unspecified, are applied to the earliest unpaid invoices.

    The carrying amount of accounts receivable is reduced by a valuation allowance that reflects management's best estimate of the amounts that will not be collected. Management individually reviews all accounts receivable balances that exceed 90 days from the invoice date and, based on an assessment of current creditworthiness, estimates the portion, if any, of the balance that will not be collected.

-9-

---

## NOTE A - NATURE OF BUSINESS, BASIS OF CONSOLIDATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

4. Inventories

   Inventories consist of lumber, retail goods, and other construction inventories and are valued at the lower of cost (first-in, first-out basis) (FIFO) or market.

5. Property and Equipment

   Property and equipment are stated at cost. Depreciation of property and equipment is provided using the straight-line methods and accelerated methods over the estimated useful lives of the respective assets. Estimated useful lives are as follows:

   |  | Years |
   |---|---|
   | Buildings | 39 years |
   | Vehicles | 3 - 6 years |
   | Leasehold improvements | Life of leases |
   | Office and yard equipment | 5 - 7 years |
   | Transportation equipment | 5 - 7 years |

6. Income Taxes

   The Companies, N.W. Realty of Illinois, Inc., and C.S. Realty, Inc. have elected to be S Corporations for federal income tax purposes under the Internal Revenue Code. In lieu of corporate income taxes, the stockholders of an S Corporation are taxed on their proportionate shares of the Company's taxable income. Therefore, no liability or provision for federal income taxes has been included in these combined financial statements. The Companies are subject to certain state taxes.

   Southport Real Estate Co. has elected to be a C Corporation for federal income tax purposes under the Internal Revenue Code. Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carryforwards and deferred tax liabilities are recognized for taxable temporary differences.

-10-

## NOTE A - NATURE OF BUSINESS, BASIS OF CONSOLIDATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

6. Income Taxes (Continued)

Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment. There were no deferred tax assets or liabilities as of December 31, 2005.

7. Use of Estimates

In preparing financial statements, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

8. Advertising

Advertising costs are expensed as incurred. Total advertising expense was $36,133 for 2005.

## NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCONSOLIDATED AFFILIATES

The Companies and Affiliates have net advances to related entities which are owned and operated by the Companies' stockholders as follows:

| | | |
|---|---|---:|
| Charmar Realty, Inc. | $ | 805,339 |
| Professional Leasing, Inc. | | 175,162 |
| K & H Cartage Co. | | 366,699 |
| Other | | 30,375 |
| | $ | 1,377,575 |

MILLER COOPER & CO., LTD.

## NOTE C – DUE FROM STOCKHOLDER

The Companies and Affiliates have uncollateralized advances to a stockholder of $3,149,680 as of December 31, 2005. Effective January 1, 2002, the advances bear interest at the prime rate (7.25% at December 31, 2005) minus 0.5%. The note was noninterest-bearing prior to 2002. Principal and interest are due on demand. The Companies are not expected to demand repayment within the next year; therefore, the balance has been classified as long-term in the accompanying consolidated balance sheet.

## NOTE D - NOTES PAYABLE, BANK

The note payable, bank consists of a revolving line of credit with interest at the prime rate (7.25% at December 31, 2005) plus 0.5%, expiring in November, 2006. The note is collateralized by various business assets of the Companies and personal guarantees by the Companies' stockholders and an affiliate. The outstanding balance was $1,500,000 as of December 31, 2005. There was no availability on this line of credit at December 31, 2005.

## NOTE E - NOTES PAYABLE, OFFICERS

Unsecured notes payable to officers are due on demand and bear interest at the prime rate (7.25% at December 31, 2005). The balance was $1,957,304 as of December 31, 2005. The officers are not expected to demand repayment during the next year; therefore, the notes have been classified as long-term in the accompanying consolidated balance sheet.

## NOTE F - LONG-TERM DEBT

Bank note, payable in monthly installments of $6,944 plus interest at the prime rate (7.25% at December 31, 2005) plus 0.5% through March, 2010. The note is collateralized by real estate owned by one of the Companies' stockholders. $ 354,167

Bank note, payable in monthly installments of $23,099 including interest at 7.50% through January 1, 2011. The note is collateralized by real estate owned by one of the Companies' stockholders. 1,500,000

Bank note, payable in monthly installments of $1,414 including interest at 6.00% through April, 2008. All business assets are pledged as collateral. 36,855

MILLER COOPER & CO., LTD.

NOTE F - LONG-TERM DEBT (Continued)

Mortgage note, payable in monthly installments of $4,130 including interest at 6.50% with a balloon payment in December, 2009. Certain assets held by C.S. Realty, Inc. are pledged as collateral.
$ 531,348

Mortgage note, payable in monthly installments of $6,550 including interest at the prime rate plus 0.5% through March, 2011. Certain assets held by N.W. Realty of Illinois, Inc. are pledged as collateral.
180,969

Mortgage note, payable in monthly installments of $3,271 including interest at the prime rate plus 0.5% through August, 2012. Certain assets held by Southport Real Estate Co. are pledged as collateral.
46,644

Notes payable, finance companies, with monthly installments ranging from $1,321 to $2,602 including interest ranging from 4.99% to 6.85%, expiring at various dates through July, 2009. All business assets are pledged as collateral.
238,754

|  |  |
|---|---|
|  | 2,888,737 |
| Less current maturities | 450,826 |
|  | $ 2,437,911 |

Maturities of long-term debt are as follows:

| | |
|---|---|
| 2006 | $ 450,826 |
| 2007 | 439,937 |
| 2008 | 397,644 |
| 2009 | 825,293 |
| 2010 | 249,220 |
| Thereafter | 525,817 |
| | $ 2,888,737 |

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2005
(See Independent Accountants' Report)

## NOTE G - EMPLOYEE BENEFIT PLANS

The Companies have a 401(k) profit sharing plan covering all nonunion employees. The Companies' contributions to the plan were $14,340 in 2005.

Additionally, in accordance with a collective bargaining agreement, the Companies have a union-sponsored pension plan covering all union employees. The contributions to this plan were approximately $448,239 in 2005. The plan is administered by representatives of the trade union. Accordingly, the Companies have no knowledge or control over the funding assumptions and methods employed. If the Companies were to withdraw from the plan or should the plan terminate, the Companies would be required to contribute an amount equal to its portion of any unfunded liability. The Companies' liability, if any, is not presently determinable; therefore, no amount has been recorded for any contingent unfunded liability.

## NOTE H - COMMITMENTS

The Companies lease three locations under operating leases from affiliated companies owned by one of the stockholders. The affiliated companies are variable interest entities (see Note J). Under the leases, the Companies are responsible for insurance, maintenance costs, and real estate taxes. Monthly rent payments, which include various insurance and maintenance costs, were $25,400 for 2005. The leases expire at various dates through January, 2013.

B.M.D.I., Inc. also leases a location under an operating lease from an unrelated party. Under the lease, B.M.D.I., Inc. is responsible for insurance, maintenance costs, and real estate taxes. Monthly rent payments, which include various insurance and maintenance costs, were $7,600 in 2005. The lease expires in April, 2006.

Rent expense for the operating locations was $307,549 in 2005.

-14-

MILLER COOPER & CO., LTD.

---

## NOTE H - COMMITMENTS (Continued)

At December 31, 2005 future minimum rental payments under operating leases are as follows:

| | | |
|---|---|---:|
| 2006 | $ | 327,600 |
| 2007 | | 304,800 |
| 2008 | | 262,800 |
| 2009 | | 262,800 |
| 2010 | | 262,800 |
| Thereafter | | 525,600 |
| | $ | 1,946,400 |

## NOTE I - CONCENTRATIONS OF RISK

1. General

   The Companies grant credit to most of their customers who are contractors. These contractors are primarily located in, but not limited to, the Midwestern United States.

2. Uninsured Cash

   The Companies also maintain cash balances at several financial institutions located in Illinois and Wisconsin. Each individual Company's accounts at each institution are insured by the Federal Deposit Insurance Corporation up to $100,000 per institution. At December 31, 2005, uninsured balances approximated $20,600.

MILLER COOPER & CO., LTD.

## NOTE J - CONSOLIDATION OF VARIABLE INTEREST ENTITIES

In January 2003, the Financial Accounting Standards Board issued Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46) and its amendment, Interpretation 46R. This Interpretation establishes standards for identifying variable interest entities and for determining the circumstances when a variable interest entity should be consolidated with its primary beneficiary. The Companies lease operating facilities from the Affiliates, entities established for the sole purpose of acquiring and leasing the building and land. Under FIN 46R, the Affiliates are variable interest entities as the Companies are the primary beneficiary, the Affiliates' stockholder has personally guaranteed the note payable for the Company, and the Affiliates assets are used as collateral for the note payable of the Company. Therefore, the Companies have consolidated the Affiliates in its consolidated financial statements. Accordingly, the financial statements have been restated as the beginning of the fiscal year 2005.

MILLER COOPER & CO., LTD.

SUPPLEMENTAL INFORMATION

# Northwest Building Materials & Supply Co. and Affiliated Companies

CONSOLIDATING BALANCE SHEET
December 31, 2005
(See Independent Accountants' Report)

| ASSETS | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---:|---:|---:|---:|
| CURRENT ASSETS | | | | |
| Cash | $ 9,533 | $ 44,817 | $ - | $ 54,350 |
| Accounts receivable, net of allowance for doubtful accounts of $73,000 | 3,471,047 | - | - | 3,471,047 |
| Inventories | 2,074,460 | - | - | 2,074,460 |
| Prepaid expenses and other | 735,618 | 45,684 | - | 781,302 |
| Total current assets | 6,290,658 | 90,501 | - | 6,381,159 |
| NET ADVANCES TO CONSOLIDATED AFFILIATES | 813,795 | (813,795) | - | - |
| NET ADVANCES TO UNCONSOLIDATED AFFILIATES | 1,357,913 | 19,662 | - | 1,377,575 |
| PROPERTY AND EQUIPMENT | | | | |
| Land | - | 516,653 | - | 516,653 |
| Buildings | - | 1,707,818 | - | 1,707,818 |
| Vehicles | 2,422,105 | - | - | 2,422,105 |
| Leasehold improvements | 341,264 | - | - | 341,264 |
| Office equipment | 474,446 | - | - | 474,446 |
| Yard equipment | 305,715 | - | - | 305,715 |
| Transportation equipment | 307,268 | - | - | 307,268 |
| | 3,850,798 | 2,224,471 | - | 6,075,269 |
| Less accumulated depreciation | 2,975,453 | 1,091,424 | - | 4,066,877 |
| | 875,345 | 1,133,047 | - | 2,008,392 |
| DUE FROM STOCKHOLDER | 2,524,763 | 624,917 | - | 3,149,680 |
| | $ 11,862,474 | $ 1,054,332 | $ - | $ 12,916,806 |

| LIABILITIES AND STOCKHOLDERS' EQUITY | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---|---|---|---|
| **CURRENT LIABILITIES** | | | | |
| Note payable, bank | $ 1,500,000 | $ - | $ - | $ 1,500,000 |
| Current maturities of long-term debt | 330,949 | 119,877 | - | 450,826 |
| Accounts payable | 1,773,053 | - | - | 1,773,053 |
| Accrued expenses | 347,093 | 2,116 | - | 349,209 |
| Customer deposits | 29,749 | - | - | 29,749 |
| Total current liabilities | 3,980,844 | 121,993 | - | 4,102,837 |
| **LONG-TERM OBLIGATIONS** | | | | |
| Long-term debt, net of current maturities | 1,798,827 | 639,084 | - | 2,437,911 |
| Notes payable, officers | 1,957,304 | - | - | 1,957,304 |
| | 3,756,131 | 639,084 | - | 4,395,215 |
| **STOCKHOLDERS' EQUITY** | | | | |
| Common stock | 16,200 | - | - | 16,200 |
| Additional paid-in capital | 18,473 | 2,100 | - | 20,573 |
| Retained earnings | 4,090,826 | 291,155 | - | 4,381,981 |
| | 4,125,499 | 293,255 | - | 4,418,754 |
| | $ 11,862,474 | $ 1,054,332 | $ - | $ 12,916,806 |

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies

CONSOLIDATING STATEMENT OF OPERATIONS

December 31, 2005

(See Independent Accountants' Report)

| | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---|---|---|---|
| Net sales | $ 25,087,371 | $ 245,974 | $ (245,974) | $ 25,087,371 |
| Cost of goods sold | 19,916,112 | - | - | 19,916,112 |
| Gross profit | 5,171,259 | 245,974 | (245,974) | 5,171,259 |
| Operating expenses | | | | |
| Delivery and yard | 1,841,032 | - | (245,974) | 1,595,058 |
| Selling, general, and administrative | 3,397,881 | 136,000 | - | 3,533,881 |
| | 5,238,913 | 136,000 | (245,974) | 5,128,939 |
| Operating income (loss) | (67,654) | 109,974 | - | 42,320 |
| Other income (expense) | | | | |
| Interest income | 144,630 | - | - | 144,630 |
| Interest expense | (314,115) | (53,882) | - | (367,997) |
| Other income (expense), net | 4,795 | (4,502) | - | 293 |
| | (164,690) | (58,384) | - | (223,074) |
| NET INCOME (LOSS) | $ (232,344) | $ 51,590 | $ - | $ (180,754) |

-20-

# Northwest Building Materials & Supply Co. and Affiliated Companies

Consolidated Financial Statements and
Independent Accountants' Report

December 31, 2006 and 2005


EXHIBIT

# CONTENTS

|                                              | Page      |
|----------------------------------------------|-----------|
| INDEPENDENT ACCOUNTANTS' REPORT              | 3         |
| CONSOLIDATED FINANCIAL STATEMENTS            |           |
| Consolidated Balance Sheets                  | 4 - 5     |
| Consolidated Statements of Operations        | 6         |
| Consolidated Statements of Equity            | 7         |
| Consolidated Statements of Cash Flows        | 8         |
| Notes to Consolidated Financial Statements   | 9 - 17    |
| SUPPLEMENTAL INFORMATION                     |           |
| Consolidating Balance Sheets                 | 19 - 22   |
| Consolidating Statements of Operations       | 23 - 24   |



# MILLER
# C(O)PER
# &Co.,Ltd

ACCOUNTANTS AND CONSULTANTS

## INDEPENDENT ACCOUNTANTS' REPORT

To the Board of Directors
Northwest Building Materials & Supply Co. and Affiliated Companies

We have reviewed the accompanying consolidated balance sheets of Northwest Building Materials & Supply Co. and Affiliated Companies as of December 31, 2006 and 2005, and the related consolidated statements of operations, equity, and cash flows for the years then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. All of the information included in these consolidated financial statements is the representation of the management of Northwest Building Materials & Supply Co. and Affiliated Companies.

A review consists principally of inquiries of Company personnel and analytical procedures applied to financial data. It is substantially less in scope than an audit in accordance with auditing standards generally accepted in the United States of America, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to the accompanying consolidated financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note J to the consolidated financial statements, Northwest Building Materials & Supply Co. and Affiliated Companies adopted Financial Accounting Standards Board Interpretation No. 46, *Consolidation of Variable Interest Entities,* and its amendment, Interpretation 46R, as of the beginning of 2005.

Our reviews were made for the purpose of expressing limited assurance that there are no material modifications that should be made to the basic consolidated financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America. The supplementary information on pages 19 through 24 is presented for purposes of additional analysis and is not a required part of the basic consolidated financial statements. Such information has not been subjected to the inquiry and analytical procedures applied in the reviews of the basic consolidated financial statements, but was compiled from information that is the representation of management, without audit review, and we do not express an opinion or any other form of assurance on such information.

MILLER, COOPER & CO., LTD.

*Miller Cooper & Co., Ltd.*

Certified Public Accountants

Northbrook, Illinois
September 20, 2007

650 DUNDEE ROAD, SUITE 250 · NORTHBROOK, IL 60062-2767
PHONE 847.205.5000 · FAX 847.205.1400 · e-mail mccltd@millercooper.com

CONSOLIDATED FINANCIAL STATEMENTS

# Northwest Building Materials & Supply Co. and Affiliated Companies
CONSOLIDATED BALANCE SHEETS
December 31, 2006 and 2005
(See Independent Accountants' Report)

| ASSETS | 2006 | 2005 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash | $ - | $ 54,350 |
| Accounts receivable, net of allowance for doubtful accounts | | |
| of $145,000 and $73,000 for 2006 and 2005, respectively | 3,040,416 | 3,471,047 |
| Inventories | 2,201,981 | 2,074,460 |
| Prepaid expenses and other | 798,372 | 781,302 |
| Total current assets | 6,040,769 | 6,381,159 |
| **NET ADVANCES TO UNCONSOLIDATED AFFILIATES** | 1,411,229 | 1,377,575 |
| **PROPERTY AND EQUIPMENT** | | |
| Land | 516,653 | 516,653 |
| Buildings | 1,707,818 | 1,707,818 |
| Vehicles | 2,422,105 | 2,422,105 |
| Leasehold improvements | 341,264 | 341,264 |
| Office equipment | 474,446 | 474,446 |
| Yard equipment | 309,613 | 305,715 |
| Transportation equipment | 307,268 | 307,268 |
| | 6,079,167 | 6,075,269 |
| Less accumulated depreciation | 4,238,134 | 4,066,877 |
| | 1,841,033 | 2,008,392 |
| **DUE FROM STOCKHOLDER** | 3,350,029 | 3,149,680 |
| | $ 12,643,060 | $ 12,916,806 |

The accompanying notes are an integral part of these statements.

| LIABILITIES AND STOCKHOLDERS' EQUITY | | 2006 | | 2005 |
|---|---|---|---|---|
| **CURRENT LIABILITIES** | | | | |
| Cash overdraft | $ | 542,057 | $ | - |
| Note payable, bank | | 1,500,000 | | 1,500,000 |
| Current maturities of long-term debt | | 439,003 | | 450,826 |
| Accounts payable | | 1,793,082 | | 1,773,053 |
| Accrued expenses | | 295,202 | | 349,209 |
| Customer deposits | | 31,353 | | 29,749 |
| Total current liabilities | | 4,600,697 | | 4,102,837 |
| **LONG-TERM OBLIGATIONS** | | | | |
| Long-term debt, net of current maturities | | 2,000,587 | | 2,437,911 |
| Notes payable, officers | | 1,945,604 | | 1,957,304 |
| | | 3,946,191 | | 4,395,215 |
| **STOCKHOLDERS' EQUITY** | | | | |
| Common stock, $1 par value; 18,300 shares authorized, issued, and outstanding | | 18,300 | | 18,300 |
| Additional paid-in capital | | 18,473 | | 18,473 |
| Retained earnings | | 4,059,399 | | 4,381,981 |
| | | 4,096,172 | | 4,418,754 |
| | $ | 12,643,060 | $ | 12,916,806 |

-5-

# Northwest Building Materials & Supply Co. and Affiliated Companies

CONSOLIDATED STATEMENTS OF OPERATIONS
Years ended December 31, 2006 and 2005
(See Independent Accountants' Report)

|                                        |    | 2006       |    | 2005       |
|----------------------------------------|----|------------|----|------------|
| Net sales                              | $  | 24,633,688 | $  | 25,087,371 |
| Cost of goods sold                     |    | 19,541,267 |    | 19,916,112 |
| Gross profit                           |    | 5,092,421  |    | 5,171,259  |
| Operating expenses                     |    |            |    |            |
| Delivery and yard                      |    | 2,003,889  |    | 1,595,058  |
| Selling, general, and administrative   |    | 3,182,534  |    | 3,533,881  |
|                                        |    | 5,186,423  |    | 5,128,939  |
| Operating income (loss)               |    | (94,002)   |    | 42,320     |
| Other income (expense)                 |    |            |    |            |
| Interest income                        |    | 188,706    |    | 144,630    |
| Interest expense                       |    | (469,014)  |    | (367,997)  |
| Other income, net                      |    | 51,728     |    | 293        |
|                                        |    | (228,580)  |    | (223,074)  |
| NET LOSS                               | $  | (322,582)  | $  | (180,754)  |

The accompanying notes are an integral part of these statements.

MILLER COOPER & CO, LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
## CONSOLIDATED STATEMENTS OF EQUITY
Years ended December 31, 2006 and 2005
(See Independent Accountants' Report)

|  | Common Stock | Additional Paid-In Capital | Retained Earnings | Total Equity |
|---|---|---|---|---|
| Balance at January 1, 2005 | $ 18,300 | $ 18,473 | $ 4,717,035 | $ 4,753,808 |
| Stockholder dividends | - | - | (154,300) | (154,300) |
| Net loss | - | - | (180,754) | (180,754) |
| Balance at December 31, 2005 | 18,300 | 18,473 | 4,381,981 | 4,418,754 |
| Net loss | - | - | (322,582) | (322,582) |
| Balance at December 31, 2006 | $ 18,300 | $ 18,473 | $ 4,059,399 | $ 4,096,172 |

The accompanying notes are an integral part of these statements.

MILLER COOPER & CO. LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies

CONSOLIDATED STATEMENTS OF CASH FLOWS

Years ended December 31, 2006 and 2005

<u>(See Independent Accountants' Report)</u>

|  | 2006 | 2005 |
|---|---|---|
| Cash flows from operating activities |  |  |
| Net loss | $ (322,582) | $ (180,754) |
| Adjustments to reconcile net loss to net cash provided by operating activities |  |  |
| Depreciation | 171,257 | 172,438 |
| Bad debt expense | 119,234 | 154,751 |
| Proceeds from condemnation award | - | 53,700 |
| (Increase) decrease in assets |  |  |
| Accounts receivable | 311,397 | (95,736) |
| Inventories | (127,521) | 250,284 |
| Prepaid expenses and other | (17,070) | (148,760) |
| Increase (decrease) in liabilities |  |  |
| Accounts payable | 20,029 | 163,012 |
| Accrued expenses | (54,007) | (106,762) |
| Customer deposits | 1,604 | (4,695) |
| Net cash provided by operating activities | 102,341 | 257,478 |
| Cash flows from investing activities |  |  |
| Purchases of equipment | (3,898) | (39,971) |
| Net (advances to) repayments from stockholder | (200,349) | 201,297 |
| Net advances to unconsolidated affiliates | (33,654) | (47,247) |
| Net cash provided by (used in) investing activities | (237,901) | 114,079 |
| Cash flows from financing activities |  |  |
| Increase (decrease) in cash overdraft | 542,057 | (22,497) |
| Net repayments on note payable, bank | - | (1,150,000) |
| Repayments on long-term debt | (449,147) | (547,910) |
| Borrowings on long-term debt | - | 1,500,000 |
| Proceeds from notes payable, officers | - | 57,500 |
| Repayments on notes payable, officers | (11,700) | - |
| Dividends to stockholders | - | (154,300) |
| Net cash provided by (used in) financing activities | 81,210 | (317,207) |
| INCREASE (DECREASE) IN CASH | (54,350) | 54,350 |
| Cash, beginning of year | 54,350 | - |
| Cash, end of year | $ - | $ 54,350 |
| Supplemental disclosure of cash flow information |  |  |
| Interest paid during the year | $ 469,014 | $ 367,997 |

The accompanying notes are an integral part of these statements

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies

## NOTE A - NATURE OF BUSINESS, BASIS OF CONSOLIDATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

1. Nature of Business

   The Companies primarily operate as distributors of building materials to various contractors. The Companies also operate retail locations for the sale of related building products. The consolidated affiliated companies lease operating facilities to the Companies.

2. Basis of Consolidation

   The consolidated financial statements include the following entities (collectively, the Companies): Northwest Building Materials & Supply Co. (the Company), Northwest Building Materials of Illinois, Inc. (Prairie View and Naperville), Southport Lumber and Supply Company (Southport), and B.M.D.I., Inc., which are all under common control.

   The consolidated financial statements also include the following entities (collectively, the Affiliates): C.S. Realty, Inc., N.W. Realty of Illinois, Inc., and Southport Real Estate Co., each of which has been identified as a variable interest entity (VIE), with the Companies as primary beneficiary. Therefore, these entities have been consolidated in these financial statements (see Note J).

   All significant intercompany accounts and transactions have been eliminated in consolidation.

3. Receivables and Credit Policies

   Accounts receivable are uncollateralized customer obligations due under normal trade terms requiring payment within thirty days from the invoice date. Accounts receivable are stated at the amounts billed to the customers. Customer account balances with invoices dated over ninety days old are considered delinquent. Interest is charged on past due balances at an annual percentage rate of 18%. Payments of accounts receivable are allocated to the specific invoices identified on the customer's remittance advice or, if unspecified, are applied to the earliest unpaid invoices.

MILLER COOPER & CO., LTD

# Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2006 and 2005
(See Independent Accountants' Report)

---

NOTE A - NATURE OF BUSINESS, BASIS OF CONSOLIDATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

3. Receivables and Credit Policies (Continued)

The carrying amount of accounts receivable is reduced by a valuation allowance that reflects management's best estimate of the amounts that will not be collected. Management individually reviews all accounts receivable balances that exceed 90 days from the invoice date and, based on an assessment of current creditworthiness, estimates the portion, if any, of the balance that will not be collected.

4. Inventory

Inventory consists of lumber, retail goods, and other construction inventories and are valued at the lower of cost (first-in, first-out basis) (FIFO) or market.

5. Property and Equipment

Property and equipment are stated at cost. Depreciation of property and equipment is provided using the straight-line methods and accelerated methods over the estimated useful lives of the respective assets. Estimated useful lives are as follows:

|  | Years |
| --- | --- |
| Buildings | 39 years |
| Vehicles | 3 - 6 years |
| Leasehold improvements | Life of leases |
| Office and yard equipment | 5 - 7 years |
| Transportation equipment | 5 - 7 years |

-10-

Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2006 and 2005
(See Independent Accountants' Report)

NOTE A - NATURE OF BUSINESS, BASIS OF CONSOLIDATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

6. Income Taxes

The Companies, N.W. Realty of Illinois, Inc., and C.S. Realty, Inc. have elected to be S Corporations for federal income tax purposes under the Internal Revenue Code. In lieu of corporate income taxes, the stockholders of an S Corporation are taxed on their proportionate shares of the Company's taxable income. Therefore, no liability or provision for federal income taxes has been included in these consolidated financial statements. The Companies are subject to certain state taxes.

Southport Real Estate Co. has elected to be a C Corporation for federal income tax purposes under the Internal Revenue Code. Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carryforwards and deferred tax liabilities are recognized for taxable temporary differences.

Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment. There were no deferred tax assets or liabilities as of December 31, 2006.

7. Use of Estimates

In preparing financial statements, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

8. Advertising

Advertising costs are expensed as incurred. Total advertising expense was $46,239 and $36,133 for 2006 and 2005, respectively.

-11-

# Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2006 and 2005
(See Independent Accountants' Report)

## NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCONSOLIDATED AFFILIATES

The Companies and Affiliates have net advances to related entities which are owned and operated by the Companies' stockholders as follows:

|  | 2006 | 2005 |
|---|---|---|
| Charmar Realty, Inc. | $ 807,576 | $ 805,339 |
| Professional Leasing, Inc. | 175,162 | 175,162 |
| K.& H Cartage Co. | 398,116 | 366,699 |
| Other | 30,375 | 30,375 |
|  | $ 1,411,229 | $ 1,377,575 |

Professional Leasing, Inc. (Professional) leases equipment to the operating companies. Lease expense paid to Professional was approximately $350,000 and $415,000 for the years ended December 31, 2006 and 2005, respectively. K&H Cartage Co. (K&H) provides Cartage services to B.M.D.I., Inc. Cartage expense paid to K&H was approximately $649,000 and $575,000 for the years ended December 31, 2006 and 2005, respectivley.

## NOTE C - DUE FROM STOCKHOLDER

The Companies and Affiliates have uncollateralized advances to a stockholder of $3,350,029 and $3,149,680 as of December 31, 2006 and 2005, respectively. Effective January 1, 2002, the advances bear interest at the prime rate (8.25% at December 31, 2006) minus 0.5%. The note was noninterest-bearing prior to 2002. Principal and interest are due on demand. The Companies are not expected to demand repayment within the next year; therefore, the balance has been classified as long-term in the accompanying consolidated balance sheet.

## NOTE D - NOTES PAYABLE, BANK

The note payable, bank consists of a revolving line of credit with interest at the prime rate (8.25% at December 31, 2006) plus 0.5%, expiring in November 2007. The note is collateralized by various business assets of the Companies and personal guarantees by the Companies' stockholders and an affiliate. The Company is required to comply with certain financial covenants. The outstanding balance was $1,500,000 as of December 31, 2006 and 2005.

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2006 and 2005
(See Independent Accountants' Report)

## NOTE E - NOTES PAYABLE, OFFICERS

Unsecured notes payable to officers are due on demand and bear interest at the prime rate (8.25% at December 31, 2006). The balance was $1,945,604 and $1,957,304 as of December 31, 2006 and 2005, respectively. The officers are not expected to demand repayment during the next year; therefore, the notes have been classified as long-term in the accompanying consolidated balance sheet.

## NOTE F - LONG-TERM DEBT

|  | 2006 | 2005 |
|---|---|---|
| Bank note, payable in monthly installments of $6,944 plus interest at the prime rate (8.25% at December 31, 2005) plus 0.5% through March 2010. The note is collateralized by real estate owned by one of the Companies' stockholders. | $ 270,833 | $ 354,167 |
| Bank note, payable in monthly installments of $23,099 including interest at 7.50% through January 1, 2011. The note is collateralized by various business assets of the Companies. | 1,345,862 | 1,500,000 |
| Bank note, payable in monthly installments of $1,414 including interest at 6.00% through April 2008. All business assets are pledged as collateral. | 23,248 | 36,855 |
| Mortgage note, payable in monthly installments of $4,130 including interest at 6.50% with a balloon payment in December 2009. Certain assets held by C.S. Realty, Inc. are pledged as collateral. The cost of these assets is $470,300. | 515,324 | 531,348 |
| Mortgage note, payable in monthly installments of $6,550 including interest at the prime rate plus 0.5% through March 2011. Certain assets held by N.W. Realty of Illinois, Inc. are pledged as collateral. The cost of these assets is $512,464. | 114,780 | 180,969 |

MILLER COOPER & CO., LTD.

NOTE F - LONG-TERM DEBT (Continued)

|  | 2006 | 2005 |
|---|---|---|
| Mortgage note, payable in monthly installments of $3,271 including interest at the prime rate plus 0.5% through August 2012. Certain assets held by Southport Real Estate Co. are pledged as collateral. The cost of these assets is $1,141,708. | 6,800 | 46,644 |
| Notes payable, finance companies, with monthly installments ranging from $1,321 to $2,602 including interest ranging from 4.99% to 6.85%, expiring at various dates through July 2009. All business assets are pledged as collateral. | 162,743 | 238,754 |
|  | 2,439,590 | 2,888,737 |
| Less current maturities | 439,003 | 450,826 |
|  | $ 2,000,587 | $ 2,437,911 |

Maturities of long-term debt are as follows:

| | |
|---|---|
| 2007 | $ 439,003 |
| 2008 | 400,933 |
| 2009 | 823,984 |
| 2010 | 249,214 |
| 2011 | 526,456 |
|  | $ 2,439,590 |

MILLER COOPER & CO., LTD.

## NOTE G - EMPLOYEE BENEFIT PLANS

The Companies have a 401(k) profit sharing plan covering all nonunion employees. The Companies' contributions to the plan approximated $3,000 and $14,000 in 2006 and 2005, respectively.

Additionally, in accordance with a collective bargaining agreement, the Companies have a union-sponsored pension plan covering all union employees. The contributions to this plan approximated $515,000 and $448,000 in 2006 and 2005, respectively. The plan is administered by representatives of the trade union. Accordingly, the Companies have no knowledge or control over the funding assumptions and methods employed. If the Companies were to withdraw from the plan or should the plan terminate, the Companies would be required to contribute an amount equal to its portion of any unfunded liability. The Companies' liability, if any, is not presently determinable; therefore, no amount has been recorded for any contingent unfunded liability.

## NOTE H - COMMITMENTS

The Companies lease three locations under operating leases from affiliated companies owned by one of the stockholders. The affiliated companies are variable interest entities (see Note J). Under the leases, the Companies are responsible for insurance, maintenance costs, and real estate taxes. Monthly rent payments, which include various insurance and maintenance costs, were $25,400 for 2006 and 2005. The leases expire at various dates through January 2013.

B.M.D.I., Inc. also leases a location under an operating lease from an unrelated party. Under the lease, B.M.D.I., Inc. is responsible for insurance, maintenance costs, and real estate taxes. Monthly rent payments, which include various insurance and maintenance costs, were approximately $1,900 and $7,600 in 2006 and 2005, respectively. The lease expired in April 2006.

MILLER COOPER & CO., LTD.

## NOTE H - COMMITMENTS (Continued)

Rent expense for the operating locations was $285,322 and $307,549 in 2006 and 2005, respectively.

At December 31, 2006, future minimum rental payments under operating leases are as follows:

| | | |
|---|---|---:|
| 2007 | $ | 304,800 |
| 2008 | | 262,800 |
| 2009 | | 262,800 |
| 2010 | | 262,800 |
| 2011 | | 262,800 |
| Thereafter | | 262,800 |
| | $ | 1,618,800 |

## NOTE I - CONCENTRATIONS OF RISK

1.  General

    The Companies grant credit to most of their customers who are contractors. These contractors are primarily located in, but not limited to, the Midwestern United States.

2.  Uninsured Cash

    The Companies also maintain cash balances at several financial institutions located in Illinois and Wisconsin. Each individual Company's accounts at each institution are insured by the Federal Deposit Insurance Corporation up to $100,000 per institution. Uninsured balances approximated $166,000 at December 31, 2006.

3.  Significant Customer

    In 2006, the Company had one customer that represented eleven percent of total net sales. At December 31, 2006, the Company had outstanding accounts receivable from this customer totaling $200,583.

MILLER COOPER & CO., LTD.

## NOTE J - CONSOLIDATION OF VARIABLE INTEREST ENTITIES

In January 2003, the Financial Accounting Standards Board issued Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46) and its amendment, Interpretation 46R. This Interpretation establishes standards for identifying variable interest entities and for determining the circumstances when a variable interest entity should be consolidated with its primary beneficiary. The Companies lease operating facilities from the Affiliates, entities established for the sole purpose of acquiring and leasing the building and land. Under FIN 46R, the Affiliates are variable interest entities as the Companies are the primary beneficiary, the Affiliates' stockholder has personally guaranteed the note payable for the Company, and the Affiliates assets are used as collateral for the note payable of the Company. Therefore, the Companies have consolidated the Affiliates in its consolidated financial statements.

## NOTE K - NEW ACCOUNTING PRONOUNCEMENT

FASB Interpretation No. 48 (FIN 48), *Accounting for Uncertainty in Income Taxes,* was issued in June 2006. FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with FASB Statement No. 109, *Accounting for Income Taxes.* This Interpretation prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. This Interpretation also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. The requirements of FIN 48 are effective for fiscal years beginning after December 15, 2006. The Company does not know the impact that this Interpretation will have on its consolidated financial statements.

MILLER COOPER & CO., LTD.

SUPPLEMENTAL INFORMATION

# Northwest Building Materials & Supply Co. and Affiliated Companies
## CONSOLIDATING BALANCE SHEETS
### December 31, 2006
#### (See Independent Accountants' Report)

| ASSETS | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---|---|---|---|
| **CURRENT ASSETS** | | | | |
| Accounts receivable, net of allowance for doubtful accounts of $145,000 | $ 3,040,416 | $ - | $ - | $ 3,040,416 |
| Inventories | 2,201,981 | - | - | 2,201,981 |
| Prepaid expenses and other | 755,255 | 43,117 | - | 798,372 |
| Total current assets | 5,997,652 | 43,117 | - | 6,040,769 |
| **NET ADVANCES TO CONSOLIDATED AFFILIATES** | 832,195 | (832,195) | - | - |
| **NET ADVANCES TO UNCONSOLIDATED AFFILIATES** | 1,372,666 | 38,563 | - | 1,411,229 |
| **PROPERTY AND EQUIPMENT** | | | | |
| Land | - | 516,653 | - | 516,653 |
| Buildings | - | 1,707,818 | - | 1,707,818 |
| Vehicles | 2,422,105 | - | - | 2,422,105 |
| Leasehold improvements | 341,264 | - | - | 341,264 |
| Office equipment | 474,446 | - | - | 474,446 |
| Yard equipment | 309,613 | - | - | 309,613 |
| Transportation equipment | 307,268 | - | - | 307,268 |
| | 3,854,696 | 2,224,471 | - | 6,079,167 |
| Less accumulated depreciation | 3,097,857 | 1,140,277 | - | 4,238,134 |
| | 756,839 | 1,084,194 | - | 1,841,033 |
| **DUE FROM STOCKHOLDER** | 2,725,112 | 624,917 | - | 3,350,029 |
| | $ 11,684,464 | $ 958,596 | $ - | $ 12,643,060 |

| LIABILITIES AND STOCKHOLDERS' EQUITY | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---|---|---|---|
| CURRENT LIABILITIES | | | | |
| Cash overdraft | $ 581,292 | $ (39,235) | $ - | $ 542,057 |
| Note payable, bank | 1,500,000 | - | - | 1,500,000 |
| Current maturities of long-term debt | 350,329 | 88,674 | - | 439,003 |
| Accounts payable | 1,793,082 | - | - | 1,793,082 |
| Accrued expenses | 293,086 | 2,116 | - | 295,202 |
| Customer deposits | 31,353 | - | - | 31,353 |
| Total current liabilities | 4,549,142 | 51,555 | - | 4,600,697 |
| | | | | |
| LONG-TERM OBLIGATIONS | | | | |
| Long-term debt, net of current maturities | 1,452,357 | 548,230 | - | 2,000,587 |
| Notes payable, officers | 1,945,604 | - | - | 1,945,604 |
| | 3,397,961 | 548,230 | - | 3,946,191 |
| | | | | |
| STOCKHOLDERS' EQUITY | | | | |
| Common stock | 16,200 | 2,100 | - | 18,300 |
| Additional paid-in capital | 18,473 | - | - | 18,473 |
| Retained earnings | 3,702,688 | 356,711 | - | 4,059,399 |
| | 3,737,361 | 358,811 | - | 4,096,172 |
| | | | | |
| | $ 11,684,464 | $ 958,596 | $ - | $ 12,643,060 |

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
## CONSOLIDATING BALANCE SHEETS
December 31, 2005
(See Independent Accountants' Report)

| ASSETS | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---|---|---|---|
| CURRENT ASSETS | | | | |
| Cash | $ 9,533 | $ 44,817 | $ - | $ 54,350 |
| Accounts receivable, net of allowance for doubtful accounts of $73,000 | 3,471,047 | - | - | 3,471,047 |
| Inventories | 2,074,460 | - | - | 2,074,460 |
| Prepaid expenses and other | 735,618 | 45,684 | - | 781,302 |
| Total current assets | 6,290,658 | 90,501 | - | 6,381,159 |
| NET ADVANCES TO CONSOLIDATED AFFILIATES | 813,795 | (813,795) | - | - |
| NET ADVANCES TO UNCONSOLIDATED AFFILIATES | 1,357,913 | 19,662 | - | 1,377,575 |
| PROPERTY AND EQUIPMENT | | | | |
| Land | - | 516,653 | - | 516,653 |
| Buildings | - | 1,707,818 | - | 1,707,818 |
| Vehicles | 2,422,105 | - | - | 2,422,105 |
| Leasehold improvements | 341,264 | - | - | 341,264 |
| Office equipment | 474,446 | - | - | 474,446 |
| Yard equipment | 305,715 | - | - | 305,715 |
| Transportation equipment | 307,268 | - | - | 307,268 |
| | 3,850,798 | 2,224,471 | - | 6,075,269 |
| Less accumulated depreciation | 2,975,453 | 1,091,424 | - | 4,066,877 |
| | 875,345 | 1,133,047 | - | 2,008,392 |
| DUE FROM STOCKHOLDER | 2,524,763 | 624,917 | - | 3,149,680 |
| | $ 11,862,474 | $ 1,054,332 | $ - | $ 12,916,806 |

| LIABILITIES AND STOCKHOLDERS' EQUITY | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---|---|---|---|
| CURRENT LIABILITIES | | | | |
| Note payable, bank | $ 1,500,000 | $ - | $ - | $ 1,500,000 |
| Current maturities of long-term debt | 330,949 | 119,877 | - | 450,826 |
| Accounts payable | 1,773,053 | - | - | 1,773,053 |
| Accrued expenses | 347,093 | 2,116 | - | 349,209 |
| Customer deposits | 29,749 | - | - | 29,749 |
| Total current liabilities | 3,980,844 | 121,993 | - | 4,102,837 |
| | | | | |
| LONG-TERM OBLIGATIONS | | | | |
| Long-term debt, net of current maturities | 1,798,827 | 639,084 | - | 2,437,911 |
| Notes payable, officers | 1,957,304 | - | - | 1,957,304 |
| | 3,756,131 | 639,084 | - | 4,395,215 |
| | | | | |
| STOCKHOLDERS' EQUITY | | | | |
| Common stock | 16,200 | 2,100 | - | 18,300 |
| Additional paid-in capital | 18,473 | - | - | 18,473 |
| Retained earnings | 4,090,826 | 291,155 | - | 4,381,981 |
| | 4,125,499 | 293,255 | - | 4,418,754 |
| | | | | |
| | $ 11,862,474 | $ 1,054,332 | $ - | $ 12,916,806 |

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
CONSOLIDATING STATEMENTS OF OPERATIONS
December 31, 2006
(See Independent Accountants' Report)

| | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---:|---:|---:|---:|
| Net sales | $ 24,633,688 | $ 235,755 | $ (235,755) | $ 24,633,688 |
| Cost of goods sold | 19,541,267 | - | - | 19,541,267 |
| Gross profit | 5,092,421 | 235,755 | (235,755) | 5,092,421 |
| Operating expenses | | | | |
| Delivery and yard | 2,239,644 | - | (235,755) | 2,003,889 |
| Selling, general, and administrative | 3,067,951 | 114,583 | - | 3,182,534 |
| | 5,307,595 | 114,583 | (235,755) | 5,186,423 |
| Operating income (loss) | (215,174) | 121,172 | - | (94,002) |
| Other income (expense) | | | | |
| Interest income | 188,706 | - | - | 188,706 |
| Interest expense | (416,579) | (52,435) | - | (469,014) |
| Other income (expense), net | 54,909 | (3,181) | - | 51,728 |
| | (172,964) | (55,616) | - | (228,580) |
| NET INCOME (LOSS) | $ (388,138) | $ 65,556 | $ - | $ (322,582) |

-23-

# Northwest Building Materials & Supply Co. and Affiliated Companies
CONSOLIDATING STATEMENTS OF OPERATIONS
December 31, 2005
(See Independent Accountants' Report)

| | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---|---|---|---|
| Net sales | $ 25,087,371 | $ 245,974 | $ (245,974) | $ 25,087,371 |
| Cost of goods sold | 19,916,112 | - | - | 19,916,112 |
| Gross profit | 5,171,259 | 245,974 | (245,974) | 5,171,259 |
| Operating expenses | | | | |
| Delivery and yard | 1,841,032 | - | (245,974) | 1,595,058 |
| Selling, general, and administrative | 3,397,881 | 136,000 | - | 3,533,881 |
| | 5,238,913 | 136,000 | (245,974) | 5,128,939 |
| Operating income (loss) | (67,654) | 109,974 | - | 42,320 |
| Other income (expense) | | | | |
| Interest income | 144,630 | - | - | 144,630 |
| Interest expense | (314,115) | (53,882) | - | (367,997) |
| Other income (expense), net | 4,795 | (4,502) | - | 293 |
| | (164,690) | (58,384) | - | (223,074) |
| NET INCOME (LOSS) | $ (232,344) | $ 51,590 | $ - | $ (180,754) |

MILLER COOPER & CO, LTD.

#288001
P600101

(OCR stamp)

| ACCT NO | DESCRIPTION | CURRENT YEAR | LAST YEAR |
|---------|-------------|--------------|-----------|
| | **ASSETS** | | |
| | **CURRENT ASSETS** | | |
| | **CASH ITEMS** | | |
| 101 | DEPOSITORY-MAIN BANK FV | (971294.55) | (798758.61) |
| 102 | DEPOSITORY WESTBANK NV | .00 | .00 |
| 103 | PAYROLL BANK ACCT | (23367.16) | (136796.13) |
| 105 | PETTY CASH-CORP CT | 1000.00 | 1000.00 |
| 108 | CASH IN DRAWER (CORP) | .00 | .00 |
| | TOTAL CASH | (993661.71) | (934554.74) |
| | | .0% | .0% |
| | **ACCOUNTS RECEIVABLE** | | |
| 110 | ACCOUNTS RECEIVABLE | .00 | .00 |
| 112 | RESERVE FOR DOUBTFUL ACCOUNTS | .00 | .00 |
| | TOTAL ACCOUNTS RECEIVABLE | .00 | .00 |
| | | .0% | .0% |
| | **OTHER RECEIVABLES** | | |
| 123 | DUE FROM CHARMAR | 689872.50 | 689872.50 |
| 124 | OFFICER RECVBL CORP | 2589342.10 | 2577698.92 |
| 125 | OTHER RECEIVABLES | 313914.49 | 93816.49 |
| 126 | DUE FROM SOUTHPORT REAL ESTATE | 775496.60 | 775496.60 |
| 127 | PROF. LEASING RECVBL | 198426.36 | 198426.36 |
| 128 | NW REALTY FL RECVBL | .00 | .00 |
| 129 | NW REALTY IL (FV-LEX-BLK) | (37346.00) | (38083.00) |
| 130 | DUE FROM K & H | 367392.82 | 261148.05 |
| 131 | DUE FROM PRAIRIE VIEW | (5350378.79) | (6032021.77) |
| 132 | DUE FROM NAPERVILLE | 1319463.82 | 3059014.65 |
| 133 | DUE FROM C6 REALTY | (273654.89) | (273654.89) |
| 134 | DUE FROM BADGERLAND | 76500.00 | .00 |
| 135 | DUE FROM B.M.D.I. | 2379189.75 | 2029267.55 |
| 136 | DUE FROM SOUTHPORT | 2516326.62 | 2749091.28 |
| 137 | DUE FROM HUNTLEY | .00 | .00 |
| | TOTAL OTHER RECEIVABLES | 5564545.38 | 6090072.74 |
| | | .0% | .0% |

UNAUDITED


EXHIBIT
Cresak 46
imp 6-4-15

BALANCE SHEET WITH LAST YEAR COMPARISON
AS OF DEC 31, 2006

| ACCT NO | DESCRIPTION | CURRENT YEAR | LAST YEAR |
|---|---|---|---|
| | TOTAL RECEIVABLES | 4570803.67 | 5155510.00 |
| | | .0% | .0% |
| | | | |
| | PRE-PAID ITEMS | | |
| 140 | DEPOSITS | 4475.82 | 4475.82 |
| 142 | PRE-PAID INSURANCE | 60675.81 | (53977.25) |
| 144 | PREPAID LEGAL FEES | .00 | .00 |
| 145 | PREPAID HEALTH INS | 22528.94 | 18971.54 |
| 146 | PREPAID OTHER | .00 | .00 |
| 150 | PRE-PAID TAXES | 298.00 | 298.00 |
| | TOTAL PRE PAID ITEMS | 87978.57 | (30231.89) |
| | | .0% | .0% |
| | | | |
| | TOTAL CURRENT ASSETS | 4658862.24 | 5125286.11 |
| | | .0% | .0% |
| | | | |
| | PROPERTY & EQUIPMENT | | |
| 160 | VEHICLES | 1906581.00 | 1906581.00 |
| 162 | CORP LEASEHOLD IMPROVEMENTS | .00 | .00 |
| 163 | CORP FURN & FIXTURES | 83062.51 | 83062.51 |
| 180 | DEPRECIATION | (1462061.40) | (1461303.40) |
| | NET PROPERTY & EQUIPMENT | 527582.11 | 528340.11 |
| | | .0% | .0% |
| | | | |
| | OTHER ASSETS | | |
| 190 | DEFFERED OTHER EXPENSE | 393084.00 | 393084.00 |
| 191 | DEFERRED INTEREST EXPENSE | .00 | .00 |
| | TOTAL ASSETS | 5579528.35 | 6046710.22 |
| | | .0% | .0% |

UNAUDITED

BALANCE SHEET WITH LAST YEAR COMPARISON
AS OF DEC 31, 2006

| ACCT NO | DESCRIPTION | CURRENT YEAR | LAST YEAR |
|---|---|---|---|
| | LIABILITIES | | |
| | CURRENT LIABILITIES | | |
| | ACCOUNTS PAYABLE | | |
| 219 | ACCRUED ACCOUNTS PAYABLE | .00 | .00 |
| 220 | ACCOUNTS PAYABLE | 27872.77 | 43917.13 |
| | TOTAL ACCOUNTS PAYABLE | 27872.77 | 43917.13 |
| | | .0% | .0% |
| | OTHER CURRENT LIABILITIES | | |
| 211 | SUBURBAN BANK 2088-1 | 1500000.00 | 1500000.00 |
| 214 | INT PAYABLE-OFFICERS | .00 | .00 |
| 218 | DUE TO TO AM EQUIP | (30375.00) | (30375.00) |
| 221 | 401K PLAN MATCHING | 2499.52 | 2237.03 |
| 222 | 401K PLAN | .00 | .00 |
| 223 | ACCRUED PAYROLL | 19090.69 | 31022.48 |
| 224 | PAY TAXES - EMPLOYEE | .00 | (.02) |
| 225 | ACCRUED FICA EMPLOYER | 1445.74 | 551.59 |
| 226 | PAY TAXES STATE - EMPLOYEE | .00 | .00 |
| 227 | ACCRUED UNEMPLOYMENT TAX | .00 | .00 |
| 228 | TAXES | .00 | .00 |
| 229 | SALES TAX - MAGNOLIA | .00 | .00 |
| 230 | DUE TO O.L. REAL ESTATE | (.10) | (76500.10) |
| 260 | ACCRUED PROPERTY TAX | .00 | .00 |
| | TOTAL OTHER CURRENT LIABILITY | 1492660.85 | 1426935.98 |
| | | .0% | .0% |
| | TOTAL CURRENT LIABILITIES | 1520533.62 | 1470853.11 |
| | | .0% | .0% |
| | NOTES PAYABLE | | |
| 262 | SUBURBAN BANK 10278 | .00 | .00 |
| 263 | OFFICER NOTES PAYABLE | 1945603.54 | 1957303.54 |
| 264 | SUBURBAN BANK 1515-2 | .00 | .00 |
| 265 | SUBURBAN BANK 12786 | 270833.48 | 354166.76 |
| 266 | SUBURBAN BANK TERM NOTE | 1345861.77 | 1500000.00 |
| 267 | DUE FROM SUBURBAN BANK | .00 | (224931.05) |
| 281 | NAVISTAR | .00 | .00 |
| 283 | GMAC | .00 | .00 |

UNAUDITED

BALANCE SHEET WITH LAST YEAR COMPARISON
AS OF DEC 31, 2006

| ACCT NO | DESCRIPTION | CURRENT YEAR | LAST YEAR |
|---|---|---|---|
| 284 | DUE TO DIAMOND ACCEPTANCE (LT) | .00 | .00 |
| 285 | NAVISTAR | .00 | .00 |
| | TOTAL NOTES PAYABLE | (3562298.79) | (3586539.25) |
| | | .0% | .0% |
| | TOTAL LIABILITIES | 5082832.41 | 5057392.36 |
| | | .0% | .0% |
| | SHAREHOLDER EQUITY | | |
| 286 | COMMON STOCK | 17000.00 | 17000.00 |
| 288 | PAID IN SURPLUS | 18473.41 | 18473.41 |
| 290 | RETAINED EARNINGS | 1426713.45 | 1453080.63 |
| 291 | PRIOR YEAR ADJUSTMENTS | .00 | .00 |
| 295 | DIVIDENDS PAID | (115301.00) | .00 |
| | NET INCOME/LOSS | (850189.92) | (499236.18) |
| | TOTAL NET WORTH | 496695.94 | 989317.86 |
| | | .0% | .0% |
| | TOTAL LIABILITIES AND EQUITY | 5579528.35 | 6046710.22 |
| | | 0% | .0% |

UNAUDITED

# Northwest Building Materials & Supply Co. and Affiliated Companies

Consolidated Financial Statements and
Independent Accountants' Report

December 31, 2007 and 2006



EXHIBIT
Cieslak #7
Cmp 6-4-15

MILLER COOPER & CO., LTD.

# CONTENTS

|  | Page |
|---|---|
| INDEPENDENT ACCOUNTANTS' REPORT | 3 |
| CONSOLIDATED FINANCIAL STATEMENTS | |
| Consolidated Balance Sheets | 4 - 5 |
| Consolidated Statements of Operations | 6 |
| Consolidated Statements of Equity | 7 |
| Consolidated Statements of Cash Flows | 8 |
| Notes to Consolidated Financial Statements | 9 - 17 |
| SUPPLEMENTAL INFORMATION | |
| Consolidating Balance Sheets | 19 - 22 |
| Consolidating Statements of Operations | 23 - 24 |



# MILLER
# COOPER
# &Co., Ltd

Accountants and Consultants

## INDEPENDENT ACCOUNTANTS' REPORT

To the Board of Directors
Northwest Building Materials & Supply Co. and Affiliated Companies

We have reviewed the accompanying consolidated balance sheets of Northwest Building Materials & Supply Co. and Affiliated Companies as of December 31, 2007 and 2006, and the related consolidated statements of operations, equity, and cash flows for the years then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. All of the information included in these consolidated financial statements is the representation of the management of Northwest Building Materials & Supply Co. and Affiliated Companies.

A review consists principally of inquiries of Company personnel and analytical procedures applied to financial data. It is substantially less in scope than an audit in accordance with auditing standards generally accepted in the United States of America, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to the accompanying consolidated financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America.

Our reviews were made for the purpose of expressing limited assurance that there are no material modifications that should be made to the basic consolidated financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America. The supplementary information on pages 19 through 24 is presented for purposes of additional analysis and is not a required part of the basic consolidated financial statements. Such information has not been subjected to the inquiry and analytical procedures applied in the reviews of the basic consolidated financial statements, but was compiled from information that is the representation of management, without audit review, and we do not express an opinion or any other form of assurance on such information.

MILLER, COOPER & CO., LTD.

*Miller Cooper & Co., Ltd.*

Certified Public Accountants

Deerfield, Illinois
February 11, 2009

1751 Lake Cook Road, Suite 400, Deerfield, IL 60015 ■ 500 West Madison Street, Suite 3350, Chicago, IL 60661
847.205.5000 ■ Fax 847.205.1400 ■ www.millercooper.com


BAKER TILLY
INTERNATIONAL

CONSOLIDATED FINANCIAL STATEMENTS

# Northwest Building Materials & Supply Co. and Affiliated Companies
## CONSOLIDATED BALANCE SHEETS
December 31, 2007 and 2006
(See Independent Accountants' Report)

| ASSETS | 2007 | 2006 |
|---|---:|---:|
| **CURRENT ASSETS** | | |
| Cash | $ 45,721 | $ 39,235 |
| Accounts receivable, net of allowance for doubtful accounts | | |
| of $70,290 and $145,000 for 2007 and 2006, respectively | 2,556,531 | 3,040,416 |
| Inventories | 2,179,597 | 2,201,981 |
| Prepaid expenses and other | 705,992 | 798,372 |
| Total current assets | 5,487,841 | 6,080,004 |
| **NET ADVANCES TO UNCONSOLIDATED AFFILIATES** | 1,449,430 | 1,411,229 |
| **PROPERTY AND EQUIPMENT** | | |
| Land | 516,653 | 516,653 |
| Buildings | 1,707,818 | 1,707,818 |
| Vehicles | 2,422,105 | 2,422,105 |
| Leasehold improvements | 351,456 | 341,264 |
| Office equipment | 494,839 | 474,446 |
| Yard equipment | 364,285 | 309,613 |
| Transportation equipment | 307,268 | 307,268 |
| | 6,164,424 | 6,079,167 |
| Less accumulated depreciation | 4,416,815 | 4,238,134 |
| | 1,747,609 | 1,841,033 |
| **DUE FROM STOCKHOLDER** | 3,313,612 | 3,350,029 |
| | $ 11,998,492 | $ 12,682,295 |

The accompanying notes are an integral part of these statements.

| LIABILITIES AND STOCKHOLDERS' EQUITY | | 2007 | | 2006 |
|---|---|---|---|---|
| **CURRENT LIABILITIES** | | | | |
| Cash overdraft | $ | 270,630 | $ | 581,292 |
| Note payable, bank | | 1,500,000 | | 1,500,000 |
| Current maturities of long-term debt | | 393,185 | | 439,003 |
| Accounts payable | | 2,300,720 | | 1,793,082 |
| Accrued expenses | | 341,638 | | 295,202 |
| Customer deposits | | 17,855 | | 31,353 |
| Total current liabilities | | 4,824,028 | | 4,639,932 |
| **LONG-TERM OBLIGATIONS** | | | | |
| Long-term debt, net of current maturities | | 1,590,365 | | 2,000,587 |
| Notes payable, officers | | 2,133,650 | | 1,945,604 |
| | | 3,724,015 | | 3,946,191 |
| **STOCKHOLDERS' EQUITY** | | | | |
| Common stock, $1 par value; 18,300 shares | | | | |
| authorized, issued, and outstanding | | 18,300 | | 18,300 |
| Additional paid-in capital | | 18,473 | | 18,473 |
| Retained earnings | | 3,413,676 | | 4,059,399 |
| | | 3,450,449 | | 4,096,172 |
| | $ | 11,998,492 | $ | 12,682,295 |

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
## CONSOLIDATED STATEMENTS OF OPERATIONS
### Years ended December 31, 2007 and 2006
#### (See Independent Accountants' Report)

|                                        | 2007        | 2006        |
|----------------------------------------|-------------|-------------|
| Net sales                              | $ 21,433,425 | $ 24,633,688 |
| Cost of goods sold                     | 16,441,185  | 19,541,267  |
| Gross profit                           | 4,992,240   | 5,092,421   |
| Operating expenses                     |             |             |
| Delivery and yard                      | 2,347,912   | 2,003,889   |
| Selling, general, and administrative   | 3,107,375   | 3,182,534   |
|                                        | 5,455,287   | 5,186,423   |
| Operating loss                         | (463,047)   | (94,002)    |
| Other income (expense)                 |             |             |
| Interest income                        | 236,210     | 188,706     |
| Interest expense                       | (417,097)   | (469,014)   |
| Other income (expense), net            | (1,789)     | 51,728      |
|                                        | (182,676)   | (228,580)   |
| NET LOSS                               | $ (645,723) | $ (322,582) |

The accompanying notes are an integral part of these statements.

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
CONSOLIDATED STATEMENTS OF EQUITY
Years ended December 31, 2007 and 2006
(See Independent Accountants' Report)

|  | Common Stock | Additional Paid-In Capital | Retained Earnings | Total Equity |
|---|---|---|---|---|
| Balance at January 1, 2006 | $ 18,300 | $ 18,473 | $ 4,381,981 | $ 4,418,754 |
| Stockholder dividends | - | - | - | - |
| Net loss | - | - | (322,582) | (322,582) |
| Balance at December 31, 2006 | 18,300 | 18,473 | 4,059,399 | 4,096,172 |
| Net loss | - | - | (645,723) | (645,723) |
| Balance at December 31, 2007 | $ 18,300 | $ 18,473 | $ 3,413,676 | $ 3,450,449 |

The accompanying notes are an integral part of these statements.

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### Years ended December 31, 2007 and 2006
#### (See Independent Accountants' Report)

|  | 2007 | 2006 |
|---|---|---|
| Cash flows from operating activities |  |  |
| Net loss | $ (645,723) | $ (322,582) |
| Adjustments to reconcile net loss to net cash |  |  |
| provided by operating activities |  |  |
| Depreciation | 178,681 | 171,257 |
| Bad debt expense | 2,924 | 119,234 |
| (Increase) decrease in assets |  |  |
| Accounts receivable | 480,961 | 311,397 |
| Inventories | 22,384 | (127,521) |
| Prepaid expenses and other | 92,380 | (17,070) |
| Increase (decrease) in liabilities |  |  |
| Accounts payable | 507,638 | 20,029 |
| Accrued expenses | 46,436 | (54,007) |
| Customer deposits | (13,498) | 1,604 |
| Net cash provided by operating activities | 672,183 | 102,341 |
| Cash flows from investing activities |  |  |
| Purchases of equipment | (85,257) | (3,898) |
| Net (advances to) repayments from stockholder | 36,417 | (200,349) |
| Net advances to unconsolidated affiliates | (38,201) | (33,654) |
| Net cash used in investing activities | (87,041) | (237,901) |
| Cash flows from financing activities |  |  |
| Increase (decrease) in cash overdraft | (310,662) | 581,292 |
| Repayments on long-term debt | (456,040) | (449,147) |
| Proceeds from notes payable, officers | 190,000 | - |
| Repayments on notes payable, officers | (1,954) | (11,700) |
| Net cash provided by (used in) financing activities | (578,656) | 120,445 |
| INCREASE (DECREASE) IN CASH | 6,486 | (15,115) |
| Cash, beginning of year | 39,235 | 54,350 |
| Cash, end of year | $ 45,721 | $ 39,235 |
| Supplemental disclosure of cash flow information |  |  |
| Interest paid during the year | $ 417,097 | $ 469,014 |

The accompanying notes are an integral part of these statements.

-8-

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies

## NOTE A - NATURE OF BUSINESS, BASIS OF CONSOLIDATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

1. **Nature of Business**

   The Companies primarily operate as distributors of building materials to various contractors. The Companies also operate retail locations for the sale of related building products. The consolidated affiliated companies lease operating facilities to the Companies.

2. **Basis of Consolidation**

   The consolidated financial statements include the following entities (collectively, the Companies): Northwest Building Materials & Supply Co. (the Company), Northwest Building Materials of Illinois, Inc. (Prairie View and Naperville), Southport Lumber and Supply Company (Southport), and B.M.D.I., Inc., which are all under common control.

   The consolidated financial statements also include the following entities (collectively, the Affiliates): C.S. Realty, Inc., N.W. Realty of Illinois, Inc., and Southport Real Estate Co., each of which has been identified as a variable interest entity (VIE), with the Companies as primary beneficiary. Therefore, these entities have been consolidated in these financial statements (see Note J).

   All significant intercompany accounts and transactions have been eliminated in consolidation.

3. **Receivables and Credit Policies**

   Accounts receivable are uncollateralized customer obligations due under normal trade terms requiring payment within thirty days from the invoice date. Accounts receivable are stated at the amounts billed to the customers. Customer account balances with invoices dated over ninety days old are considered delinquent. Interest is charged on past due balances at an annual percentage rate of 18%. Payments of accounts receivable are allocated to the specific invoices identified on the customer's remittance advice or, if unspecified, are applied to the earliest unpaid invoices.

MILLER COOPER & CO., LTD.

**Northwest Building Materials & Supply Co. and Affiliated Companies**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2007 and 2006
(See Independent Accountants' Report)

---

NOTE A - NATURE OF BUSINESS, BASIS OF CONSOLIDATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

3.  Receivables and Credit Policies (Continued)

The carrying amount of accounts receivable is reduced by a valuation allowance that reflects management's best estimate of the amounts that will not be collected. Management individually reviews all accounts receivable balances that exceed 90 days from the invoice date and, based on an assessment of current creditworthiness, estimates the portion, if any, of the balance that will not be collected.

4.  Inventory

Inventory consists of lumber, retail goods, and other construction inventories and are valued at the lower of cost (first-in, first-out basis) (FIFO) or market.

5.  Property and Equipment

Property and equipment are stated at cost. Depreciation of property and equipment is provided using the straight-line methods and accelerated methods over the estimated useful lives of the respective assets. Estimated useful lives are as follows:

|  | Years |
|---|---|
| Buildings | 39 years |
| Vehicles | 3 - 6 years |
| Leasehold improvements | Life of leases |
| Office and yard equipment | 5 - 7 years |
| Transportation equipment | 5 - 7 years |

MILLER COOPER & CO., LTD.

NOTE A - NATURE OF BUSINESS, BASIS OF CONSOLIDATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

6.  Income Taxes

The Companies, N.W. Realty of Illinois, Inc., and C.S. Realty, Inc. have elected to be S Corporations for federal income tax purposes under the Internal Revenue Code. In lieu of corporate income taxes, the stockholders of an S Corporation are taxed on their proportionate shares of the Company's taxable income. Therefore, no liability or provision for federal income taxes has been included in these consolidated financial statements. The Companies are subject to certain state taxes.

Southport Real Estate Co. has elected to be a C Corporation for federal income tax purposes under the Internal Revenue Code. Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carryforwards and deferred tax liabilities are recognized for taxable temporary differences.

Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment. There were no deferred tax assets or liabilities as of December 31, 2007.

7.  Use of Estimates

In preparing financial statements, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

8.  Advertising

Advertising costs are expensed as incurred. Total advertising expense was $50,124 and $46,239 for 2007 and 2006, respectively.

-11-

## Northwest Building Materials & Supply Co. and Affiliated Companies
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2007 and 2006
<u>(See Independent Accountants' Report)</u>

## NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCONSOLIDATED AFFILIATES

The Companies and Affiliates have net advances to related entities which are owned and operated by the Companies' stockholders as follows:

|  | 2007 | 2006 |
|---|---|---|
| Charmar Realty, Inc. | $ 824,240 | $ 807,576 |
| Professional Leasing, Inc. | 186,155 | 175,162 |
| K & H Cartage Co. | 408,660 | 398,116 |
| Other | 30,375 | 30,375 |
|  | $ 1,449,430 | $ 1,411,229 |

Professional leasing, Inc. (Professional) leases equipment to the operating companies. Lease expense paid to Professional was approximately $342,000 and $350,000 for the years ended December 31, 2007 and 2006, respectively. K&H Cartage Co. (K&H) provides Cartage services to B.M.D.I., Inc. Cartage expense paid to K&H was approximately $642,000 and $649,000 for the years ended December 31, 2007 and 2006, respectively.

## NOTE C - DUE FROM STOCKHOLDER

The Companies and Affiliates have uncollateralized advances to a stockholder of $3,313,612 and $3,350,029 as of December 31, 2007 and 2006, respectively. Effective January 1, 2002, the advances bear interest at the prime rate (7.25% at December 31, 2007) minus 0.5%. The note was noninterest-bearing prior to 2002. Principal and interest are due on demand. The Companies are not expected to demand repayment within the next year; therefore, the balance has been classified as long-term in the accompanying consolidated balance sheet.

## NOTE D - NOTES PAYABLE, BANK

The note payable, bank consists of a revolving line of credit with interest at the prime rate (7.25% at December 31, 2007) plus 2%, expiring June 1, 2008. The note is collateralized by various business assets of the Companies and personal guarantees by the Companies' stockholders and an affiliate. The Company is required to comply with certain financial covenants. The outstanding balance was $1,500,000 as of December 31, 2007 and 2006.

MILLER COOPER & CO., LTD.

# Northwest Building Materials & Supply Co. and Affiliated Companies

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

December 31, 2007 and 2006

(See Independent Accountants' Report)

## NOTE E - NOTES PAYABLE, OFFICERS

Unsecured notes payable to officers are due on demand and bear interest at the prime rate (7.25% at December 31, 2007). The balance was $2,133,650 and $1,943,650 as of December 31, 2007 and 2006, respectively. The officers are not expected to demand repayment during the next year; therefore, the notes have been classified as long-term in the accompanying consolidated balance sheet.

## NOTE F - LONG-TERM DEBT

|  | 2007 | 2006 |
|---|---|---|
| Bank note, payable in monthly installments of $6,944 plus interest at the prime rate plus 0.5% through March 2010. The note is collateralized by real estate owned by one of the Companies' stockholders. | $ 187,500 | $ 270,833 |
| Bank note, payable in monthly installments of $23,099 including interest at 7.50% through January 1, 2011. The note is collateralized by various business assets of the Companies. | 1,163,637 | 1,345,862 |
| Bank note, payable in monthly installments of $1,414 including interest at 6.00% through April 2008. All business assets are pledged as collateral. | 4,171 | 23,248 |
| Mortgage note, payable in monthly installments of $4,130 including interest at 6.50% with a balloon payment in December 2009. Certain assets held by C.S. Realty, Inc. are pledged as collateral. The cost of these assets is $470,300. | 493,318 | 515,324 |
| Mortgage note, payable in monthly installments of $6,550 including interest at the prime rate plus 0.5% through March 2011. Certain assets held by N.W. Realty of Illinois, Inc. are pledged as collateral. The cost of these assets is $512,464. | 43,777 | 114,780 |

-13-

# Northwest Building Materials & Supply Co. and Affiliated Companies
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### December 31, 2007 and 2006
#### (See Independent Accountants' Report)

## NOTE F - LONG-TERM DEBT (Continued)

|  | 2007 | 2006 |
|---|---|---|
| Mortgage note, payable in monthly installments of $3,271 including interest at the prime rate plus 0.5%. The note was fully repaid in 2007. Certain assets held by Southport Real Estate Co. was pledged as collateral. The cost of these assets is $1,141,708. | $         - | $       6,800 |
| Notes payable, finance companies, with monthly installments ranging from $1,321 to $2,602 including interest ranging from 4.99% to 6.85%, expiring at various dates through July 2009. All business assets are pledged as collateral. | 91,147 | 162,743 |
|  | 1,983,550 | 2,439,590 |
| Less current maturities | 393,185 | 439,003 |
|  | $  1,590,365 | $  2,000,587 |

Maturities of long-term debt are as follows:

| | |
|---|---|
| 2008 | $      393,185 |
| 2009 | 814,444 |
| 2010 | 249,209 |
| 2011 | 526,712 |
| | $   1,983,550 |

MILLER COOPER & CO., LTD.

## NOTE G - EMPLOYEE BENEFIT PLANS

The Companies have a 401(k) profit sharing plan covering all nonunion employees. The Companies' contributions to the plan approximated $3,000 in 2006. There were no contributions in 2007.

Additionally, in accordance with a collective bargaining agreement, the Companies have a union-sponsored pension plan covering all union employees. The contributions to this plan approximated $697,000 and $515,000 in 2007 and 2006, respectively. The plan is administered by representatives of the trade union. Accordingly, the Companies have no knowledge or control over the funding assumptions and methods employed. If the Companies were to withdraw from the plan or should the plan terminate, the Companies would be required to contribute an amount equal to its portion of any unfunded liability. The Companies' liability, if any, is not presently determinable; therefore, no amount has been recorded for any contingent unfunded liability.

## NOTE H - COMMITMENTS

The Companies lease three locations under operating leases from affiliated companies owned by one of the stockholders. The affiliated companies are variable interest entities (see Note J). Under the leases, the Companies are responsible for insurance, maintenance costs, and real estate taxes. Monthly rent payments, which include various insurance and maintenance costs, were $25,400 for 2007 and 2006. The leases expire at various dates through January 2013.

B.M.D.I., Inc. also leases a location under an operating lease from an unrelated party. Under the lease, B.M.D.I., Inc. is responsible for insurance, maintenance costs, and real estate taxes. Monthly rent payments, which include various insurance and maintenance costs, were approximately $1,900 in 2006. The lease expired in April 2006.

MILLER COOPER & CO., LTD.

## NOTE H - COMMITMENTS (Continued)

Rent expense for the operating locations was $231,424 and $285,322 in 2007 and 2006, respectively.

At December 31, 2007, future minimum rental payments under operating leases are as follows:

| | | |
|---|---|---:|
| 2008 | $ | 262,800 |
| 2009 | | 262,800 |
| 2010 | | 262,800 |
| 2011 | | 262,800 |
| 2012 | | 262,800 |
| Thereafter | | 21,900 |
| | $ | 1,335,900 |

## NOTE I - CONCENTRATIONS OF RISK

1.  Underline{General}

    The Companies grant credit to most of their customers who are contractors. These contractors are primarily located in, but not limited to, the Midwestern United States.

2.  Uninsured Cash

    The Companies also maintain cash balances at several financial institutions located in Illinois and Wisconsin. Each individual Company's accounts at each institution are insured by the Federal Deposit Insurance Corporation up to $100,000 per institution. There are no uninsured balances at December 31, 2007.

3.  Significant Customers

    In 2007, the Company had three customers that represented 15%, 11%, and 12% of net sales. At December 31, 2007, the Company had outstanding accounts receivable from these customers totaling $612,000. In 2006, the Company had one customer that represented 11% of total net sales. At December 31, 2006, the Company had outstanding accounts receivable from this customer totaling approximately $201,000.

-16-

## NOTE J - CONSOLIDATION OF VARIABLE INTEREST ENTITIES

In January 2003, the Financial Accounting Standards Board issued Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46) and its amendment, Interpretation 46R. This Interpretation establishes standards for identifying variable interest entities and for determining the circumstances when a variable interest entity should be consolidated with its primary beneficiary. The Companies lease operating facilities from the Affiliates, entities established for the sole purpose of acquiring and leasing the building and land. Under FIN 46R, the Affiliates are variable interest entities as the Companies are the primary beneficiary, the Affiliates' stockholder has personally guaranteed the note payable for the Company, and the Affiliates assets are used as collateral for the note payable of the Company. Therefore, the Companies have consolidated the Affiliates in its consolidated financial statements.

## NOTE K - NEW ACCOUNTING PRONOUNCEMENTS

FAS Interpretation No. 48 (FIN 48), Accounting for Uncertainty in Income Taxes, was issued in June 2006. FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with FASB Statement No. 109, Accounting for Income Taxes. This Interpretation prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. This Interpretation also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. The requirements of FIN 48 are effective for fiscal years beginning after December 15, 2008. The Company does not know the impact that this Interpretation will have on its consolidated financial statements.

## NOTE L - RECLASSIFICATION

Certain reclassifications have been made to the 2006 consolidated financial statements to conform to the 2007 presentation.

MILLER COOPER & CO., LTD.

SUPPLEMENTAL INFORMATION

# Northwest Building Materials & Supply Co. and Affiliated Companies
CONSOLIDATING BALANCE SHEETS
December 31, 2007
(See Independent Accountants' Report)

| ASSETS | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---|---|---|---|
| **CURRENT ASSETS** | | | | |
| Cash | $ - | $ 45,721 | $ - | $ 45,721 |
| Accounts receivable, net of allowance for doubtful accounts of $70,290 | 2,556,531 | - | - | 2,556,531 |
| Inventories | 2,179,597 | - | - | 2,179,597 |
| Prepaid expenses and other | 665,367 | 40,625 | - | 705,992 |
| Total current assets | 5,401,495 | 86,346 | - | 5,487,841 |
| **NET ADVANCES TO CONSOLIDATED AFFILIATES** | 829,968 | (829,968) | - | - |
| **NET ADVANCES TO UNCONSOLIDATED AFFILIATES** | 1,410,867 | 38,563 | - | 1,449,430 |
| **PROPERTY AND EQUIPMENT** | | | | |
| Land | - | 516,653 | - | 516,653 |
| Buildings | - | 1,707,818 | - | 1,707,818 |
| Vehicles | 2,422,105 | - | - | 2,422,105 |
| Leasehold improvements | 351,456 | - | - | 351,456 |
| Office equipment | 494,839 | - | - | 494,839 |
| Yard equipment | 364,285 | - | - | 364,285 |
| Transportation equipment | 307,268 | - | - | 307,268 |
| | 3,939,953 | 2,224,471 | - | 6,164,424 |
| Less accumulated depreciation | 3,230,875 | 1,185,940 | - | 4,416,815 |
| | 709,078 | 1,038,531 | - | 1,747,609 |
| **DUE FROM STOCKHOLDER** | 2,688,695 | 624,917 | - | 3,313,612 |
| | $ 11,040,103 | $ 958,389 | $ - | $ 11,998,492 |

| LIABILITIES AND STOCKHOLDERS' EQUITY | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---|---|---|---|
| CURRENT LIABILITIES | | | | |
| Cash overdraft | $ 270,630 | $ - | $ - | $ 270,630 |
| Note payable, bank | 1,500,000 | - | - | 1,500,000 |
| Current maturities of long-term debt | 334,692 | 58,493 | - | 393,185 |
| Accounts payable | 2,300,720 | - | - | 2,300,720 |
| Accrued expenses | 339,522 | 2,116 | - | 341,638 |
| Customer deposits | 17,855 | - | - | 17,855 |
| Total current liabilities | 4,763,419 | 60,609 | - | 4,824,028 |
| LONG-TERM OBLIGATIONS | | | | |
| Long-term debt, net of current maturities | 1,111,763 | 478,602 | - | 1,590,365 |
| Notes payable, officers | 2,133,650 | - | - | 2,133,650 |
| | 3,245,413 | 478,602 | - | 3,724,015 |
| STOCKHOLDERS' EQUITY | | | | |
| Common stock | 16,200 | 2,100 | - | 18,300 |
| Additional paid-in capital | 18,473 | - | - | 18,473 |
| Retained earnings | 2,996,598 | 417,078 | - | 3,413,676 |
| | 3,031,271 | 419,178 | - | 3,450,449 |
| | $ 11,040,103 | $ 958,389 | $ - | $ 11,998,492 |

Miller Cooper & Co., Ltd.

# Northwest Building Materials & Supply Co. and Affiliated Companies
CONSOLIDATING BALANCE SHEETS
December 31, 2006
(See Independent Accountants' Report)

| ASSETS | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---|---|---|---|
| CURRENT ASSETS | | | | |
| Cash | $ - | $ 39,235 | $ - | $ 39,235 |
| Accounts receivable, net of allowance for doubtful accounts of $145,000 | 3,040,416 | - | - | 3,040,416 |
| Inventories | 2,201,981 | - | - | 2,201,981 |
| Prepaid expenses and other | 755,255 | 43,117 | - | 798,372 |
| Total current assets | 5,997,652 | 82,352 | - | 6,080,004 |
| NET ADVANCES TO CONSOLIDATED AFFILIATES | 832,195 | (832,195) | - | .. |
| NET ADVANCES TO UNCONSOLIDATED AFFILIATES | 1,372,666 | 38,563 | - | 1,411,229 |
| PROPERTY AND EQUIPMENT | | | | |
| Land | - | 516,653 | - | 516,653 |
| Buildings | - | 1,707,818 | - | 1,707,818 |
| Vehicles | 2,422,105 | - | - | 2,422,105 |
| Leasehold improvements | 341,264 | - | - | 341,264 |
| Office equipment | 474,446 | - | - | 474,446 |
| Yard equipment | 309,613 | - | - | 309,613 |
| Transportation equipment | 307,268 | - | - | 307,268 |
| | 3,854,696 | 2,224,471 | - | 6,079,167 |
| Less accumulated depreciation | 3,097,857 | 1,140,277 | - | 4,238,134 |
| | 756,839 | 1,084,194 | - | 1,841,033 |
| DUE FROM STOCKHOLDER | 2,725,112 | 624,917 | - | 3,350,029 |
| | $ 11,684,464 | $ 997,831 | $ - | $ 12,682,295 |

-21-

| LIABILITIES AND STOCKHOLDERS' EQUITY | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---|---|---|---|
| CURRENT LIABILITIES | | | | |
| Cash overdraft | $ 581,292 | $ - | $ - | $ 581,292 |
| Note payable, bank | 1,500,000 | - | - | 1,500,000 |
| Current maturities of long-term debt | 350,329 | 88,674 | - | 439,003 |
| Accounts payable | 1,793,082 | - | - | 1,793,082 |
| Accrued expenses | 293,086 | 2,116 | - | 295,202 |
| Customer deposits | 31,353 | - | - | 31,353 |
| Total current liabilities | 4,549,142 | 90,790 | - | 4,639,932 |
| | | | | |
| LONG-TERM OBLIGATIONS | | | | |
| Long-term debt, net of current maturities | 1,452,357 | 548,230 | - | 2,000,587 |
| Notes payable, officers | 1,945,604 | - | - | 1,945,604 |
| | 3,397,961 | 548,230 | - | 3,946,191 |
| | | | | |
| STOCKHOLDERS' EQUITY | | | | |
| Common stock | 16,200 | 2,100 | - | 18,300 |
| Additional paid-in capital | 18,473 | - | - | 18,473 |
| Retained earnings | 3,702,688 | 356,711 | - | 4,059,399 |
| | 3,737,361 | 358,811 | - | 4,096,172 |
| | $ 11,684,464 | $ 997,831 | $ - | $ 12,682,295 |

Miller Cooper & Co., Ltd.

# Northwest Building Materials & Supply Co. and Affiliated Companies
CONSOLIDATING STATEMENTS OF OPERATIONS
December 31, 2007
(See Independent Accountants' Report)

|  | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---|---|---|---|
| Net sales | $ 21,433,425 | $ 172,732 | $ (172,732) | $ 21,433,425 |
| Cost of goods sold | 16,441,185 | - | - | 16,441,185 |
| Gross profit | 4,992,240 | 172,732 | (172,732) | 4,992,240 |
| Operating expenses |  |  |  |  |
| Delivery and yard | 2,520,644 | - | (172,732) | 2,347,912 |
| Selling, general, and administrative | 3,024,957 | 82,418 | - | 3,107,375 |
|  | 5,545,601 | 82,418 | (172,732) | 5,455,287 |
| Operating income (loss) | (553,361) | 90,314 | - | (463,047) |
| Other income (expense) |  |  |  |  |
| Interest income | 236,210 | - | - | 236,210 |
| Interest expense | (385,540) | (31,557) | - | (417,097) |
| Other income (expense), net | (3,399) | 1,610 | - | (1,789) |
|  | (152,729) | (29,947) | - | (182,676) |
| NET INCOME (LOSS) | $ (706,090) | $ 60,367 | $ - | $ (645,723) |

-23-

# Northwest Building Materials & Supply Co. and Affiliated Companies
CONSOLIDATING STATEMENTS OF OPERATIONS
December 31, 2006
(See Independent Accountants' Report)

| | Operating Companies | Affiliates | Eliminations | Consolidated |
|---|---|---|---|---|
| Net sales | $ 24,633,688 $ | 235,755 $ | (235,755) $ | 24,633,688 |
| Cost of goods sold | 19,541,267 | - | - | 19,541,267 |
| Gross profit | 5,092,421 | 235,755 | (235,755) | 5,092,421 |
| Operating expenses | | | | |
| Delivery and yard | 2,239,644 | - | (235,755) | 2,003,889 |
| Selling, general, and administrative | 3,067,951 | 114,583 | - | 3,182,534 |
| | 5,307,595 | 114,583 | (235,755) | 5,186,423 |
| Operating income (loss) | (215,174) | 121,172 | - | (94,002) |
| Other income (expense) | | | | |
| Interest income | 188,706 | - | - | 188,706 |
| Interest expense | (416,579) | (52,435) | - | (469,014) |
| Other income (expense), net | 54,909 | (3,181) | - | 51,728 |
| | (172,964) | (55,616) | - | (228,580) |
| NET INCOME (LOSS) | $ (388,138) $ | 65,556 $ | - $ | (322,582) |

-24-



P#600010Q
N#2888001

DRAFT

BALANCE SHEET WITH LAST YEAR COMPARISON
AS OF DEC 31, 2007

| ACCT NO | DESCRIPTION | CURRENT YEAR | LAST YEAR |
|---|---|---|---|
| | **ASSETS** | | |
| | **CURRENT ASSETS** | | |
| | **CASH ITEMS** | | |
| 101 | DEPOSITORY-MAIN BANK PV | (1257433.55) | (971294.55) |
| 102 | DEPOSITORY-WESTBANK NV | .00 | .00 |
| 103 | PAYROLL BANK ACCT | (11414.31) | (23367.16) |
| 105 | PETTY CASH-CORP CT | 1000.00 | 1000.00 |
| 108 | CASH IN DRAWER (CORP) | .00 | .00 |
| | TOTAL CASH | (1267847.86) | (993661.71) |
| | | .0% | .0% |
| | **ACCOUNTS RECEIVABLE** | | |
| 110 | ACCOUNTS RECEIVABLE | .00 | .00 |
| 112 | RESERVE FOR DOUBTFUL ACCOUNTS | .00 | .00 |
| | TOTAL ACCOUNTS RECEIVABLE | .00 | .00 |
| | | .0% | .0% |
| | **OTHER RECEIVABLES** | | |
| 123 | DUE FROM CHARMAR | 689872.50 | 689872.50 |
| 124 | OFFICER RECVBL CORP | 2355988.18 | 2589342.10 |
| 125 | OTHER RECEIVABLES | 344037.05 | 95326.49 |
| 126 | DUE FROM SOUTHPORT REAL ESTATE | 770709.46 | 775496.60 |
| 127 | PROP. LEASING RECVBL | 203984.36 | 198426.36 |
| 128 | NW REALTY FL RECVBL | .00 | .00 |
| 129 | NW REALTY-IL (PV-LEX-BLK) | (36481.00) | (37346.00) |
| 130 | DUE FROM K & H | 494945.24 | 367392.82 |
| 131 | DUE FROM PRAIRIE VIEW | (12911512.55) | (5131790.79) |
| 132 | DUE FROM NAPERVILLE | 8753334.85 | 1919463.82 |
| 133 | DUE FROM CS REALTY | (277590.89) | (273654.89) |
| 134 | DUE FROM BADGERLAND | 76500.00 | 76500.00 |
| 135 | DUE FROM B.M.D.I. | 2537030.72 | 2379189.75 |
| 136 | DUE FROM SOUTHPORT | 2870005.86 | 2516326.62 |
| 137 | DUE FROM HUNTLEY | .00 | .00 |
| | TOTAL OTHER RECEIVABLES | 5870903.78 | 6164545.38 |
| | | .0% | .0% |


EXHIBIT
Cieslick #8
CM96-4-15

UNAUDITED

BALANCE SHEET WITH LAST YEAR COMPARISON
AS OF DEC 31, 2007

| ACCT NO | DESCRIPTION | CURRENT YEAR | LAST YEAR |
|---|---|---|---|
| | TOTAL RECEIVABLES | 4603055.92 .0% | 5170883.67 .0% |
| | **PRE-PAID ITEMS** | | |
| 142 | PRE-PAID INSURANCE | 44843.20 | 43906.81 |
| 144 | PREPAID LEGAL FEES | .00 | .00 |
| 145 | PREPAID HEALTH INS | 26203.32 | 25968.94 |
| 146 | PREPAID OTHER | .00 | .00 |
| 150 | PRE-PAID TAXES | .00 | 298.00 |
| | TOTAL PRE-PAID ITEMS | 71046.52 .0% | 70173.75 .0% |
| | TOTAL CURRENT ASSETS | 4674102.44 .0% | 5241057.42 .0% |
| | **PROPERTY & EQUIPMENT** | | |
| 160 | VEHICLES | 1599313.00 | 1599313.00 |
| 162 | CORP-LEASEHOLD IMPROVEMENTS | .00 | .00 |
| 163 | CORP FURN & FIXTURES | 84208.29 | 83062.51 |
| 164 | TRANSPORT EQUIP | 307268.00 | 307268.00 |
| 180 | DEPRECIATION | (1462061.40) | (1462061.40) |
| | NET PROPERTY & EQUIPMENT | 528727.89 .0% | 527582.11 .0% |
| | **OTHER ASSETS** | | |
| 190 | DEFERRED OTHER EXPENSE | 581790.00 | 581790.00 |
| 191 | DEFERRED INTEREST EXPENSE | .00 | .00 |
| | TOTAL ASSETS | 5784620.33 .0% | 6350429.53 .0% |

UNAUDITED

BALANCE SHEET WITH LAST YEAR COMPARISON
AS OF DEC 31, 2007

| ACCT NO | DESCRIPTION | CURRENT YEAR | LAST YEAR |
|---|---|---|---|
| | **LIABILITIES** | | |
| | **CURRENT LIABILITIES** | | |
| | ACCOUNTS PAYABLE | | |
| 219 | ACCRUED ACCOUNTS PAYABLE | 4372.67 | .00 |
| 220 | ACCOUNTS PAYABLE | 13511.84 | 27872.77 |
| | TOTAL ACCOUNTS PAYABLE | 17884.51 | 27872.77 |
| | | .0% | .0% |
| | OTHER CURRENT LIABILITIES | | |
| 140 | DEPOSITS | (4475.82) | (4475.82) |
| 211 | SUBURBAN BANK 2888-1 | 1500000.00 | 1500000.00 |
| 214 | INT PAYABLE-OFFICERS | .00 | .00 |
| 218 | DUE TO TO-AM EQUIP | (30375.00) | (30375.00) |
| 221 | 401K PLAN MATCHING | 5547.52 | 2499.52 |
| 222 | 401K PLAN | .00 | .00 |
| 223 | ACCRUED PAYROLL | 23733.81 | 19090.69 |
| 224 | PAY TAXES - EMPLOYEE | .00 | .00 |
| 225 | ACCRUED FICA EMPLOYER | 680.01 | 1445.74 |
| 226 | PAY TAXES STATE - EMPLOYEE | .00 | .00 |
| 227 | ACCRUED UNEMPLOYMENT TAX | .00 | .00 |
| 228 | TAXES | .00 | .00 |
| 229 | FLORIDA LOAN | 190000.00 | .00 |
| 230 | DUE TO B.L. REAL ESTATE | .00 | (.10) |
| 260 | ACCRUED PROPERTY TAX | .00 | .00 |
| | TOTAL OTHER CURRENT LIABILITY | 1685110.52 | 1488185.03 |
| | | .0% | .0% |
| | TOTAL CURRENT LIABILITIES | 1702995.03 | 1516057.80 |
| | | .0% | .0% |
| | NOTES PAYABLE | | |
| 262 | SUBURBAN BANK 10278 | .00 | .00 |
| 263 | OFFICER NOTES PAYABLE | 1943649.51 | 1945603.54 |
| 264 | SUBURBAN BANK 1515-2 | .00 | .00 |
| 265 | SUBURBAN BANK 12786 | 187500.20 | 270833.48 |
| 266 | SUBURBAN BANK TERM NOTE | 1163636.86 | 1345861.77 |
| 267 | DUE FROM SUBURBAN BANK | .00 | .00 |
| 281 | NAVISTAR | .00 | .00 |

UNAUDITED

BALANCE SHEET WITH LAST YEAR COMPARISON
AS OF DEC 31, 2007

| ACCT NO | DESCRIPTION | CURRENT YEAR | LAST YEAR |
|---|---|---|---|
| 283 | GMAC | .00 | .00 |
| 284 | DUE TO DIAMOND ACCEPTANCE (LT) | .00 | .00 |
| 285 | NAVISTAR | .00 | .00 |
| | TOTAL NOTES PAYABLE | (3294786.59) | (3562298.79) |
| | | .0% | .0% |
| | TOTAL LIABILITIES | 4997781.62 | 5078356.59 |
| | | .0% | .0% |
| | SHAREHOLDER EQUITY | | |
| 286 | COMMON STOCK | 17000.00 | 17000.00 |
| 288 | PAID IN SURPLUS | 18473.41 | 18473.41 |
| 290 | RETAINED EARNINGS | 1236599.53 | 1311412.45 |
| 291 | PRIOR YEAR ADJUSTMENTS | .00 | .00 |
| 295 | DIVIDENDS PAID | .00 | .00 |
| | NET INCOME/LOSS | (485234.23) | (74812.92) |
| | TOTAL NET WORTH | 786838.71 | 1272072.94 |
| | | .0% | .0% |
| | TOTAL LIABILITIES AND EQUITY | 5784620.33 | 6350429.53 |
| | | .0% | .0% |

UNAUDITED

# Northwest Building Materials
# & Supply Co. and
# Affiliated Companies

## Consolidated Financial Statements and
## Independent Accountants' Report

### December 31, 2008 and 2007

## PRELIMINARY DRAFT


EXHIBIT
Cieslak #9
Cml 6-4-15
PENGAD 800-631-6989

CONSOLIDATED FINANCIAL STATEMENTS

PRELIMINARY DRAFT

# Northwest Building Materials & Supply Co. and Affiliated Companies
## CONSOLIDATED BALANCE SHEETS
December 31, 2008 and 2007
(See Independent Accountants' Report)

| ASSETS | 2008 | 2007 |
|---|---:|---:|
| **CURRENT ASSETS** | | |
| Cash | $ 28,075 | $ 45,721 |
| Accounts receivable, net of allowance for doubtful accounts of $55,000 and $70,290 for 2008 and 2007, respectively | 1,735,694 | 2,556,531 |
| Inventories | 1,730,490 | 2,179,597 |
| Prepaid expenses and other | 595,789 | 705,992 |
| Total current assets    PRELIMINARY DRAFT | 4,090,048 | 5,487,841 |
| NET ADVANCES TO UNCONSOLIDATED AFFILIATES | 1,493,686 | 1,449,430 |
| **PROPERTY AND EQUIPMENT** | | |
| Land | 516,653 | 516,653 |
| Buildings | 1,707,818 | 1,707,818 |
| Vehicles | 2,422,105 | 2,422,105 |
| Leasehold improvements | 355,015 | 351,456 |
| Office equipment | 499,296 | 494,839 |
| Yard equipment | 366,597 | 364,285 |
| Transportation equipment | 307,268 | 307,268 |
| | 6,174,752 | 6,164,424 |
| Less accumulated depreciation | 4,516,866 | 4,416,815 |
| | 1,657,886 | 1,747,609 |
| DUE FROM STOCKHOLDER | 3,325,153 | 3,313,612 |
| | $ 10,566,773 | $ 11,998,492 |

The accompanying notes are an integral part of these statements.

-4-

| LIABILITIES AND STOCKHOLDERS' EQUITY | 2008 | 2007 |
|---|---|---|
| CURRENT LIABILITIES | | |
| Cash overdraft | $        88,795 | $       270,630 |
| Note payable, bank | 1,500,000 | 1,500,000 |
| Current maturities of long-term debt | 337,711 | 393,185 |
| Accounts payable | 2,970,224 | 2,300,720 |
| Accrued expenses | 228,323 | 341,638 |
| Customer deposits | - | 17,855 |
| Total current liabilities PRELIMINARY DRAFT | 5,125,053 | 4,824,028 |
| LONG-TERM OBLIGATIONS | | |
| Long-term debt, net of current maturities | 1,241,857 | 1,590,365 |
| Notes payable, officers | 2,111,552 | 2,133,650 |
| | 3,353,409 | 3,724,015 |
| STOCKHOLDERS' EQUITY | | |
| Common stock, $1 par value; 18,300 shares | | |
| authorized, issued, and outstanding | 18,300 | 18,300 |
| Additional paid-in capital | 18,473 | 18,473 |
| Retained earnings | 2,051,538 | 3,413,676 |
| | 2,088,311 | 3,450,449 |
| | $   10,566,773 | $   11,998,492 |

## Northwest Building Materials & Supply Co. and Affiliated Companies
### CONSOLIDATED STATEMENTS OF OPERATIONS
Years ended December 31, 2008 and 2007
(See Independent Accountants' Report)

|  | 2008 | 2007 |
|---|---:|---:|
| Net sales | $ 16,631,329 | $ 21,433,425 |
| Cost of goods sold | 13,032,262 | 16,441,185 |
| Gross profit | 3,599,067 | 4,992,240 |
| Operating expenses | | |
| Delivery and yard | 1,996,384 | 2,347,912 |
| Selling, general, and administrative | 2,603,965 | 3,107,375 |
|  | 4,600,349 | 5,455,287 |
| Operating loss | (1,001,282) | (463,047) |
| Other income (expense) | | |
| Interest income | 14,838 | 236,210 |
| Interest expense | (410,976) | (417,097) |
| Other income (expense), net | 35,282 | (1,789) |
|  | (360,856) | (182,676) |
| NET LOSS | $ (1,362,138) | $ (645,723) |

PRELIMINARY DRAFT

The accompanying notes are an integral part of these statements.

# Northwest Building Materials & Supply Co. and Affiliated Companies

CONSOLIDATED STATEMENTS OF EQUITY

Years ended December 31, 2008 and 2007

(See Independent Accountants' Report)

| | Common Stock | Additional Paid-In Capital | Retained Earnings | Total Equity |
|---|---|---|---|---|
| Balance at January 1, 2007 | $ 18,300 | $ 18,473 | $ 4,059,399 | $ 4,096,172 |
| Net loss | - | - | (645,723) | (645,723) |
| Balance at December 31, 2007 | 18,300 | 18,473 | 3,413,676 | 3,450,449 |
| Net loss | - | - | (1,362,138) | (1,362,138) |
| Balance at December 31, 2008 | $ 18,300 | $ 18,473 | $ 2,051,538 | $ 2,088,311 |

PRELIMINARY DRAFT

The accompanying notes are an integral part of these statements.

## Northwest Building Materials & Supply Co. and Affiliated Companies
CONSOLIDATED STATEMENTS OF CASH FLOWS
Years ended December 31, 2008 and 2007
(See Independent Accountants' Report)

|  | 2008 | 2007 |
|---|---|---|
| Cash flows from operating activities |  |  |
| Net loss | $ (1,362,138) | $ (645,723) |
| Adjustments to reconcile net loss to net cash |  |  |
| provided by operating activities |  |  |
| Depreciation | 100,051 | 178,681 |
| Bad debt expense | 35,994 | 2,924 |
| (Increase) decrease in assets |  |  |
| Accounts receivable | 784,843 | 480,961 |
| Inventories | 449,107 | 22,384 |
| Prepaid expenses and other | 110,203 | 92,380 |
| Increase (decrease) in liabilities |  |  |
| Accounts payable | 669,504 | 507,638 |
| Accrued expenses | (112,280) | 46,436 |
| Customer deposits | (18,890) | (13,498) |
| Net cash provided by operating activities | 656,394 | 672,183 |
| Cash flows from investing activities |  |  |
| Purchases of equipment | (10,328) | (85,257) |
| Net (advances to) repayments from stockholder | (11,541) | 36,417 |
| Net advances to unconsolidated affiliates | (44,256) | (38,201) |
| Net cash used in investing activities | (66,125) | (87,041) |
| Cash flows from financing activities |  |  |
| Increase (decrease) in cash overdraft | (181,835) | (310,662) |
| Repayments on long-term debt | (403,982) | (456,040) |
| Proceeds from notes payable, officers | - | 190,000 |
| Repayments on notes payable, officers | (22,098) | (1,954) |
| Net cash provided by (used in) financing activities | (607,915) | (578,656) |
| INCREASE (DECREASE) IN CASH | (17,646) | 6,486 |
| Cash, beginning of year | 45,721 | 39,235 |
| Cash, end of year | $ 28,075 | $ 45,721 |
| Supplemental disclosure of cash flow information |  |  |
| Interest paid during the year | $ 410,976 | $ 417,097 |

PRELIMINARY DRAFT

The accompanying notes are an integral part of these statements.

## NOTE A - NATURE OF BUSINESS, BASIS OF CONSOLIDATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

1. Nature of Business                    **PRELIMINARY DRAFT**

   The Companies primarily operate as distributors of building materials to various contractors. The Companies also operate retail locations for the sale of related building products. The consolidated affiliated companies lease operating facilities to the Companies.

2. Basis of Consolidation

   The consolidated financial statements include the following entities (collectively, the Companies): Northwest Building Materials & Supply Co. (the Company), Northwest Building Materials of Illinois, Inc. (Prairie View and Naperville), Southport Lumber and Supply Company (Southport), and B.M.D.I., Inc., which are all under common control.

   The consolidated financial statements also include the following entities (collectively, the Affiliates): C.S. Realty, Inc., N.W. Realty of Illinois, Inc., and Southport Real Estate Co., each of which has been identified as a variable interest entity (VIE), with the Companies as primary beneficiary. Therefore, these entities have been consolidated in these financial statements (see Note J).

   All significant intercompany accounts and transactions have been eliminated in consolidation.

3. Receivables and Credit Policies

   Accounts receivable are uncollateralized customer obligations due under normal trade terms requiring payment within thirty days from the invoice date. Accounts receivable are stated at the amounts billed to the customers. Customer account balances with invoices dated over ninety days old are considered delinquent. Interest is charged on past due balances at an annual percentage rate of 18%. Payments of accounts receivable are allocated to the specific invoices identified on the customer's remittance advice or, if unspecified, are applied to the earliest unpaid invoices.

NOTE A - NATURE OF BUSINESS, BASIS OF CONSOLIDATION, AND SUMMARY OF
SIGNIFICANT ACCOUNTING POLICIES (Continued)

3.  Receivables and Credit Policies (Continued)    PRELIMINARY DRAFT

    The carrying amount of accounts receivable is reduced by a valuation allowance that reflects
    management's best estimate of the amounts that will not be collected. Management individually
    reviews all accounts receivable balances that exceed 90 days from the invoice date and, based on an
    assessment of current creditworthiness, estimates the portion, if any, of the balance that will not be
    collected.

4.  Inventory

    Inventory consists of lumber, retail goods, and other construction inventories and are valued at the
    lower of cost (first-in, first-out basis) (FIFO) or market.

5.  Property and Equipment

    Property and equipment are stated at cost. Depreciation of property and equipment is provided using
    the straight-line methods and accelerated methods over the estimated useful lives of the respective
    assets. Estimated useful lives are as follows:

    |                            | Years          |
    |----------------------------|----------------|
    | Buildings                  | 39 years       |
    | Vehicles                   | 3 - 6 years    |
    | Leasehold improvements     | Life of leases |
    | Office and yard equipment  | 5 - 7 years    |
    | Transportation equipment   | 5 - 7 years    |

## NOTE A - NATURE OF BUSINESS, BASIS OF CONSOLIDATION, AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

6.  Income Taxes

PRELIMINARY DRAFT

The Companies, N.W. Realty of Illinois, Inc., and C.S. Realty, Inc. have elected to be S Corporations for federal income tax purposes under the Internal Revenue Code. In lieu of corporate income taxes, the stockholders of an S Corporation are taxed on their proportionate shares of the Company's taxable income. Therefore, no liability or provision for federal income taxes has been included in these consolidated financial statements. The Companies are subject to certain state taxes.

Southport Real Estate Co. has elected to be a C Corporation for federal income tax purposes under the Internal Revenue Code. Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carryforwards and deferred tax liabilities are recognized for taxable temporary differences.

Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment. There were no deferred tax assets or liabilities as of December 31, 2008.

7.  Use of Estimates

In preparing financial statements, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

8.  Advertising

Advertising costs are expensed as incurred. Total advertising expense was $24,509 and $50,124 for 2008 and 2007, respectively.

-11-

9. Fair Vlue of Financial Instruments    PRELIMINARY DRAFT

The carrying amounts of financial instruments, including cash, accounts receivable, accounts payable, accrued liabilities, and short-term borrowings approximate fair value due to the short maturity of these instruments. The carrying amount of long-term debt approximates fair value because the interest rates fluctuate with market interest rates or the fixed rates are based on current rates offered to the Companies for debt with similar terms and maturities.

In accordance with FASB Staff Position No. FAS 157-2, the Companies have elected to defer the provisions of FASB Statement No. 157, *Fair Value Measurements* for all nonfinancial assets and liabilities.

## NOTE B - TRANSACTIONS AND NET ADVANCES TO UNCONSOLIDATED AFFILIATES

The Companies and Affiliates have net advances to related entities which are owned and operated by the Companies' stockholders as follows:

|                             | 2008 | | 2007 | |
|-----------------------------|------|---------|------|---------|
| Charmar Realty, Inc.        | $    | 824,240 | $    | 824,240 |
| Professional Leasing, Inc.  |      | 202,147 |      | 186,155 |
| K & H Cartage Co.           |      | 436,924 |      | 408,660 |
| Other                       |      | 30,375  |      | 30,375  |
|                             | $    | 1,493,686 | $  | 1,449,430 |

Professional leasing, Inc. (Professional) leases equipment to the operating companies. Lease expense paid to Professional was approximately $261,000 and $342,000 for the years ended December 31, 2008 and 2007, respectively. K&H Cartage Co. (K&H) provides Cartage services to B.M.D.I., Inc. Cartage expense paid to K&H was approximately $560,000 and $642,000 for the years ended December 31, 2008 and 2007, respectively.

# Northwest Building Materials & Supply Co. and Affiliated Companies
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2008 and 2007
(See Independent Accountants' Report)

## NOTE C – DUE FROM STOCKHOLDER    PRELIMINARY DRAFT

The Companies and Affiliates have uncollateralized advances to a stockholder of $3,325,153 and $3,313,612 as of December 31, 2008 and 2007, respectively. Effective January 1, 2002, the advances bear interest at the prime rate (3.25% at December 31, 2008) minus 0.5%. The note was noninterest-bearing prior to 2002. Principal and interest are due on demand. The Companies are not expected to demand repayment within the next year; therefore, the balance has been classified as long-term in the accompanying consolidated balance sheet.

## NOTE D - NOTES PAYABLE, BANK

The note payable, bank consists of a revolving line of credit with interest at the prime rate (3.25% at December 31, 2008) plus         expiring         The note is collateralized by various business assets of the Companies and personal guarantees by the Companies' stockholders and an affiliate. The Company is required to comply with certain financial covenants. The outstanding balance was $1,500,000 as of December 31, 2008 and 2007.

## NOTE E - NOTES PAYABLE, OFFICERS

Unsecured notes payable to officers are due on demand and bear interest at the prime rate (3.25% at December 31, 2008). The balance was $2,111,552 and $2,133,650 as of December 31, 2008 and 2007, respectively. The officers are not expected to demand repayment during the next year; therefore, the notes have been classified as long-term in the accompanying consolidated balance sheet.

## NOTE F - LONG-TERM DEBT

|  | 2008 | 2007 |
|---|---|---|
| Bank note, payable in monthly installments of $6,944 plus interest at the prime rate plus 0.5% through March 2010. The note is collateralized by real estate owned by one of the Companies' stockholders. | $ 104,167 | $ 187,500 |
| Bank note, payable in monthly installments of $23,099 including interest at 7.50% through January 1, 2011. The note is collateralized by various business assets of the Companies. | 968,881 | 1,163,637 |

-13-

NOTE F - LONG-TERM DEBT (Continued)    PRELIMINARY DRAFT

|  | 2008 | 2007 |
|---|---|---|
| Bank note, payable in monthly installments of $1,414 including interest at 6.00% through April 2008. All business assets are pledged as collateral. | - | 4,171 |
| Mortgage note, payable in monthly installments of $4,130 including interest at 6.50% with a balloon payment in December 2009. Certain assets held by C.S. Realty, Inc. are pledged as collateral. The cost of these assets is $470,300. | 466,057 | 493,318 |
| Mortgage note, payable in monthly installments of $6,550 including interest at the prime rate plus 0.5% through March 2011. Certain assets held by N.W. Realty of Illinois, Inc. are pledged as collateral. The cost of these assets is $512,464. | - | 43,777 |
| Notes payable, finance companies, with monthly installments ranging from $1,321 to $2,602 including interest ranging from 4.99% to 6.85%, expiring at various dates through July 2009. All business assets are pledged as collateral. | $ 40,463 | $ 91,147 |
|  | 1,581,576 | 1,985,557 |
| Less current maturities | 337,711 | 393,185 |
|  | $ 1,243,865 | $ 1,592,372 |

Maturities of long-term debt are as follows:

| | | |
|---|---|---|
| 2009 | $ | 337,711 |
| 2010 | | 713,254 |
| 2011 | | 528,603 |
| | $ | 1,579,568 |

## NOTE G - EMPLOYEE BENEFIT PLANS          PRELIMINARY DRAFT

The Companies have a 401(k) profit sharing plan covering all nonunion employees. The Companies' contributions to the plan approximated $7,000 in 2008. There were no contributions in 2007.

Additionally, in accordance with a collective bargaining agreement, the Companies have a union-sponsored pension plan covering all union employees. The contributions to this plan approximated $582,000 and $697,000 in 2008 and 2007, respectively. The plan is administered by representatives of the trade union. Accordingly, the Companies have no knowledge or control over the funding assumptions and methods employed. If the Companies were to withdraw from the plan or should the plan terminate, the Companies would be required to contribute an amount equal to its portion of any unfunded liability. The Companies' liability, if any, is not presently determinable; therefore, no amount has been recorded for any contingent unfunded liability.

## NOTE H - COMMITMENTS

The Companies lease three locations under operating leases from affiliated companies owned by one of the stockholders. The affiliated companies are variable interest entities (see Note J). Under the leases, the Companies are responsible for insurance, maintenance costs, and real estate taxes. Monthly rent payments, which include various insurance and maintenance costs, were $25,400 for 2008 and 2007. The leases expire at various dates through January 2013.

B.M.D.I., Inc. also leases a location under an operating lease from an unrelated party. Under the lease, B.M.D.I., Inc. is responsible for insurance, maintenance costs, and real estate taxes. Monthly rent payments, which include various insurance and maintenance costs, were approximately $1,900 in 2006. The lease expired in April 2006.

NOTE H - COMMITMENTS (Continued)      PRELIMINARY DRAFT

Rent expense for the operating locations was $210,551 and $231,424 in 2008 and 2007, respectively.

At December 31, 2008, future minimum rental payments under operating leases are as follows:

| | | |
|---|---|---:|
| 2009 | $ | 262,800 |
| 2010 | | 262,800 |
| 2011 | | 262,800 |
| 2012 | | 262,800 |
| 2013 | | 21,900 |
| | $ | 1,073,100 |

NOTE I - CONCENTRATIONS OF RISK

1. General

    The Companies grant credit to most of their customers who are contractors. These contractors are primarily located in, but not limited to, the Midwestern United States.

2. Uninsured Cash

    The Companies also maintain cash balances at several financial institutions located in Illinois and Wisconsin. Interest bearing accounts are insured by the Federal Deposit Insurance Corporation (FDIC) up to $250,000 per institution, and non-interest bearing accounts are fully insured by the FDIC. These temporary FDIC insurance limits remain in effect for participating institutions through December 31, 2009. At December 31, 2008, the Companies had no uninsured cash balances.

## NOTE I - CONCENTRATIONS OF RISK (Continued)     PRELIMINARY DRAFT

3.   Significant Customers

In 2007, the Company had three customers that represented 15%, 11%, and 12% of net sales. At December 31, 2007, the Company had outstanding accounts receivable from these customers totaling $612,000. In 2007, the Company had three customers that represented 15%, 11%, and 12% of total net sales. At December 31, 2007, the Company had outstanding accounts receivable from these customers totaling approximately $612,000.

## NOTE J - CONSOLIDATION OF VARIABLE INTEREST ENTITIES

In January 2003, the Financial Accounting Standards Board issued Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46) and its amendment, Interpretation 46R. This Interpretation establishes standards for identifying variable interest entities and for determining the circumstances when a variable interest entity should be consolidated with its primary beneficiary. The Companies lease operating facilities from the Affiliates, entities established for the sole purpose of acquiring and leasing the building and land. Under FIN 46R, the Affiliates are variable interest entities as the Companies are the primary beneficiary, the Affiliates' stockholder has personally guaranteed the note payable for the Company, and the Affiliates assets are used as collateral for the note payable of the Company. Therefore, the Companies have consolidated the Affiliates in its consolidated financial statements.

## NOTE K - NEW ACCOUNTING PRONOUNCEMENTS

FAS Interpretation No. 48 (FIN 48), Accounting for Uncertainty in Income Taxes, was issued in June 2006. FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with FASB Statement No. 109, Accounting for Income Taxes. This Interpretation prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. This Interpretation also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. The requirements of FIN 48 are effective for fiscal years beginning after December 15, 2008. The Company does not know the impact that this Interpretation will have on its consolidated financial statements.

## NOTE L - RECLASSIFICATION

PRELIMINARY DRAFT

Certain reclassifications have been made to the 2007 consolidated financial statements to conform to the 2008 presentation.

P#600101   N#2888001

Draft  (SCANNED)
AT 5/20/09

05/14/2009          Northwest Bldg Matls Corporate              Page    1
3:51 PM
                  BALANCE SHEET WITH LAST YEAR COMPARISON
                         AS OF DEC 31, 2008

ACCT          DESCRIPTION                    CURRENT        LAST
NO                                            YEAR          YEAR

------------------------------------------------------------------------

                ASSETS


            CURRENT ASSETS
               CASH ITEMS
    101         DEPOSITORY-MAIN BANK PV      (155021.27)   (1257433.55)
    102         DEPOSITORY-WESTBANK NV             .00            .00
    103         PAYROLL BANK ACCT           (12496.34)     (11414.31)
    105         PETTY CASH-CORP CT            1000.00        1000.00
    108         CASH IN DRAWER (CORP)             .00            .00
                                          --------------  --------------
                TOTAL CASH                 (166517.61)   (1267847.86)
                                                .0%            .0%


            ACCOUNTS RECEIVABLE
    110         ACCOUNTS RECEIVABLE           1731.00            .00
    112         RESERVE FOR DOUBTFUL ACCOUNTS     .00            .00
                                          --------------  --------------
                TOTAL ACCOUNTS RECEIVABLE    1731.00            .00
                                                .0%            .0%


            OTHER RECEIVABLES
    123         DUE FROM CHARMAR            689872.50      689872.50
    124         OFFICER RECVBL CORP        2367529.05     2355988.18
    125         OTHER RECEIVABLES           300123.45      344037.05
    126         DUE FROM SOUTHPORT REAL ESTATE  775734.46   775734.46
    127         PROP. LEASING RECVBL        220410.97      204418.58
    128         NW REALTY FL RECVBL              .00            .00
    129         NW REALTY-IL (PV-LGX-BLK)   (35409.00)     (36481.00)
    130         DUE FROM K & H              600549.79      494945.24
    131         DUE FROM PRAIRIE VIEW      (23520272.67) (12911512.55)
    132         DUE FROM NAPERVILLE       18834725.37     9003334.85
    133         DUE FROM C8 REALTY         (277554.89)    (277590.89)
    134         DUE FROM BADGERLAND         76500.00       76500.00
    135         DUE FROM S.M.D.I.          3107924.28     2537030.72
    136         DUE FROM SOUTHPORT        3280238.62     2870085.86
    137         DUE FROM HUNTLEY                 .00            .00
                                          --------------  --------------
                TOTAL OTHER RECEIVABLES   6420371.93     6126363.00
                                                .0%            .0%




                        UNAUDITED




EXHIBIT
PENGAD 800/631-6989
Lesla K410
CM 8 Gx 4 -15

BALANCE SHEET WITH LAST YEAR COMPARISON
AS OF DEC 31, 2008

| ACCT NO | DESCRIPTION | CURRENT YEAR | LAST YEAR |
|---|---|---|---|
| | TOTAL RECEIVABLES | 6255585.32 | 4858515.14 |
| | | .0% | .0% |
| | PRE-PAID ITEMS | | |
| 142 | PRE-PAID INSURANCE | 19544.20 | 44843.20 |
| 144 | PREPAID LEGAL FEES | .00 | .00 |
| 145 | PREPAID HEALTH INS | 18449.99 | 26203.32 |
| 146 | PREPAID OTHER | .00 | .00 |
| 150 | PRE-PAID TAXES | .00 | .00 |
| | TOTAL PRE-PAID ITEMS | 37994.19 | 71046.52 |
| | | .0% | .0% |
| | TOTAL CURRENT ASSETS | 6293579.51 | 4929561.66 |
| | | .0% | .0% |
| | PROPERTY & EQUIPMENT | | |
| 160 | VEHICLES | 1599313.00 | 1599313.00 |
| 162 | CORP LEASEHOLD IMPROVEMENTS | .00 | .00 |
| 163 | CORP FURN & FIXTURES | 84208.29 | 84208.29 |
| 164 | TRANSPORT EQUIP | 307268.00 | 307268.00 |
| 180 | DEPRECIATION | (1463047.40) | (1463047.40) |
| | NET PROPERTY & EQUIPMENT | 527741.89 | 527741.89 |
| | | .0% | .0% |
| | OTHER ASSETS | | |
| 190 | DEFFERED OTHER EXPENSE | 778727.00 | 778727.00 |
| 191 | DEFERRED INTEREST EXPENSE | .00 | 00 |
| | TOTAL ASSETS | 7600048.40 | 6236030.55 |
| | | .0% | .0% |

UNAUDITED

BALANCE SHEET WITH LAST YEAR COMPARISON
AS OF DEC 31, 2008

| ACCT NO | DESCRIPTION | CURRENT YEAR | LAST YEAR |
|---|---|---|---|
| | | | |
| | LIABILITIES | | |
| | | | |
| | CURRENT LIABILITIES | | |
| | ACCOUNTS PAYABLE | | |
| 219 | ACCRUED ACCOUNTS PAYABLE | 2119808.15 | 4372.67 |
| 220 | ACCOUNTS PAYABLE | 3025.53 | 13511.84 |
| | | -------------- | -------------- |
| | TOTAL ACCOUNTS PAYABLE | 2122833.68 | 17884.51 |
| | | .0% | .0% |
| | | | |
| | OTHER CURRENT LIABILITIES | | |
| 140 | DEPOSITS | (4475.82) | (4475.82) |
| 211 | SUBURBAN BANK 2888-1 | 1500000.00 | 1500000.00 |
| 214 | INT PAYABLE-OFFICERS | .00 | .00 |
| 218 | DUE TO TO-AM EQUIP | (30375.00) | (30375.00) |
| 221 | 401K PLAN MATCHING | (1608.33) | 2499.52 |
| 222 | 401K PLAN | .00 | .00 |
| 223 | ACCRUED PAYROLL | 16910.07 | 23733.81 |
| 224 | PAY TAXES - EMPLOYEE | .00 | .00 |
| 225 | ACCRUED FICA EMPLOYER | 1246.97 | 680.01 |
| 226 | PAY TAXES STATE - EMPLOYEE | .00 | .00 |
| 227 | ACCRUED UNEMPLOYMENT TAX | .00 | .00 |
| 228 | TAXES | .00 | .00 |
| 229 | FLORIDA LOAN | 190000.00 | 190000.00 |
| 230 | DUE TO B.L. REAL ESTATE | .00 | .00 |
| 260 | ACCRUED PROPERTY TAX | .00 | .00 |
| | | -------------- | -------------- |
| | TOTAL OTHER CURRENT LIABILITY | 1671697.91 | 1682062.52 |
| | | .0% | .0% |
| | | | |
| | TOTAL CURRENT LIABILITIES | 3794531.55 | 1699947.03 |
| | | .0% | .0% |
| | | | |
| | NOTES PAYABLE | | |
| 262 | SUBURBAN BANK 10278 | .00 | .00 |
| 263 | OFFICER NOTES PAYABLE | 1921551.53 | 1943649.53 |
| 264 | SUBURBAN BANK 1515-2 | .00 | .00 |
| 265 | SUBURBAN BANK 12706 | 104166.92 | 187500.20 |
| 266 | SUBURBAN BANK TERM NOTE | 968881.40 | 1163636.86 |
| 267 | DUE FROM SUBURBAN BANK | .00 | .00 |
| 281 | NAVISTAR | .00 | .00 |

UNAUDITED

BALANCE SHEET WITH LAST YEAR COMPARISON
AS OF DEC 31, 2008

| ACCT NO | DESCRIPTION | CURRENT YEAR | LAST YEAR |
|---|---|---|---|
| 283 | GMAC | .00 | .00 |
| 284 | DUE TO DIAMOND ACCEPTANCE (LT) | .00 | .00 |
| 285 | NAVISTAR | .00 | .00 |
| | | -------------- | -------------- |
| | TOTAL NOTES PAYABLE | (2994599.85) | (3294786.59) |
| | | .0% | .0% |
| | TOTAL LIABILITIES | 6789131.44 | 4994733.62 |
| | | .0% | .0% |
| | SHAREHOLDER EQUITY | | |
| 286 | COMMON STOCK | 17000.00 | 17000.00 |
| 288 | PAID IN SURPLUS | 18473.41 | 18473.41 |
| 290 | RETAINED EARNINGS | 1205823.52 | 1236599.53 |
| 291 | PRIOR YEAR ADJUSTMENTS | .00 | .00 |
| 295 | DIVIDENDS PAID | .00 | .00 |
| | NET INCOME/LOSS | (430379.97) | (30776.01) |
| | TOTAL NET WORTH | 810916.96 | 1241296.93 |
| | | .0% | .0% |
| | TOTAL LIABILITIES AND EQUITY | 7600048.40 | 6236030.55 |
| | | .0% | .0% |

UNAUDITED

P# 600101   N#2888001

CURRENT YEAR COMPARISON SPREADSHEET
FOR PERIODS ENDING DEC 31, 2008

EXAMINED
5/26/09

| ACCT DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CORPORATE REVENUES** | | | | | | | | | | | | | |
| 300 SALES MAGNOLIA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 320 CORPORATE INCOME | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 325 ADMIN SERVICE CHARG | 29,400 | 26,096 | 26,154 | 27,412 | 28,200 | 36,724 | 40,300 | 36,752 | 29,500 | 40,100 | 33,600 | 39,216 | 393,454 |
| 330 SLSMN ADMIN SERVICE | 17,765 | 12,008 | 16,701 | 14,187 | 14,443 | 13,051 | 12,764 | 11,624 | 11,378 | 12,204 | 10,224 | 11,300 | 157,646 |
| 430 TRUCK RENTAL | -34,298 | -33,239 | -33,239 | -28,423 | -29,406 | -28,502 | -28,502 | -12,999 | 0 | 0 | -16,338 | -16,338 | 261,284 |
| 875 CORPORATE DISCOUNT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 877 INTEREST INCOME | 61,795 | 51,118 | 51,643 | 41,536 | 41,104 | 30,767 | 30,712 | 46,613 | 30,670 | 41,866 | 40,278 | 40,901 | 489 |
| 878 GAIN/(LOSS) ON SALE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| **\*TOTAL REVENUES** | 143,258 | 102,461 | 127,737 | 111,558 | 113,153 | 109,044 | 112,278 | 107,989 | 71,548 | 94,170 | 100,390 | 107,835 | 1301,42. |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **SELLING EXPENSES** | | | | | | | | | | | | | |
| 996 EMPLOYEES - SELLING | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 550 SELLING WAGES | 26,374 | 23,869 | 28,753 | 20,050 | 20,894 | 19,245 | 18,401 | 14,885 | 15,396 | 16,025 | 11,353 | 13,501 | 227,18 |
| 552 PAY TAX-FICA SLSMN | 1,774 | 1,776 | 2,206 | 1,754 | 2,219 | 2,141 | 1,979 | 1,240 | 1,184 | 939 | 856 | 1,113 | 19,18. |
| 554 WORKMANS COMP INS SL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 556 PAY TAX-UNEMPLOYMENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 558 VEHICLE RENTAL SLSMN | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 560 VEHICLE INS SLSMN | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 562 GAS & OIL SLSMN | 1,104 | 1,448 | 1,447 | 1,713 | 1,680 | 1,322 | 1,469 | 1,313 | 1,426 | 1,177 | 1,568 | 891 | 16,5 |
| 564 TOLLS SLSMN | 1,243 | 40 | 0 | 1,630 | 40 | 80 | 0 | 0 | 0 | 0 | 80 | 40 | 3,15. |
| 566 VEHICLE MAINT SLSMN | 0 | 163 | 80 | 0 | 0 | 1,096 | 0 | 44 | 45 | 0 | 138 | 0 | 1,56. |
| 568 HEALTH INSURANCE SLS | 1,204 | -1,241 | 1,335 | 1,216 | 1,966 | 1,666 | 1,821 | 1,505 | 1,436 | 1,184 | 1,436 | 1,436 | 14,96. |
| 570 PHONE SLSMN | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 572 MEETINGS SLSMN | 0 | 409 | 201 | 156 | 213 | 362 | 102 | 22 | 356 | 0 | 0 | 107 | 1,92 |
| 574 BUSINESS DEVELOPMENT | 0 | 483 | 1,343 | 0 | 159 | 487 | 370 | 348 | 187 | 0 | 306 | 0 | 3,72 |
| 576 ENTERTAINMENT SLSMN | 0 | 0 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 578 TRAVEL EXPENSE SLSMN | 0 | 406 | 699 | 46 | 0 | 482 | 119 | 10 | 0 | 991 | 58 | 0 | 2,81. |
| 580 OTHER SELLING EXP | 0 | 0 | 0 | 0 | 76 | 0 | 0 | 0 | 1,350 | 0 | 0 | 0 | 1,42 |
| **TOTAL SELLING EXPE** | 31,699 | 27,353 | 36,081 | 26,564 | 27,247 | 26,881 | 24,261 | 18,368 | 21,380 | 20,315 | 17,873 | 17,088 | 295,11. |
| | 22.1% | 26.7% | 28.2% | 23.8% | 24.1% | 24.7% | 21.6% | 17.0% | 29.9% | 21.6% | 17.8% | 15.8% | 22.7% |
| **CORPORATE EXPENSES** | | | | | | | | | | | | | |
| 305 RECEIVABLE DISCOUNT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 425 GAS & OIL | 1,585 | 1,779 | 1,902 | 2,000 | 2,253 | 2,223 | 2,176 | 3,077 | 1,653 | 2,012 | 1,172 | 0 | 21,83: |
| 435 AUTO MAINT. | 0 | 0 | 0 | 400 | -400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 440 GARAGE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

CURRENT YEAR COMPARISON SPREADSHEET
FOR PERIODS ENDING DEC 31, 2008

| ACCT | DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | |
|------|-------------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|----|
| 445 | TOLLS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 450 | LICENSE & FEES | 535 | 168 | 160 | 391 | 160 | 7,379 | 3,921 | 3,826 | 160 | 641 | 482 | 612 | 13 76 |
| 455 | DUES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 468 | CASUALTY LOSSES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 470 | VEH DEPRECIATION | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 500 | OPERATIONS WAGES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 504 | PAY TAX-FICA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 508 | PAY TAX-UNEMPLOYMENT | 262 | 98 | 65 | 31 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 456 |
| 515 | BLDG IMPROVEMENTS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 38 | 0 | 0 | 19 | |
| 800 | OFFICE SALARIES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 801 | ADMIN SALARIES | 29,369 | 26,094 | 26,154 | 35,480 | 37,435 | 36,723 | 40,290 | 36,750 | 38,786 | 40,027 | 33,563 | 39,213 | 419,88 |
| 802 | PAY TAX-FICA | 2,210 | 1,971 | 1,971 | 2,065 | 2,126 | 2,098 | 2,297 | 2,096 | 2,191 | 2,259 | 1,868 | 2,193 | 25,34 |
| 804 | PAY TAX-UNEMPLOYMEN | 376 | 263 | 78 | 27 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 760 |
| 806 | TELEPHONE | 757 | 900 | 740 | 986 | 497 | 236 | 336 | 323 | 323 | 323 | 973 | 776 | 7,16 |
| 808 | UTILITIES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 810 | DEPRECIATION | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 812 | VEH INSURANCE | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 9,60 |
| 813 | VEHICLE RENTAL - AD | 34,299 | 33,238 | 33,238 | 28,424 | 29,406 | 28,502 | 28,502 | 12,999 | 0 | 0 | 16,338 | 16,338 | 261,28 |
| 814 | GEN INSURANCE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 815 | OFFICERS INSURANCE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 818 | HEALTH INSURANCE | 1,673 | 1,523 | 1,673 | 1,673 | 1,523 | 1,673 | 1,863 | 1,572 | 1,502 | 1,265 | 1,502 | 1,502 | 18,94 |
| 820 | LEGAL EXPENSE | 0 | 15,000 | 0 | 641 | 0 | 31,508 | 3,000 | 525 | 2,500 | 160 | 13,383 | 360 | 67,07 |
| 823 | AUDIT EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,800 | 12,738 | 6,460 | 22,99 |
| 824 | OUTSIDE SERVICES | 717 | 475 | 553 | 560 | 473 | 474 | 499 | 874 | 487 | 515 | 444 | 656 | 6,72 |
| 825 | PURCHASES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 826 | OFFICE SUPPLIES | 332 | 195 | 892 | 822 | 82 | 183 | 444 | 162 | 375 | 120 | 647 | 416 | 4,66 |
| 827 | OFFICE EQUIP. RENTA | 129 | 129 | 129 | 129 | 129 | 129 | 129 | 129 | 129 | 129 | 129 | 129 | 1,54 |
| 828 | FORMS & PRINTING | 0 | 252 | 0 | 0 | 0 | 553 | 0 | 0 | 0 | 0 | 0 | 0 | 80 |
| 829 | OFF EQUIP MAINT/REP | 0 | 0 | 0 | 0 | 369 | 0 | 0 | 48 | 0 | 0 | 0 | 0 | 41 |
| 830 | POSTAGE | 214 | 182 | 149 | 147 | 116 | 134 | 75 | 214 | 196 | 189 | 108 | 90 | 1,82 |
| 831 | LATE FEES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,104 | 2,001 | 0 | 0 | 4,10 |
| 832 | TRAVEL EXPENSES | 0 | 827 | -498 | 190 | 140 | 0 | 0 | 0 | 221 | 0 | 0 | 0 | 88 |
| 833 | SELLING EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 834 | BUSINESS DEVELOPMEN | 9,722 | 8,196 | 7,498 | 1,536 | 10,240 | 4,808 | 5,782 | 4,163 | 4,769 | 11,431 | 3,700 | 6,933 | 78,77 |
| 835 | EMPLOYEE BENEFITS | 0 | 200 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| 836 | SUBSCRIPTIONS | 175 | 13,160 | 813 | 125 | 3,028 | 125 | 710 | 1,164 | 787 | 125 | 1,571 | 125 | 21,90 |
| 838 | DONATIONS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 125 | 12 |
| 840 | ADVERTISING | 1,283 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 372 | 150 | 1,00 |
| 841 | LOAN INTEREST | 1,500 | 0 | 1,500 | 1,500 | 3,391 | 1,600 | 1,500 | 1,500 | 1,500 | 9,000 | 2,042 | 1,500 | 26,53 |
| 842 | INTEREST OFFICERS | 8,870 | 3,898 | 5,921 | 5,337 | 19,374 | 3,235 | 5,202 | 2,641 | 4,607 | 4,502 | 4,607 | 5,404 | 73,49 |
| 843 | INTEREST LINE OF CR | 30,504 | 0 | 20,687 | 10,656 | 10,333 | 15,813 | 0 | 15,913 | 10,656 | 11,250 | 9,719 | 10,521 | 146,03 |
| 844 | BAD DEBT EXP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

CURRENT YEAR COMPARISON SPREADSHEET
FOR PERIODS ENDING DEC 31, 2008

| ACCT | DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD |
|------|-------------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 846 | WORKMANS COMP INS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 848 | BANK CHARGES | 1,329 | 666 | 186 | 2,324 | 1,467 | 2,606 | 4,133 | 2,196 | 1,569 | 1,220 | 984 | 398 | 19,098 |
| 850 | OTHER EXPENSES | 3,124 | 0 | 7,207 | 1,507 | 4,713 | 4,471 | 3,133 | 701 | 6,555 | 3,493 | 6,598 | 2,843 | 44,345 |
| 852 | COMPUTER EXPENSE | 0 | 1,026 | 921 | 550 | 0 | 550 | 0 | 400 | 1,785 | 550 | 0 | 0 | 5,782 |
| 856 | 401K EXPENSE | 254 | 254 | 254 | 254 | 254 | 254 | 254 | 254 | 254 | 254 | 254 | 254 | 3,048 |
| 857 | USE TAX | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 858 | ENTERTAINMENT/FOOD | 0 | 0 | 105 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 105 |
| 859 | RENT - PROPERTY TAX | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 860 | OTHER INCOME | 0 | 0 | 0 | 0 | 0 | 0 | -3,623 | 0 | 0 | 0 | -1,502 | -150 | 5,275 |
| 862 | XEROX -- COPY EXPENS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 863 | EMPLYMNT AGENCY FEE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 864 | INTEREST EXPENSE | 8,792 | 8,522 | 13,801 | 12,607 | 9,923 | 10,026 | 9,081 | 9,741 | 16,843 | 8,883 | 8,872 | 8,369 | 125,460 |
| 994 | EMPLOYEES - ADMIN | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 995 | EMPLOYEES - OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

|  | *TOTAL EXPENSES | 170,511 | 147,167 | 162,882 | 137,727 | 165,073 | 182,984 | 134,767 | 120,433 | 122,191 | 125,261 | 139,635 | 123,170 | 1731,803 |
|  |  | 119.0% | 143.6% | 127.5% | 123.5% | 145.9% | 167.8% | 120.0% | 111.5% | 170.8% | 133.0% | 139.1% | 114.2% | 133.1% |
|  | INCOME BEFORE TA | -27,253 | -44,706 | -35,145 | -26,169 | -51,920 | -73,939 | -22,490 | -12,444 | -50,643 | -31,092 | -39,244 | -15,335 | 430,380 |
|  |  | -19.0% | -43.6% | -27.5% | -23.5% | -45.9% | -67.8% | -20.0% | -11.5% | -70.8% | -33.0% | -39.1% | -14.2% | -33.1% |

CURRENT YEAR COMPARISON SPREADSHEET
FOR PERIODS ENDING DEC 31, 2008

| ACCT | DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **S U M M A R Y   R E C A P** | | | | | | | | | | | | | |
| 320 | CORPORATE INCOME | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 325 | ADMIN SERVICE CHARG | 29,400 | 26,096 | 26,154 | 27,412 | 28,200 | 36,724 | 40,300 | 36,752 | 29,500 | 40,100 | 33,600 | 39,216 | 393,454 |
| 330 | SLSMN ADMIN SERVICE | 17,765 | 12,008 | 16,701 | 14,187 | 14,443 | 13,051 | 12,764 | 11,624 | 11,378 | 12,204 | 10,224 | 11,300 | 157,648 |
| 430 | TRUCK RENTAL | -34,298 | -33,239 | -33,239 | -28,423 | -29,406 | -28,502 | -28,502 | -12,999 | 0 | 0 | -16,338 | -16,338 | 261,284 |
| 875 | CORPORATE DISCOUNT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 877 | INTEREST INCOME | 63,795 | 31,118 | 51,643 | 41,536 | 41,104 | 30,767 | 30,712 | 46,613 | 30,670 | 41,866 | 40,228 | 40,981 | 489,034 |
| 878 | GAIN/(LOSS) ON SALE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **T O T A L   R E** | 143,258 | 102,461 | 127,737 | 111,558 | 113,153 | 109,044 | 112,278 | 107,969 | 71,548 | 94,170 | 100,390 | 107,835 | 1301,421 |
| | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | OPERATING EXPENSES | 170,511 | 147,167 | 162,882 | 137,727 | 165,073 | 182,984 | 134,767 | 120,433 | 122,191 | 125,261 | 139,635 | 123,170 | 1733,801 |
| | | 119.0% | 143.6% | 127.5% | 123.5% | 145.9% | 167.8% | 120.0% | 111.5% | 170.8% | 133.0% | 139.1% | 114.2% | 133.1% |
| | INCOME BEFORE TAX | -27,253 | -44,706 | -35,145 | -26,169 | -51,920 | -73,939 | -22,490 | -12,444 | -50,643 | -31,092 | -39,244 | -15,335 | 430,380 |
| | | -19.0% | -43.6% | -27.5% | -23.5% | -45.9% | -67.8% | -20.0% | -11.5% | -70.8% | -33.0% | -39.1% | -14.2% | -33.1% |
| 880 | FEDERAL CORP INCOME | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 885 | STATE CORP TAX | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | INCOME TAXES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% |
| | **N E T   I N C O M** | -27,253 | -44,706 | -35,145 | -26,169 | -51,920 | -73,939 | -22,490 | -12,444 | -50,643 | -31,092 | -39,244 | -15,335 | 430,380 |
| | | -19.0% | -43.6% | -27.5% | -23.5% | -45.9% | -67.8% | -20.0% | -11.5% | -70.8% | -33.0% | -39.1% | -14.2% | 33.1% |

CURRENT YEAR COMPARISON SPREADSHEET
FOR PERIODS ENDING DEC 31, 2008

| ACCT | DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD |
|------|-------------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|

LABOR RECAP

| | TOTAL REVENUES | 143,258 | 102,461 | 127,737 | 111,558 | 113,153 | 109,044 | 112,278 | 107,989 | 71,548 | 94,170 | 100,390 | 107,835 | 1203,421 |
| | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| 500 | OPERATIONS WAGES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 800 | OFFICE SALARIES | 0 | 0 | 0 | 0 | 0 | .0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 801 | ADMIN SALARIES | 29,369 | 26,094 | 26,154 | 35,480 | 37,435 | 36,723 | 40,290 | 36,750 | 38,786 | 40,027 | 33,563 | 39,213 | 419,882 |
| | TOTAL LABOR | 29,369 | 26,094 | 26,154 | 35,480 | 37,435 | 36,723 | 40,290 | 36,750 | 38,786 | 40,027 | 33,563 | 39,213 | 439,882 |
| | | 20.5% | 25.5% | 20.5% | 31.8% | 33.1% | 33.7% | 35.9% | 34.0% | 54.2% | 42.5% | 33.4% | 36.4% | 32.3% |

TO:

# sbt

**Suburban Bank & Trust**
Member FDIC

#28880C
P 600101

As of (date) ~~June 30, 2006~~

Signed 8/14/06

## PERSONAL FINANCIAL STATEMENT

If For A Loan
Amount_____   Term _____   Purpose __Loan Renewal__

OR

In Regards to Loan(s) in name of __~~Northwest Building Material & Supply Co.~~__
__~~Charles R. Hanson~~__

IMPORTANT: Read these directions before completing this Statement.

☐ If you are applying for individual credit in your own name and are relying on your own income or assets and not the income or assets of another person as the basis for repayment of the credit requested, complete only Sections 1 and 3.

☐ If you are applying for joint credit with another person, complete all Sections providing information in Section 2 about the joint applicant.

☐ If you are applying for individual credit, but are relying on income from alimony, child support, or separate maintenance or on the income or assets of another person as a basis for repayment of the requested, complete all Sections, providing information in Section 2 about the person whose alimony, support or maintenance payments or income or assets you are relying.

☐ If you are relying on assets held jointly with another in completing this statement the joint owner may be required to sign this statement.

☐ If this statement relates to your guaranty of the indebtedness of other person(s), firm(s) or corporation(s), complete Sections 1 and 3.

☐ We intend to apply for joint credit (Initials) _____   Date _____

| SECTION 1 - INDIVIDUAL INFORMATION (Type or Print) | SECTION 2 - OTHER PARTY INFORMATION (Type or Print) |
|---|---|
| Name ~~Charles R. Hanson~~ | Name ~~Marian B. Hanson~~ |
| Legal Residence    No. Yrs. ~~501 Columbine Lane      11~~ | Legal Residence    No. Yrs. ~~Same~~ |
| City, State & Zip ~~West Chicago, IL 60185~~ | City, State & Zip ~~Same~~ |
| Soc. Sec. #    Place of Birth ~~Oak Park, IL~~ | Soc. Sec. #    Place of Birth ~~Rapid City, SD~~ |
| Drivers Lic.    Number ~~FL~~ | IL    Number |
| Citizenship/Country    State ~~USA~~ | Citizenship/Country    State ~~USA~~ |
| Marital Status    Since ~~Married~~ | Marital Status    Since ~~Married~~ |
| Occupation ~~CEO~~ | Occupation ~~Book keeping~~ |
| Business Name    No. Yrs. ~~Northwest Building Material 31~~ | Business Name    No. Yrs. ~~Same~~ |
| Business Address ~~21775 N. Weiland Road~~ | Business Address ~~c/o 501 Columbine Lane~~ |
| City, State & Zip ~~Prairie View, IL 60069~~ | City, State & Zip ~~West Chicago, IL 60185~~ |
| Res. Phone    Bus. Phone ~~(630)-231-9038   847-634-3406~~ | Res. Phone    Bus. Phone ~~630-231-9038      Same~~ |
| IF LESS THAN 2 YEARS: | IF LESS THAN 2 YEARS: |
| Previous Residence    No. Yrs. | Previous Residence    No. Yrs. |
| City, State & Zip | City, State & Zip |
| IF LESS THAN 2 YEARS: | IF LESS THAN 2 YEARS: |
| Previous Occupation | Previous Occupation |
| Business Name | Business Name |
| Business Address | Business Address |
| City, State & Zip | City, State & Zip |
| Business Phone | Business Phone |

EXHIBIT
Cieslak#11
CmPb-475
PENGAD 800-631-6989

## SECTION 2 - STATEMENT OF FINANCIAL CONDITION
### ROUND TO NEAREST DOLLAR

| ASSETS (Do not include Assets of doubtful value) | | LIABILITIES | In Dollars |
|---|---|---|---|
| Cash Deposit (Schedule 1) | | Notes Payable to Banks - Secured (Schedule 8) | |
| Marketable Securities (Schedule 2) | | Notes Payable to Banks - Unsecured (Schedule 8) | |
| Non-Marketable Securities (Schedule 3) | | Amounts Payable to Others - Secured (Schedule 8) | |
| Real Estate Owned - Personal Use (Schedule 4) | | Amounts Payable to Others - Unsecured (Schedule 8) | 2,537,638 |
| Real Estate Owned for Investment Purposes (Schedule 5) | | Personal Real Estate Mortgages Payable (Schedule 4) | |
| IRA's or Deferred Compensation (Schedule 9) | | Investment Real Estate Mortgages Payable (Schedule 5) | |
| Cash Value Life Insurance (Schedule 7) | | Due to Brokers | |
| Loans Receivable (Attach Schedule) Due from 7,500,000 NWBM/Hanson | | Unpaid Income Tax | |
| Due from Shareer | | Other Unpaid Interest | |
| Contracts Receivable (Amounts due you) Pers. Prop | | Other Debt (Itemize) | |
| Other Personal Property TOTAL ASSETS | | | |
| TOTAL ASSETS | $ | TOTAL LIABILITIES | |
| | | NET WORTH (Total Assets Minus Total Liabilities) | |

| SOURCES OF INCOME FOR YEAR ENDED 12/31/05 20 | | PERSONAL INFORMATION | |
|---|---|---|---|
| Salary, Bonuses & Commissions (Gross) | $ | Do You Have a Will? Yes If so, Name of Executor Hanson, Jr. &Katharine Henry | |
| Dividends Plus Interest | $ | Are You a Partner or Officer in Any Other Venture? | |
| Real Estate Income (Net of Expenses) | | POSITION    COMPANY    % OF OWNERSHIP | |
| Other Income (Alimony, Child Support, or Separate Maintenance Income Need Not Be Disclosed if You Do Not Wish to Have it Considered as a Basis for Repaying this Obligation) | | 1. | |
| Other  Social Security | $ | 2. | |
| TOTAL | $ | 3. | |

| CONTINGENT LIABILITIES YES ☐ NO ☒ | | | Are you Obligated to Pay Alimony, Child Support or Separate Maintenance Payments? If so Describe. |
|---|---|---|---|
| Type* | To Whom | Amount? | |
| | | $ | Income Tax Settled Through (date) 12/31/04 |
| | | $ | Are You a Party in Any Suits or Legal Actions? If so Describe. No |
| | | $ | |
| | | $ | Are Any of the Scheduled Assets Held in a Trust? No |
| | | $ | Personal Bank Accounts Carried at |

*G = Co-Maker
Guarantor     TX = Tax Liens     L = Lease     O = Other
Endorser

## SCHEDULE 1 - CASH, CHECKING ACCOUNTS, SAVINGS ACCOUNTS, AND CERTIFICATES OF DEPOSIT

| Type | NAME OF FINANCIAL INSTITUTION | CITY, STATE | AMOUNT | IN NAME OF | ACCOUNT NO. | PLEDGED YES/NO |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

## SCHEDULE 2 - U.S. GOVERNMENT & AGENCIES, STOCKS AND BONDS

| Number of Shares or Face Value | Description | In Name Of | Pledged | Market |
|---|---|---|---|---|
| | | | | |
| | | | | |

TOTAL

## SCHEDULE 3 - RESTRICTED OR CONTROLLED STOCK (Include Interest In Your Own Company)

| Number of Shares | Description | In Name Of | Pledged Yes or No? | Source of Ownership | Percent of Ownership | Value |
|---|---|---|---|---|---|---|
| | | | | | | |

## SCHEDULE 4 - REAL ESTATE OWNED-PERSONAL USE

| Address Of Property | Type¹ | How is Title Held JT/TIC/TE/TRUST | Title In Name Of | Percent Owned | Date Acquired | Cost | Market Value | Source of Value | Monthly Payment | Mortgage Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

TOTAL

¹APT. - Apartment Building  SFR - Single Family Residence  COMM. - Commercial

## SCHEDULE 5 - REAL ESTATE OWNED FOR INVESTMENT PURPOSES

| A. Owner B. Purchase Date C. Cost | Address Of Property (Indicate if If Under Contract, U/C if Under Construction, or R if Rental Property) | Type of Property* | % Owned | How is Title Held JT/TIC/TE/TRUST | Present Market Value Source of Value | Amount of Mortgage & Liens | Mortgage Payments |
|---|---|---|---|---|---|---|---|
| A. N/A B. C. $ | Address Lender | | | | $ | $ | $ |
| A. B. C. $ | Address Lender | | | | $ | $ | $ |
| A. B. C. $ | Address Lender | | | | $ | $ | $ |
| A. B. C. $ | Address Lender | | | | $ | $ | $ |
| Please enter totals on Balance Sheet | | | | | $ | $ | $ |

*APT. - Apartment Building  SFR = Single Family Residence  COMM. = Commercial

## SCHEDULE 6 - IRA'S OR DEFERRED COMPENSATION PLANS (i.e. 401(k))

| Type: IRA or 401(k) | Where Deposited | Beneficiary | Current Value |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | TOTAL | |

## SCHEDULE 7 - LIFE INSURANCE AND GROUP INSURANCE CARRIED

| Name of Insurance Company | Issued Date | Owner Of Policy | Beneficiary | Face Amount | Policy Loans | Cash Surrender Value |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

## SCHEDULE 8 - CURRENT NOTES PAYABLE, BANK AND OTHERS

Give names of banks, finance companies, or other creditors (include credit card issuers) where credit has been obtained.

| To Whom Owed | Date Obtained | Name in Which Account is Carried | What is the Collateral | Account No. If Applicable | Current Balance |
|---|---|---|---|---|---|
| Northwest Building Materials Supply Co. | | Shareholder | | — | $2,478,638 |
| | | | | | |
| | | | | TOTAL | |

## SCHEDULE 9 - CREDIT REFERENCES

Give names of banks, finance companies, or other creditors (include credit card issuers) where credit has been obtained and how paid off.

| Name | Address | Date Obtained | Name in Which Account is Carried | High Credit |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

The information contained in this statement is provided for the purpose of obtaining, or maintaining credit with Suburban Bank & Trust Company on behalf of the undersigned, or persons, firms or corporations in whose behalf the undersigned may either severally or jointly with others, execute a guaranty in your favor. Each understands that you are relying on the information provided herein (including the designation made as to ownership or property) in deciding to grant or continue credit. Each undersigned certifies under penalty of perjury that the information provided is true and complete and that you may consider that statement as continuing to be true and correct until a written notice of a change is given to you by the undersigned. You are authorized to make all inquiries you deem necessary to verify the accuracy of the statements made herein, and to determine my/our creditworthiness. You are authorized to answer questions about your credit experience with the undersigned.

I HAVE READ, UNDERSTAND AND AGREE TO MAKE THESE REPRESENTATIONS AND WARRANTIES.

Signature (Individual) _C. Howson_        Date Signed _8-14-06_

Signature (Other Party) _Marian B. Howson_    Date Signed _8-14-06_

TO:

# SUBURBAN BANK & Trust Co.

Member FDIC

# 2838.001
P 600101

As of (date) June 30, 2007

DT 10/25/07

## PERSONAL FINANCIAL STATEMENT

If For A Loan                                                    Loan Renewal
Amount _____ Term _____ Purpose _____

OR

In Regards to Loan(s) in name of _Northwest Building Material & Supply Co._
_Charles R Hanson_

IMPORTANT: Read these directions before completing this Statement.

☐ If you are applying for individual credit in your own name and are relying on your own income or assets and not the income or assets of another person as the basis for repayment of the credit requested, complete only Sections 1 and 3.

☐ If you are applying for joint credit with another person, complete all Sections providing information in Section 2 about the joint applicant.

☐ If you are applying for individual credit, but are relying on income from alimony, child support, or separate maintenance or on the income or assets of another person as a basis for repayment of the requested, complete all Sections, providing information in Section 2 about the person whose alimony, support or maintenance payments or income or assets you are relying.

☐ If you are relying on assets held jointly with another in completing this statement the joint owner may be required to sign this statement.

☐ If this statement relates to your guaranty of the indebtedness of other person(s), firm(s) or corporation(s), complete Sections 1 and 3.

☐ We intend to apply for joint credit (initials) _____ Date _____

| SECTION 1 - INDIVIDUAL INFORMATION (Type or Print) | SECTION 2 - OTHER PARTY INFORMATION (Type or Print) |
|---|---|
| Name  Charles R. Hanson | Name  Marian B.Hanson |
| Legal Residence  501 Columbine Lane  No. Yrs. 12 | Legal Residence  Same  No. Yrs. |
| City, State & Zip  West Chicago, IL 60185 | City, State & Zip  Same |
| Soc.  Place of Birth  Oak Park, IL | Soc. S#  Place of Birth  Rapid City, SD |
| Drivers License/State  FL  Number | Drivers License/State  IL  Number |
| Citizenship/Country  USA  State | Citizenship/Country  USA  State |
| Marital Status  Married  Since | Marital Status  Married  Since |
| Occupation  CEO | Occupation  Book Keeping |
| Business Name  Northwest Building Material & Supply Co.  No. Yrs. 32 | Business Name  No. Yrs. |
| Business Address  21775 N. Weiland Road | Business Address  c/o 501 Columbine LANE |
| City, State & Zip  Prairie View, IL 60069 | City, State & Zip  West Chicago, IL 60185 |
| Res. Phone  Bus. Phone  847-634-3406 | Res. Phone  630-231-9038  Bus. Phone |
| IF LESS THAN 2 YEARS: | IF LESS THAN 2 YEARS: |
| Previous Residence  No. Yrs. | Previous Residence  No. Yrs. |
| City, State & Zip | City, State & Zip |
| IF LESS THAN 2 YEARS: | IF LESS THAN 2 YEARS: |
| Previous Occupation | Previous Occupation |
| Business Name | Business Name |
| Business Address | Business Address |
| City, State & Zip | City, State & Zip |
| Business Phone | Business Phone |

EXHIBIT
Cieslik #12
CMP6-475
PENGAD 800-631-6989